No. 26-10735

# In the United States Court of Appeals for the Eleventh Circuit

CAIR FOUNDATION, ET AL.,
*Plaintiffs-Appellees,*

V.

RONALD DESANTIS, GOVERNOR, STATE OF FLORIDA,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:25-cv-516-MW

## OPENING BRIEF ON APPEAL

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
david.dewhirst@myfloridalegal.com
jenna.hodges@myfloridalegal.com

April 20, 2026

DAVID M.S. DEWHIRST
  *Solicitor General*

JEFFREY PAUL DESOUSA
JASON J. MUEHLHOFF
  *Chief Deputy Solicitors General*

TYLER E. GUSTAFSON
  *Assistant Solicitor General*

CASEY J. WITTE
  *Solicitor General Fellow*

*Counsel for Governor Ron DeSantis*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................iv

STATEMENT REGARDING ORAL ARGUMENT.................................vii

STATEMENT OF JURISDICTION.........................................................1

ISSUES PRESENTED ...............................................................................2

SUMMARY OF THE ARGUMENT .........................................................4

STATEMENT OF THE CASE ...................................................................8

     A.    CAIR's founding and its ties with organized terror. ................................................................................................8

     B.    Executive Order 25-244. ........................................................15

     C.    CAIR's lawsuit...........................................................................16

     D.    The district court's preliminary injunction...........................17

STANDARD OF REVIEW.......................................................................19

ARGUMENT.............................................................................................20

I.    CAIR is unlikely to succeed on the merits because it has shown no injury traceable to the EO and thus lacks standing. ...............................................................................20

II.   CAIR is unlikely to succeed on the merits of its First Amendment coercion claim.........................................................24

     A.    Because a state is obviously not required to contract with terror groups or their supporters, the key factual question in this case was whether CAIR is a terrorist organization...........................................25

B.     The district court abused its discretion by ignoring the Governor's evidence linking CAIR to terrorism. ................................................................................................ 31

III.    The case should be reassigned on remand. ..................................... 37

A.     The district court will have difficulty putting previous views and findings aside. ........................................ 39

B.     Reassignment is appropriate to preserve the appearance of justice. ........................................................... 41

C.     Reassignment will not entail disproportionate waste and duplication. ......................................................... 45

CONCLUSION ................................................................................. 47

CERTIFICATE OF COMPLIANCE ....................................................... 48

CERTIFICATE OF SERVICE................................................................ 48

iii

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ......................................................................... passim
*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) .......................................................... 25, 26, 27
*Boim v. Holy Land Found. for Relief & Dev.,*
  549 F.3d 685 (7th Cir. 2008) .................................................... 12
*Boim v. Quranic Literacy Inst.,*
  340 F. Supp. 2d 885 (N.D. Ill. 2004) ........................................ 12
*CBS Broadcasting, Inc. v. EchoStar Comm'ns Corp.,*
  265 F.3d 1193 (11th Cir. 2001) ................................................ 31
*Chudasama v. Mazda Motor Corp.,*
  123 F.3d 1353 (11th Cir. 1997) .......................................... 37, 45
*Cobell v. Kempthorne,*
  455 F.3d 317 (D.C. Cir. 2006)............................... 41, 42, 43, 46
*Floridians Protecting Freedom, Inc. v. Ladapo,*
  754 F. Supp. 3d 1165 (N.D. Fla. 2024) ................................... 40
*FTC v. AbbVie Prods. LLC,*
  713 F.3d 54 (11th Cir. 2013) .................................................... 31
*Haines v. Liggett Grp. Inc.,*
  975 F.2d 81 (3d Cir. 1992)........................................................ 44
*Hand v. Scott,*
  No. 4:17CV128, 2018 WL 5828688 (N.D. Fla. Apr. 4, 2018) .............. 40
*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
  572 U.S. 559 (2014) ................................................................. 31
*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003)............................................ 12, 30
*Islamic Am. Relief Agency v. Gonzales,*
  477 F.3d 728 (D.C. Cir. 2007)............................................ 24, 30
*Johnson v. Sawyer,*
  120 F.3d 1307 (5th Cir. 1997) ................................................. 43
*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,*
  51 F.3d 982 (11th Cir. 1995) .................................................... 31

*Miller v. Sam Houston State Univ.*,
  986 F.3d 880 (5th Cir. 2021) ................................................................ 45
*Moon v. Med. Tech. Assocs., Inc.*,
  577 F. App'x 934 (11th Cir. 2014) ...................................................... 32
*Murthy v. Missouri*,
  603 U.S. 43 (2024) ......................................................................... 20, 22
*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) .................................................................... passim
*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022) ............................................... 40
*Rust v. Sullivan*,
  500 U.S. 173 (1991) ....................................................................... 6, 30
*Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
  158 F.4th 1227 (11th Cir. 2025) .......................................................... 21
*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..................................................................... 21, 24
*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020) ........................................................... 19
*United States v. El-Mezain*,
  664 F.3d 467 (5th Cir. 2011) ......................................................... 13, 33
*United States v. Gupta*,
  572 F.3d 878 (11th Cir. 2009) ................................................. 38, 39, 43
*United States v. Holy Land Found.*
  *for Relief & Dev.*, No. 3:04-CR-0240, 2009 WL 10680203 (N.D. Tex.
  July 1, 2009)................................................................................. 13, 34, 35
*United States v. Khan*,
  997 F.3d 242 (5th Cir. 2021) ................................................... 41, 42, 46
*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995)............................................................. 43
*United States v. Torkington*,
  874 F.2d 1441 (11th Cir. 1989) ...................................................... passim
*United States v. White*,
  846 F.2d 678 (11th Cir. 1988) ................................................. 7, 38, 39, 42
*Walt Disney Parks & Resorts U.S., Inc. v. DeSantis*,
  No. 4:23CV163, 2023 WL 11763037 (N.D. Fla. June 1, 2023) ............ 46

**Statutes**

18 U.S.C. § 2339B(a)(1) ........................................................................28
28 U.S.C. § 2106.................................................................................37

**Rules**

Fed R. Civ. P. 52(a)(2) .......................................................................32

**Executive Orders**

Exec. Order 12947, *Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process*,
60 Fed. Reg. 5079 (1995) ....................................................................11
Exec. Order 14362, *Designation of Certain Muslim Brotherhood Chapters as Foreign Terrorist Organizations and Specially Designated Global Terrorists*,
90 Fed. Reg. 55033 (2025) ....................................................................8

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument, which will help the Court decide important Constitutional issues involving the First Amendment and state police powers.  This case presents novel questions about Florida's ability to protect its citizens and divert state resources away from terrorist organizations.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1292.

## ISSUES PRESENTED

Governor DeSantis issued Executive Order 25-244 to ensure that Floridians would be protected from terroristic violence by diverting state resources away from terrorist organizations and those providing material support to terrorists or terrorist organizations. Executive Order 25-244 does not target any protected speech or activity. It simply designates terrorist organizations in an effort to keep state resources from those designated entities and their material supporters. Nevertheless, the district court found that the Executive Order violated the Plaintiffs' First Amendment rights against coercion without properly analyzing standing, the facts before the court, and the relevant law. The issues on appeal are:

1.    Whether Plaintiffs' have proven standing at the preliminary-injunction stage of the case when Plaintiffs rely on alleged anticipatory and speculative third-party injuries.

2.    Whether the district court abused its discretion by erroneously evaluating Plaintiffs' coercion claim *and* by ignoring facts presented by the Governor in support of the Executive Order at the preliminary-injunction stage.

2

3.    Whether this case should be reassigned on remand because any reasonable observer would believe that the district court is biased against the Governor.

## SUMMARY OF THE ARGUMENT

In *Holder v. Humanitarian Law Project,* the Supreme Court recognized the commonsense principle that the government may ban the provision of material support to terrorists.  561 U.S. 1, 35 (2010).  The Constitution, after all, is not a suicide pact.  And just as the government may ban others from supporting terror groups, it both can and should *itself* refrain from financing terror groups.  That means refusing to enter government contracts with those groups, or with groups that fund terror organizations.  Every dollar in the coffers of a terror group is another dollar that can be used to perpetuate violence against humanity.

Responding to a growing body of evidence, Governor Ron DeSantis issued Executive Order 25-244, formally designating the Council on American-Islamic Relations (CAIR) a terrorist organization. Fla. Exec. Order No. 25-244; ECF 21-1.  As the factual basis for that designation, the EO detailed CAIR's founding by, and longstanding connections to, known terrorist organizations such as the Muslim Brotherhood and Hamas.  The Governor's evidence was weighty.  EO at 2.  Indeed, CAIR was an unindicted co-conspirator in the *Holy Land Foundation* prosecution, the largest terrorism-financing case in our Nation's history, and many of

its highest-ranking members and affiliates have been convicted of terror-related crimes. *Id.* at 2–3.

Despite the strong evidence, the impact of the EO is narrowly tailored: It prevents CAIR or any entity that provides material support to CAIR "from receiving any contract, employment, funds, or other benefit or privilege from such Executive or Cabinet Agency." EO at 4. That is all. As far as the EO is concerned, CAIR remains free to speak or advocate for any position it desires and may continue to associate with any willing entity. The EO merely ensures that taxpayer funds do not flow to terrorist organizations or those who provide them with material aid.

Yet the district court has now preliminarily enjoined the EO. Remarkably, it did so without examining the essential question in this case: whether there was sufficient evidence to justify CAIR's designation as a terrorist organization. The district court instead simply assumed that CAIR was a run-of-the-mill advocacy group—just another civic entity—and that CAIR was wrongfully targeted by the Governor because of its viewpoint. Thus, the district court concluded that the EO impermissibly coerces third parties to punish CAIR for exercising its protected First Amendment rights. That approach cannot be squared with

*Humanitarian Law Project*, or with the principle that the government can choose how to allocate its funds. *See Rust v. Sullivan*, 500 U.S. 173, 201 (1991).

Not only that, but the district court misapplied the law on standing. To establish an Article III injury traceable to the EO, CAIR offered evidence that an unnamed podcast company canceled a contract it held with CAIR, and that the South Florida Muslim Federation cut ties with CAIR-Florida. But those events are not fairly traceable to the EO—at least not on this record—because CAIR failed to show that either the podcast company or the Federation feared the loss of any government contracts or benefits. Far more likely, those entities disassociated from CAIR and CAIR-Florida because they did not want to deal with a suspected terror group. That a third party acted independently of any government regulation is not a basis to challenge the regulation.

Because the Governor is likely to succeed on the merits, this Court should reverse the preliminary injunction.

And because the district court's comments reflect that it has prejudged the case and cannot be fair to the Governor, the case should be reassigned on remand. This order is the latest in a long-running vendetta

against the Governor from this particular judge. The order contains gratuitous insults, rehashes old disputes from prior cases, and demonstrates outright hostility toward Florida's Chief Executive Officer. Reassignment is appropriate "where a reasonable person would question the trial judge's impartiality." *United States v. White*, 846 F.2d 678, 695 (11th Cir. 1988). No reasonable person could think, as explained below, that this trial judge possesses the capacity for impartiality when the Governor is a party. Correction is long overdue. On remand, this Court should order reassignment of the case to a different district judge.

## STATEMENT OF THE CASE

### A.    CAIR's founding and its ties with organized terror.

CAIR was founded by known terrorists as part of a larger terror organization.  In fact, CAIR was conceived by the Muslim Brotherhood and Hamas.[1]  Between the late 1980s and early 1990s, Musa Abu Marzook, a Hamas leader, established several entities under the "Palestine Committee of the Muslim Brotherhood" umbrella.[2]

The Muslim Brotherhood has been scrutinized for its ties to terrorism by the federal government[3] and is a terrorist organization under

---

[1] Hamas was founded by Muslim Brotherhood members in the late 1980's as "one of the wings of M[usli]m Brotherhood." *See* The Covenant of the Islamic Resistance Movement (Aug. 18, 1988), https://perma.cc/9Y27-Z6QN.  Hamas, guided by "Islamic fundamentalism," seeks to destroy the state of Isreal and establish an "Islamic state" in its place through violence. Jim Zanotti, Cong. Rsch. Serv. IF12549, Hamas: Background, Current Status, and U.S. Policy 1 (2024); *see also* ECF 37 at 5 n.2

[2] Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History* 19 (July 2025), https://perma.cc/E2C2-7D6b; *see also* ECF 37 at 5.

[3] Exec. Order No. 14362, *Designation of Certain Muslim Brotherhood Chapters as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 55033 (2025).  Since, the federal government has designated certain chapters of the Muslim Brotherhood as terrorist organizations.  *E.g.*, Press Release, U.S. Dep't of the Treasury, *Treasury and State Departments Designate Muslim Brotherhood*

Florida law.[4]  The Brotherhood aims to advance the global Islamic state, or what it calls "Settlement."[5]  These organizations included the Holy Land Foundation (HLF) and Islamic Association for Palestine (IAP).[6]

Yet the Palestine Committee planned to create one more organization focused on "political work" that would establish its "headquarters" in Washington, D.C.[7]  This was especially needed given that the Palestine Committee became concerned that Hamas would soon be targeted by the United States.[8]  So when the Palestine Committee convened in Philadelphia,[9] the attendees agreed that they should create "an official U.S. cover representing the Islamic community" that would also serve as a "cover for the [HLF and IAP] in case they got dissolved."[10]

---

*Branches as Terrorist Organizations* (Jan. 13, 2026), https://perma.cc/8LZH-X8SP.

[4] Fla. Exec. Order No. 25-244, *Protecting Floridians from Radical Islamic Terrorist Organizations* (2025); *see also* ECF 21-1.

[5] Vidino, *supra* n.2, at 10; *see also* ECF 37 at 5–7.

[6] Vidino, *supra* n.2, at 10; *see also* ECF 37 at 5–7.

[7] Vidino, *supra* n.2, at 25; *see also* ECF 37 at 5–7.

[8] Vidino, *supra* n.2, at 20; *see also* ECF 37 at 5–8.

[9] Vidino, *supra* n.2, at 10; *see also* ECF 37 at 5–8.

[10] Vidino, *supra* n.2, at 24–25; *see also* ECF 37 at 5–8.

Mere months after the Philadelphia meeting, two prominent attendees[11] founded CAIR in Washington D.C. and staffed the new organization with individuals from the Philadelphia meeting.[12]  One attendee affiliated with HLF became the head of an early CAIR chapter,[13] with Ahmad and Awad performing the early fundraising and organizing for CAIR while both were still at IAP.[14]  Ahmad would serve as the chairman of CAIR's Board of Directors until 2005, and then as a member of the Board for several years.[15]  Awad still serves as CAIR's Executive Director.[16]

---

[11] The two IAP officials were Omar Ahmad and Nihad Awad. *Id.* at 20. Ahmad drove much of the meeting's conversation and Awad gave "a presentation on [] media strategy." Vidino, *supra* n.2, at 23; *see also* ECF 37 at 6.

[12] Vidino, *supra* n.2, at 25–26; *see also* ECF 37 at 5–6.

[13] Vidino, *supra* n.2, at 25–26; *see also* ECF 37 at 6–7.

[14] Nihad Awad, *Muslim-Americans in Mainstream America*, The Link (Feb.–Mar. 2000), https://perma.cc/N8SJ-AC9D ("Omar suggested to me that we leave the IAP . . . He proposed that I move to Washington, D.C., where any effective national effort would have to be based, while he tried to raise the seed money for the project."); *see also* ECF 37 at 7 n.16.

[15] *CAIR Board Elects New Chairman*, CAIR (May 18, 2005), https://perma.cc/VS22-H88E; *see also* ECF 37 at 7 n.17.

[16] Nihad Awad, National Executive Director, CAIR (last accessed Feb. 11, 2026), https://perma.cc/9VPA-44YX; ECF 37 at 7 n.18.

10

By 1994, the Palestine Committee's own records confirmed that CAIR, along with HLF and IAP, was part of the Palestine Committee.[17] One Palestine Committee meeting agenda suggested that CAIR would be responsible for future "[c]oordination" among those groups.[18] The minutes from that meeting reaffirm the Palestine Committee's commitment to the "Mother Group"—the Muslim Brotherhood.[19]

Given CAIR's founding and leadership, it is no surprise that numerous terrorist designations, investigations, and convictions have swirled around CAIR. In 1995, President Clinton signed EO 12947, formally designating Hamas a terrorist organization.[20] That same year, the U.S. Treasury designated Palestine Committee organizer Marzook a Specially

---

[17] Vidino, *supra* n.2, at 26; *see also* ECF 37 at 7 n.19.

[18] Lara Burns, et al., *CAIR—Why History is Important* 4 (2025), https://perma.cc/VB73-LKBE; *see also* ECF 37 at 7 n.20.

[19] Lara Burns, et al., *CAIR—Why History is Important* 5 (2025), https://perma.cc/VB73-LKBE; *see also* ECF 37 at 7 n.21.

[20] ECF 37 at 8; *see also* Exec. Order 12947, *Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process*, 60 Fed. Reg. 5079 (1995). The United States also designated Hamas as a Foreign Terrorist Organization in 1997. U.S. Dept. of State, Foreign Terrorist Organizations (last accessed Feb. 11, 2026), https://perma.cc/ZNH2-S7BD.

Designated Terrorist.[21] In 2001, the U.S. Treasury added HLF as a specially designated terrorist organization.[22] And in 2004, IAP was held liable for a murder committed by two Hamas terrorists because it had fundraised, published propaganda, and organized travel to the United States for Hamas.[23] Much of IAP's material support for Hamas occurred while Ahmad and Awad were leading IAP.[24]

CAIR itself faced similar troubles. In 1999, Omar Ahmad, then serving as CAIR's chairman, was caught on a wiretap directing an HLF

---

[21] ECF 37 at 8 n.23; *see also* Press Release, *Shutting Down the Terrorist Financial Network, U.S. Dep't of the Treasury, Dec. 4, 2001*, U.S. Dep't of Treasury (Dec. 4, 2001), https://perma.cc/SVF9-PCPK.

[22] *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 159, 167–68 (D.C. Cir. 2003).

[23] *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 688 (7th Cir. 2008) (en banc) (noting that the IAP is an "alter ego" of the American Muslim Society and affirming judgment of liability against the IAP); *see also* ECF 37 at 8 n.25.

[24] *See Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885, 906–13 (N.D. Ill. 2004), *aff'd in relevant part, Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d at 687–88, 701 (citing deposition testimony from Omar Ahmad); *see also* ECF 37 at 8.

employee and organizing payments for an individual convicted of fundraising for Hamas in the United States.[25]

In the late 2000s, litigation revealed that CAIR, alongside the IAP and HLF, was a key player in "the largest terrorism financing case in U.S. history."[26] At trial, FBI Special Agent Lara Burns labeled CAIR a "front group for Hamas."[27] The Department of Justice went so far as to list CAIR and IAP as unindicted co-conspirators in the HLF prosecution.[28] And the federal court rejected CAIR's challenge to that designation, concluding that there was "ample evidence to establish the associations of CAIR . . . with HLF, IAP, and with Hamas,"[29] including a check

---

[25] *See United States v. El-Mezain*, 664 F.3d 467, 530–31 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (describing Ahmad's wiretapped statements); *see also* ECF 37 at 8 n.27.

[26] Jason Trahan, *Witness links charity, jihad: Holy Land prosecution expert's credibility questioned by defense*, Dallas Morning News (July 26, 2007), 2007 WLNR 14329176; *see also* ECF 37 at 9 n.28.

[27] Jason Trahan, *Judge due to rule on Holy Land defense challenge*, Dallas Morning News (Oct. 14, 2008), 2008 WLNR 19527769; *see also* ECF 37 at 9 n.29.

[28] *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-0240-P, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009), *aff'd in relevant part*, 624 F.3d 685 (5th Cir. 2010); *see also* ECF 37 at 9 n.30.

[29] ECF 37 at 9.

13

from HLF to CAIR for "consulting services."[30]  Prosecutors successfully proved that HLF and its co-conspirators had funneled "approximately $12.4 million" to Hamas.[31]

Governor DeSantis is not the first to limit government involvement with CAIR.  In 2008, the FBI banned all "non-investigative outreach activities with CAIR" to avoid "supporting individuals who support extremist or terrorist ideologies."[32]  And in 2014, the United Arab Emirates designated CAIR a terrorist organization.[33]  Texas followed suit in 2025.[34]

---

[30] Vidino, *supra* n.2, at 26; *see also* ECF 37 at 9 n.32.

[31] Press Release, U.S. Dep't of Just., Federal Judge Hands Downs Sentences in Holy Land Foundation Case (May 27, 2009), https://perma.cc/6HAN-GPB2; *see also* ECF 37 at 9 n.33.

[32] Dep't of Just., Review of FBI Interactions with the Council on American-Islamic Relations 1 (2013), https://perma.cc/2EHW-H8EF; *see also* Vidino, *supra* n.2, at 26.

[33] *UAE Includes 2 US Muslim Groups on Terror List*, Voice of America (Nov. 17, 2014), https://perma.cc/3KBX-J94Y; *see also* ECF 37 at 10 n.35.

[34] Proclamation, Governor Greg Abbott (Nov. 18, 2025), https://perma.cc/W3E3-P88F; *see also* ECF 37 at 10 n.36.

In addition to these organizational charges and designations, various CAIR officials, employees, and affiliates have been arrested, deported, or convicted for terror-related activities.[35]

### B.    Executive Order 25-244.

Considering this wealth of incriminating evidence, the Governor signed Executive Order 25-244 on December 8, 2025.  EO at 1–4.  The EO contains numerous factual findings and designates several groups as terrorist organizations.  *Id.* at 1–3.  These include entities the United States has designated a Foreign Terrorist Organization, as well as the Muslim Brotherhood and CAIR.  *See id.* at 3.

Based on those findings, the EO requires all executive and cabinet agencies to "undertake all lawful action" to prevent the designated terrorist groups, or any person known to have provided material support to them, "from receiving any contract, employment, funds, or other benefit or privilege" from those agencies.  *Id.* at 3–4.  In sum, the EO ensures that Florida state funds do not flow to terrorist groups.

---

[35] Disassociation from Council on American-Islamic Relations, H.R. 1209, 2024 Sess. at *2–4 (2024), https://perma.cc/FZ9E-X2DT; *see also* ECF 37 at 11–12.

15

### C.    CAIR's lawsuit.

On December 15, 2025, CAIR, and its associated Florida entity, CAIR-Florida, sued the Governor.  ECF 2.  CAIR amended its complaint on January 16, 2026, alleging viewpoint discrimination, retaliation, coercion, petition, and association claims under the First Amendment, as well as a due process claim under the Fourteenth Amendment. ECF 21.  Not until January 23 did CAIR—not CAIR-Florida—move for a preliminary injunction on its First Amendment claims.  ECF 24.

The Governor opposed the preliminary injunction and filed a declaration detailing the evidence described above.  ECF 37, 37-1.  The Governor explained that the EO had nothing to do with CAIR's speech and everything to do with its conduct and associations with known terrorists.  ECF 37 at 3, 20, 32–33, 35–36.  Rather than dispute the Governor's evidence, CAIR replied that the district court "need not reach th[e] issue" of whether CAIR was a terror group because the EO did not create a "legal process" for a designated terror group to challenge its designation—the basis for CAIR's separate claim of a due process violation.  ECF 41 at 13.

The parties agreed that the district court could resolve the motion without an evidentiary hearing.  ECF 40 at 1.

### D.    The district court's preliminary injunction.

The district court enjoined the EO as to CAIR based solely on CAIR's coercion claim.  Order at 22.  Relying almost exclusively on CAIR's evidence, the district court concluded that CAIR's coercion claim was likely to succeed on the merits because the EO created a "prior restraint" and could not "overcome the heavy presumption against the EO's constitutional validity."  Order at 5, 18 (quotation marks and citation omitted).  In its view, the EO coerced third parties—namely, any group that wished to "platform, collaborate with, or otherwise provide support to [CAIR]"—into disassociating from CAIR by threatening to deny to those third parties any Florida government benefits.  Order at 11–16.  And the court concluded that the EO would fail any level of First Amendment scrutiny.  Order at 18.

The district court therefore instructed the Governor to "take no steps to enforce Executive Order 25-244 as it applies to Plaintiff CAIR."  Order at 30.

17

Notably, however, the district court failed to identify any evidence offered by CAIR to prove that any third parties had disassociated or would disassociate from CAIR based on a concern over losing or becoming ineligible for government contracts or benefits. And it almost entirely ignored the Governor's evidence of CAIR's terror ties. Its lone commentary on that evidence came in a footnote, waving off that evidence as a mere "strained guilt-by-association theory." Order at 22 n.14. The district court failed to explain why that evidence is "strained," and it overlooked that when it comes to terrorism, association is worthy of guilt.

Beyond these reversible errors, the district court's order trammels the notion of judicial impartiality in ways that merit this Court's attention and correction. The district court's order granting the preliminary injunction teems with personal attacks on the Governor—and Florida. In explaining why, in its view, governors (unlike U.S. Presidents) deserve no deference in designating terrorist organizations, the district court mocked the Governor: "While he gave it the good ol' college try, Defendant is not the president." Order at 20 n.13. "Once again," the court wrote, "Florida chooses political posturing over the First Amendment." Order at 2. In fact, the court found that the EO was part of the "troubling trend

18

of using an executive office to make a political statement at the expense of others' constitutional rights." Order at 1. "Unfortunately," the court added, the Governor was "choosing to be a bully [] in the familiar sense of the term"—i.e., "an abusive meanie." Order at 9 n.7.

## STANDARD OF REVIEW

In reviewing a preliminary injunction on appeal, this Court considers the following injunction factors: (1) whether the plaintiff "has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues, (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

Its ultimate review of the preliminary injunction is "for abuse of discretion." *Id.* at 1285 n.3. But the Court "review[s] de novo" any underlying legal conclusions and asks whether the district court's factual findings constitute "clear error." *Id.*

19

## ARGUMENT

State funds shouldn't benefit terrorists.  Accordingly, the Governor's EO declares that state agencies should decline to enter into government contracts with—or offer government benefits to—terrorist groups, including CAIR, or anyone that offers them material support.  The district court, however, preliminarily enjoined the Governor's exercise of common sense on the theory that the EO illegally coerces third parties to punish CAIR for its protected viewpoint.  That order should be reversed. CAIR is unlikely to succeed on the merits both because (I) it lacks standing and (II) its coercion theory is wrong.

**I.    CAIR is unlikely to succeed on the merits because it has shown no injury traceable to the EO and thus lacks standing.**

For Article III standing, a plaintiff must suffer an injury that is (1) "concrete, particularized, and actual or imminent," (2) "fairly traceable to the challenged action," and (3) "redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).  At the preliminary injunction stage, CAIR must make a "clear showing" that it is "likely to establish each element of standing."  *Id.* at 58 (quotation marks and citation omitted).  In concluding that CAIR had standing, the district court analyzed

two alleged injuries: first, the decision of an unnamed podcasting company to withdraw "from an agreement to produce a podcast with [CAIR]," and second, the decision of the South Florida Muslim Federation to "disassociate[]" from CAIR-Florida. Order at 6–7. For two reasons, neither support standing.

*First*, those "injuries" are not traceable to the EO. The district court never established, and CAIR did not present evidence to prove, that this unnamed podcasting company or the South Florida Muslim Federation would be covered by the EO. Yet to establish an Article III injury in the pre-enforcement context, the challenged policy must be shown to cover those allegedly being coerced. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1241 (11th Cir. 2025). To have standing to raise a coercion claim, in other words, CAIR must show that the *EO* coerces third parties into punishing CAIR for CAIR's protected speech—in particular, by disassociating from CAIR and refusing to provide it services. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187–88, 194, 197 (2024). That, in turn, requires identifying third parties who are (1)

21

covered by the EO and (2) would otherwise associate with CAIR. Any injury short of that fails on traceability grounds.

The unnamed podcast company doesn't qualify. The EO could only "coerce" a third party if the third party received, or hoped to receive, public benefits that the EO threatened to cut off. Outside of that, the EO has no coercive effect. Indeed, it *only* withholds government contracts and benefits, so a third party uninterested in receiving those contracts or benefits necessarily remains unaffected. Yet CAIR presented no details about the podcast company. It neither alleged nor proved, for example, that the podcast company had government contracts that it risked losing through continued association with CAIR. So while the district court concluded that the podcasting company "did not act unreasonably in withdrawing from its agreement" with CAIR, Order at 7, it offered no basis for thinking that the company's decision was *traceable* to the EO.[36]

---

[36] Relatedly, there is no evidence to conclude that a favorable ruling would redress CAIR's alleged harms. "To determine whether an injury is redressable, [courts] consider the relationship between the judicial relief requested and the injury suffered." *Murthy*, 603 U.S. at 73 (quotation marks and citation omitted). CAIR's injury? The alleged loss of an unknown podcast company—who is not party to this suit—that would "*reconsider*" contracting with CAIR if the EO is enjoined or rescinded. Order

Any injury stemming from the South Florida Muslim Federation's decision to disassociate from CAIR-Florida is similarly irrelevant. To begin, that injury had nothing to do with *CAIR*; it pertained only to CAIR-Florida, a separate plaintiff in this case that sought no preliminary injunction. *See, e.g.*, Order at 30 (enjoining enforcement of the EO only "as it applies to Plaintiff CAIR"). And the argument about the South Florida Muslim Federation suffers the same traceability defect afflicting the podcast company's alleged withdrawal. CAIR failed to establish that the Federation was coerced by the EO—that it disassociated from CAIR because the Federation feared the loss of its own government contracts or benefits. To the contrary, CAIR supplied no evidence that the Federation enjoyed or hoped to enjoy any government contracts or benefits that it stood to lose. On this record, the EO had no coercive effect on the Federation, making any injury to CAIR not traceable to the EO.

The district court relied on *Department of Commerce v. New York*, which held that Article III injury is not defeated when the injury stems in part from third-party action if the injury hinges on the "predictable

---

at 6 (citing ECF 41-1 (Reply Brief Declaration)). That speculation falls short of establishing Article III standing.

effect of Government action on decisions of third parties."  Order at 8 (quoting 588 U.S. 752, 768 (2019)).  But it's hardly "predictable" that third parties unregulated by an executive order—here, the podcast company and the South Florida Muslim Federation—altered their conduct based on that order.  And *Driehaus* explains that to establish injury, the affected actor must engage in conduct "arguably . . . proscribed" by the regulation.  573 U.S. at 159.  Based on CAIR's sparse evidentiary showing, it lacks standing.

## II.  CAIR is unlikely to succeed on the merits of its First Amendment coercion claim.

Equally infirm was the district court's discussion of CAIR's First Amendment coercion claim.  Indeed, the district court ignored the core factual question in this case: whether the evidence supports the Governor's decision to designate CAIR a terror organization.  States obviously cannot be forced to contract with terror organizations.  *Cf. Humanitarian L. Project*, 561 U.S. at 35; *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007).  Any analysis of CAIR's First Amendment claim therefore required evaluating the Governor's evidence of CAIR's deep ties to terrorism.  But the district court never did that.  Had it, the court

would have been compelled to conclude on this record that the EO was justified.

**A. Because a state is obviously not required to contract with terror groups or their supporters, the key factual question in this case was whether CAIR is a terrorist organization.**

When a state does precisely what it is allowed to do—impose regulations to ensure taxpayer funds never finance or materially support terrorism—the challenged regulation survives even the most exacting form of scrutiny. The Governor's EO does just that by diverting state resources from terrorist organizations and disincentivizing other actors with whom the government deals from providing material support to terrorist organizations. The Governor's interest in *thwarting* terrorism is compelling and outweighs any other interest in supporting terrorist organizations. Even seemingly benign support of a terrorist organization, after all, can bolster terroristic violence. This EO stands.

Of course, the First Amendment guards against "the curtailment of constitutionally protected expression." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). It stands to reason that "a government official cannot do indirectly what she is barred from doing directly." *Vullo*, 602

U.S. at 190. It follows that "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* The First Amendment coercion doctrine reflects this principle. *See id.*

To prove First Amendment coercion, the plaintiff must identify state action that reasonably could be understood to convey a threat of adverse action against third parties, that is in turn meant to punish or suppress the plaintiff's speech. *See Bantam Books*, 372 U.S. at 67–68. And crucially, the government must lack the authority to regulate that speech directly. *See Vullo*, 602 U.S. at 190–91; *see also id.* at 200 (Jackson, J., concurring) (explaining that "the fact of coercion, without more, does not state a First Amendment claim"). Coercion of third parties is problematic only if the coercion "actually violates a speaker's First Amendment rights." *Id.* at 200 (Jackson, J., concurring).

*Bantam Books* and *Vullo* exemplify these concepts. In *Bantam Books*, a Rhode Island commission threatened legal action against book distributors if the distributors did not pull numerous children's books that the commission deemed injurious to youth morality. 372 U.S. at 59–64. Because at least some of those books "were not obscene," *id.* at 64— and thus were protected speech—the Supreme Court held that the

26

commission's conduct amounted to a "system of prior administrative re-straints" that "designedly stopped the circulation of publications" throughout the state. *Id.* at 68–70. That violated the First Amendment. *Id.* at 71–72.

Similarly, in *Vullo*, a New York official "allegedly pressured regu-lated entities to help stifle the NRA's pro-gun advocacy by threatening enforcement actions against those entities that refused to disassociate from the NRA." 602 U.S. at 180–81. At the motion to dismiss stage, those allegations sufficed to state a claim of First Amendment retaliation be-cause the state official's pressure campaign constituted "viewpoint dis-crimination." *Id.* at 187; *see also id.* at 188 ("What she cannot do, how-ever, is use the power of the State to punish or suppress disfavored ex-pression.").

In short, these cases hold that the government cannot force third parties to regulate speech that the government could not itself regulate. But unlike government conduct targeting children's books or Second Amendment advocacy, regulations directed at stopping terrorism finance and material support are undoubtedly valid, even when they sweep in some speech. *Humanitarian Law Project* makes that plain. That case

27

examined a federal statute that was similar to the EO here. The law made it a crime to "knowingly provid[e] material support or resources to a foreign terrorist organization." *Humanitarian L. Project*, 561 U.S. at 8 (quoting 18 U.S.C. § 2339B(a)(1)). The plaintiffs—several American groups and individuals—sued to enjoin the statute's enforcement as applied to their activities, claiming that they merely intended to offer various forms of counseling to the organization. *Id.* at 10. They alleged, for instance, that they "wished to provide support for the humanitarian and political activities" of two designated terrorist groups, including by offering "legal training" and "political advocacy." *Id.* In particular, the plaintiffs asserted their desire to "train[] members" of the terror groups "on how to use humanitarian and international law to peacefully resolve disputes" and to "teach[]" those groups "how to petition various representative bodies such as the United Nations for relief." *Id.* at 14–15.

Given those representations, the Supreme Court framed the issue as "whether the Government may prohibit" the act of providing "material support" to a terrorist group "*in the form of speech*." *Id.* at 28 (emphasis added). It therefore found that the statute implicated the plaintiffs' First Amendment rights. *See id.* at 25–28. And it further concluded that the

statute, as applied to plaintiffs, was a "content-based regulation of speech," making intermediate scrutiny inapplicable. *Id.* at 27–28. The Court thus examined the statute under "rigorous scrutiny." *Id.* at 28.

Unsurprisingly, the statute survived even that searching form of review. Thwarting terrorism is a textbook compelling interest. *Id.* at 28–29. And barring all forms of material support for terrorism is necessary to ensure that terrorist groups lack the resources to commit more violence. The Supreme Court therefore credited the government's conclusion that "it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." *Id.* at 33. And the material-support statute was tailored in that it imposed no "restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id.* at 36. Because support to a terrorist group—"even seemingly benign support"—can

"bolster[] the terrorist activities of that organization," the statute did not violate the First Amendment. *Id.* at 36, 39.

*Humanitarian Law Project* speaks clearly:  Laws forbidding material support to terrorism survive the most rigorous First Amendment scrutiny. *See also Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) (explaining that there is "no First Amendment right . . . to support terrorists").  Naturally, the government can (and must) ensure that its *own* funds do not flow to terror groups. *Cf. Rust v. Sullivan*, 500 U.S. 173, 201 (1991) ("The Government has no constitutional duty to subsidize an activity[.]").  Indeed, "where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional." *Islamic Am. Relief Agency*, 477 F.3d at 735.

Consequently, when a state's chief executive officer designates a group a terrorist organization and takes steps to stop third parties (who otherwise do business with the state) from lending support to that organization, the only pertinent question is whether the group is truly a terrorist organization.  As explained below, the district court enjoined the

30

Governor from enforcing the EO without even considering the substantial evidence linking CAIR to terrorism.  That was error.

### B.    The district court abused its discretion by ignoring the Governor's evidence linking CAIR to terrorism.

To grant a preliminary injunction, the district court must "determine whether the evidence establishes" that plaintiffs met their burden of establishing an entitlement to relief.  *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).  When the plaintiff's claim turns on a dispute of fact, a district court must therefore resolve the factual contest before granting equitable relief.  *Cf. CBS Broadcasting, Inc. v. EchoStar Comm'ns Corp.*, 265 F.3d 1193, 1207–08 (11th Cir. 2001) ("[T]he district court is not at liberty to accept one construction of the evidence and reject the other without the benefit of an evidentiary hearing.").

As a result, a district court errs when it "ignores or misunderstands the relevant evidence" and awards relief based on "considerations having little factual support."  *FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 61 (11th Cir. 2013); *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014) ("A district court would necessarily abuse its

31

discretion if it based its ruling on . . . a clearly erroneous assessment of the evidence." (internal quotation and citation omitted)).  This is especially true when the parties presented competing evidence over "hotly contested issues," *Moon v. Med. Tech. Assocs., Inc.*, 577 F. App'x 934, 936 (11th Cir. 2014); *see also* Fed R. Civ. P. 52(a)(2), and even more so when one party offered the *only* evidence as to those issues.

As noted, the validity of the EO here turned on the lynchpin factual question of whether CAIR's structure, leadership, and connections with extremist groups justified the Governor's designation of it as a "terrorist organization."  Yet the district court never asked or answered that question.  That was an abuse of discretion.  In issuing the EO, the Governor relied on a wealth of information, including numerous scholarly works, official federal findings and declarations, and federal court proceedings. *See* ECF 37-1 at 2–4 (Declaration of Jay K. Arnold, Jr.).  On top of that, the Governor offered a detailed account of the evidence of CAIR's efforts to facilitate terrorism.  *See* ECF 37, at 3–11.

The district court engaged with none of that evidence.  It did not consider, for example, that:

32

- CAIR originated from the Palestine Committee's 1993 Philadelphia meeting, where the express goal was to create a U.S. "cover" to support Hamas.[37]

- By 1994, internal Palestine Committee records identified CAIR as a part of the Palestine Committee of the Muslim Brotherhood.[38] Branches of the Muslim Brotherhood have been labeled as terrorist organizations by the U.S. Treasury and State Departments.[39]

- One of CAIR's founders, Omar Ahmad, was a powerful member of the Palestine Committee and exercised sizable influence over HLF's terror financing.[40] Ahmad was once caught on wiretap directing payments to a Hamas fundraiser.[41]

- Bassem Khafagi, a CAIR Community-Affairs Director, pled guilty in 2003 to bank and visa fraud involving funneling money to a group supporting suicide attacks.[42]

---

[37] ECF 37 at 27; *see also* Lorenzo Vidino, *The Hamas Network in America: A Short History* 9, 12–13 (2023).

[38] ECF 37 at 27–28.

[39] ECF 37 at 5, 7; *see also* U.S. Treasury Dep't., *Treasury and State Departments Designate Muslim Brotherhood Branches as Terrorist Organizations*, (Jan. 13, 2026), https://home.treasury.gov/news/press-releases/sb0357.

[40] ECF 37 at 27–28; *see also El-Mezain*, 664 F.3d at 530–31 (describing Ahmad's wiretapped statements).

[41] ECF 37 at 27–28.

[42] ECF 37 at 10–11; *see also* Danielle Pletka, *Can CAIR Be Shut Down?*, AEI (Jan. 17, 2026), https://www.aei.org/articles/can-cair-be-shut-down/.

- Randall "Ismail" Royer, a CAIR communications specialist, pled guilty to weapons and explosives charges that involved assistance he provided to the Taliban.[43]

- Abdurahman Alamoudi, a CAIR affiliate, was sentenced in 2004 for a Libyan-funded plot to assassinate the Saudi crown prince.[44]

- Ghassan Elashi, the founder of CAIR-Texas, was convicted in 2008 of providing material support to Hamas via HLF.[45]

- Mohammad El-Mezain, CAIR's Endowments Chairman, was found guilty in 2008 of conspiracy to provide material support to Hamas.[46]

- Muthanna al-Hanooti, Executive Director of CAIR-Michigan was sentenced in 2011 for violating U.S. sanctions against Iraq by coordinating with Saddam Hussein's regime.[47]

- CAIR, along with Omar Ahmad, was an unindicted co-conspirator in the HLF terror-financing prosecution.[48]

---

[43] ECF 37 at 10–11.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] ECF 37 at 28; *Holy Land Found. for Relief & Dev.*, No. 3:04-CR-0240, 2009 WL 10680203, at \*7, \*9, (N.D. Tex., July 1, 2009), *aff'd in relevant part,* 624 F.3d 685 (5th Cir. 2010).

Those and other facts convinced the FBI in 2008 to instruct its agents to cut ties with CAIR,[49] and convinced both the United Arab Emirates and the State of Texas to designate CAIR a terrorist organization.[50]

Rather than evaluate that evidence, the district court declared by fiat that the Governor offered "no evidence" for his positions and dismissed the Governor's declaration as "mere *ipse dixit*." Order at 17–18. The closest the district court came to addressing the evidence of CAIR's terror ties was its offhand remark, in a footnote, that CAIR was "one of America's largest Muslim civil rights organizations" and its characterization of the Governor's arguments, also in a footnote, as a "strained guilt-by-association theory." Order at 22 n.14.[51] That only confirms that

---

[49] ECF 37 at 9–10; *see also* Vidino, *supra* n.2, at 26; Dep't of Just., Review of FBI Interactions with the Council on American-Islamic Relations 1 (2013), https://perma.cc/2EHW-H8EF.

[50] ECF 37 at 10–11; *see also supra* nn.33–34.

[51] Of course, another term for guilt-by-association is co-conspirator, which is illegal and carries criminal punishment. And, of course, a federal court determined CAIR was exactly that in the *Holy Land Foundation* case. *See Holy Land Found. for Relief & Dev.*, 2009 WL 10680203, at *7. This district court's crusade to uncharitably characterize the Governor's evidence ignores this key point.

the district court did not take seriously its duty to consider and weigh all the facts.

Had it examined the Governor's evidence, it would have found that CAIR has much more than a passing "association" with the occasional person linked to terror. Instead, the evidence shows that CAIR started as a U.S. "cover" for the Muslim Brotherhood, that it is a "front" for Hamas, that a CAIR founder and chairman was caught on wiretap directing payments to a Hamas fundraiser, that numerous CAIR executives and employees have been convicted of terrorism-related offenses, and so on. The district court's failure is especially puzzling since it found as "indisputable facts" that "*Hamas* is a wicked organization" and that "[t]he October 7, 2023, *terror* attacks in Israel were horrific." Order 1 n.1 (emphasis added). But the district court never grappled with, or even acknowledged, CAIR's clear ties to Hamas.

Relatedly, because the district court failed to consider the evidence linking CAIR to terrorism, it likewise failed to ask whether the EO was actually motivated by a desire to punish CAIR for its expression, as opposed to the Governor's permissible desire to limit CAIR's access to government funds that could be used to promote terroristic violence. Again,

36

the district court simply assumed that the Governor targeted CAIR because of his disagreement with CAIR's speech. But the EO says nothing about CAIR's *speech*; it focuses on CAIR's *conduct*. Prohibited First Amendment coercion, at the very least, must be targeted at First Amendment conduct: that the government co-opted a third party to "punish or suppress" the plaintiff's "disfavored speech." *Vullo*, 602 U.S. at 190. The district court failed to inquire into that nexus here—yet another error.

Having left unanswered the core factual question in the case, the district court's preliminary injunction order must be reversed.

## III. The case should be reassigned on remand.

The district court failed to meaningfully engage with key facts and misapplied the law, which warrants reversal. But reversal alone is not enough here. This Court should also reassign the case to another district court judge on remand.

This Court's "authority to grant [reassignment] is well established." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 (11th Cir. 1997); *see also* 28 U.S.C. § 2106. "Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the

37

public." *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989) (per curiam).

In making that determination, this Court will primarily consider: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether assignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *United States v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009).

This case checks all the boxes. The district court openly and repeatedly disparaged the Governor in this case and has resurfaced old grudges in its order. Litigants—and the public—expect more from Article III judges. As this Court has explained: "it is not merely of some importance but is of *fundamental* importance that justice should not only be done, but should manifestly and undoubtedly *be seen* to be done." *United States v. White*, 846 F.2d 678, 696 (11th Cir. 1988). When a judge's behavior compromises the appearance of justice, the reviewing court should order reassignment to "respond to the appearance of a lack of neutrality and act to preserve in the public mind the image of absolute impartiality and fairness of the judiciary." *Torkington*, 874 F.2d at 1447.

**A. The district court will have difficulty putting previous views and findings aside.**

The first reassignment factor asks "whether the original judge would have difficulty putting his previous views and findings aside." *Gupta*, 572 F.3d at 891. The animating concern here aims to ensure that the district court has not "become hardened against the Government," and "evidenced a commitment that clearly reflects that [it] is no longer able to view these cases impartially." *White*, 846 F.2d at 696.

Judge Walker's order clearly demonstrates his inability to put aside his contentious history with the Governor and fairly decide the case. From the jump, Judge Walker frames this case in light of past skirmishes: "The First Amendment bars the Governor from continuing the troubling trend of using an executive office to make a political statement at the expense of others' constitutional rights." Order at 1. The Order continues: "Once again, Florida chooses political posturing over the First Amendment." Order at 2.

That feud carries into Judge Walker's merits analysis. In the Order's standing section, he offers a long comment criticizing Florida law and executive actions that fall outside Article III's purview. *See* Order at

39

9 n.8 (lamenting, "over the past decade," the "cottage industry of crafting law" that is "unreviewable" by Article III courts but has "very real effect on real people").[52]

Nor is this antagonism new. Judge Walker has repeatedly voiced his disdain for the Governor and his administration in prior cases. *See, e.g., Floridians Protecting Freedom, Inc. v. Ladapo*, 754 F. Supp. 3d 1165, 1171 (N.D. Fla. 2024) ("To keep it simple for the State of Florida: it's the First Amendment, stupid"); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1230 (N.D. Fla. 2022) (referring to law as "positively dystopian"); *Hand v. Scott*, No. 4:17CV128, 2018 WL 5828688,

[52] Judge Walker has repeated this criticism elsewhere, most notably in a recent preliminary injunction involving the State. *See* Notice of Filing of Official Transcript, ECF 71 at 98:15–20, Co*mput. & Commc'n Indus. Ass'n, v. Uthmeier*, No. 4:24-CV-438 (N.D. Fla. Feb. 28, 2025) ("The practical point is you pass laws that shut down protests, passed on all manner of laws that stop all kinds of speech and say, we don't have an enforcement mechanism; we are having it privately enforced; or we don't know who it applies to. So even if it chills vast amounts of speech in violation of the First Amendment, so sad too bad."). Judge Walker has also criticized the Eleventh Circuit's standing doctrines. *Id.* at 63:20–23 ("In fairness, [the State] may be reading Eleventh Circuit daily published opinions, which is why they start with standing since you're not a religious organization or a church."). As stated in the motion filed with this brief, the Governor requests that this Court take judicial notice of Judge Walker's statements.

at *1 (N.D. Fla. Apr. 4, 2018) ("Rather than comply with the requirements of the United States Constitution, Defendants continue to insist they can do whatever they want with hundreds of thousands of Floridians' voting rights and absolutely zero standards. They ask this Court to stay its prior orders.  No." (citation omitted)).

These repeatedly criticisms "suggest the district court has condemned . . . the [government] as an institution." *Cobell v. Kempthorne*, 455 F.3d 317, 333–34 (D.C. Cir. 2006); *see also United States v. Khan*, 997 F.3d 242, 250 (5th Cir. 2021) (reassignment after district court's statements "reveal a level of prejudice—not just skepticism—against the government as a party in this case.").  At minimum, it establishes "the appearance of a lack of neutrality" sufficient for reassignment.  *Torkington*, 874 F.2d at 1447.  Judge Walker's long-standing hostility towards the Governor falls far short of the judiciary's promise of impartiality.

## B. Reassignment is appropriate to preserve the appearance of justice.

Most importantly, Judge Walker's order and hostility toward the Governor and his counsel make clear that "reassignment is appropriate to preserve the appearance of justice." *Torkington*, 874 F.2d 1441, 1447

(11th Cir. 1989).  One straightforward path to jettison the appearance of justice is when a district court impugns the government's motives and actions.  *See id.* at 1447; *see also Khan*, 997 F.3d at 249 (reassignment necessary when judge repeatedly offered "hostile remarks against the government and its attorneys").  At bottom, "where a reasonable person would question the trial judge's impartiality," reassignment is the proper medicine. *White*, 846 F.2d at 695.[53]

Judge Walker's order demonstrates open antagonism against the Governor and his State.  The court outright declares that the "Defendant is choosing to be a bully [] in the familiar sense of the term"—i.e., "an abusive meanie." Order at 9 n.7.  The court further described the EO as "[p]olitical grandstanding" and declared that this case proves "it is easy for those in power to target minority groups with little pushback." Order at 28.  But most egregious was Judge Walker's gratuitous reference to the Governor's 2024 presidential campaign: "While he gave it the good ol'

---

[53] While a district court's legal ruling is often not alone sufficient for reassignment, "a particular judicial ruling can be *evidence* of . . . bias or prejudice."  *Cobell*, 455 F.3d at 334. Here, the district court's decision to ignore the Governor's evidence of CAIR's terrorist ties and overemphasized CAIR's evidence to establish standing is further evidence of its bias. *See supra* at 15, 21, 28–33.

college try, Defendant is not the president." Order 20 n.13. That alone merits disqualification.[54]

Courts have repeatedly reassigned cases when the district court has expressed similar animus or bias against government actors. *See, e.g., Johnson v. Sawyer*, 120 F.3d 1307, 1336 (5th Cir. 1997) (reassignment needed after judge stated to jury that "[i]t is a sad day for the government and for the United States of America"); *Cobell*, 455 F.3d at 328 (reassignment after judge stated government was "setting the gold standard for arrogance in litigation strategy and tactics").

In fact, this Court has ordered reassignment over comments far less hostile than the district court's comments here. In *Torkington*, for example, this Court was troubled by the district court's characterization of the government's prosecution as "silly," and "a waste of the taxpayers' money." *See* 874 F.2d at 1447; *see also Gupta*, 572 F.3d at 892

---

[54] The Court also included gratuitous comments regarding the Attorney General—the Governor's counsel in this case, including the latent comment that the Attorney General is the "Defendant's favorite familiar." *See* Order at 15 n.11; *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (reassignment warranted when "district judge made several comments during the proceedings which evidenced his distrust of [defendant's] lawyers," unrelated to Microsoft's conduct at issue).

43

(reassignment after court "disparaged the merits of [the government's] prosecution").

And Judge Walker's hostility is well-publicized. Countless news outlets have published stories documenting this judge's confrontations with Florida, including this case. *See, e.g.,* Matt Naham, *'Choosing to be a bully': Judge upbraids DeSantis for 'terrorist organization' executive 'decree' that 'bears all the hallmarks of unconstitutional coercion'*, Law & Crime (Mar. 5, 2026), https://perma.cc/QW75-4ENU; Zach Schonfeld, *Judge blocks DeSantis's 'Stop WOKE Act,' says Florida feels like a 'First Amendment upside down'*, The Hill (Aug. 18, 2022), https://perma.cc/55Q7-FJJ4; Nate Monroe *Opinion: Federal judge smacks down DeSantis administration over threats in abortion fight*, The Florida Times-Union (Oct. 18, 2024), https://perma.cc/Y4YT-WTJ2 ("It's a continuing oddity of Florida's litigation-saturated Ron DeSantis era that federal judges have become nearly household names, and none more so than U.S. District Judge Mark Walker . . . ."). Such publicity further undermines public confidence in judicial neutrality and further necessitates reassignment. *See Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 84 (3d

44

Cir. 1992) (ordering reassignment after judge's criticisms "generated widespread attention in the media").

## C. Reassignment will not entail disproportionate waste and duplication.

Finally, reassignment will not entail "waste and duplication out of proportion to gains realized from reassignment." *Torkington*, 874 F.2d at 1447. This case is in the early stages of litigation. To date, the district court has ruled only on plaintiff's motion for a preliminary injunction. *See* DE 43. Discovery is ongoing and has, to date, not involved the district court. *See, e.g.*, *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021) (finding no disruption to "judicial efficiency[] particularly because full discovery has not yet occurred."). A new judge on remand "will need little time to 'get up to speed.'" *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1374 (11th Cir. 1997).[55]

\* \* \*

The Governor and other Florida leaders long ago realized they were unlikely to get a fair hearing in front of Judge Walker (which has

---

[55] Even if this case were further along, concerns about judicial efficiency cannot outweigh the judiciary's commitment to the appearance of

45

correspondingly increased this Court's workload).  But the headline-grab-bing invective leaves the reasonable public in no doubt that, when hailed into Judge Walker's court, its laws and leaders will be denied a fair shake.  At the least—the very least—Judge Walker has created the ap-pearance that he cannot be impartial.  Reassignment is, therefore, nec-essary.  But were there any doubt, this Court should still, in Judge Walker's words, "choose to err on the side of caution—which, here, is also the side of judicial integrity—and [reassign].  Maintaining public trust in the judiciary is paramount, perhaps now more than ever in the history of our Republic." *Walt Disney Parks & Resorts U.S., Inc. v. DeSantis*, No. 4:23CV163, 2023 WL 11763037, at \*5 (N.D. Fla. June 1, 2023) (order rec-using himself after finding State's motion to disqualify "without merit").

---

fairness.  Appellate courts routinely order reassignment even in long-running and complicated cases.  *See, e.g., United States v. Khan*, No. 20-20030, 2021 WL 1811755 (5th Cir. May 6, 2021) (reassignment needed despite case proceeding for "four-and-a-half years" and including "a sub-stantial and nuanced factual record"); *Cobell*, 455 F.3d at 319 (reassign-ing case after 10 years of active litigation).

## CONCLUSION

This Court should reverse the preliminary injunction and remand with instructions to the Chief Judge of the Northern District of Florida to reassign the case to a different district judge for further proceedings.

Dated: April 20, 2026                                        Respectfully submitted,

JAMES UTHMEIER                                       */s/ David M.S. Dewhirst*
  *Attorney General*                                    DAVID M.S. DEWHIRST
                                                                    *Solicitor General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*        JEFFREY PAUL DESOUSA (FBN 110951)
                                                              JASON J. MUEHLHOFF
                                                                *Chief Deputy Solicitors General*
OFFICE OF ATTORNEY GENERAL         TYLER E. GUSTAFSON (FBN 1049292)
The Capitol, PL-01                                      *Assistant Solicitor General*
Tallahassee, FL 32399                           CASEY J. WITTE (FBN 1070288)
david.dewhirst@myfloridalegal.com       *Solicitor General Fellow*
jenna.hodges@myfloridalegal.com

*Counsel for Governor Ron DeSantis*

47

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 8,805 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ David M.S. Dewhirst*

**CERTIFICATE OF SERVICE**

I certify that on April 20, 2026, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ David M.S. Dewhirst*

48