**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS            )
INDUSTRY ASSOCIATION, et al.,        )
                                     )
            Plaintiffs,              ) Case No: 4:24cv438
                                     )
        v.                           ) Tallahassee, Florida
                                     ) February 28, 2025
JAMES UTHMEIER, in his official)
capacity as Attorney General         )
of the State of Florida,             )
                                     ) 9:00 AM
            Defendant.               )
_____      )


**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 137)**


Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                           111 North Adams Street
                           Tallahassee, Florida 32301
                           megan.a.hague@gmail.com

            *Proceedings reported by stenotype reporter.*
      *Transcript produced by Computer-Aided Transcription.*

APPEARANCES:


For the Plaintiffs:        Clement & Murphy PLLC
                           By:  ERIN E. MURPHY
                                JAMES XI
                                KEVIN JOSEPH WYNOSKY
                                MITCHELL KESHAVA PALLAKI
                                Attorneys at Law
                                erin.murphy@clementmurphy.com
                                james.xi@clementmurphy.com
                                kevin.wynosky@clementmurphy.com
                                mitchell.pallaki@clementmurphy.com
                           706 Duke Street
                           Alexandria, Virginia 22314


                           Stearns Weaver Miller
                           By:  DOUGLAS L. KILBY
                                Attorney at Law
                                dkilby@stearnsweaver.com
                           106 East College Avenue
                           Suite 700
                           Tallahassee, Florida 32301


For the Defendant:         Office of the Attorney General
                           By:  KEVIN A GOLEMBIEWSKI
                                DAVID M. COSTELLO
                                Attorneys at Law
                           kevin.golembiewski@myfloridalegal.com
                           david.costello@myfloridalegal.com
                           3507 East Frontage Road
                           Suite 200
                           Tampa, Florida 33607


                           Florida Attorney General's Office
                           By:  JOHN M. GUARD
                                DARRICK WILLIAM MONSON
                                ANITA J. PATEL
                                Attorneys at Law
                                john.guard@myfloridalegal.com
                                darrick.monson@myfloridalegal.com
                                anita.patel@myfloridalegal.com
                           PL-01 The Capitol
                           Tallahassee, Florida 32399

APPEARANCES (Cont'd.):


For the Defendant:          Florida Attorney General's Office
                            By:  DAVID M. COSTELLO
                                 Attorney at Law
                            david.costello@myfloridalegal.com
                            3501 East Frontage Road
                            Suite 200
                            Tampa, Florida 33606Firm}

**P R O C E E D I N G S**

(Call to Order of the Court at 9:00 AM on Friday, February 28, 2025.)

THE COURT:  Please take your seats.

All right.  We are here for a hearing on a preliminary injunction, Case No. 4:24cv438.  I issued an order on the hearing procedures on February 25th.

The matter has been well-briefed by the parties.  The last word, in terms of filings, was from the plaintiffs in terms of the reply as it relates to the preliminary injunction, that is, as distinguished from the motion to dismiss.  So I indicated we'll start with counsel for the defense.

Counsel, you may proceed.

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

I was going to set up a PowerPoint if that's okay.

THE COURT:  That's fine.

(Pause in proceedings.)

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

Kevin Golembiewski for the Attorney General of Florida.

There's broad bipartisan agreement, Your Honor, that social media platforms are addicting kids to their products. There's also broad agreement about the features that are fostering that addiction.  Those features, according to the U.S. Surgeon General for the Biden Administration, include

infinite scroll, auto play, displaying personalized metrics, and other commercial practices that manipulate kids into spending more and more time scrolling and on the platform.  They do that by short-circuiting kids' self-control mechanisms and overstimulating the reward systems in their brains.  Children have less cognitive defenses against those types of practices. And, as a result, they are more likely to be hooked.

As a result of platforms' decision to use these practices to maximize bottom lines, kids across this country have experienced behavioral addiction to platforms, and we've seen a mental health crisis in this country that has harmed a generation of children.

In March 2024, the Florida legislation passed HB 3 in an effort to make a dent in this public health crisis. Plaintiffs are trade associations that challenge HB 3 on First Amendment grounds, and they seek a preliminary injunction enjoining multiple provisions of a statutory scheme, but they have not established clear entitlement to that extraordinary relief for multiple reasons, including they haven't established standing, and the claims fail on the merits.

Before jumping into the merits and standing, Your Honor, I just want to do some table-setting about the law and about the scope of plaintiffs' claims.  So the aim of the law is to address compulsive use; it is not focused on content or kids engaging with material they find interesting.  And

that's confirmed by the fact that if a platform simply chooses not to use these addictive features, these harmful practices, kids can contract with the platform to create an account and they can spend as much time as they want.  The law is not concerned with time spent on platforms.

This makes HB 3 materially different than the social media laws in other states that plaintiffs have repeatedly referenced in their filings.  They reference and rely on: *Griffin*, *Yost, Reyes*, *Paxton*, and other cases, but the laws in each of those cases did not target addiction.  Florida's law is first of its kind in that respect.

Some of the laws excluded from coverage platforms that have news, sports, or education on them.  Some of the laws targeted content.  Ohio's law, for example, only applies to platforms that target kids.

And one of the criteria for that is, quote, "whether the subject matter targets kids," but HB 3 is not concerned with subject-matter content.  If an educational app uses all these features, gamifies the experience, and causes kids to compulsively use it, it could be liable under this law as well, just like a social networking platform, a streaming service, or a gaming service.  The focus is functionality.

And so just to set the table with plaintiffs' claims, plaintiffs assert claims on behalf of users and adults.  They have not pleaded any claims on behalf of the member platforms,

and we raise this early for two reasons.  First, just to lay out the scope of what's before the Court in this hearing, and, second, because it's relevant to our shotgun pleading argument.

In the complaint plaintiffs include one sentence and one paragraph, paragraph 63, mentioning members' rights.  They say that HB 3 interferes with the First Amendment right of platforms to disseminate speech.  There is no factual development of that point.  There's no facts explaining what expression, what platforms are engaged in that's being interfered with, and that's a particularly glaring deficiency given *Moody* explains that not all news feeds, not all platforms are engaged in expression.  There need to be facts there.  And under *Iqbal* and *Twombly*, that's insufficient for them to state a claim.

We also took them not to be asserting members' rights because there's good strategic reasons for that.  First, plaintiffs have resisted discovery of platforms in this proceeding, and if they are asserting members' rights that would open the door to more discovery of platforms.

Second, if plaintiffs asserted members' rights, their associational standing argument would be even more difficult.  Because if members' rights are being asserted, stands to reason member participation is even more necessary.  And further confirming to us that only members -- only users' rights were asserted in the 26(f) report where plaintiffs represented in

asking this Court to limit discovery that *Moody* and the editorial right discussed in that case are irrelevant.

But then in the PI reply, plaintiffs came back and said, Well, the law interferes with editorial rights and cited *Moody*. And so that kind of shifting claims is exactly what the Eleventh Circuit's rigid shotgun pleadings rules are designed to protect against and is another reason why the complaint is a shotgun pleading that must be dismissed and the PI denied as moot on that basis alone.

Now, moving to standing -- moving to the merits of the case in standing, there's three main issues that I'd like to discuss today: Lack of standing, lack of a cause of action, and that plaintiffs are unlikely to succeed on the merits.

For standing plaintiffs rely on associational standing, but for three independent reasons, they haven't met their burden to establish that: They can't use associational standing to assert the rights of nonmembers; they haven't proven that any member platform would have standing -- that means the member platform would have both an injury in fact and prudential standing to assert the rights of users; and they haven't proven that member participation is unnecessary.

So, first, and just briefly, organizations cannot use associational standing to assert nonmember rights. All the exceptions to the bar on third-party claims are premised on a close relationship. Next friend standing involves a close,

often familial, relationship.  Associational standing involves the association-member relationship.  Third-party standing involves a close-aligned relationship.

And so our point is that plaintiffs can't end-run that common requirement that goes through the jurisprudence on third-party claims and use associational standing to assert the rights of third-party users that they admittedly have no relationship with.  But if the Court disagreed and thought members could press associational standing on behalf of users, the PI must be denied for two reasons at the member-standing prong of associational standing.

First, they fail to plead that any members regulated by HB 3 and has prudential standing.  Nowhere in their complaint do they identify that a member engages in conduct that could subject it to regulation under subsection (1)(e) of the law, and they also fail to offer any evidence at the preliminary injunction stage establishing injury in fact or member standing. And, in fact, in plaintiffs' PI reply, they didn't engage with any of the evidence that that we laid out in our PI response. They simply referred back to their MTD response which, of course, only addressed the pleadings and not the PI evidence.

And so for injury in fact, the standard, as this Court knows, is there at least needs to be an allegation that a plaintiff will engage in conduct that arguably triggers enforcement.  For HB 3 that means there need to be some

allegations identifying a member that arguably engages in all the conduct in (1)(e), including that it has 10 percent or more of its users who are under age 16 using the platform for two-plus hours per day.  Plaintiffs have not done that.

Instead their theory seems to be, Our members are social media platforms, some of the major ones.  This law is focused on social media, so somebody has got to be covered.  But cases like *Summers* and *Georgia Republican Party* reject that type of probabilistic analysis and say, You've got to come forth with specific facts identifying a member who satisfies the criteria and faces a credible threat of enforcement.  And so plaintiffs have not come close to getting there at the PI stage.

They've offered declarations from four individuals, each of which has only vague, equivocal legal conclusions about this issue.  So the four quotes from the declarations are on the screen, and they include statements like:  *I understand that YouTube may be subject to the Act, as one or more of its services may meet the definition of social media.*

That's not enough to meet the heightened burden at the PI stage to establish that YouTube, indeed, engages in the conduct that would trigger HB 3.  There needed to be some factual allegations about the user base, about the algorithms, et cetera.

And the depositions didn't help the plaintiffs.  If anything, it undercut the declarations.  Most notably,

Mr. Cleland, who had put in his deposition -- or in his declaration that Facebook and YouTube were likely covered by the law, admitted upon questioning that he does not know which members are covered.

Mr. Schruers admitted that NetChoice and CCIA have access to very little nonpublic information, like the demographic or user data.

Ms. Veitch said she's not a data scientist.  She doesn't know about the user rates.

And Mr. Boyle was silent -- the Snap representative was silent on this issue.

So all that together, all we have is a couple conclusory legal statements that these platforms may be covered under the law, which is not enough.  They had to come forward with some conduct that could arguably be proscribed by the law under subsection (1)(e) or, in other words, identify some conduct that at least lines up with those four requirements in (1)(e).

THE COURT:  Counsel, can I ask a question?

MR. GOLEMBIEWSKI:  Yes, sir.  Yes, Your Honor.

THE COURT:  And I'll phrase it that way because in light of DOJ's position, I want to make sure this is a safe place for you.  I don't want to ask any questions -- and the same goes for plaintiffs' counsel.  I realize the new trend is to file ethics complaints if a judge asks questions.  It hurts

the feelings of lawyers.

So I think you answered my question which is you don't have to, for purposes of standing, with certainty, prove it would apply. It's that you'd have to have some granular facts in which you could both -- you could argue that it arguably would apply to it. In other words, you don't have to go through and expend all the funds that have been described as compliance cost to establish, in fact, this is the percentage and these are the users. But you would at least have to have some granular facts from which this Court can conclude it would arguably apply to at least one of the members; correct?

MR. GOLEMBIEWSKI: Yes, Your Honor. So for --

THE COURT: And as I understood your argument, Judge, it's defective in two ways: First, Judge -- and we've cited authority that says this -- for the complaint to stand, which the PI is tied to, you've got to have at least some allegations. And then we cited, Judge, your *Pernell* case -- and you could have cited any number of cases -- noting that for a preliminary injunction, you can't just allege stuff. You've got to have some facts, which is why, Judge, I just went through the declarations and the depositions.

So it's defective, and we have a problem for two reasons. You don't have any facts in front of you which would suggest it would arguably apply to any particular member. While you may intuitively, Judge, think -- and we all may intuitively

think that these features, for example, exist in YouTube and you can, for example, in YouTube know that they have an entire -- I don't know what to call it -- a sub -- kid service so you can say, Okay, well, they've obviously got kids in front of them.

The problem is, Judge, there's gaps when you are trying to decide whether the law could apply to them because you've got to have at least one addictive feature and meet the other three qualifications. And here there is no one member that there is any granular facts from which you could find all four of those things arguably apply, and there's not even any allegation.

So it both fails as a complaint and would fail -- even if they alleged it in the complaint, you don't have any granular facts in the depositions or declarations that would establish as to any one member those four criteria arguably would apply.

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

THE COURT:  All right.

MR. GOLEMBIEWSKI:  That's correct.  And just to -- one example.

So, for example, on this arguably point, if they would have said, Here's a platform.  It has -- it appears to have 15 percent of its under-16 users using the platform for 2.1 hours a day over the past several years.  You know, that doesn't exactly line up with the 10-percent threshold, but from there you could infer that it's arguably covered by the law.  There

needed to be something, some kind of factual basis like that for one particular member.

And they could have used pseudonyms -- we know that from Eleventh Circuit precedent -- to identify that platform, but they had to have some kind of factual basis there otherwise --

THE COURT:  And let me ask you this because interestingly arguments end up being brought back up in other subsequent cases.  I'm not suggesting you'd have to run actual numbers.  You suggested -- gave the example, I think it may be slightly less exacting than that what they'd have to produce.

But I thought your point was, Judge, even if you didn't have to have any one member say, For this time frame we specifically met the 10-percent rule and the two-hour usage, there'd at least have to be some facts that would suggest that they had a belief -- and this Court would have a belief -- that's so.  And whether or not -- we can leave it for another day, whether or not you have to have that sort of specific conclusion and study or data to suggest that it in fact would apply, Judge, we don't even have any underlying facts from which you could infer that it would meet that threshold; right?

MR. GOLEMBIEWSKI:  That's correct.

THE COURT:  Okay.

MR. GOLEMBIEWSKI:  That's correct, Your Honor.  Yeah, exactly, not in the complaint and certainly not in the PI

discovery even though there was ample opportunity for them to come forward with those type of bare-bones facts.

THE COURT:  And aside from any deficiency in the complaint, even if they had such an allegation in the complaint, Judge, that wouldn't be enough for PI because you've got to have facts that would support the allegation.

MR. GOLEMBIEWSKI:  Correct, Your Honor.

THE COURT:  I understand your argument.

MR. GOLEMBIEWSKI:  And just to close on this injury-in-fact section, because plaintiffs have failed to establish that any one member has injury in fact, even if they are asserting members' rights, they lack standing because no member -- you need to have that injury in fact to assert whoever's rights through associational standing.  So that would dispose of all claims that they intend to bring.

On top of that, they haven't established that any member has prudential standing.  And so for the claims asserting the users' rights, they would have to show that a member could come into court with an injury in fact and get by the bar on third-party claims.  And there's two ways they could really show that:  Overbreadth and third-party standing.

Overbreadth doesn't apply under the Eleventh Circuit's decision in *Mata Chorwadi* because our law does not penalize or regulate users.  So, therefore, the law cannot be applied to them, to the users, and you can't use overbreadth to assert

their rights.

Plaintiffs don't mention *Mata Chorwadi* in their responsive filing. They rely heavily on *American Booksellers*. But the plaintiffs in *Mata Chorwadi* briefed *American Booksellers*, cited it, and the Eleventh Circuit rejected that and said in this context you can't use overbreadth, period.

That leaves third-party standing. Plaintiffs' main contention on this point is they are directly -- the member platforms are a directly regulated business. And so under *Craig v. Boren*, they can assert the rights of their user/customers, but they don't even argue that the users face a hindrance. Instead they say, We don't have to show hindrance because of *Craig v. Boren*. But *Kowalski* explained -- summarizing all the third-party standing jurisprudence and even cited *Craig*, cited cases like *Powers*, and said, Running through these cases are two requirements, hindrance and close relationship.

And the Eleventh Circuit of *Young Apartment*s said, Yeah, you've got to show hindrance and close relationship even if you are a directly regulated business. Here there is no argument, much less a showing, that users face a barrier to enforcing their First Amendment rights.

And, in fact, the plaintiffs have cited *SEAT* from the Western District of Texas and *Reyes*, two other challenges to social media laws. In both those cases, there were users who challenged the law, and in *SEAT* there were minor users. And so

there is no argument here that users can't enforce their own First Amendment rights and the hindrance fails, and this is an independent basis, then, for saying that they haven't established member standing.

That leaves member participation, the third prong of associational standing.  Plaintiffs haven't shown that member participation was unnecessary.  The PI litigation has shown that members are going to have to participate in this case.

The NetChoice and CCIA representatives can't even identify which platforms are covered, much less litigate a case asserting the rights of those platforms' users.  They recognize they don't have access to nonpublic information.  And this is particularly jarring because plaintiffs seek -- bring as-applied claims on behalf of covered members when they can't identify those members, and they seek an injunction only to covered members.  So we'd have to identify them even to provide that injunctive relief.

Moving beyond standing to cause of action, plaintiffs chose to plead the First Amendment claim only under Section 1983.  This is similar to the *UPSIDE* case before Your Honor recently where the plaintiffs pleaded only a Section 1983 cause of action and not an equitable cause of action, and that's a problem because you cannot use Section 1983 to assert the rights of third parties.  The statute allows the person who has been deprived of rights to bring a lawsuit and hold the defendant

liable.

In this case if the Attorney General was held liable, it would be to the plaintiffs.  If the plaintiffs sought attorneys' fees under '83 and '88, the Attorney General would be liable to the plaintiff trade associations, not to the individual rights holder.

And this is something that the old Fifth -- albeit in dicta in a Judge Wisdom opinion -- recognized is the case in the State of 1983.  This is the law in the Second Circuit Court of Appeals, and Judge Posner has recognized that you can't use '83 to assert third-party claims.

So this is another independent basis why they have not proven a likelihood of success on the merits.

THE COURT:  The Fifth has actually spoken on this more recently; right?

MR. GOLEMBIEWSKI:  Yes, Your Honor.  They are split -- they are a split panel --

THE COURT:  Was it a split panel?  Or was it a preliminary -- was it a court on -- a panel that decided a preliminary injunction, and ultimately the final panel said they got it wrong before?

MR. GOLEMBIEWSKI:  That's exactly right, yeah.

THE COURT:  Hasn't the Eleventh Circuit said -- I believe in one of my cases -- We don't care what the preliminary injunction panel says.  It doesn't matter and it's not good law.

I mean, maybe that only applies to Judge Walker favorable preliminary injunction rulings.  That may be the special rule that it's enforceable and binding any other time, but not when Judge Walker is affirmed, but I thought that's what the Eleventh Circuit said.

MR. GOLEMBIEWSKI:  In *Jacobson* they might.  The Eleventh Circuit might have said that, but the Fifth Circuit might have different rules.  And our point in citing those case --

THE COURT:  Well, I'm not bound by the Fifth; right?

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

THE COURT:  So for my purposes in the Eleventh Circuit law, the Eleventh Circuit would say, I go with what the final panel said, not the preliminary injunction panel.  Isn't that what -- I'm pretty sure that's what Chief Judge Pryor said to me.

I mean, Counsel, I only have to get a spanking once to learn the lesson.

MR. GOLEMBIEWSKI:  Well, you are not bound by the Fifth at all, so you don't have to listen to either of those opinions, Your Honor.

THE COURT:  Well, I know, but you bring up the Fifth --

MR. GOLEMBIEWSKI:  Yes, Your Honor.

THE COURT:  -- is my point.  You are touting the Fifth

Case 4:24-cv-00438-MW-MAF    Document 71    FILED 03/11/25    Page 20 of 137
USCA11 Case: 26-10735    Document: 16-2    Date Filed: 04/20/2026    Page: 20 of 137

20

as, Judge, look at this dicta by Wisdom as something you ought to follow when the Fifth Circuit, albeit in not the most detailed way -- I would use that rather than what I was going to say -- and I would ask plaintiffs' counsel -- I don't think any of the Courts that have explained why you can do this under 1983 -- other than saying, Well, that's what happens and what we do, I don't believe anybody has really ever explained and directly engaged with the language of 1983 and explained why that's so, including the Fifth's most recent statement.

I think they just say, This happens all the time, so it must be so. Maybe not the most fair way to characterize it, but I think it's generally fair; no?

MR. GOLEMBIEWSKI: That's right. That's right. They've said that's how we have always done it. Whereas the stay panel -- I know the stay panel -- I know it might be entitled to less weight, but they did do some textual analysis. And Judge Winsor recently passed on this argument. He didn't decide it, but he just said that the textual analysis was persuasive.

So our point is that there is a body of jurists who have analyzed the text -- and it ain't binding; we agree -- but there is a body of jurists who have analyzed the texts and indicated that you can't use 1983 in the way plaintiffs are trying to.

THE COURT: And let me footnote something that I was

going to ask as a question now that plaintiffs will need to answer, which I raised -- as you pointed out -- in one of my prior cases; namely, if you don't plead a claim in equity, how does that save your claim if you don't have a 1983 claim?

That's not for you.  That's for them.  I'm saying I just need to bookmark that because you raise the issue, and I don't want to forget.  If I don't ask them, I want them to address:  If I find that 1983 isn't the appropriate vehicle, what do I do with the fact they did not plead in the alternative?

MR. GOLEMBIEWSKI:  I can give you an answer.

THE COURT:  Well, you said they'd lose.

MR. GOLEMBIEWSKI:  That's indeed what I would say, but the PI would be denied.

And they could amend and bring an equitable cause of action, but the PI would be denied.  And that's not just a technicality.  This matters because 1983 comes with fee awards that can be hefty when these cases go up and down the courts.

THE COURT:  I'm not saying I agree with you on the merits as it relates to 1983, but I just want to make sure that they respond with respect to whether or not they did, in fact, plead in the alternative that it was a claim in equity.

But, go ahead.

MR. GOLEMBIEWSKI:  Okay.  I'll move on to the merits.

THE COURT:  By the way, do you disagree that there is

such a claim, because that jurisprudence is rather odd as well? They kind of cite to *Ex Parte Young*. And based on my read, the case law just says, Well, we've allowed it. It happens. It exists. I'm not -- what's the case that would say you could bring such a claim in equity?

MR. GOLEMBIEWSKI: I can't speak on that.

THE COURT: Okay. Go ahead.

Merits.

MR. GOLEMBIEWSKI: Yes, sir.

So there's three different reasons why the Attorney General is likely to prevail on the merits of the First Amendment claim. The plaintiffs have not shown that the First Amendment rights of children and adults are implicated. Even if they are implicated, this law is at most a content neutral --

THE COURT: Does it matter if the members' First Amendment rights are implicated?

MR. GOLEMBIEWSKI: We don't believe the members' rights are implicated either, if Your Honor construes the complaint as bringing members' rights.

THE COURT: Help me to understand that.

MR. GOLEMBIEWSKI: So the only argument that plaintiffs make as to members' rights is in the reply brief, the PI reply. And they say -- they cite *Moody*. It's just one paragraph, and they say, The members' right -- has a right to use these addictive features as part of the presentation of

speech.  But *Moody* did not say that.

*Moody* focused on the editorial judgment in developing and selecting the content for a newsfeed, and the use of that editorial discretion decides what goes in the newsfeed, and how it's ordered can be expressive.  But the Court did not go as far as to say any kind of functionality you pair with that newsfeed is also protected expression.

This is like *Arcara* in a sense where the Supreme Court said, You can't put together books and sex and say it's all expression.  You can't put together newsfeeds and any kind of functionality, including just commercial practices, that manipulate the user, and say it's all expression.  And *Moody* doesn't provide them support for that extension.

In fact, there was a series of states, New York and other states, that have filed an amicus brief that cautioned the Court not to write a decision that would say such a thing in that case, and the Supreme Court didn't.  And Justice Kagan in the majority opinion even mentioned that social media sites present new dangers such as harms to children's mental health that make them different than prior types of media, like newspapers.

And so we read *Moody* as carefully cabining its opinion to that newsfeed function.

THE COURT:  Well, as it relates to children and adults, children under 13 can't use them at all; right?

So riddle me this:  How does that not implicate the First Amendment if they don't have access at all?

I mean, isn't that the ultimate First Amendment bar?

MR. GOLEMBIEWSKI:  Well, they do not -- they are not denied access, Your Honor.  So if any platform -- and this gets into kind of the merits of this two-step test that the Courts discuss in *TikTok*.

So, first, the law does not directly regulate speech because it regulates only contracting to enter accounts with platforms that use addictive features.  Now, we are not saying that anytime --

THE COURT:  What's your best case on that, Counsel?

I mean, so you are telling me, Judge, no Republican can get library cards, and check out books.  Judge, we are just talking about library cards so First Amendment -- not a First Amendment case.

MR. GOLEMBIEWSKI:  Well, we are not taking that kind of maximalist position, Your Honor.  We do think that if you are regulating commercial activity and on the face of the law it's evident you are targeting expression, like in that situation, the First Amendment would be implicated.  And --

THE COURT:  Isn't that a content-based question?

It seems to me you are conflating what -- and you may win on that, but it seems to me those are two different questions:  One, is the First Amendment implicated?  Two, is it

content based?

It sounds a lot like what you were just saying to me is really the question I've got to answer about whether it's content based.  But help me to understand why I've got that wrong.

MR. GOLEMBIEWSKI:  It is a similar inquiry, Your Honor, and I think *TikTok* is the most -- provides the most guidance on this.

So what you are looking at in this disproportionate burden test that the Court discussed in *TikTok* is is the focus or aim of the law expression.  For content based you are looking at is the purposes or aim of the law content.  It's a similar analysis.  But what the Court indicated in *TikTok* was, Well, the focus of the law there was corporate control, not the speech of TikTok.  There were causal steps between the law which regulated divestiture and corporate control and any alleged burden on speech, and that was another indicator --

THE COURT:  Counsel, I'm completely confused.  And this is why I asked and tried to separate it out.  Again, it doesn't mean you lose, but I thought *TikTok* starts with the assumption the First Amendment is implicated.  And what you are talking about is exactly what I ask, which is whether or not -- isn't that an explanation for why it's not content based.

Do I have that wrong?  Did *TikTok* -- that decision didn't assume the First Amendment was implicated?

MR. GOLEMBIEWSKI:  Well, it did assume that, but you are wrong where this analysis came in the opinion.  So in the first section --

THE COURT:  So they assumed it, but they talked about it anyway?

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

THE COURT:  Okay.  All right.

MR. GOLEMBIEWSKI:  So they start out -- so the DC Circuit -- just to step back, the DC Circuit said that the First Amendment applied.  The Supreme Court walked that back and said, We are not so sure the First Amendment applies.  Because there is these causal steps between the regulation and alleged burden on speech, because the focus is corporate control, it appears that this law is only aimed at commercial activity, not any speech.

And so they are hesitant to say -- to hold that the law implicated speech, but they did say --

THE COURT:  Since this targets user content, isn't that what makes this different?

MR. GOLEMBIEWSKI:  This law does not target any kind of content.  The law says that if a platform uses addictive features, it can't enter contracts with kids.  The law is totally agnostic to kids going on social media platforms, speaking, listening --

THE COURT:  But one of the four criteria about whether

the law applies to you and that you can either have a private action against you or the government can come after you is if you're -- right -- if it's tied to user content?  Isn't that one of the four prongs?

Am I missing something?

MR. GOLEMBIEWSKI:  The first prong you might be referring to is it applies to platforms that allow users to post content or see other users' activity.  That's not concerned with speech.  That is identifying platforms that engage in interaction and allow for --

THE COURT:  Isn't that exactly what the *Reyes* case in Utah dealt with?  That if you've got categories of speech -- and this is switching to the content-based question.  Because I've got to tell you, you've got a hard road to hoe to convince me that this isn't -- it doesn't mean you lose, but it's not -- it doesn't implicate speech.

But with content based, let's start with this:  Can't we agree, even though it has nothing to do with message, you couldn't say that you can't have any type of political discussion of any kind, not related to any particular message, but just categorically eliminate any kind of political discussion?

That would be content based; correct?

MR. GOLEMBIEWSKI:  Correct.

THE COURT:  And so setting aside whether or not you've

got a speaker as a proxy for a message or you are limiting particular messages and so forth, the law is pretty clear that if you knock out a category of speech, that's content based; right?

MR. GOLEMBIEWSKI:  If the law on its face is discriminating against a category of speech.

THE COURT:  Why is this case not the same as *Reyes*, because you functionally have stopped social interactive speech, which is what the Court in Utah said was the problem with the category.

MR. GOLEMBIEWSKI:  Well --

THE COURT:  It may be twofold:  One, Judge, we think this is distinguishable why.  And, number two, we think the Court in Utah just flat out got it wrong.  I realize it's not binding.

So I realize there are multiple aspects to that question and you can answer none or all of them --

MR. GOLEMBIEWSKI:  Well, that's --

THE COURT:  -- because, again, I don't want to upset you.

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

So our law is different than Utah.  So what the *Reyes* court focused on was the law specifically singled out social content.  But our law in saying --

THE COURT:  What if our law is the functional

equivalent of that?

MR. GOLEMBIEWSKI:  I disagree, Your Honor, because our law says if you can see other users' activities or users can upload content and the site has the addictive features, then the law applies.  If Disney+, for instance, which is plainly an entertainment-based service, allowed 7- and 8-year-olds to see what other 7- and 8-year-olds were watching, what they are binging, and gamified streaming experience in that way, the law would apply there too.  So it's not concerned with social speech.

The law in *Reyes* specifically said "social speech." But we also disagree with *Reyes* that the mere category of social speech could be considered a content-based distinction because *City of Austin* explains that subject matter, message, viewpoint, those are the things that content-based discrimination is concerned with.  And "social speech," I don't even know what that means.  Every kind of speech that's social or communicative.

I think what plaintiffs are getting at is -- and the *Reyes* court might be getting at is -- if you are posting personal updates or talking about your life, that's social.  But if a platform -- if today Facebook was covered and it allowed those personal update posts, et cetera, and then tomorrow it only allowed posts about movies and music and sports, it would still be covered under the law.  Because the content of the post

doesn't matter at all, whether it's social, antisocial, whatever.  And so *Reyes* is wrong on that point, and our law is also distinguishable because it doesn't even single out social content.

THE COURT:  I went to India last summer and went to all the stepwells.  Isn't what this is trying to block no different?

In that context it's women in India, for hundreds of years, that's where they met and interacted was in the stepwells.  Isn't this the digital equivalent of that?

And isn't that why the *Reyes* court said this was a problem and why it's content based?

MR. GOLEMBIEWSKI:  So two responses.  So, first, the *Reyes* court said on its face there was a content based distinction.  Plaintiffs haven't even argued that here.  They assumed the law is content neutral on its face, and they argue purpose or discrimination.

And that seems to be what Your Honor is getting at, that this is a stealth content regulation really trying to get kids off popular social media sites.  But the law doesn't function like that in operation because it can apply to any kind of site.

THE COURT:  But you'd agree that if it functioned that way, Houston, we may have a problem?

MR. GOLEMBIEWSKI:  If the law -- I don't agree.  I

don't agree, Your Honor.

Because if the law only applied to Facebook and Instagram, the platforms tout that those sites have all the diverse thought, human thought, and perspectives on there, period.  So we are not singling out any kind of content if we apply it to only to those cites.

And, in fact, the Eleventh Circuit in *NetChoice v. Moody* kind of rejected that kind of speaker-based analysis where the platforms were saying the law in *NetChoice I* singled out platforms that have over one hundred million users, and so that shows they are coming after the particular content on the sites, and the Eleventh Circuit said that's not the case.

Justice Kagan also recognized that at the *NetChoice* oral argument where she said there's no specific discrimination when it comes to big platforms, bigness has no protection.  And so for singling them out, it could be for innumerable reasons.

THE COURT:  I thought there was all kinds of case law that says if you functionally -- based on who you target, you're functionally addressing particular exchanges, that does matter?

You really would read *Moody* as so sweeping as knocking out all those prior cases?  That if the subset -- sort of, I guess, the example would be if you are going to knock out all local newspapers that have a different voice than national news conglomerates that you are targeting -- you can infer from going after local newspapers -- which, of course, this doesn't apply

anymore because they have all been eaten up, and the same handful of people are delivering all the messages -- but in our history there was a distinction that mattered.  And I thought there was all kinds of cases, and that's just one example, where it is fair based on targeting a group.

And I guess it would depend on how the sweep -- isn't there a difference between targeting one platform versus targeting a group of platforms where you've functionally taken out almost an entire type of speech?  Let me give you an example.

There are small commercial planes in this -- I just flew recently with my bride to Fort Jefferson on a float plane.  Arguably, that was a commercial flight.  I paid to fly with six people.

But if you have a law that covers -- and I know this isn't speech, but follow my analogy, however poor.  If you have a law that covers every major airline, even down to Spirit, Frontier, et cetera, doesn't that tell you something about the reach even though there are technically other commercial flights out there?

So if there's a billion flights and 999 million of them are covered because you've targeted this collective group of platforms, so it's 99 percent -- and I'm not suggesting there is a record here that would support that, that would have been a question I have for the plaintiffs.  Isn't there something we

can infer from that?

If there's four major social platforms, which that would be where children would socially interact, and it's like 99 percent of, you know, that type of social interaction, wouldn't that tell us something? Or no?

MR. GOLEMBIEWSKI: It could. And this is the *Minneapolis Star* line of cases. If there is that kind of singling out -- speaker-based singling out, it could tell us something. But in *TikTok* the Court underscored that it needs to be a speaker-based distinction that shows there's really some kind of content-based discrimination going on in that the platforms aren't being regulated based on a special characteristic.

And so maybe all these platforms make up the bulk of the social media universe, but if they are also engaging in practices that are manipulative and getting kids to compulsively use them, that's a special characteristic that we can use to regulate them. If newspapers were -- big newspaper companies were lacing their newspaper -- this is -- this is, you know, fantastical, but if they are lacing their newspapers with LSD and selling them, we could regulate that even if it's targeting the biggest --

THE COURT: Arguably they are laced with something worse than LSD, but go ahead.

MR. GOLEMBIEWSKI: If they are doing that, we can

regulate them because they are choosing this business practice. And this is a situation where the law is content neutral on its face. It doesn't apply to any of those platforms if they chose not to use the addictive features. So that shows the law is not concerned with what content they have.

If they just chose to take on a business practice that doesn't manipulate kids, it might hurt their bottom lines and advertisement revenue a little bit. They can -- kids can continue contracting with them. So they've chosen to make that special characteristic part of their business models, and the State can regulate that and address the problem in front of it.

Cases like *McCullen* from the Supreme Court and, again, in *TikTok*, the Court says the State can address the problem in front of it. It doesn't have to say, All right, we are going to regulate all platforms on the Internet to address these addictive features just to avoid getting hit with the ruling that the law is content based. You can zero in on the platforms using these features and that gamify their sites through this interaction are the ones that have proven to be the most addictive.

And Your Honor also mentioned the point about the record evidence. There is no evidence that the law is, indeed, only applying to the biggest social media sites like TikTok, et cetera. Plaintiffs, if they want to come forward and say that this is a stealth content-based regulation, they need to offer

some evidence.  In *Minneapolis Star* there was evidence that the law had the effect of only applying to the two or three largest newspapers in that state.

And so where we are at in the analysis here, Your Honor, is the law is content neutral on its face.  The government hasn't offered any kind of content-based justification, and so plaintiffs are having to hang on this claim that it's a speaker-based law, and, therefore, it discriminates on content even though there is an elephant in the room that this industry is addicting kids.  And that's what the Florida Legislature is addressing here, not any kind of content. They can put whatever content on their sites they want and not be covered by the law if they don't use addictive features or if kids aren't compulsively using it two-plus hours.

THE COURT:  Of course that all assumes the addictive features aren't themselves expressive; right?

MR. GOLEMBIEWSKI:  Even if the addictive features were expressive, the law wouldn't be content based.

The First Amendment might be implicated if Your Honor assumes, Okay, these -- this law is regulating these addictive features and they are expressive, so the First Amendment applies.  You can send a push notification with any content in the world.  It could say:  Check out the site, this is just what happened in the news; Kobe Bryant passed away; Steph Curry dropped 50 points in a game.  It wouldn't matter because it's a

content-neutral regulation of push notifications.

Same with autoplay/infinite scroll.  Those don't deliver only a particular type of content.  Apps from Duolingo to Facebook use these types of features.  And so it doesn't matter what kind of content is being delivered.

THE COURT:  I'm feeling a little bit better about myself as a luddite.  Does Facebook even exist, sir?

MR. GOLEMBIEWSKI:  It definitely exists.

THE COURT:  I thought it was called -- isn't it called something else now?

MR. GOLEMBIEWSKI:  MySpace still exists.

THE COURT:  Okay.

MR. GOLEMBIEWSKI:  I can tell you that.

THE COURT:  I don't think I said "MySpace."  I think I said "Facebook," but, go ahead.

MR. GOLEMBIEWSKI:  Yeah, I think it exists.

But, yeah, so just to wrap up the content neutral, they had to show that the speaker-based regulation is just a content-based regulation.  And they haven't even showed it's, indeed, a speaker-based regulation because the law could apply to any type of platform that is interactive and has the features, whether it's Disney+, Duolingo, et cetera.

And I want to take one more try explaining the *TikTok* test.

THE COURT:  By the way, I understand the actual

program is called Facebook.  It's --

(Indiscernible crosstalk.)

THE COURT:  -- called Meta.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  I was trying to be funny, but apparently that was lost on everyone.  But, go ahead.

MR. GOLEMBIEWSKI:  I just want to --

THE COURT:  And I'm not offended.  My wife doesn't think I'm funny either.

MR. GOLEMBIEWSKI:  Just on the threshold issue where the First Amendment is implicated, *TikTok* admitted, Your Honor -- and this is where confusion might come in -- that it has not clearly articulated the framework for disproportionate burden cases.  And so it is still unclear what exactly you are looking at when you are examining whether a regulation of commercial activity like contracting is, in fact, aimed at speech rather than merely incidentally burdening it.

But our law has many similar features to the law in *TikTok* that gave the Court pause in finding that this First Amendment was implicated.  Our law is not like a law banning library cards.  Because on the face of that law, there is no interest unrelated to expression that's apparent.  Here there's an apparent interest of protecting kids from addiction.  That's apparent from the face of the law.

And even if the Court disagreed with *TikTok* and

thought that that's still too of an unclear area of law, *Indigo Room* and *Gary* from the Eleventh Circuit are on point.  The plaintiffs try to distinguish those cases, the alcohol ordinance cases, in two ways.

They say, Well, those involved nonspeech products.  But the cases did not care what the actual business was doing.  The focus was:  Was it selling alcohol?  What is the law focused on?  That harmful practice.

Our law is focused on a harmful practice of addictive features.  It doesn't care if kids speak and listen on social media.  They can't be penalized for that just like the kids in *Indigo Room* and *Gary* couldn't be penalized for expressive dancing or going to political rallies.  The law was silent as to that.

Second, the plaintiffs say, Well, on social media you go on there, and the primary function is to socialize.  Well, the primary function of bars and clubs is to socialize too.  And since Your Honor has injected humor, the whole show *Cheers* with Woody Harrelson was all about going to a bar and socializing.

And so there is going to be some effects -- obviously, if you are stopping kids from going into bars -- on them socializing, but the Eleventh Circuit didn't care.  They said the First Amendment wasn't implicated in either case.  So that's also an easy way just to resolve this without getting into the thicket of the disproportional burden test.

And that gets us to tailoring.  So if the law -- if tailoring applies and scrutiny applies, the law is at most a content-neutral manner restriction.  And the plaintiffs haven't even argued that it's not a manner restriction, meaning they don't argue that the law prohibits speech.  All it does is restrict the manner of engaging with social media platforms, and it's content neutral on its face.  And so then the law just needs to be narrowly tailored to serve a significant governmental interest, which it is, child well-being, and it leaves open ample alternative channels.

And just before applying that law, *TikTok* underscored that when the Legislature is implementing a content-neutral interest, it has latitude.  It can make deductions and inferences and rely on predictive judgments about how regulation will advance its interest of reducing whatever harm is at stake.

Our law does that.  There is no question it will reduce kids' exposure to addictive features by regulating contracts that expose kids to those harmful practices, and it does not burden a substantial amount of speech unrelated to the interest.

Children can use any platform without addictive features.  They can use their parents' accounts.  They can use platforms that allow them to go on the platform without an account, as YouTube allows people to watch videos without an account.  And adults are not burdened in any meaningful way.

The age verification technology that exists, according to our expert, Mr. Allen, is far different than the technology that existed 25 years ago in *Reno* and *ACLU*.

Some platforms like Instagram, according to Mr. Allen, are already doing facial image analysis to identify, from looking at photos or pictures, the age of the user.  And HB 3 on its face does not require any particular method of age verification.  It gives discretion to the platforms to use commercially reasonable methods.

And Mr. Allen testified that those include a whole swath of methods that don't require adults to give over sensitive personal information.  And recently in the *Free Speech Coalition v. Paxton* case, the Supreme Court also expressed scepticism at the idea that age verification is still a burden to adults.  And so for those reasons, the law would satisfy tailoring.

But even if the Court disagrees on standing, disagrees on cause of action, and disagrees on the merits, there's still several other bases for denying the PI.  First, Section 501.1736(2), which prohibits contracting with kids 13 and under to have accounts, does not -- is not facially invalid because it applies to kids of tender years -- and that's language from the Supreme Court's decision in *Prince* -- who don't have an interest in entering a contract with lengthy terms of services with social media sites.  And so if Facebook decides to contract with

Case 4:24-cv-00438-MW-MAF    Document 71    Filed 03/11/25    Page 41 of 137
USCA11 Case: 26-10735    Document: 16-2    Date Filed: 04/20/2026    Page: 41 of 137

41

kids who are 6- and 7-years-old to give them accounts, the law could be validly enforced against them, and that would be a clean, plainly legitimate sweep.

Next, the record is underdeveloped particularly as to members' rights. So if plaintiffs now are changing positions and saying that they want to assert a claim based on members' rights, there is no evidence in the record about what expression the members are engaged in or how that expression is stifled.

The complaint is also a shotgun pleading, and plaintiffs had a seven-month delay in challenging the law, which kind of forced us to agree to voluntarily not enforce so that we could have an orderly PI schedule and actually get discovery, which has proven very helpful on standing and understanding the trade associations' actual knowledge of the platforms, which is very limited.

And so for those reasons, the complaint should be dismissed and the PI denied as moot. But at a minimum, the PI should be denied.

Thank you, Your Honor.

THE COURT: Thank you. That was about 50 minutes. I did ask you some questions. I said I was going to give you 30 minutes uninterrupted.

You got ample time; is that correct?

MR. GOLEMBIEWSKI: Yes, Your Honor.

THE COURT: And just to amplify something you said

earlier so I don't hear something different later on argued somewhere else, you were afforded the opportunity by this Court, over the plaintiffs' objection, for discovery; is that correct?

MR. GOLEMBIEWSKI:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Why don't we do this:  For the benefit of my court reporter, it's -- unlike testimony, this is a little bit harder, this type of exchange, and Counsel and the Court, as well, were speaking at a rather fast pace.  So we are going to go ahead and take a ten-minute break.

And when we come back, Counsel, I'll hear from plaintiffs' counsel.

Thank you.

(Recess taken at 9:54 AM.)

(Resumed at 10:08 AM.)

THE COURT:  Counsel, before we begin, just a couple of editorial notes, I guess.

I didn't ask a lot of questions I could have asked because I wanted counsel to be able to make his presentation on behalf of the defense.  So I want to make plain -- and I think I said this at least once -- my silence doesn't necessarily mean I agree with every point.  So you certainly should push back.  I more was asking some questions because I want to make sure that I flagged it because there were some questions I wanted to make sure that I had answered by the plaintiffs.

The second thing that would be helpful to me -- and this is not meant to be in the pejorative as it relates to counsel's argument.  I didn't understand all of your claims to be as cast by the defense.  So as we're going through, it would be helpful to the Court for you to say, Well, Judge, actually, this is our claim, and this is -- you know, we refer to this in our complaint or our PI.

Because as I was following through -- and, again, I didn't interrupt when we did -- there's -- my sort of outline of how I construed your arguments in a number of instances varies from counsel's characterizations of your arguments.

And so I would ask that you do that as you go throughout and identify those points and explain why you disagree that that's not the fair characterization of your claims or the structures of your claims; okay?

And so you may proceed.

And I will note that my law clerks all lost the bet at how long it took me to interrupt counsel.  And they didn't tell me the time, and I didn't have any money down.

But I'll try to extend to you the same courtesy.

MS. MURPHY:  Not at all.  Is it okay if I am here since I'm using a binder?

THE COURT:  Certainly.  Keep your voice up, and if the court reporter can't hear you, she'll let you know.  She doesn't have to ask me.  I just tell her to tell lawyers and witnesses

directly.

MS. MURPHY:  Very good.  I would just like to say I welcome questions.  So if there are particular points where there is something you want to be sure that -- you know, about a disagreement, by all means feel free to stop and ask me.  So that is not a concern on my part at all.

So Florida House Bill 3 is the latest in a series of recent efforts by states to restrict access to websites based on concerns about their potential effects on minors, many of which -- actually, almost all of which have been enjoined by courts throughout the country.  These kinds of laws are nothing new historically.  Efforts to restrict access to speech have cropped up anytime a medium or forum for speech has captured the attention of minors, whether it be, you know, back in the day with laws about movies, television, comic books, video games, et cetera.

And while Florida's law may differ in a few of its particulars from some of the other laws that have been enjoined throughout the country, none of those distinctions changes the bottom line here.  Just as with those other laws, HB 3 burdens far too much speech while advancing the State's professed interest little, if at all.

I think I'm at least clear now at this point about what the State's interest is, but that itself has been a bit of a moving target throughout the briefing in this case.  Sometimes

they are talking about predators; sometimes they are talking about content; sometimes they are talking about how much time is on service; sometimes they are talking about addiction. Ultimately, it really doesn't matter because, principally, you have a problem here with tailoring. This just isn't a law that is narrowly tailored to try to avoid abridging speech to the greatest degree possible, which is the requirement in the context of the First Amendment.

So I know that -- you know, obviously, I'd like to be talking about the merits since -- but the State has raised standing issues here, and since they are jurisdictional, I will start there.

To be clear, we absolutely are asserting associational standing on behalf of our members, but we are not purporting to bring this lawsuit only on behalf of the interests of users. We've said -- from day one and in every brief we've filed on our preliminary injunction, in the motion to dismiss, in response to every argument the State has made, we have said our members are the basis for associational standing here and our members independently have Article III standing.

They have Article III standing because of the compliance costs they would face. They have Article III standing because of their -- the restrictions on their ability to disseminate third-party speech, which *Moody* said is itself a First Amendment right. And they have Article III standing

because restrictions on the ability to disseminate what I think even the State would agree is their own speech -- you know, there is speech generated on these services that is speech that originates with the service itself that isn't third-party speech, and I don't see how the State could have any argument that that's not our speech -- and this restricts the ability to disseminate that speech as well.  So those are all interests of our members.

And I don't take the State to dispute that if we have a covered member, there would be compliance costs; there would be at least the restriction as to disseminating our own speech; and certainly, as to services here that are the exact services the Supreme Court was talking about in *Moody,* there would be the exact First Amendment interest that the Supreme Court recognized in *Moody.*

They instead -- they seem to be making a kind of either -- technical argument that they don't think we've given enough information to conclude that we have any members who are covered by this law.

THE COURT:  Well, let's circle back for one minute. Let's -- and I'm not -- this is not a finding of the Court.  I'm not concluding this at this juncture.  But let's circle back to the complaint itself.

If the complaint itself doesn't state a claim, can that be fixed by the arguments raised in the preliminary

injunction and subsequent papers?

MS. MURPHY: I think it could. I mean, I do think you have to be clear -- in the complaint, all we need to do is adequately allege standing, and we allege -- we have -- you know, we are trade services. We have trade organizations that have members that are covered. We said that, and you really don't have to say --

(Phone interruption.)

MS. MURPHY: You really don't have -- is it good? Yes? Okay -- to say more than that in the complaint. Now, they can push back and say, We have some reason we don't trust the allegations in the complaint. And at that point, you know, we can provide more information.

THE COURT: Setting aside standing, I believe counsel said that what was troubling was that you didn't allege that the -- the members weren't alleging a First Amendment complaint. They were simply alleging the deprivation of users' rights and that was a defect. And maybe I'm mischaracterizing his argument, but --

MS. MURPHY: No, I under --

THE COURT: -- that there was another defect.

MS. MURPHY: I understood him to say that, but then he promptly said, Well, they only alleged it in paragraph -- I think it's 66. I mean -- because we did allege it. We clearly allege this implicates our members and our users. We allege

both of those things.  And when they said, We are unclear whether you're alleging both of those things, we confirmed in our briefing, No, no, we're alleging both of those things.

So I think at this point -- you know, I mean --

THE COURT:  And is the theory that the -- Judge, the reason why the -- not just the members but the users matter is that, unlike the case cited by counsel, here, Judge, there is a -- is a bridge and a nexus between our members and the users, not It's completely dissimilar from the hotel and the hotel patrons?  That Court recognized that there was a complete break and a disconnect between the hotel and the patrons based on the rights that were being discussed.  Whereas here, Judge, there's a seamless connection between our members and users for purposes of the -- this complaint and our claims.

MS. MURPHY:  That's right.  So in the hotel case, you know, the theory was:  By virtue of regulating us in certain ways, you're -- the signs you're making us put up might chill our patrons from calling 9-1-1.  That was the argument there.

Here, this is a law that directly inscripts our members into the service of the State for the purpose of restricting the access of our users to our services.  They are inextricably intertwined.  The reason we are being regulated is to restrict the access of people who want to be using our services.  You cannot kind of think about those two things distinctly and say, You're only regulating us, not them; or only

our interests matter or only theirs do.  They are inextricably intertwined.  They're saying, We want to restrict your ability to provide access to places where your users would like to engage in First Amendment activity.

That is the classic -- you know, I mean, even outside the First Amendment context, that's *Craig v. Boren*.  But that's *Brown versus Entertainment Merchants Association.*  I mean, that was a case brought by a trade association alone.  There was -- the only plaintiffs there were trade associations who were asserting that they had members who would like to sell video games to the minors who had the parental control restriction, and the Court raised no standing concerns, no third-party standing concerns, no concerns about any of this.  It resolved the whole case by focusing on the First Amendment rights of minors, because if you say you can't give certain forms of speech or allow people to access certain forms of speech or engage in it, of course that has an effect on the people -- the users who want to engage in the speech.

And to me -- the way I think about this is it's almost less even a question of standing.  I'm not even sure how a court would engage in the substantive First Amendment analysis of whether a law is narrowly tailored to avoid abridgment of speech without asking, Whose speech does it abridge?  Whose First Amendment rights does this impact?  And often -- in most cases, if not -- you know, certainly many cases, it's not just the

plaintiff.  It's going to be plaintiff and users and others out there.

So we think we fall just squarely into the long line of cases where it's been commonplace for vendors or trade associations representing vendors to be able to assert the interests of the people who would like to use their services and engage in the First Amendment activities that they provide.

THE COURT:  Let's -- and I distracted you, so let's go back to the question of what's before this Court that would -- for purposes of standing, to show that a member -- this law would apply to the member.

MS. MURPHY:  Sure.

THE COURT:  And you've heard me say to counsel for the defense, I'm not suggesting that you have to expend huge sums of money and prove with certainty -- mathematical certainty that this would apply to us.

But it does seem to me that at least one member -- there have to be -- especially for preliminary injunction purposes, there has to be at least one member through declarations, depos, or something before this Court which would suggest they arguably fall within the statute such that their fear is reasonable, such that it's reasonable for them to engage in compliance costs, which is the injury, I believe, you allege; correct?

MS. MURPHY:  Correct.

THE COURT:  So with respect to -- pick me one member -- I don't need to go through it because it only takes one member.  What's the one member, and what declaration, depo, or other record evidence are you relying on to support the fact that, in fact, there's an algorithm being used; that one of the addictive functions applies; that they're uploading or viewing content -- uploading and viewing content, and then it's arguable that there's the percentage of the users and the time?

MS. MURPHY:  Sure.  So, if I may, I'll tell you two just because we did two.

So we have two members who submitted declarations and were deposed.  That's Snap and YouTube.  They submitted declarations where both of them said, We believe we may be covered by this law.  And they then talked about things --

THE COURT:  Well, let -- can we agree that if I got a declaration that just said "I believe we may be covered by this law," that would not be the quantum of evidence that would be accepted at the Eleventh Circuit if you just had the conclusory statement?

MS. MURPHY:  I mean -- I guess I have a little trouble agreeing with that when you're talking about a law that was enacted with a press conference that said, We're passing this to regulate you, you know -- which we didn't explain, but, like, they've literally said (indiscernible crosstalk).

THE COURT:  Well, Counsel, let me give you a good

example.  And I'm not saying I agree with it and it abandoned 50 years of jurisprudence, but in *Jacobson*, the Eleventh Circuit said, We don't care that there was a witness on the stand.  We don't care that Judge Walker weighed the credibility of witnesses because we can judge on a cold record the credibility of folks better than he can.  We don't care that the witness under oath, subject to the Court's observations -- the fact finder concluded that they were being honest when they said that they were going to spend money on -- money they would have spent on outreach and other programs are now being spent on education. So they gave specific examples.

They didn't bring in a ledger; they didn't bring in an accountant for the entity, but a person under oath that had the personal knowledge testified to that.  I found they were credible, and I said that that was enough.  And they said, No. No, it's not.

And I understand diversion of resources is different than compliance costs here.

MS. MURPHY:  Yep.

THE COURT:  But it just seems to me that if that's not enough for purposes of standing, how would somebody's conclusory statement believe "I work for this company, I've read the law, and I think that it would apply to us"?

MS. MURPHY:  I think it is different because that's in the context of saying we're going to divert resources.  That

does make a difference.  That is not the same thing as saying, We believe we're a regulated entity, and we believe that to the degree that we are going to take down these --

THE COURT:  But that --

MS. MURPHY:  -- complaints --

(Indiscernible crosstalk.)

THE COURT:  -- belief has to be reasonable.

MS. MURPHY:  It does have to be --

THE COURT:  So how do I -- as the fact finder, which I am for the purpose of this hearing, a preliminary injunction, how do I conclude that YouTube or Snapchat -- that person -- just based on their belief because they've read the law and their position, that, de facto, makes it -- I mean, that makes it reasonable by virtue of the fact that they --

MS. MURPHY:  (Indiscernible crosstalk.)

So if it helps you, I didn't get through everything that I have before you because it's not just the declarations.

THE COURT:  Sure.

MS. MURPHY:  Your Honor allowed depositions here, and they deposed these witnesses from these companies, and there is a record that was created where they go through that they have the particular features; that they have minors who use the services.  I mean, the Snap rep, you know, talked about having about 15 to 20 percent of people on its services that are -- that would fall within the age restrictions the State is

imposing here; that they cover all the features.

The only thing that the State can say is, Wow, people couldn't make explicit representations about whether they meet the two-hour threshold.  Our members don't necessarily keep those kinds of metrics, and we're not even sure exactly how the State expects -- is doing those metrics.  So I think if all you're saying is, you know, You didn't provide this -- and what you don't hear from the State --

THE COURT:  How about this:  Is -- by any metrics, our users -- generally a chunk of them spend extended periods of time, and our user data suggests that minors use the services much the way adults do, and from that we fairly extrapolate that we meet the 10 percent, two-hour usage?

MS. MURPHY:  I mean, if you wanted us to provide some additional information that way, we can try and pull that together.

THE COURT:  I'm not saying --

MS. MURPHY:  What I would say is --

THE COURT:  I'm just saying is -- do you think that's required?  If not, why not?

MS. MURPHY:  I don't think that's required.  I think it's enough.  Once we say we reasonably believe we are covered, I think it's incumbent on the State to say why our belief is not reasonable in their view, and they have not said that.  They have never said that they actually don't think any of our

members are covered.

THE COURT:  Isn't the burden on the plaintiff to establish the belief is reasonable for purpose of a preliminary injunction?

MS. MURPHY:  There is no -- we have by saying we reasonably believe it.  I don't see any basis in this record or in the State's arguments to doubt that that is a reasonable belief.  They have not said that they have any reason to think that this law actually covers nobody.

THE COURT:  Let me give you an example.  And I'm not suggesting you have to use magic words, although certainly it would make my life as a judge a lot easier.  So I've had all kinds of cases where I've had to read the declarations, try to figure out what can be reasonably inferred from the facts, and basically create a diagram of the declaration to see if I can figure out a way that it can be reasonably inferred from the declaration that the person said X so there's standing.

MS. MURPHY:  Sure.

THE COURT:  And I've actually got a law clerk that now works in Orlando that I think bears some scars as I was hurling declarations across a conference room table a couple of years ago, because for the life of me I don't understand why that's not the way declarations are drafted.

So I'm not saying that this is -- there's not underlying facts from which I can infer, but let's take the

YouTube -- the declaration from YouTube.  I'm not saying you have to use the magic word "algorithm," but these declarations are not written where it says, for example, "YouTube uses algorithms, and here's an example of the type of algorithm we use."  I'm not sure that I can't fairly infer from the balance of the declaration that they're using algorithms, but -- that's my concern.

And you don't have to do this, but if you want to take the time to do this, it would be helpful for me for you to say, In the YouTube declaration and as confirmed through the deposition -- I'm sorry.  Yeah, the YouTube declaration -- this is why it's -- we've got an algorithm.  This is why they clearly said you upload and/or -- and view -- can view content.  This is the addictive feature that's listed in the statute that -- one or more that's used by ours and -- you don't have to do that, but I can tell you that for me to find there's standing, that's the exercise I've got to go through.

MS. MURPHY:  Well, let me step back a moment and tell you why I actually am not really sure that is the exercise you have to go through, because the ultimate question here --

THE COURT:  I hope Chief Judge Pryor is not on my panel if I don't engage in that exercise.  But, go ahead.

MS. MURPHY:  I will happily make this argument to Chief Judge Pryor too.

The ultimate question here is whether we have a

credible fear that the law will be enforced against us.

THE COURT:  And for there to be a credible fear of enforcement, there has to be a credible fear that the statute applies to you; right?

MS. MURPHY:  There can be a credible fear based on the fact that the State has publicly singled out our members as parties that it believes are covered by this law.  That itself is evidence that --

THE COURT:  If that's what you are hanging your hat on, where's that in the record?

MS. MURPHY:  We pointed out in our briefing that they're -- in the press release -- the press coverage -- in the official signing press conference about this law, they singled out members of ours; and in their own briefing, they talk about our members as the reason this law was passed.

So when you have a government entity that passes a law and says, We're passing it to regulate you, and then we say, We're worried that they are going to regulate us, and we think we are going to have to come into compliance because they've said they plan to regulate us; and then they come in and they don't say, No, no, we don't plan to regulate you.  What -- you know, You're wrong.  You misunderstood.  They just say, Well, you haven't laid out for us all the facts we would need to help us establish our case when we come regulate you.

That is not our burden on standing.  Our burden is to

show a credible threat of enforcement.

THE COURT:  Counsel, I agree with you that could be a -- one way of showing a credible threat.  But let me -- when we start talking about traceability and redressability, though, I think it depends on who says it.

So, for example, in the case where some folks in the state of Florida decided if you had any connection to a Palestinian, not that you are Palestinian, not that your mama was Palestinian, if you thought about dating a Palestinian or any connection at all, you're suddenly going to be -- we don't want you on campus.  That's a slight exaggeration.  But the statements were made by the chancellor that had -- was a figurehead and had no authority to enforce anything.  So for there -- it seems to me -- and that's an example in terms of credible threat.

Here doesn't it matter who makes the statement?  So if somebody disconnected from enforcement or -- in terms of traceability or redressability here, makes a statement, they're just interested in it, does that somehow make the threat of enforcement a credible threat that would give you what you need for purposes of standing?

MS. MURPHY:  If we were just pointing to, like, a news article where somebody in the Florida government said something about us, okay.  But we're talking about the record at which the Attorney General was part of the official press signing -- State

press statement for the signing of this law.  You know, this is -- wasn't just some -- just the people who passed it.  It also included people who are going to enforce it who were all there saying, We're bringing this to come at you.  They singled out NetChoice and said, like, NetChoice and its members are going to sue us because they think this law is unconstitutionally regulating them, and they'll lose on the merits.

THE COURT:  So, Judge, regardless of what sort of facts we present to support those underlying facts, we've got the AG tacitly -- I believe it would have been her at the time, now him -- shaking her head "yes" as a spokesman said, We're going after NetChoice; and based on those statements -- and we've got somebody connected to the enforcement side, which is setting aside private enforcement.  But the public enforcer, that's what gives us the credible --

MS. MURPHY:  So I'm not -- I'm certainly not asking you to say, like, one thing alone is it.  We've got multiple things here.  We have declarations where we said -- our members went on record and said under oath, We believe we may be covered by this, and we're not in compliance, and we're going to have to expend a bunch of money to do it.  They sat for depositions where they answered all the State's questions, said, Yes, we have this feature.  We have this feature.  Yes, we use algorithms.  Yes, we have minors.

THE COURT:  So that gives us algorithms; that gives us --

MS. MURPHY:  They went through the addictive features.

THE COURT:  -- addictive features, and I assume they talked about uploading or viewing content.

MS. MURPHY:  The content was discussed.

THE COURT:  So then the question becomes -- as it relates to my concern about at least one member would meet -- or could meet that full criteria such that there's a credible threat and it's reasonable -- the fear that gave rise to somebody saying, I think I'm covered, so I'm going to have to engage in these compliance costs, it comes down to what do we need as it relates to the percentage and the time; right?

MS. MURPHY:  And I just don't think that we can't get in the standing door without providing the State all the details it wants about whatever data we can compile to tell it exactly who is covered, and I would note --

THE COURT:  Which are the -- which y'all were suggesting were, in fact, the compliance costs?

MS. MURPHY:  Sure, that --

THE COURT:  So the argument is we don't have to sustain the injury that would give us standing, which is the compliant costs, in order to get in the courthouse doors.

And I, with all due respect to the defense, would agree with that proposition at the 30,000-foot-up view.

But don't you still have to have something -- some fact that would support that it's a reasonable for them to believe that the 10 percent user and the time requirements would apply?  You've always said, Judge, we said we have a lot of young people using and/or -- I guess it's YouTube that has the child or -- feature or --

MS. MURPHY:  Right, YouTube Kids --

THE COURT:  YouTube Kids.

MS. MURPHY:  -- that's designed for younger kids.

THE COURT:  And what is there on this record that I would look at that would suggest it was a reasonable apprehension that it applies such that my fear is justified and, therefore, I would -- it's reasonable for me to engage in, compliance costs that there are people spending lots of time on it?

MS. MURPHY:  I mean, if you're looking for something that we put forward that specifically categorize --

THE COURT:  I'm not saying two hours.  I'm not saying --

(Indiscernible crosstalk.)

MS. MURPHY:  I think it's a reasonable inference -- first, I think the right question is whether it's a reasonable view of ours that the State thinks that we satisfy the criteria, because we have to comply with the law or risk an enforcement action as long as the State thinks we're covered.

THE COURT:  NetChoice has, though, a program or feature?

MS. MURPHY:  I'm sorry?

THE COURT:  NetChoice has a social media platform?

MS. MURPHY:  NetChoice itself -- I'm talking about the members.

THE COURT:  No, I know.

So when you said, though, earlier, because facts matter, that the AG specifically was part --

MS. MURPHY:  Oh, they were talking about both NetChoice and its members.  They called out members by name.

THE COURT:  Well, that's what I was asking --

MS. MURPHY:  Yes.

THE COURT:  -- because --

MS. MURPHY:  They called out members by name and then said, NetChoice will sue us.

THE COURT:  -- this couldn't possibly apply to NetChoice; right?

MS. MURPHY:  They understood that the universe of entities they were regulating are NetChoice members.  That's why they talked about the members and NetChoice.  I don't think they --

(Indiscernible crosstalk.)

THE COURT:  Did they call out Snapchat or YouTube?  Who did they call out?

MS. MURPHY:  I believe it was -- they definitely called out Snap, which is also one of our declarants here.

So, you know, at that point I think it's -- it's -- you know, when you put all that together, what the State really seems to be asking for here is something -- I mean, first off, they are the only state in the country in any of these lawsuits that's challenged standing, and I think there's a reason for that.

I mean, if this -- if they really are not convinced this law covers our members -- any of our members -- I don't understand what this law is.  The whole point of this law is to cover certain of our members, and they are not here telling Your Honor that they don't think it covers our members.  They are not here saying, We don't plan to enforce against you.  And in many courts, that's enough.

You know, the very fact that I've come forward as a plaintiff and said, I believe you're going to enforce the law against me -- if the State defendant won't say, No, no, you're wrong.  I won't enforce against you --

THE COURT:  In fairness, they may be reading Eleventh Circuit daily published opinions, which is why they start with standing since you're not a religious organization or a church.  So -- I mean, there are reasons why that might be so.

I want you to say whatever else you want on standing, but I want you to move -- be able to move to the other points.

MS. MURPHY:  Sure.  I think the only other things, you know, that I would say on standing is, I mean, we obviously think we have user standing -- member standing.

But the *Virginia v. American Booksellers* case is a case where the Court said that the American -- the association could go forward -- even if the booksellers and association didn't have standing in their own right that they could go forward purely on the standing of their users.  The Court has a footnote in that case that explicitly reserves judgment on whether the plaintiffs had standing in their own right, and the whole holding of the case is in the First Amendment context; you can go forward on your users alone.

Now, we don't think we need to do that because we believe our members have standing in their own right, but, ultimately, that is the square holding of that case in the First Amendment context; that if you -- that you can assert the First Amendment rights of users even if, unlike here, you as a plaintiff wouldn't have standing.

So any way -- any which way you look at it, we think you come to the conclusion that there is Article III standing here, which, of course, goes also to why we think, of course, we can raise the interests of our users either way.

THE COURT:  Do you wish to add anything -- I know you have addressed it in your papers -- anything to prudential standing as distinguished from Article III standing?

And let me pause here and say I -- you haven't said that, but I'm also -- I can't apologize for everybody talking about standing because jurisdiction does matter.

MS. MURPHY:  Sure.

THE COURT:  I mean, we can't reach anything.  It's a given.  And I've got to -- an obligation, even if it wasn't raised by the government, to address and consider jurisdiction.

But do you wish to address it?  And I'm not saying you have to, and I promise I'm going to give you as much time as you need.  Do you wish to address prudential standing, or do you want to move on to the next point?

MS. MURPHY:  The only thing I would say that I think they are putting in the prudential standing bucket is this idea of excessive member participation, which I just don't think -- you know, the Eleventh Circuit has indicated that's not really something you should be focusing on the front end; let plaintiffs try to prove their case.

And here they've already -- what's happened to date has shown just because members aren't plaintiffs doesn't mean you can't get information from them if you need to.  There are third-party discovery tools.  They've already been able to depose members and ask whatever questions they wanted.  You know, obviously, there's limitations on that, but that's the kind of thing that should be assessed as the case goes forward, not some basis to say, Oh, you might need to know something from

the members, so we're going to dismiss.

You always need some information about members in associational standing cases that are based on members.  That's why the Eleventh Circuit has said, No, the test is excessive member participation, and has specifically said that that's really almost never going to be a concern in a case like this where you're only seeking injunctive relief that would apply to every --

(Indiscernible crosstalk.)

THE COURT:  It would similarly come up in cases where you're -- for example, damages.

MS. MURPHY:  Exactly, where you're seeking different relief for different members, which we're not.

THE COURT:  I do want you to address -- and it's okay if you want to leave it at what's in the brief, but two things: One, directly engage with the question about whether the members, as opposed to -- I'm sorry -- the association, rather, as opposed to the members, can bring a 1983 claim; and, two, what do I do with the fact and the alternative argument about equity if it wasn't pled, and do you believe it was pled?

MS. MURPHY:  Sure.

So, you know, first, we absolutely think there is an equitable cause of action wholly apart from 1983.  Do our -- does our complaint in each count say "and *Ex Parte Young*"?  No. So, you know, I suppose if you wanted us to amend to add those

words to each count we could, but there's really no need to do so.  It's commonplace to understand that as long as a complaint seeks equitable relief, it has invoked the equitable *Ex Parte Young* cause of action.

That's exactly how *Brown* itself was set up, as a case where they pled only 1983 claims, but they also were seeking equitable relief.

So I don't think there's really, you know, any requirement or anything to be gained from just having us amend to add those words.  So we do think that's an independent basis to have a cause of action here.

I also don't think their 1983 argument is right because it is premised on the notion that we don't have standing.  They're assuming that we're only asserting third-party rights, and we're not, for all the reasons we have already discussed.

But even if there were, ultimately, kind of third-party rights at issue here -- and the law talks about -- 1983 has been invoked in many contexts where you're focusing on the users, not just on the members.  And I think if you go back to the text of 1983, I mean, it doesn't say that you have to be the party whose constitutional rights were violated to invoke 1983.  You can get a remedy for an injury that's caused by the violation of constitutional rights.

So even if you thought -- and if our interest was

compliance costs, the users' interests were First Amendment, it doesn't matter as long as we have an injury and it's being caused by a violation of the Constitution.  We have a cause of action.

And so I think their 1983 argument really becomes entirely derivative of their argument that we don't have standing, and we obviously think we do have standing.  So we feel confident that we have a cause of action.

The last thing I'd say before turning to the merits is, you know, for all the reasons we've discussed, I don't think there is any deficiency in what we've provided.  But given that we have a case that's been fully briefed on a PI motion and all of that, if there was some reason Your Honor felt you needed more information, I think it would make more sense to give us a little time to see if we can provide information rather than kind of start this whole thing over again from scratch by virtue of a technicality where I -- especially when I don't think they really don't think our members are covered by this law.

So if I can turn to the merits.  So the -- obviously, the threshold question here is whether this law implicates the First Amendment at all, and on that question, we do think the answer is quite easy.

This is a law that is not about singling out some activity that's wholly unrelated to expressive activity.  They are imposing a restriction on the ability to access expressive

activity, to access services where you look at other people's speech, you engage in your own speech, you share your views with people.  It is all about the exchange and the engaging in First Amendment activity, and the whole point of this law is to restrict who can get access to these sites to engage in that activity.  They are not regulating the act of creating an account for the sake of regulating the act of creating an account.  They are regulating it as the gateway to getting in the door to engage in First Amendment protected activity.

And I do think it's important to recognize at the outset that this case, like other cases that, you know, have been enjoined across the country -- this is not a case like the one at the Supreme Court where the argument is that you're dealing with speech that's not protected vis-a-vis minors.  The speech here is unquestionably in -- in the main, constitutionally protected as to minors.  They've made no argument that this law is about trying to keep minors from accessing speech --

THE COURT:  This would be different, for example, if it was asserting the right for minors to see pornography because they have no such right.

MS. MURPHY:  Exactly.

Section 2 of this law is focused on content that is harmful to minors.  We didn't challenge Section 2.  That's not at issue here.  So it would be different if you were targeting

specific speech and saying, The reason we can do so is because we think it's not constitutionally protected as to minors. That's not their argument.  I take them to take as a given that this is -- you know, these are services where minors engage in speech that is constitutionally protected vis-a-vis minors, not just adults.  And so when you are passing a law that says -- you know, it really is no different from the law that says you can't go to the bookstore; you can't get the library card.  You're regulating and restricting the means of accessing and engaging in First Amendment activity.  That plainly implicates the First Amendment.

And it's quite different from *TikTok,* which, as Your Honor noted, the Court did proceed on the assumption that the law at issue in *TikTok* implicated the First Amendment anyway, but the law at issue in *TikTok* regulated foreign ownership of a company.  Now, it had a significant impact because if the law went into effect, all of TikTok's users wouldn't be able to access content anymore.  And the Court said, That alone is reason enough that we're going to assume that it does implicate the First Amendment.

But you don't even need to get into that kind of question here because the restriction on access -- you know, in the *TikTok* context, it was incidental.  They weren't passing the law to prevent people from accessing TikTok.  They said, If you get rid of the foreign ownership, it's fine.  Here it's all

about access.  This isn't an incidental effect of them restricting an account.  They're restricting an account because they don't want minors using these services, or they only want --

THE COURT:  Well, they say using these services with those addictive qualities.  What says you to that?

MS. MURPHY:  I'd say using these services.  They're just talking about features of these services and labeling them addictive.  These are -- and there is deposition testimony explaining that these are features.

They are -- I mean, first off, they're expressive features.  One of the features they're singling out is you have the ability to see if they liked other people's content or yours.  That's, obviously, expressive activity saying "I liked your content," "I didn't like it," "I found it funny," "I found it boring."  You know, that's expressive activity.  Those are metrics of expressive activity.

The decision to allow people to continue accessing content -- I mean, you know, what they're arguing is akin to saying they can decide whether you can break your book out into chapters or a series.  Those are decisions about how you're presenting your content, and they are important to the way our services function.

I mean, the Snap declarant explained in their deposition that the idea of getting rid of push notifications,

the things that tell you that one of your friends has sent a Snap, the service would kind of cease to do what it's designed to do, which is facilitate daily spontaneous interaction where you communicate with each other instantaneously.  If you had to go and say, I'm going to have to wait and look at the end of the day and see if, perhaps, anybody sent me a Snap, it's degrading what the services are all about.  So they may want to call them addictive features, but they are inherently part of it.

And their argument -- when they say, Oh, just drop them -- I mean, to be clear, that would be -- they'd be saying, you know, We can make you drop them as to, like, everybody, because these are not just services that are being used by minors.  They are services that are used mostly in the main by adults.

And the logic of their argument is that they can restrict the ability of services to give adults push notifications, or whatever it may be, because those are somehow something that can be divorced from the content and have nothing to do with expression.  I think that's a pretty radical conception that really would get at a lot of decisions that are made about how all sorts of content are presented.  Of course you have to make decisions.  How long is this going to be?  Am I going to break my movie into three parts versus one four-hour movie people sit through?  You make those decisions as part of how you deliver content and how you want users to engage with

it.

So I don't think you can divorce those and say, you know, Oh, just get rid of the features we don't like and offer a different service, and then suddenly the law won't apply to you.

THE COURT:  What's your best argument this is content based?

MS. MURPHY:  Sure.

So I'd focus on the first and second prongs of the definition of the services that are covered here.  So they want to focus on the features, but it's not enough to have the features.  It only -- you know, there's all sorts of services that have those features that they are not regulating.  They only want to regulate the ones that, first off, have -- they put it as where you upload bad content or can view content that's uploaded by others.  In other words, services that -- that facilitate user interaction, that kind of give a platform for the everyday person to communicate with other everyday people, instead of being a service where the provider themself selects all of the content.

THE COURT:  Same question I asked counsel on the other side:  Are you suggesting that this is the functional equivalent of what the Court was addressing in Utah in the *Reyes* case?

MS. MURPHY:  Absolutely.  Absolutely.  I think it's the same thing.

THE COURT:  So, Judge, it's content based because it's

addressing a category of speech, and functionally, it's regulating the category of speech of social interaction.

MS. MURPHY: Absolutely. That is -- you know, if you want to articulate the difference between a Disney+ streaming service and what this is going after, they are -- they seem to have particular concern when average citizens are talking to each other and there is not somebody selling the service who maybe has a broader kind of customer base who may push back a little bit on what content is there.

They seem to have a little bit of distrust once you're letting just -- you know, empowering everyday people to communicate with each other, or empowering everyday people to see the things, as often happens on many of these sites, to follow their elected officials, to learn more about the schools they want go to, their sports teams, all sorts of things.

THE COURT: Is that the beginning and end of the inquiry; that it's a category of speech, so, therefore, it's not content neutral? Or does it -- is there a further step to that, it has to be a category, and from that we imply something else?

MS. MURPHY: I think that it's the fact that you're singling out specific -- you know, like, it's -- one way of thinking about it is we clearly have a law that's singling out certain speakers because it doesn't apply to everybody who has the features. So then you ask what's the basis for singling out the certain speakers, and that basis sure strikes me as content

based, especially when you then have all of the evidence they themselves are putting forward is talking about, you know, we're worried about the things that we see here.

THE COURT:  So you attack a category of speech -- when you attack a category, it suggests you're going after speech, and that's the mischief associated with allowing you to go after a category?

MS. MURPHY:  Yeah, I think that's right.

I would also say I think the second prong of the definition is content based.  It's just basically the flip side of what Ohio tried to do in the *Yost* case by saying, We're going to focus on places where minors spend at least two hours a day. That's just saying, We're going to use a metric to figure out if you have speech that's especially attractive to minors, or even a little attractive to minors, since two hours a day is hardly, in my mind -- you know, I can't think of all the things I did for two hours a day that were speech-related as a child that I didn't think I (indiscernible) --

(Reporter requested clarification.)

MS. MURPHY:  I was not addicted to all of them, but I don't think that -- once you're saying we're going to single out services on the basis of whether their content seems to be attractive to minors, that is itself a content-based distinction.

So both of these prongs that single out -- that say,

We're not worried about everyone who has these features -- you know, if some news site has them and, like, 10 percent --

THE COURT:  Well, Counsel says, Look to *City of Austin* because, Judge, it follows up -- was it *Reed* that it followed up?  *Reed* --

MS. MURPHY:  *City of Austin* is first.

THE COURT:  It was after *Reed.*  *Reed* first and then *City of Austin*; right?

Yeah.  So -- he says, But wait.  *City of Austin* clarified this whole category issue.  What -- and says it's more complicated than that -- what says you to that? -- and that *Reed* -- I'm sorry.  *City of Austin* would suggest that's not -- this doesn't -- isn't content based for the same reasons *City of Austin* said.

MS. MURPHY:  I mean, I think what the Court was getting at in the later case was, look, if there's no way to -- like, if the law doesn't work in the -- I mean, you know, it was dealing -- there they had to be able to say, Are you addressing a service that's on the property?  And there's no way to know if a law is talking about a service that's on the property without looking at the content.

And it was almost -- as I take what the Court was saying, they were saying, Look, in that particular context, the examination of content was incidental to an interest.  It was actually property based, not content based.  And in that kind of

rare context where there's no way to understand it by -- other than looking a little bit at content, maybe that doesn't qualify as content based here.  But here it's --

THE COURT:  Or, broadly construed, it says that just because you break things down in category doesn't really suggest anything about whether you're going after a message or not, and, therefore, 30,000-foot-up view of that holding is that it's a lot more complicated, and the prior case was easy because it was just distinguishing between political speech as a category and other speech.  Isn't that another way of looking at sort of the *Austin* gloss on *Reed*?

MS. MURPHY:  I think that would be an awfully broad way to read *Reed.*  To me*, Reed* was more recognizing there are certain narrow contexts in which you may be able to peek at content without being content based.  I don't think *Reed* meant to be throwing out --

THE COURT:  *City of Austin* was the one that said that, though; right?

MS. MURPHY:  I mean, I'm mixing them up now.  Which one --

THE COURT:  Maybe I've got them written in reverse.

MS. MURPHY:  Whichever one came second.

THE COURT:  *City of Austin* came second.

MS. MURPHY:  The second one I think was referring to, look, there's going to -- you know, it is content --

THE COURT:  There's an aberration where you are going to have to look at content, but it doesn't make it content based is your point.

MS. MURPHY:  Right, right.

THE COURT:  I understand you.

MS. MURPHY:  But in the vast majority of cases, if the thing that -- the reason you are covered or not is because you provide a certain type of content, that's going to be enough to be content based.  And here you have a definition that's asking: Do you focus on social interaction, and do you have content that is attractive to minors?  Those aren't incidental to the definition here.  That's what they're trying to get at because they want to regulate services that they think minors may be using -- may enjoy using more than they think is appropriate.

So I do think that the law here is content based.  Of course, even if it's not content based, it's subject to heightened scrutiny either way because it implicates the First Amendment.  So content based only goes to the question of whether it's strict scrutiny versus intermediate scrutiny, and we do not think this law could satisfy either --

THE COURT:  And we'll talk about that in a minute.  Before I get there, I think, arguably, I could have articulated that better, talking about the gloss that *Austin* put on *Reed*.

But *Austin* could also be construed as suggesting that just because you have to look to content doesn't mean that

you're going after the subject of speech would be a -- may be the better way of looking at that. I don't want to spend too much time. You've answered that question and that dichotomy.

Why don't you now talk about, Judge, strict scrutiny, this is how it would apply, why it fails. And then, Judge, we disagree, but if you apply intermediate scrutiny, this is how it would apply and why we win.

And then I need you to talk, before you sit down, about *Moody* and what *Moody* tells us and -- or doesn't tell us that would apply in this case and our -- and my consideration of the issues before me.

MS. MURPHY: Sure. So I'm going to say one last note on *Austin* and *Reed* which is to Your Honor's point. The Court explicitly said that just because a law is content neutral on its face doesn't mean it's not content based. You do have to look behind it and see what the distinctions are. So even when they were stepping away a little bit, they still said of course it's not -- it goes both ways.

And I'm actually -- I think it might be helpful to talk a little about *Moody* up front just to kind of --

THE COURT: Sure.

MS. MURPHY: -- set the table for why we don't think it's particularly relevant here.

That's not because our rights aren't at stake. It's because the law is different in its nature. So the law at issue

Case 4:24-cv-00438-MW-MAF    Document 71    FILED 03/11/25    Page 80 of 137
USCA11 Case: 26-10735    Document: 16-2    Date Filed: 04/20/2026    Page: 80 of 137

80

in the *Moody* case -- the two laws that were at issue there, the way they regulate it is by restricting the editorial discretion of the services. They said, you know, you can't not put certain content on, or you can't deliver content in a certain way. So they didn't -- they were not access restrictions in the sense of saying you can't let certain people use your services. They were regulating the ability of the service provider to how they could disseminate third-party speech and, in some respects, how they could disseminate, you know, the speech that they themselves generate.

THE COURT: And because of that, you don't believe you have to address a concern addressed by Barrett in her concurrence about how much information you have to put on about the industry and the burden?

MS. MURPHY: Exactly. Because the reason that mattered in that case is because when you have a law that's targeting the exercise of editorial discretion by regulated entities, that -- you know, the natural question is, one, is every regulation engaged in this kind of activity; and, two, if they are, are they exercising First Amendment rights?

And what the Court said in *Moody* was, We think most of them are, but we are just not totally clear if this law might reach some other entities that might not be engaged in First Amendment activity, and so that's what our concern is.

That -- none of that really comes into play here at

all because this is an access restriction. It's not a law that's saying we're going to restrict -- you know, kind of like you have to supply certain types of content; you have to present it in certain ways. It's saying people under a certain age can't have accounts on your site, and people in another age group can't have them unless their parents say yes. And even adults, you know, have to verify their age before they get there.

So there's -- the First Amendment interest there exists wholly apart from whether you think third-party feeds are third-party speech, our speech, some combination of the two. The users have a right to see that third-party speech under the First Amendment no matter whose speech it is.

And so -- and we also, conversely -- you know, even if you set aside the question that we think we already won in *Moody* that, of course, we are engaged in First Amendment activity when we disseminate third-party speech, this law prevents us even from disseminating our own speech.

So it just is a law that doesn't implicate what the Court was worried about there when it was saying, We're not really sure if this might reach, like, Uber and email. I mean, this law carves out email and direct messaging. So the concerns the Court was talking about there of we're not sure who this covers and we need to know that so that we can ask whether they are all engaged in First Amendment activity is just really not

particularly front and center in this case at all since here we have an access restriction, not a restriction that's principally on the manner in which -- you know, what kind of content we can disseminate and how.

THE COURT:  So I want to make sure I understand your facial constitutional challenge, and I know a lot of ink has been spilled on this by various judges and panels.  But are you saying the universe, for purposes of analyzing this -- the universe I'm looking at, is covered websites, and because it can't constitutionally be applied to any of -- the website that it covers, that's why it's facially unconstitutional?

MS. MURPHY:  Yes.

THE COURT:  And so the fact the other websites that it doesn't cover is irrelevant for purposes of the facial constitutional challenge here?

MS. MURPHY:  Absolutely.  It's irrelevant in the sense of -- if we prevail and you issue a preliminary injunction, it's irrelevant as to entities that aren't covered by the law.  We're not seeking relief as to entities that are not covered by the law; we are seeking relief as to entities that are.

And so, you know, that's why a lot of what they're saying about "We need more information about exactly who of your members is covered" I don't -- that's not relevant to the merits here, because unlike in *Moody* -- you know, to be clear, we think the law in *Moody* is facially unconstitutional.  We are

litigating those issues in *Moody*. But the Court's concern was this law may apply to some other entities that may not be exercising First Amendment rights.

And in this context, this law is only going to apply, by its terms, to entities that are facilitating the ability of the users to engage in First Amendment activity. That's the first definitional prong of who's covered by this law. So you're never going to have an entity that's covered by this law that isn't allowing users to come engage in First Amendment activity on their service, and that alone is the basis for -- our First Amendment arguments stem from the restrictions that are being imposed on access to the content that's covered by virtue of prong one of the definition.

So turning to the application of strict and intermediate scrutiny, certainly the first question is whether there is a compelling government interest. I think as I'm hearing the State today, they're not articulating a parental control interest or an interest in harm from predators.

THE COURT: Well, it's the opposite of parental control because you're going to argue parental control is why it's not the least restrictive means; right?

MS. MURPHY: Yes. And they can't really argue parental control as to minors under 14 since as to them they say, We don't care what the parents think. We are not going to let you have an account anyway.

So as I understand, their articulated interest is this --

THE COURT:  The addictive nature of --

MS. MURPHY:  It's the addictive nature.

THE COURT:  -- platforms with these features.

MS. MURPHY:  It's the addictive nature.

Now, the first problem they have with that is the problem the Supreme Court pointed out in *Brown*, which was their evidence of so-called behavioral addiction here is really correlation evidence.  They haven't met the high burden of demonstrating causation and really tethering this to, you know, these are the cause of --

THE COURT:  That analysis would be much different, though, if I subject it to an intermediate-level scrutiny; correct?

MS. MURPHY:  It's still their burden.  It is still their burden, and I think it takes something more than correlation to get there.  You know, it is a lesser burden, but we still don't think the evidence that they have submitted is sufficient.

But, ultimately, even if you accepted that there is an interest, I think kind of the biggest problem with this law is, first, it's not even clear how it advances those interests in any meaningful way.  But to the extent it does -- so it's certainly not the less -- least restrictive, even a less --

there were many less restrictive means available that would not

burden nearly as much speech.

THE COURT:  I understand the least restrictive

argument, but help me to understand -- if you are concerned

about minors being addicted and spending too much time on these

platforms, telling anybody 13 or under they can't be on them,

that may not be, in terms of tailoring or least restrictive --

but help me to understand -- you just, I thought, said that it

is completely disconnected from their concern.  How would that

be --

MS. MURPHY:  I said it doesn't advance it in a

particularly --

THE COURT:  How would it not --

MS. MURPHY:  -- meaningful way, and I think here are

some of the problems.  I do think the analysis is a little bit

different for 14 and 15 --

THE COURT:  If I say you can't play with rattlesnakes

because I don't want you to get bit by a rattlesnake -- so you

can't ever be near a rattlesnake.  That would keep you from

getting bit by the rattlesnake; right?

MS. MURPHY:  Sir, one of the things that's a little

bit unusual about their argument is they are saying, As long as

you don't create an account, we're okay with you, you know,

seeing and engaging with the same content.  They even say in

their briefs "We don't care if you have the ability to upload

content in some means where you don't have an account."  And so it just seems pretty odd to me to be saying, like, We really don't care if you do all of these things so long as you just don't do them under the guise of an account.  At that point all you seem to be doing is hamstringing the ability of our members to say, We're going to take into account how old you are so we can tailor this service more appropriately to your age.

THE COURT:  If you don't use the account, then you'd have to use your -- somebody else's if you want to get on these services such that you'd be monitored, presumably, by somebody else; right?

MS. MURPHY:  Not necessarily.  I mean, for one, they talk about using it in a way where you are not using an account at all, which is possible on some services, but also -- I mean, there's certainly nothing that says that just because you go to a service through your parents' account your parents are going to sit there and watch what you do the whole time you are on the service.  That is not a requirement.  There is nothing in this law, other than for the 14- and 15-year-olds, at the -- you know, a gate-checking, "Yes, you can have an account."  There is nothing in this law that does anything to facilitate (indiscernible crosstalk).

THE COURT:  For purposes of there being a nexus between what you are doing and trying to fix the problem, does it have to be a perfect fit, or does it just have to advance

that interest substantially?

MS. MURPHY:  It has to be narrowly tailored to avoid unnecessary abridgment of speech.  That --

THE COURT:  I understand.

MS. MURPHY:  That is the standard even under intermediate scrutiny.  The Supreme Court said that in *McCutcheon,* in *McCullen,* and *Packingham,* all intermediate scrutiny cases.  And the *Americans for Prosperity* case discusses at length how narrow tailoring is the standard even in the intermediate scrutiny case.

THE COURT:  And I understand that.  I was asking a slightly different question.  When you were saying you start off with the proposition is it advancing an interest and is it even connected to the interest, I understand that then bleeds over into is it narrowly tailored and so forth.

I was taking umbrage with the notion there was a complete disconnect between -- as -- but I understand for your purposes it certainly is relevant for purposes of analyzing whether it's tailored or not.

MS. MURPHY:  And I would say I do think there's a pretty significant disconnect when it comes to 14- and 15-year-olds.  I would -- it was just something that was pointed out in the *Reyes* case, in the *Griffin* case, in *Arkansas* that there is something pretty odd about saying, We're terribly concerned that you might be addicted if you use these services,

but as long as your parents say it's okay, we've lost all interest in whether and how much you use them. As *Brown* says, that's really -- you know, if your concern is really -- if you -- that's *Brown*'s words. It's not how you address a serious societal concern.

THE COURT: What about the idea, though, that what we've done is if you get older but you are still not old enough, we at least want to create the filter of the parent who knows whether you're a mature 15-year-old and acts responsibly versus one that isn't? And we understand that nobody is going to know the kid better than a parent, and so we tried to create sort of this hybrid for 14- and 15-year-olds recognizing there's a great difference between maturity levels and such. And who knows them better than their parents? So we are going to use their parents as a filter to make that kid-specific judgment. I'm not saying that means they win, but isn't that a fair way to look at it too?

MS. MURPHY: I think it's just not a remotely narrowly tailored way to advance their interest, because if what you really want to ensure is -- you know, if you really came at it as, look, we are not trying to prevent complete access to these services but, rather, want to deal with specific concerns we have about some minors who may be focused on, you know, particular content that we are troubled with or minors who may be using these services for more time than we think they could,

it's much more sensible to focus on how do we give parents effective tools to help them, if they want to, to monitor their children.

THE COURT:  Would it be okay if the law said because we are concerned about these very things, you've got to allow parents to sign off, and you've got to -- sign out, rather, and -- sign their kids out, and you've got to honor that if they did?

MS. MURPHY:  We are not challenging the parts of the law that say, for instance, that if a parent asks us to terminate a minor's account, we have to do so.  We are not challenging that.  That -- you know, if the parent themself is exercising authority to say, I don't want my minor to use this service, we are not here trying to override that.

The problem is this law starts from a default of you don't get to use it unless your parent comes in and says yes, and then it kind of counterintuitively says, As long as they say yes once, we've lost all interest in what you do afterwards.

And the reason that matters is because, as *Brown* and other cases say, it -- just that complete kind of lack of connecting the way you're regulating to what you say is the reason you're regulating calls into question whether this is really about distrusting and disliking certain speech or certain speakers or certain services, which is the whole reason we have heightened scrutiny in the First Amendment, because we want the

State to assure us that that's not what's going on.  And when you have that kind of disconnect, they haven't assured us that that's not what's going on.

And I think here, you know, is the existence of parental control tools that are much more tailored to what they are talking about.  There are tools where you could tell parents, Look, if you are worried about how much time your minor is spending on a service, here's -- here's application-level tools, here's device-level tools.  You can turn off the Internet in your house for hours a day like Florida requires its schools to do because that's how it effectuates keeping kids off --

THE COURT:  Your point is those are both less restrictive means, but they're also showing ways in which it could be narrowly tailored, but it's not.

MS. MURPHY:  And they are more tailored.  It's not just that they're narrowly -- they actually do more to advance the interest the State is talking about here, because instead of saying, Look, there's some number of minors who might be using these services in a way that's harmful.  We are going to keep all minors off them or at least keep, you know, 14- and 15-year-olds off, unless their parents say they can be on them, it says, We recognize that there's a massive amount of protected First Amendment activity going on here, and before shutting it all down, we are going to instead start with how can we look at the particular aspects that may give us pause and say, What can

we do to address them and to determine that, you know, hey, maybe we want to ensure that parents understand that there are tools out here; that they know how to use them; that they are available to them.

The reality may be there's some parents who don't share Florida's view that it is really problematic for their child to watch, you know, three hours of political coverage on YouTube for a day. There is built into this the notion that the State knows better than the parents do what children want. And I think a law that focused on empowering parents instead of the State coming in and saying, We are going to kind of make the decisions for all children across the board rather than letting you determine what is safe and effective and valuable and educational and useful and socially productive for your minors -- you know, that's the kind of thing that generally is subject to significant First Amendment suspicion if we -- it's a law that ends up operating pretty much the same way the law that was held unconstitutional in *Brown* operates.

And I don't think that kind of the State singling out these features and saying "Oh, we're focused on these particular features" really works because the features they are talking about are features that exist on all types of services. They exist on streaming services. They exist on other services online. They are not regulating the features -- QUA features. They are interested in these features only when these features

are used in connection with particular services when minors engage in particular forms of protected First Amendment activity, and that right there is a reason to be suspicious of what the State is doing and hold them to a very high burden. And when you come at this from the level of "We are just going to restrict access across the board," that just doesn't cut it.

Is there something else you asked me to cover before I sit down?  I'm trying to recall.

THE COURT:  You are going to have another chance to talk again.

We are going to take a break.  You can confer with your colleagues.

Counsel for the government can communicate with his colleagues.

And when we come back -- let me find out -- assuming that I don't interrupt you, Counsel, how long -- I had said 10 minutes, but how long do you need for your sort of rebuttal?

MR. GOLEMBIEWSKI:  To be safe, maybe 15 minutes.

THE COURT:  Sure.  I'll give both sides 15 minutes.

So y'all can go over your notes.

And, Ms. Murphy, if after he does his 15 minutes if you'd like a break to look at your notes so you can make best use of your 15 minutes, we can take another break; okay?

MS. MURPHY:  Sounds good.

THE COURT:  We'll take a 10-minute break and come

Case 4:24-cv-00438-MW-MAF    Document 71    FILED 03/11/25    Page 93 of 137
USCA11 Case: 26-10735    Document: 16-2    Date Filed: 04/20/2026    Page: 93 of 137

93

back, and I'll hear the rebuttal from counsel.

And then if you don't need a break, we'll hear from you.

And we'll wrap it up.

Thank you.

(Recess taken at 11:13 AM.)

(Resumed at 11:29 AM.)

THE COURT:  Counsel, you may proceed.

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

So I'd like to start with standing.

Standing is not a technicality, and it can't be granted based on speculation.  You asked plaintiffs for any record evidence establishing that a platform engages in the conduct contemplated by subsection (1)(e), including that 10 percent, two-hour threshold, and they were not able to identify anywhere in the record where that's the case.

The plaintiffs seem to be saying the members they are identifying at this point are YouTube and Snap.  On page 20 through 22 of the YouTube declarant's deposition, Ms. Veitch, she recognized that she doesn't know what the demographic or user rates are of YouTube.  And she said she's not a data scientist, so she doesn't have that information.  And she didn't offer anything that could substantiate, even at a basic level, that YouTube meets that 10 percent, two-hour threshold.

Counsel has suggested that this is some kind of burden

on platforms to come forward with this proof even though it's their burden in a preenforcement challenge, but the Snap representative, Mr. Boyle, on page 119 through 120 of his transcript said: *We do track the amount of time spent in the application. We have the capability to aggregate that data to break it down by different demographics.* But he never said that a lot of kids are on the platform more than two hours per day or offered anything, and that's important.

So plaintiffs have pivoted to credible threat, but the *Driehaus* standard has multiple prongs. The first is they need to allege, a plaintiff, that they are engaged in conduct that is arguably proscribed, and then they have to establish credible threat. Here plaintiffs haven't even established that any member engages in conduct that can be arguably proscribed. Instead they've jumped that, pivoted to credible threat, and are relying on speculation and things not in the record.

The complaint does not allege that the Attorney General has it out for any particular NetChoice members or that the Attorney General singled out any members at that press conference. The plaintiffs have only cited 23 seconds of that press conference in their filings, and they are -- they are the 23 seconds of Former House Speaker Renner's speech where he talked about the functionality of the law when that is read in context.

Sure, legislators at times might talk about platforms,

but what matters is the text of the law for standing. Legislatures say a lot of things a lot times, and that's why the Eleventh Circuit has said in cases like *Hubbard* you can't go mining the legislative record for legislative intent or motivation. At standing you have to come forward with some credible threat of enforcement from the entity that you are suing, and there are is nothing like that in this record about the Attorney General and there is nothing even establishing that first step of arguably proscribed conduct under *Driehaus*.

THE COURT: Counsel, I've just got to ask -- and I think the answer would be, Judge, that's not this case. But certainly if there was no issue at all, you passed a law -- I understand why you couldn't, but you passed a law that says this law is directed to YouTube and YouTube then sues, so there is not going to be an issue of application. I mean, there's case law that says you can assume the Attorney General is going to enforce the law of the state. So if there wasn't an application issue, you don't have to have anything else to suggest that it would be reasonable to take actions because you are going to assume the Attorney General is going to enforce the law of the state if it clearly applies to you; right?

MR. GOLEMBIEWSKI: You are saying if they've established our belief proscribed -- and then the -- individuals engaged in arguably proscribed conduct, they sue. On credible threat, if the Attorney General is defending the law, are we --

you are saying we would assume that --

THE COURT:  No.  I'm saying you're suggesting that you would have to have a -- I don't think it necessarily matters is my point.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  Are you suggesting there has to be a statement from the Attorney General to show there is a credible threat of enforcement?

I think the law is pretty clear that if it applies to somebody, I can be in reasonable apprehension that the Attorney General is going to do her -- his job now and follow the law; right?

MR. GOLEMBIEWSKI:  Yeah, I'm not touching on that question at all.

What I'm saying is they're jumping over arguably proscribed and saying, Well, they have standing because the Attorney General suggested something at the press conference when she didn't even do that.

THE COURT:  The question was the unremarkable proposition that it works the other way as well.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  That if it clearly applies to you, then this idea that you've got to have some statement that somebody is going to enforce wouldn't be necessary.

MR. GOLEMBIEWSKI:  Yeah.  There's --

THE COURT:  I was just saying the reflexive is true.

MR. GOLEMBIEWSKI:  I see.  Yes, Your Honor.

There's Eleventh Circuit precedent that supports that proposition --

THE COURT:  Okay.

MR. GOLEMBIEWSKI:  -- you know, if there is traceability and redressability, et cetera.

And what this redounds to, because they can't identify any record (indiscernible), is again a probabilistic argument. They are asking the Court to make the leap to say, Well, we represent a lot of social media platforms, so one must be covered, even though the Legislature crafted a law with very specific criteria and didn't just advance some kind of broad law addressing all quote/unquote "social media."

And plaintiffs, they have offered no evidence to suggest that the law in effect is only going to target their members.  Their members don't even include the full universe of social media platforms as commonly understood.  TikTok is not a member, and TikTok has 170 million people.  So even if the law --

THE COURT:  Do I know that from this record?

MR. GOLEMBIEWSKI:  That TikTok is not a member?

THE COURT:  Yeah.

MR. GOLEMBIEWSKI:  Yes, Your Honor.

THE COURT:  I guess my --

MR. GOLEMBIEWSKI:  They've disclaimed that.

THE COURT:  I know that.  And so what other information is actually in the record?  The record is really thin on terms of the universe that's in and out, right, other than --

MR. GOLEMBIEWSKI:  Yeah, that's right.

I mean, yeah, so the plaintiffs say, Well, they know -- the State knows this law applies.  I don't know who this law applies to, Your Honor.  It's very specific in its criteria, and there's been no evidence put forward about any platforms that meet the criteria.

THE COURT:  I understand.

MR. GOLEMBIEWSKI:  My point is a practical point. Even though --

THE COURT:  The practical point is you pass laws that shut down protests, passed on all manner of laws that stop all kinds of speech and say, We don't have an enforcement mechanism; we are having it privately enforced; or we don't know who it applies to.  So even if it chills vast amounts of speech in violation of the First Amendment, so sad too bad.

I understand that theory generally, but that's not the problem in this case.

You can continue.

MR. GOLEMBIEWSKI:  Yeah, that's right.

And there's been no argument, for example, that the

10 percent, two-hour threshold is vague, to your point.

I mean, the folks that testified know they have this data on users, but they weren't able to offer any testimony to substantiate that conduct.

So the next point, Your Honor, that I just wanted to briefly mention is the cause-of-action issue. So I think plaintiffs suggested that the cause-of-action problem in 1983 is derivative of a standing problem, but that's not the case. Section 1983 allows the person who has been deprived of rights to bring an action and hold the State actor liable.

An association cannot assert the rights of its members because that is a third-party claim, and the members are the rights holders under 1983. Associational standing and the cause of action are two distinct issues. An association might be able to bring an equitable cause of action on behalf of members, but 1983 does not allow the association to assert the rights of any third-party rights holders, members, or users. And --

THE COURT: Since they pled and ask for equitable relief, what else would they have to put in their complaint to seek equitable relief under *Ex Parte Young* and that line of cases that recognizes the claim in equity?

MR. GOLEMBIEWSKI: Well, they need to at least cite *Ex Parte Young* and say somewhere they are bringing a cause of action under equity.

THE COURT: What if they don't cite anything?

What if 1983 wasn't there, they don't use the magic words "claim in equity," but they say the First Amendment is violated and they just ask for equitable relief?

Why would that not fall squarely within the case law that recognizes such a claim?

MR. GOLEMBIEWSKI:  That's -- well, if they just have a request for relief, that's different than the cause of action. They need to plead a cause of action and identify one in their complaint.  You can't just seek equitable relief for damages and say, Well, we have --

THE COURT:  *Ex Parte Young* really isn't a cause of action, is it?

MR. GOLEMBIEWSKI:  No, you are right, Your Honor. It's not really a cause of action, but it's indicative of at least providing some kind of guidance to the defendant and the Court of putting on notice what's the vehicle -- the procedural vehicle through which this action is being pursued.  If you just request an injunction in the relief, that doesn't signal to the defense or the Court what's the cause of action or vehicle being used to get this teed up on the merits.

THE COURT:  Except that if everybody on the planet recognizes you can bring a claim for equity based on a constitutional right under *Ex Parte Young*, it tells the government that's what you are doing.  So I don't know why that wouldn't put somebody on notice.

But that -- we don't have to resolve that right now.

MR. GOLEMBIEWSKI:  Okay.  Yes, Your Honor.

And so then I'd like to turn to the merits.  So, first, just as a threshold matter, plaintiffs say that the State and the defendants have just labeled these features addictive. That is not the case.

The U.S. Surgeon General recognized them as addictive. Experts recognize them as addictive.  The legislative staff analysis in this case was pretty thorough and cited a lot of --

THE COURT:  The Surgeon General also said COVID was dangerous, but I get it.  It doesn't necessarily say -- the U.S. Surgeon General, just because he says something doesn't make it so.

But, go ahead.

MR. GOLEMBIEWSKI:  Well, Your Honor, it is well known in this country that kids are addicted to these platforms.  This is a mental health --

THE COURT:  It was well known when I was growing up that I was going to become a Satanist because I played Dungeons & Dragons.  Is that -- I don't know what really that means.  You can say that there's studies, Judge, and you can't ignore expert reports that say X.

But invoking the "it's commonly known" -- I mean, it was commonly known that masks would prevent, potentially, the spread of COVID, but apparently that was fake news.  So, I mean,

I don't understand how the "commonly known" helps you.

MR. GOLEMBIEWSKI:  Even if you put aside the "commonly known," Your Honor, our point is that plaintiff suggests that this is some -- what -- the point they are making --

THE COURT:  And by the way, "commonly known" certainly wouldn't -- if you are subject to strict scrutiny, that certainly wouldn't be enough; right?

MR. GOLEMBIEWSKI:  Agreed.

THE COURT:  And you would even agree the sort of loosey-goosey causal effect under existing case law wouldn't be enough for strict scrutiny; right?

MR. GOLEMBIEWSKI:  A direct causal link is required under *Brown* for strict scrutiny.  Is it not required for intermediate --

THE COURT:  Right.  I think I said --

(Indiscernible crosstalk.)

MR. GOLEMBIEWSKI:  No, that's right.  But the plaintiff suggested otherwise, so I wanted to --

THE COURT:  All right.

(Indiscernible crosstalk.)

MR. GOLEMBIEWSKI:  -- since we are talking -- since we are talking.

But the point that the plaintiffs seem to be making about this, saying we are slapping a label on addictive features, is that it's arbitrary and that we really have a

stealth point here, a purpose, to chill expression.  But our point is that nothing about these -- us singling out these features is arbitrary.  No one can contest that there's data out there.  Whether you disagree with the U.S. Surgeon General or not, they are saying that, experts are saying that.  And there's also evidence that kids are compulsively using this product at rates we have never seen.

Kids weren't reading comics -- millions and millions of kids weren't reading comics eight hours a day.  Millions and millions of kids weren't listening to rap music eight hours a day.  There's something different going on here, and there's a consensus --

THE COURT:  The problem, Counsel, that's a really bad example, the comics, because there is an entire exhibit in Glasgow where they barred comics in the entire country because somebody decided that comics were turning their youth against their parents and were causing them to engage and worship the supernatural and stuff.

So, I mean, I guess that was the point the plaintiffs were making is from the beginning of time, we've targeted things under some belief that it's harming our youth, but doesn't necessarily make it so.

But, go ahead.

MR. GOLEMBIEWSKI:  But -- but I think that helps -- that cuts in our favor, Your Honor, because the point about the

ban in Glasgow was that it believed kids were being turned against their parents.  There was concern about exposure to content.

This law applies to these addictive features that -- push notifications, infinite scroll doesn't expose you to any particular content.  It's a psychological hook that keeps you scrolling because you don't have to press "load" more.  So it's qualitatively different than in those types of example.

THE COURT:  And that's -- the nub of the case is whether it is regulating speech or it's not.  I get that part.

MR. GOLEMBIEWSKI:  Gotcha.

THE COURT:  That's one of the primary issues you and plaintiffs' counsel disagree about.

MR. GOLEMBIEWSKI:  And I'll get into that, then, on the content-neutral piece.

So *City of Austin* is important*.  City of Austin* followed *Reed*, Your Honor, and it emphasized that what matters for the content-based analysis is whether the law discriminates based on communicative content.  Because as the Supreme Court has previously recognized in *R.A.V.*, the focus for the content-based analysis is, is the law going to drive viewpoints, ideas, and, in particular, messages from the marketplace.

*Reed* held that -- and this is how the Fifth Circuit had interpreted *Reed* and this is what led to *Austin* -- that if you have to read something, it's necessarily content based.  But

even under that maximalist view of *Reed*, which *City of Austin* receded from, our law is not content based.  You don't have to look at any of the posts uploaded, any of the user activity to know whether our law applies.  Its subject matter doesn't matter.

If the site has those functions, the law applies.  And so *Austin -- Austin* stated:  *The City's provisions at issue here do not single out any topic or subject matter for differential treatment.  A sign's substantive message itself is irrelevant to the application of the provisions.*

THE COURT:  It doesn't single out any subject matter.  And their whole issue here is it singles out a subject matter; namely, social communication, i.e., *Reyes*.

MR. GOLEMBIEWSKI:  Well, the next section -- the sentence expounds on that:  *A sign's substantive message itself is irrelevant to the application of provisions.*  That's what matters, the communicative content or the substantive message.  When you are singling that out, that is a content-based discrimination.  But this broad category of social speech doesn't turn on any kind of substantive message.

Anything a child says on the platform --

THE COURT:  Fair enough.  And that's what I think I said to you earlier, Counsel, it's not that you lose.  I said there were two aspects.

One, is there such a thing -- separate and apart from,

for example, speaker by proxy, is there another category which is -- you can tell because it takes out a subject.  I used political speech as an example.  It's not a particular message; it's just a general category of speech.  And I said, But, secondarily, the issue becomes is that sort of social speech -- and I'm not bound by *Reyes*, and this case is, again, by functionality not as direct as *Reyes* -- there's a separate issue about whether or not *Reyes* is correct or the distinction here doesn't matter.

So I do want you to explain that to me, and I think you were doing that but sort of indirectly.

Do you think, for example -- let's start with *Reyes*. That's the easiest thing.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  And assume there was no distinction between this law and *Reyes*, which there is, do you think that Utah court got it wrong by saying because it's targeting that subject, namely, the social interaction, that that's the type of subject that would be content based and fall within the ambit of the case law, i.e. *Reed* and *Austin*?

MR. GOLEMBIEWSKI:  Yes, I do think it got it wrong.

THE COURT:  Okay.

MR. GOLEMBIEWSKI:  I think social speech is too general of a category.  It doesn't -- if you are regulating quote/unquote "social speech," you are not regulating any

particular communicative content because all speech is social.

I guess I struggle with this even because I don't know what the definition even is of "social speech."  If social speech is any communication between peers and a law regulates that, that is not singling out any communicative content.  It's regulating out -- it's regulating an exchange, but it's not threatening or singling out viewpoints, ideas, or messages.

And so --

THE COURT:  Does it matter at all that it's singling out and blocking that communication in that sphere and that type of communication?

So, in other words, would it matter, for example, if you said, You can have conversations anywhere except in a tent.  You just -- you don't want Boy Scouts talking anymore.  I guess there is no such thing as Boy Scouts anymore.  Whatever it's called now, but -- Scouts of the World or something; whatever it's called now -- does that matter or no?

MR. GOLEMBIEWSKI:  No.  That just sounds like a manner restriction to me.  If you say, you know, you can't -- you can't socialize outside of a jail, that doesn't seem to me to single out any kind of content at all.

If you recognize -- all you're doing is regulating some kind of interaction or communication, but there's no specific substance or message to that.

In *Austin* the plaintiffs -- the plaintiffs made a

similar move where they said, Well, regulate --

THE COURT:  So you are saying with, like, for example, the political -- because I want to flesh this out -- like, with a category of political speech, Judge, we agree it doesn't have to say no conservative or no liberal speech.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  But by saying "political speech," it's targeting a subject matter, namely, you can't communicate about anything political one way or the other at all, and it's taking out a specific subset of speech.  Whereas the social speech, whatever it means, Judge -- I don't even know how you are going to define it or how they mean it -- it's so broad and so vast. It encompasses so much speech.  It's completely disconnected from the sort of categories of speech that may not have a specific message or viewpoint, but it is a category.  And, for example, political speech is a subject sufficiently narrow that that's why it was problematic.

MR. GOLEMBIEWSKI:  That's right.  That's right.

And so that's actually -- I mean, the next sentence in *City of Austin* is:  *There are no content-discriminatory classifications for political messages, ideological messages, or directional messages concerning specific events.*  And so the Court conceptualized the issue the same as that level of generality.

It has to be more specific because if you are singling

out political speech, you threaten to drive from the marketplace of ideas that type of speech.  You are disfavoring it.  If you are regulating interaction, you are not disfavoring any ideas.  You can -- you're disfavoring -- you could be disfavoring all ideas altogether, but you are not singling anything out.

And so, I mean, it's just hard -- like, if this is the case, then, when you send a kid to detention, everybody has to be quiet in study hall, that's a First Amendment problem because they are not able to communicate.  I mean, that's a content-based regulation.

I mean, the whole point of *City of Austin* was to figure out the right level of generality of thinking about this content-based distinction.  And the Court narrowed it down to the subject matters, political speech.  Social speech would engulf all those, right, because if a restriction on social speech was a content-based discrimination, that means you are restricting all kinds of speech, and somehow it's still singling out speech.  But that's not how the test works.

THE COURT:  I understand your argument.  Thank you.

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

Okay.  And just to address tailoring.  So -- because the law is content neutral, intermediate scrutiny applies or time, place, manner restriction, which we know in our brief is a little bit more forgiving under cases like *Club Madonna* and *Lady J.*  And plaintiffs didn't dispute that.  We think that

that's the analysis that applies, but the law satisfies either form of tailoring.

Plaintiffs' principle argument on tailoring is that there's parental controls.  And in their PI reply, they said that the less restrictive alternative is promoting parental controls.  I mean, I don't know exactly what that means.

If they are saying -- requiring platforms to have parental controls or requiring parents to turn off the Internet at night, that would seem to me pretty restrictive.  If they are talking about just --

THE COURT:  Well, we've empowered parents to control what books our kids read in school.  Why is it far-fetched to empower parents and think they know best for their individual children about who they are engaging with socially on social media platforms?

MR. GOLEMBIEWSKI:  Well, parents certainly have a role, but the key is these controls.  And the controls have proven ineffective.  So these platforms --

THE COURT:  You are taking the control away.  Because if I've got a 13-year-old child and I want him to -- does my kid get to sign up if I want him to be able to sign up and have an account in a social media platform on Facebook?

MR. GOLEMBIEWSKI:  You can register for an account and a kid can use your account, and you can monitor them.

THE COURT:  I don't want to monitor them.  Just like I

want them to read the book about the two penguins raising an egg together.  The two male penguins raising an egg together.  I don't want to sign up on my account.  I want to have my own Facebook account.  I want my kid -- you've taken that choice away from me; right?

MR. GOLEMBIEWSKI:  I just think it's an irrelevant issue because their -- I mean, the degree of control that parents have is irrelevant.  What's --

THE COURT:  The point, Counsel -- and I don't think it's particularly far-fetched -- is the State of Florida picks and chooses when they want the parents to be making the decision.  And when it suits their purposes, they do; and when it doesn't, they don't.

But I've got it.  Fair enough.

MR. GOLEMBIEWSKI:  So our point is mainly about these parental controls are ineffective.  So -- and we have evidence to that effect.  The plaintiffs, they don't have evidence really on anything at this point.

So the Snap declarant testified that the number of parents that actually use their parental controls is in the single digits even though these platforms have touted these controls for years.  We cited articles from leaked TikTok documents where TikTok said they only had parental controls for PR purposes.  The parental controls are also ineffective according to our doctor, Dr. Alter.  And this is something that

in the *Free Speech Coalition v. Paxton* case Justice Barrett remarked on; that it's hard to manage all these parental controls, and the past ten years have shown they are not a less-restrictive alternative.

But even if they were, even if promoting -- I mean, this is like -- it's, like, a stunning argument to me.  Because the argument seems to be:  We should have done a PSA promoting parental controls and just kept trusting platforms to implement them with fidelity despite the *FTC* finding they don't implement them with fidelity, despite kids being on these platforms so extensively, despite parents not being able to navigate these controls.  The less-restrictive alternative was to just trust them?  That's similar arguments like tobacco companies made 25 years ago.  So just setting that aside, even if this were one less-restrictive alternative, that is not enough to defeat a law under intermediate scrutiny.

The Supreme Court in *TikTok v. Garland* said, Okay, the plaintiffs here paraded all these alternatives that might be less restrictive.  But in intermediate scrutiny, when the State is impleting a content-neutral interest, that's not going to defeat the law if -- as long as the law is not substantially unrelated, the burden it imposes, to its aim as long as it's tailored.

And this law is tailored to that aim.  Kids are going to be -- reduce their exposure to addictive features through

accounts. The account restriction or contracting for accounts is rational, because how "accounts" is defined in the statute is things -- profiles, et cetera, that platforms use to track users' activity. And so with an account, you can track users' activity, target them with push notifications, target them with personalized display metrics, and it can effectuate these addictive features. And so there's a nexus there.

So this law, we think, easily clears intermediate scrutiny, particularly that we have a compelling government interest of protecting child well-being. And this law does not substantially burden any speech unnecessarily.

And the last point, Your Honor, is just on the members' rights issue. So I understand, based on plaintiffs' presentation, their argument to be they're bringing claims on behalf of the members, and through that claim they are also asserting the rights of kids and adults. But that's -- but the Courts don't allow some kind of omnibus claim.

What was happening in *Brown* was the sellers of video games were seeking to enforce their own rights, and California justified the ban on violent video games by saying kids don't have a First Amendment right to receive that kind of speech. So you, video game companies, don't have a right to distribute it. And so kids' rights were relevant only to understanding the scope of the speakers' rights.

The video game companies did not bring an independent

claim on behalf of kids. And so I'm a little -- I'm more confused at this point about are they asserting claims on behalf of children and adults, as well as members, or is it just members and they are using alleged burdens on kids and adults to make their case?

And I would just underscore that this is another reason why the complaint is a shotgun pleading because it jams together so many different contentions in one count, and it incorporates all allegations by reference.

That's all I have unless Your Honor has any other questions.

THE COURT: No additional questions.

Thank you.

MR. GOLEMBIEWSKI: Thanks.

MS. MURPHY: So, actually, we'll start with standing.

And, you know, we think we have met our burden on standing here. As the State acknowledges, the question is simply whether we have adequately alleged and demonstrated for PI purposes that we have conduct that's arguably proscribed by the statute.

You can look at the deposition of the Snap deponent here, pages 117 through 23. The State went through each of the aspects of this law and asked: Does Snap have this feature? Does Snap do this? Does Snap do this? And the answer was yes as to all of them.

And the only thing -- that's why they are harping on it -- the only thing they don't have is precise information about the number of hours that minors use the services. But I think it's certainly reasonable for a member to say, Look, we have all the features. We -- as our deponent said, 15 to 20 percent of our users are minors. And, oh, by the way, you've specifically identified us as a service that you believe -- you, the State, who is going to enforce this, believe is covered by it. So we think there's a pretty good chance we are covered by this law and that you're going to come after us. And I can point you to one of the cases that we --

THE COURT: Let me ask you this first: When you are talking about the 15 percent, 20 percent of our users are minors and so forth, is that part of the explanation of the Snapchat representative of why they think the provision applies to them?

MS. MURPHY: It was questions that were being asked by the State in its effort to illicit whether the law covers -- is likely to cover Snap. And they asked them about, you know, what percentage of your users are minors? Do you have users in Florida? Do you have minor users in Florida? They asked all these questions and Snap answered them, and they are not pointing to anything Snap said that gave them reason to think Snap is not, in their mind, covered by the law. They are just pointing to one piece in all of this.

THE COURT: So there certainly is evidence before this

Court based on that -- and I'll certainly go back based on your representation as an officer of the Court -- that they have a -- it's not an insubstantial number of minors using at least Snapchat.

So is there any discussion in that depo, not necessarily about minors but about average uses or typical uses, et cetera, in terms of times people stay on the service?

MS. MURPHY:  I think the particular deponent -- you know, these were not 30(b)(6) depositions, didn't have that kind of level of detailed information.  So to the extent the Court thinks --

THE COURT:  Is there any mention or reference anywhere at all about timing even in the most general way?  Yes, our services are generally used by folks, and they just -- and it's not uncommon for people to use it for hours at a time.

MS. MURPHY:  I don't recall if there's specific discussion in that respect in the deposition.  I will note that the State's evidence here is all evidence they are putting on. I mean, the State just stood up and told Your Honor people are using -- these minors are using these services for eight hours a day.

They have put on their own evidence where they have people talking about the use of minors of the particular services that they are saying are covered.  So they seem to have their own evidence they are suggesting shows that the amount of

time is significant, which again goes to -- I mean, this is not -- this is not, Hey, we have to come in and confess and demonstrate and prove that every single aspect of the law is covered.  We have to show that we are arguably proscribed.

THE COURT:  You are saying, Judge, we also can rely, like any fact finder, it doesn't mean who produces it or who files the depo or the affidavit.  You can rely on any information in the record at this stage to determine whether the plaintiff met its burden.  And, Judge, there is nothing that keeps us from relying on the depos they took and the information they submitted.

And if you look at all that information together, to answer your question, yes, Judge, there is information from which you could fairly extrapolate there are -- for at least one of our members, there's a large number of children users and fairly extrapolate that they're staying on -- that users that use these types of services, based on the addictive qualities, use them for the amount of times that would fall squarely within the ambit of this provision.

MS. MURPHY:  And I think --

THE COURT:  Is that -- am I following you?

MS. MURPHY:  Yes.  And I would just put that all in the specific context of the legal inquiry here that is arguably proscribed.

And, certainly, if you look at all the information

that's available here from us, from them, from the depositions, everything we have at this point, I think it's really hard to say that there's not even an arguable basis for our members, who have submitted declarations where they said, We believe we are covered, who took the time to bring this lawsuit because we believe we are likely going to face enforcement actions from the State if we don't take action.

All of that is done because we do in good faith believe that members here could be covered by this statute and that the State would enforce it against them.

THE COURT:  Well, let me -- and it is important, so let me ask you the question this way because I also don't want to distort what the burden is.

The burden for preliminary injunction is roughly akin to summary judgment.  You've got to come forward with evidence -- and it doesn't matter who files it, but you've got to come forward with evidence from which I find, as a fact finder, that it is not speculative or just a possibility, but, rather, that it's reasonable to believe that these -- this provision would apply to this particular member such that their fear that they are going to have to, for pre-enforcement purposes, expend a lot of money on compliance costs is reasonable such -- their fear that they are going to have to do that, expend it, is reasonable; correct?

MS. MURPHY:  I think that's fair.  I mean, I do want

to be clear --

THE COURT:  Fair, or that's what's required?

MS. MURPHY:  I think that's required.

I just want to be clear about what -- you know, as I understand the legal test as the State said, there's arguably proscribed and then a credible threat of enforcement.  And, you know, the credible threat part is a little bit more focused on if I'm covered, are you likely to kind of enforce against me?  The arguably proscribed part is it's arguably.

So, yes, at summary judgment -- I'm sorry -- yes, at a preliminary injunction, it's a higher standard than just the pleadings standard, but the standard is still arguably proscribed.  We don't, because we are at a PI, have to prove we are --

THE COURT:  Well --

(Indiscernible crosstalk.)

THE COURT:  Let me give you an example because I want to make sure if there is anything else you want to say, you can say it.  For example, I did this with teachers where they submitted affidavits that were many, many, pages long talking about how they felt about the law, and then they came to other hearings and testified about how it made them feel.  And I kept wondering why do I care?  But what they were thin on in the affidavits and thin on at their depositions or thin on their testimony in court was these are the eight topics I can't talk

about.

And so there had to be some evidence that suggested that they either were, in fact, going to continue to talk about those topics that their speech arguably may have been proscribed or fall within those topics, and they are going to continue the speech such that they ran the risk of being -- losing their jobs, or whatever penalties they were going to impose.  Or they stopped talking because there was evidence that would suggest they arguably -- their -- whatever topics they were covering fell within those topics such that they were either speaking at risk or stopped speaking.

MS. MURPHY:  Right.

THE COURT:  It seems to me the same thing is here.  There has to be evidence that would suggest that -- and I know that's a chill case, and it's not directly to this case.  But here the idea is that you don't have to prove beyond a reasonable doubt it's going to apply.  But what you do have to do is have some evidence such that it's not just speculative or a possibility, but there's a reasonable belief you are covered by the statute such that you are going to expend money, ergo be injured by compliance costs in this pre-enforcement context.

Do I have that wrong?

MS. MURPHY:  No, I think that's right.

I think this is even easier because it's not a context where you are saying, you know, I might just refrain from -- you

know, we haven't not been clear about what it is we think we have to do if we are covered.  Our declarations cover that extensively in terms of, Here's how we are not, you know, presently doing what the State would require, and it would cost us time and money to do it.

So I think we've been very clear here on the direct connection between our fear of enforcement --

THE COURT:  And, Judge --

(Indiscernible crosstalk.)

THE COURT:  -- we've got people that show we are using uploading.  We've got algorithms.

MS. MURPHY:  Yes.

THE COURT:  We have, clearly, one or more of these addictive features.  We've got a bunch of kids who are users, a high percentage.

And so whether or not 10 percent of them do or do not stay on a significant length of time, that's really what we are talking about, Judge, whether a percentage of the kids that we have -- which we've clearly established we have a fear because we have a large number of minors using our services, and that the law doesn't require us to go through the exercise to establish that with any precision.

And there certainly is evidence before you, not the least of which is the government's own evidence, that if you've got a bunch of kids on your social platform, they are going to

be spending extensive periods of time on it.  Otherwise, it would be completely inconsistent with what they found in their entire rationale for the law to begin with.  And that's not something they have just alleged in their papers, it's what they filed.

And so, Judge, if you want to argue the record doesn't support a particular finding or something reasonable -- so, for example, if you are opposing -- if you are filing a motion for summary judgment and you don't think the other side is going to respond, don't file the entire deposition of the plaintiff because the judge may deny summary judgment because you provided the judge with the information that would suggest there are disputed issues of fact.

Here, Judge, you can look to their affidavits, and that's our source to fill the one gap they've identified.

MS. MURPHY:  Yes.

THE COURT:  Is that it in a nutshell?

MS. MURPHY:  Yes.

THE COURT:  It's not a finding.  I just wanted to make sure I understood.

MS. MURPHY:  That's it in a nutshell.  And a way I might put it just even a little more simplistically is I don't think you have to ignore the context of the law, the nature of the law, and their justifications for the law in answering the questions of is it -- you know, do we have an arguable basis to

believe that a law that they say they passed to come after us is actually coming after us?  I think that you don't have to kind of dispense the common sense just because we are talking about standing.

So we do think there is an evidentiary basis in the record to address the standard, which is simply the arguably proscribed question, and we think we do have standing here on behalf of our members.  And, of course, as we discussed earlier, we can assert the rights of our users as well.

Turning to the merits, just, you know, a few points on all of this.  I mean, for one, to the extent what the State is trying to say is that it can isolate these particular features that they call addictive features because they are not in and of themselves covered by the First Amendment -- I do think it's worth noting, and they are not denying -- that would mean that they can restrict or ban them even as to adults, and it wouldn't implicate the First Amendment; that they could say, Services can no longer offer the option of, you know, allowing users to see if other people liked their content.  And they'd say, That doesn't implicate the First Amendment because we are regulating some sort of conduct of offering certain features rather than speech.  I think that's a pretty extraordinary proposition that really just can't be right.

It's -- if you take that logic and apply it outside the context of anything other than these services -- I mean,

their own experts analogize these features to kind of a digital version of a to-be-continued at the end of a book.  The notion that the State could single that out and say, You know, no more to-be-continueds because a lot of times kids want to read the next book if it says "to-be-continued."  I get it that they have a reason they are saying they are worried about these features, but the notion that you can divorce these features from the content and say they have nothing to do with the First Amendment is just flat wrong, and I don't think there is any authority out there to support it.

I also think they have a real problem when they say that this law is really about these features.  It's not.  If this were just about features, we'd have one prong of the definition.  It would be the features.  This is about the use of the features on particular services and particular -- in conjunction with particular types of content and social interaction, and that's not an accident.

Again, they have experts here who have talked about -- they are not just concerned in the abstract.  You don't see their experts saying, you know, I'm really worried that there's too many kids who are going on and watching political rallies or, you know, interacting with their church on Facebook or something like that.  They are talking about content.  They are worried that they might interact with particular content that could give rise to self-harm or self-image concerns.

They are worried that allowing -- facilitating the back and forth of kind of playground interaction in a social setting on the --

THE COURT:  Counsel --

(Indiscernible crosstalk.)

THE COURT:  -- my concern with this line, how do I know -- that's a good argument if I said, Tell me what you think is being done and why you think this is the mischief they're -- how do I get --

MS. MURPHY:  Sure.

THE COURT:  And I don't want to spend too much time on this.  But how do I get to where you are at --

MS. MURPHY:  Sure.

THE COURT:  -- that that's the -- that's what they are doing?

Because it doesn't say that in the statute; right?

MS. MURPHY:  Well, so -- so I would say three things. First, I think two prongs of the statute do tell you this is content based, the first and the second one.  Because the first one does single out these -- you know, where you are uploading and looking at the content of other users and all of that kind of interaction.

Now, they would say, you know, we think that's content neutral.  I don't think it is, but --

THE COURT:  And I do want you to focus on that.  I'm

sorry to interrupt you, but I do want to give you a chance.

Because one thing that -- I'm not suggesting it's the only thing counsel said, but one thing that counsel has said that sticks with me is -- and that's why I asked him, Do you -- not that there's sort of this category of speech and what can you get out of it, but do you disagree with the *Reyes* court. And he said yes. And, of course, I'm not bound by that. I'm just using that as a shorthand so y'all can discuss the topic.

And he says, Well, Judge, assuming -- even though it's distinguishable on its face because here it's functionality, there it was a specific provision that said we are targeting this type of exchange. His argument was, Judge, that exchange can literally include any interaction between two people talking about anything, and that's why that's not the sort of category that if you prohibit it, it's content based.

I definitely want you to respond to that.

MS. MURPHY: Sure. So I do think you can view that as content based. And I guess another way to kind of come at it is -- one thing that is clear from the first prong of the definition is it is carving out certain speakers. I think -- I mean, we'd kind of have to -- the State would have to agree it operates to say certain types of services are covered and certain types are not.

And then you ask what is the basis for the distinction that they are drawing to say streaming services are on one

side -- you know, Disney+ is over here, but, you know, Snap is over here?  What is their basis for thinking those things are different?

And the basis that the statute itself identifies is that they seem to have some particular concern when you just have users who are the speakers speaking to each other providing content and interacting with each other.  Whereas there's somehow -- for some reason less concern if you are getting kind of all your cartoons selected by Disney+ instead of some of them coming from users on YouTube Kids.

And at that point, that strikes me as, as the Supreme Court has said, not all speaker-based distinctions are necessarily content based, but they raise the concern that they might be.  And here I don't see how you don't end up finding that the distinction seems to be based on, you know, we are just worried that we don't know as much about what content you are going to get once you are empowering everybody to speak to each other as opposed to having kind of one speaker control it.

That's the distinction they are drawing, and that strikes me as a content-based distinction, especially when you put it in the context of their own evidence and experts and things that they are citing where they say, Yeah, our worry is -- you know, we are less worried if someone sits and watches TV for several hours.  We are more worried if they are there engaging in kind of peer-to-peer social interaction with other

people their age where they comment on each other's -- what other people are doing, have likes and dislikes, or we are worried that you might see particular forms of content on these services because they are a (indiscernible).

(Reporter requested clarification.)

MS. MURPHY:  A little less regulated.

And then if I can just -- one more content-based thing is I didn't hear them say any response to our argument that the second prong of the definition, by singling out services that minors find more attractive, is in and of itself just a proxy for the content-based distinction of speech that minors -- that is more attractive to minors, which is the same distinction that the *Yost* Court found sufficient to find the law content based in Ohio.  It just comes at it from a different -- a different lens.

THE COURT:  Give me one second.

(Pause in proceedings.)

THE COURT:  I want you to assume -- and I'm not ruling, but I want you to assume I find your argument about content based unpersuasive.  I don't want you to sit down or leave or end until you explain to me or I give a chance to respond to counsel for the government's suggestion about why under intermediate scrutiny you would lose.

MS. MURPHY:  Sure, sure.

So I will turn straight to that.  And I'd point you in particular on that to the Arkansas *Griffin* case which was

resolved under intermediate scrutiny, not strict scrutiny.  And I'd also note *Packingham* was a case that's resolved under intermediate scrutiny, not strict scrutiny.

So certainly in this context, we have Courts that have said, Look, when you come at Internet restrictions and say you can't access the services at all by virtue of concerns -- I mean, in *Packingham*, the concern -- nobody --

THE COURT:  The sex offender case.

MS. MURPHY:  Nobody denied that there was absolutely a compelling interest in protecting people and particularly minors.  But the Court said restricting the access of sex offenders themselves, convicted sex offenders, is not sufficiently tailored under intermediate scrutiny.  It seems to me a fortiori saying, Oh, we'll come at it from the side of taking, you know, the innocent users who just want to engage in First Amendment activity and say all of you can't get on there.  It has got to be not narrowly tailored.

I think, you know, the State said that causation is only required in the strict scrutiny context.  I don't know what authority they have for that.  Certainly *Brown* was a strict-scrutiny context case, but it did not say causation only matters in the strict scrutiny context.  It's just that there's a little bit lesser burden to demonstrate causation in the intermediate scrutiny context, and we don't think they have done that.

And, indeed, you know, the fact that they kind of just want to say, Well, everyone knows this is true.  I mean, that's -- that's not evidence.  That's the State's argument, and it is certainly not some widely accepted proposition that the types of features they are singling out caused so-called behavioral addiction.

But even if you assume that, I still think the real problem here is the narrow tailoring problem, because the idea of just stopping all the access at the front end is inherently not narrowly tailored when you are talking about a universe of speech so broad as what is on these types of services.  And while you don't have to have the least restrictive means in the intermediate scrutiny context, you do have to be narrowly tailored to avoid unnecessary abridgment of First Amendment rights.

That's what the *Americans for Prosperity* case made very clear.  To the extent Courts didn't think you needed narrow tailoring in the intermediate scrutiny context, that was a mistake.  You do.  And here we have plenty of other alternatives that not only are less restrictive but are actually much more tailored to addressing concerns that -- while there are lots of beneficial ways that minors can use these services, there may be instances where concerns arise.  And --

THE COURT:  What says you to Counsel's comment that, Judge, the record before you suggests that parental controls,

and what you suggest are all these alternatives, are absolutely not effective and that narrowly tailored doesn't require you to rely on and use, and it doesn't become narrowly tailored because they are ineffective alternatives?

MS. MURPHY:  Sure.

I do not think they've come close to meeting their burden of proving that these are ineffective, and even here, standing at the podium, what I heard the State say is they are ineffective because not a lot of parents use them.  They pointed to evidence that not a lot of parents use them.  That is not evidence that they are ineffective.

It could be -- and this is precisely what the Supreme Court said in *Brown* and in several cases before it when it talked about the burden that you need to show that they actually are ineffective.  It may be that they are not used because they don't know enough about them or how to use them.  It may be that parents aren't using them because some parents don't share the State's concerns.

THE COURT:  Well, let me ask you this way, Counsel: We've got kids that are graduating that can't read and write at grade level, and there can be a variety of reasons why that's so.  We've got increased rates of -- related to social isolation and so forth or suicide.  We've got all manner of problems -- and I'm not saying -- I'm not just bringing stuff in from outside the record.  There's been articulated by the State the

host of problems that's trying to be addressed.

And parents aren't addressing it, and so that's not fixing the problems.  Having parental controls is not fixing the problem.  The State just has to surrender and say, Let's just have a generation of imbeciles, and it becomes this steamroll effect where they are less educated, more detached, more suicidal, less productive?

I mean, it seems to me whatever I'm doing as a judge, there's got to be a commonsense gloss to it, even when I'm applying standards articulated by the Supreme Court or the Eleventh Circuit.  So when we start talking about whether something is narrowly tailored or not, I'm supposed to set aside common sense, and it's supposed to be divorced from reality in terms of whether or not -- I guess, does it matter if it's just hypothetical ways that you could draw a more narrow statute that may or may not be and likely are ineffective?

I mean, I'm just -- it's the reverse of what I said.  Although I saw some heads shaking and I didn't say anything -- I never shook my head "no" when a judge said anything in a court, but I'll -- it is what it is.  We have a new level of professionalism in courts.

But, you know, I'll ask you sort of the reverse question I asked them about their -- the State's focus on parents when they want to.  The same is true here.  Are the State's hands really tied if we are faced with some sort of

public pandemic -- and mental health is a -- can be a pandemic -- and parents aren't engaged?  The State is really -- and that would be the alternative to relying on the parents. Their hands are really tied because it's not narrowly tailored because they should have relied on parents which weren't policing their children to begin with?

MS. MURPHY:  So the point is not that the State's hands are not completely tied.  It's that if the State wants to go to the extreme measure of shutting off massive amounts of First Amendment protected activity, the burden is on the State to demonstrate, not just hypothesize, that alternatives that would not restrict nearly as much First Amendment activity actually are ineffective.

And their own expert, Dr. Allen, when he testified about this, said -- 210 to 218 in his deposition, said that he was just speculating about whether they actually are ineffective, as opposed to whether parents might be choosing not to use them or just kind of don't know how to use them.  That's their burden.  That's what it means to be heightened scrutiny.

And even in intermediate scrutiny, it is the State's burden.  So they can't just come in and say, Look, you told us there's alternatives, but, like, we don't think they are effective because not enough parents, in our view, are using them.  So we are going to go straight to the absolute most draconian approach, which is say under 14, no access; and 14 to

15, you know, we're creating a default, the kind of default that *Brown* said it's not even clear is permissible on the part of the government, that we are going to assume that minors can't have access to speech unless and until their parents say okay.

We are going to go straight to those absolute kind of most draconian measures without first even examining whether, Hey, maybe if we worked, kind of, in partnership to ensure parents know all about these tools, maybe there's some ways the State could work together kind of to figure out if there are some aspects of them that need to be fine-tuned, if we need to educate parents about, Here's ways to ensure your minors don't circumvent them.

That's what *Brown* and a long line of cases before it say are the measures that a State is supposed to try first rather than start all the way at the other end of the spectrum of saying, We'll just shut down the access to speech entirely. And most of those cases, by the way, were saying that even in context where we are talking about stuff that is, you know, not so obviously constitutionally protected as to minors.

So in this context, you know, I think *Brown* really is the most on-point case where we have the State shutting that down.  The State just has to do a lot more work before it can go to the type of means it has selected here.

THE COURT:  Anything additional?

MS. MURPHY:  I think that's it for me unless you have

any other questions.

THE COURT:  I don't have any other questions.

I do want to say to counsel for the government who is lead counsel, You were not shaking your head.  That was not directed to you, and you've been nothing but a model of professionalism in your presentation today.

Anything additional from the government?

MR. GOLEMBIEWSKI:  No, Your Honor.

THE COURT:  All right.  Court is in recess -- before I go there, let me say this:

Y'all took months, months to brief everything in this case.  I'm pretty sure -- and I think the record will make this clear -- I offered up a hearing in December.  So I'm not suggesting I'm going to spend months and months and months writing an order, but I do want to make clear I get some time as well.

And if counsel gets months to brief it, then I get some time to write an order.  And so if I had set it in December and we had not had any discovery and y'all hadn't had extended time for briefs, it's not unusual for me to stop everything I'm doing and continue cases or get coverage from other judges and get an order out in, you know, 72 hours.  I'm not going to do that.

So I'm not suggesting I'm going to sit on this.  I'm not suggesting it's going to take me months and months, but I am

going to take time to write an order.  Because I know that's one of the issues that comes up, when are we going to hear from you?  I'm not suggesting these lawyers would.  I'm shocked at the number of times I get a call -- not me, but my chambers -- saying, When is Judge Walker going to issue an order within 24 hours of thousands of pages being submitted to me on some topic?  So I'm going to -- it's going to take me a little time to write an order.

I'll do my best.  I understand the importance of it.  And I understand that I need to move forward both quickly and thoughtfully in getting an order out, and I'll do my best.

I'm not going to give you a date by which I'll do it, but I'll try to do it sooner rather than later.  I do have a trial every week for the next three weeks.  That doesn't mean I'm not working on this, but I have a trial for, again, every week for the next three weeks.

So I'll do my best, again, to get to it as quickly as I can; all right?

Thank you.

Court is in recess.

(Proceedings concluded at 12:26 PM on Friday, February 28, 2025.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                          3/11/2025

Megan A. Hague, RPR, FCRR, CSR          Date
Official U.S. Court Reporter


**I N D E X**


OTHER RECORD MADE                                        PAGE

Argument by Mr. Golembiewski                               4
Argument by Ms. Murphy                                    43
Rebuttal Argument by Mr. Golembiewski                     93
Rebuttal Argument by Ms. Murphy                          114