No. 26-10735

# In the United States Court of Appeals for the Eleventh Circuit

CAIR FOUNDATION, ET AL.,
*Plaintiffs-Appellees,*

v.

GOVERNOR, STATE OF FLORIDA,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:25-cv-516-MW-MJF

## DEFENDANT-APPELLANT'S APPENDIX VOLUME 1

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jason.muehlhoff@myfloridalegal.com*

April 27, 2026

DAVID M.S. DEWHIRST
  *Solicitor General*

JASON J. MUEHLHOFF
JEFFREY P. DESOUSA
  *Chief Deputy Solicitors General*

TYLER E. GUSTAFSON
  *Assistant Solicitor General*

CASEY J. WITTE
  *Solicitor General Fellow*

*Counsel for Defendant-Appellant*

App. 1

# Index

**Docket/Tab#**

**Volume 1**

District Court Docket Sheet ...................................................................... A

Complaint ........................................................................................... 2

First Amended Complaint ................................................................... 21

Office of the Governor, Executive Order Number 25-244 ................... 21-1

CAIR-Foundation, Inc.'s Motion for Preliminary Injunction and
    Supporting Memorandum of Law ..................................................... 24

Answer to Amended Complaint ........................................................... 36

Defendant's Response to Plaintiff's Motion for Preliminary
    Injunction ......................................................................................... 37

Declaration of Jay K. Arnold Jr. ....................................................... 37-1

Order Cancelling Hearing ................................................................... 40

CAIR-Foundation, Inc.'s Reply in Support of its Motion for Preliminary
    Injunction ......................................................................................... 41

**Volume 2**

Supplemental Declaration of Manal Fakhoury on behalf of CAIR-
    Foundation, Inc. ............................................................................. 41-1

Order Granting Motion for Preliminary Injunction ............................. 43

Defendant's Notice of Appeal ............................................................. 44

# A

APPEAL,MEDIATION

# U.S. District Court
## Northern District of Florida (Tallahassee)
## CIVIL DOCKET FOR CASE #: 4:25-cv-00516-MW-MJF

CAIR-FOUNDATION INC et al v. DESANTIS
Assigned to: JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MICHAEL J FRANK
Case in other court: USCA, 26-10735-A
Cause: 28:1331 Fed. Question

Date Filed: 12/15/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**CAIR-FOUNDATION INC**
*A WASHINGTON DC NONPROFIT
CORPORATION*

represented by **AARON SAUL FLEISHER**
SOUTHERN POVERTY LAW CENTER -
MONTGOMERY AL
400 WASHINGTON AVE
MONTGOMERY, AL 36104
202-536-9719
Email: aaron.fleisher@splcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVIDSON SWIFT**
MUSLIM LEGAL FUND OF AMERICA
100 N CENTRAL EXPRESSWAY
SUITE 1010
RICHARDSON, TX 75080
972-914-2507
Fax: 972-692-7454
Email: cswift@clcma.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SCOTT DANIEL MCCOY**
SOUTHERN POVERTY LAW CENTER -
MONTGOMERY AL
400 WASHINGTON AVE
MONTGOMERY, AL 36104
334-922-0293
Email: scott.mccoy@splcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AHMED KHALED SOUSSI**
SOUTHERN POVERTY LAW CENTER -
NEW ORLEANS LA
201 ST CHARLES AVENUE
SUITE 2000

App. 4

USCA11 Case: 26-10735    Document: 22-1    Date Filed: 04/27/2026    Page: 5 of 246

NEW ORLEANS, LA 70170
334-213-8303
Email: ahmed.soussi@splcenter.org
*ATTORNEY TO BE NOTICED*

**ARTHUR E AGO**
SOUTHERN POVERTY LAW CENTER -
WASHINGTON DC
1101 17TH STREET NW
SUITE 550
WASHINGTON, DC 20036
202-961-9325
Email: arthur.ago@splcenter.org
*ATTORNEY TO BE NOTICED*

**GADEIR IBRAHIM ABBAS**
CAIR LEGAL DEFENSE FUND -
WASHINGTON DC
453 NEW JERSEY AVENUE SE
WASHINGTON, DC 20003
720-251-0425
Email: gabbas@cair.com
*ATTORNEY TO BE NOTICED*

**HUEY LAGARTO REY FISCHER
GARCIA**
SOUTHERN POVERTY LAW CENTER -
MONTGOMERY AL
400 WASHINGTON AVE
MONTGOMERY, AL 36104
504-884-7680
Email: huey.fischergarcia@splcenter.org
*ATTORNEY TO BE NOTICED*

**LENA F MASRI**
CAIR LEGAL DEFENSE FUND -
WASHINGTON DC
453 NEW JERSEY AVENUE SE
WASHINGTON DC, DC 20003
202-488-8787
Fax: 249-928-2298
Email: ldf@cair.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**SAMUEL R SIMKINS**
AKEEL & VALENTINE PLC - TROY MI
888 W BIG BEAVER ROAD
SUITE 350
TROY, MI 48084
248-269-9595
Fax: 248-269-9119
Email: sam@akeelvalentine.com
*PRO HAC VICE*

App. 5

*ATTORNEY TO BE NOTICED*

**SHEREEF H AKEEL**
AKEEL & VALENTINE PLC - TROY MI
888 W BIG BEAVER ROAD
SUITE 350
TROY, MI 48084
248-269-9595
Fax: 248-269-9119
Email: shereef@akeelvalentine.com
*ATTORNEY TO BE NOTICED*

**OMAR M SALEH**
FLORIDA LEGAL CONSULTING PA -
SUNRISE FL
9000 NW 44TH STREET
SUITE 200
SUNRISE, FL 33351
954-305-5454
Email: osaleh@floridalegalconsulting.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **CAIR-FLORIDA INC**<br>*A FLORIDA NONPROFIT CORPORATION* | represented by | **AARON SAUL FLEISHER**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**CHARLES DAVIDSON SWIFT**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SCOTT DANIEL MCCOY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AHMED KHALED SOUSSI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ARTHUR E AGO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GADEIR IBRAHIM ABBAS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**HUEY LAGARTO REY FISCHER GARCIA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LENA F MASRI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SAMUEL R SIMKINS**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**SHEREEF H AKEEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**OMAR M SALEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RONALD DESANTIS**
*IN HIS OFFICIAL CAPACITY AS*
*GOVERNOR STATE OF FLORIDA*

represented by **JAMES PAUL WACZEWSKI**
WACZEWSKI LAW GROUP -
TALLAHASSEE FL
2520-2 BARRINGTON CIRCLE
TALLAHASSEE, FL 32308
850-524-2100
Fax: 850-383-6604
Email:
James.waczewski@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JASON JOHN MUEHLHOFF**
FLORIDA ATTORNEY GENERAL'S
OFFICE
107 W GAINES STREET
TALLAHASSEE, FL 32399
714-330-6936
Email:
jason.muehlhoff@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JEFFREY PAUL DESOUSA**
FLORIDA ATTORNEY GENERALS
OFFICE
SOLICITOR GENERALS OFFICE
107 WEST GAINES STREET
TALLAHASSEE, FL 32399
850-414-3830
Email: jeffrey.desousa@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

App. 7

| Date Filed | # | Docket Text |
|---|---|---|
| 12/15/2025 | 1 | COMPLAINT against All Plaintiffs ( Filing fee $ 405 receipt number AFLNDC-9731358.), filed by CAIR-Foundation, Inc., CAIR-Florida, Inc.. (SALEH, OMAR) (Entered: 12/15/2025) |
| 12/15/2025 | 2 | AMENDED DOCUMENT by CAIR-Florida, Inc., CAIR-Foundation, Inc.. Amendment to 1 Complaint *Corrected*. (SALEH, OMAR) (Entered: 12/15/2025) |
| 12/16/2025 | 3 | DOCKET ANNOTATION BY COURT: Re 1 & 2 . TO ATTORNEY OMAR SALEH: Party names (including aliases) are to be added using all caps and no punctuation. (See "Style Guide for Electronic Case Filing," available on Clerk's website.) The party names will be corrected by the clerk. Further, counsel is advised by this entry, that a Civil Cover Sheet must be filed as a separate entry using the event selection "Civil Cover Sheet" which is found under "Other Filings" under "Other Documents". PLEASE RE-FILE THE CIVIL COVER SHEET. (rcb) (Entered: 12/16/2025) |
| 12/16/2025 | | Set Deadline Attorney Admissions for Lena F. Masri, Gadeir I. Abbas, Arthur Ago, Huey Fischer Garca, Shereef H. Akeel & Samuel Simkins Deadline - by **12/29/2025**. (rcb) (Entered: 12/16/2025) |
| 12/16/2025 | 4 | MOTION to Appear Pro Hac Vice by Huey Fischer Garcia.( Filing fee $ 219 receipt number AFLNDC-9731700.) by CAIR-Florida, Inc., CAIR-Foundation, Inc.. (Attachments: # 1 Exhibit Huey Fischer Garcia Certificate of Good Standing, # 2 Text of Proposed Order Proposed Order Granting Admission Pro Hac Vice) (FISCHER GARCIA, HUEY) (Entered: 12/16/2025) |
| 12/16/2025 | 5 | NOTICE REGARDING REQUEST FOR RELIEF re 1 . Accordingly, this Court will take no action in this case unless and until a proper motion is filed. Signed by JUDGE MARK E WALKER on 12/16/2025. (rcb) (Entered: 12/16/2025) |
| 12/16/2025 | 6 | ORDER ADMITTING HUEY FISCHER GARCA PRO HAC VICE RE: 4 . The 4 motion is GRANTED. Signed by JUDGE MARK E WALKER on 12/16/2025. (rcb) (Entered: 12/16/2025) |
| 12/16/2025 | 7 | MOTION to Appear Pro Hac Vice by Arthur Ago.( Filing fee $ 219 receipt number AFLNDC-9733242.) by CAIR-Florida, Inc., CAIR-Foundation, Inc.. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Text of Proposed Order Proposed Order) (AGO, ARTHUR) (Entered: 12/16/2025) |
| 12/17/2025 | 8 | CIVIL COVER SHEET. (SALEH, OMAR) (Entered: 12/17/2025) |
| 12/17/2025 | 9 | ORDER ADMITTING ARTHUR AGO PRO HAC VICE RE: 7 . The 7 motion is GRANTED. Signed by JUDGE MARK E WALKER on 12/17/2025. (rcb) (Entered: 12/17/2025) |
| 12/22/2025 | 10 | MOTION to Appear Pro Hac Vice by Lena Masri.( Filing fee $ 219 receipt number AFLNDC-9738176.) by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Good Standing) (MASRI, LENA) (Entered: 12/22/2025) |
| 12/22/2025 | 11 | ORDER ADMITTING LENA MASRI PRO HAC VICE - This Court has considered, without hearing, the motion for admission pro hac vice for Lena Masri. ECF No. 10 . The motion is GRANTED. Signed by JUDGE MARK E WALKER on 12/22/2025. (baf) (Entered: 12/22/2025) |
| 01/05/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE MARK E WALKER notified that action is needed ***Notice of appearance have not been filed by 12/29/2025 |

App. 8

USCA11 Case: 26-10785     Document: 28-1     Date Filed: 01/27/2026     Page: 9 of 246

| | | for attorney's Shereef H. Akeel & Samuel Simkins. The notice regarding attorney admissions have been resent by e-mail.*** (baf) (Entered: 01/05/2026) |
|---|---|---|
| 01/05/2026 | 12 | MOTION FOR ADMISSION PRO HAC VICE FOR SAMUEL SIMKINS by Samuel Simkins.( Filing fee $ 219 receipt number AFLNDC-9747996.) by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (Attachments: # 1 Exhibit Certificate of Good Standing) (SIMKINS, SAMUEL) Modified title on 1/6/2026 (baf). (Entered: 01/05/2026) |
| 01/06/2026 | 13 | ORDER ADMITTING SAMUEL SIMKINS PRO HAC VICE - This Court has considered, without hearing, the motion for admission pro hac vice for Samuel Simkins. ECF No. 12 . The motion is GRANTED. Signed by JUDGE MARK E WALKER on 1/6/2026. (baf) (Entered: 01/06/2026) |
| 01/13/2026 | 14 | MOTION to Appear Pro Hac Vice by Shereef H. Akeel.( Filing fee $ 219 receipt number AFLNDC-9756549.) by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (AKEEL, SHEREEF) (Entered: 01/13/2026) |
| 01/13/2026 | 15 | ORDER ADMITTING SHEREEF H. AKEEL PRO HAC VICE RE: 14 . The 14 motion is GRANTED. Signed by JUDGE MARK E WALKER on 1/13/2026. (rcb) (Entered: 01/13/2026) |
| 01/14/2026 | 16 | MOTION to Appear Pro Hac Vice by Gadeir Abbas.( Filing fee $ 219 receipt number AFLNDC-9759465.) by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Good Standing) (ABBAS, GADEIR) (Entered: 01/14/2026) |
| 01/15/2026 | 17 | ORDER ADMITTING GADEIR ABBAS PRO HAC VICE RE: 16 . The 16 motion is GRANTED. Signed by JUDGE MARK E WALKER on 1/15/2026. (rcb) (Entered: 01/15/2026) |
| 01/16/2026 | 18 | MOTION to Appear Pro Hac Vice( Filing fee $ 219 receipt number AFLNDC-9761388.) by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (Attachments: # 1 Exhibit Ahmed Soussi COGS) (SOUSSI, AHMED) (Entered: 01/16/2026) |
| 01/16/2026 | 19 | ORDER ADMITTING AHMED SOUSSI PRO HAC VICE RE: 18 .The 18 motion is GRANTED. Signed by JUDGE MARK E WALKER on 1/16/2026. (rcb) (Entered: 01/16/2026) |
| 01/16/2026 | 20 | NOTICE *of SUMMONS TO DEFENDANT RONALD DESANTIS* by CAIR-FLORIDA INC, CAIR-FOUNDATION INC (FISCHER GARCIA, HUEY) (Entered: 01/16/2026) |
| 01/16/2026 | 21 | FIRST AMENDED COMPLAINT against RONALD DESANTIS, filed by CAIR-FOUNDATION INC, CAIR-FLORIDA INC. (Attachments: # 1 Exhibit A) (MCCOY, SCOTT) (Entered: 01/16/2026) |
| 01/20/2026 | 22 | Summons Issued as to RONALD DESANTIS. (rcb) (Entered: 01/20/2026) |
| 01/20/2026 | 23 | AFFIDAVIT of Service for Complaint, First Amended Complaint served on Ronald DeSantis on 1/20/2026, filed by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (MCCOY, SCOTT) (Entered: 01/20/2026) |
| 01/20/2026 | | Set Deadline- RE: 23 - Answer due by **2/10/2026**. (rcb) (Entered: 01/20/2026) |
| 01/23/2026 | 24 | MOTION for Preliminary Injunction *and Supporting Memorandum* by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (Attachments: # 1 Affidavit Declaration of Ahmed Soussi, # 2 Affidavit Declaration of CAIR National, # 3 Affidavit Declaration of CAIR Florida, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 |

App. 9

USCA11 Case: 26-10735    Document: 22-1    Date Filed: 04/27/2026    Page: 10 of 246

| | | |
|---|---|---|
| | | Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21) (SOUSSI, AHMED) (Entered: 01/23/2026) |
| 01/23/2026 | 25 | ORDER SETTING CONFERENCE SCHEDULE RE: 24 . The parties shall file a proposed briefing schedule with respect to the motion for preliminary injunction on or before 5:00 p.m.(ET) , Wednesday, **1/28/2026** . The parties should refer to ECF No. 26 in Case No.: 1:23cv111-MW/HTC as a template for the information to include in their proposed briefing schedule. The Clerk shall set this matter for a telephonic scheduling conference on Friday, **1/30/2026**, at 12:00 p.m. (ET). Signed by JUDGE MARK E WALKER on 1/23/2026. (rcb) Modified on 1/23/2026 (rcb). (Entered: 01/23/2026) |
| 01/23/2026 | 26 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **1/30/2026 12:00 PM** before JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call Judge Walker's Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **855-244-8681** When prompted for an access code, enter: **2309 453 2428#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is compromised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 01/23/2026) |
| 01/26/2026 | 27 | NOTICE of Appearance by JASON JOHN MUEHLHOFF on behalf of RONALD DESANTIS (MUEHLHOFF, JASON) (Entered: 01/26/2026) |
| 01/26/2026 | 28 | NOTICE of Appearance by JEFFREY PAUL DESOUSA on behalf of RONALD DESANTIS (DESOUSA, JEFFREY) (Entered: 01/26/2026) |
| 01/28/2026 | 29 | JOINT REPORT ON PARTIES' MEET-AND-CONFER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION. (SOUSSI, AHMED) Modified to edit title on 1/28/2026 (rcb). (Entered: 01/28/2026) |
| 01/29/2026 | 30 | INITIAL SCHEDULING ORDER. Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **2/12/2026**. Rule 26 Meeting Report due by **3/16/2026**. Discovery due by **5/28/2026**. Status Report due by **3/2/2026**. Signed by JUDGE MARK E WALKER on 1/29/2026. (rcb) (Entered: 01/29/2026) |
| 01/29/2026 | 31 | NOTICE of Appearance by JAMES PAUL WACZEWSKI on behalf of RONALD DESANTIS (WACZEWSKI, JAMES) (Entered: 01/29/2026) |
| 01/30/2026 | 32 | Minute Entry for proceedings held before JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 1/30/2026. Parties discuss casestatus and schedule for 14 Motion for Preliminary Injunction. Court adopts schedule in 29 Joint Report. Response/counter declarations due on or before **2/11/2026**. Reply/declarations, if any, due on or before **2/18/2026**. Preliminary injunction hearing set for 2:00 pm ET on 2/27/26, if necessary (Court Reporter Shannon Zelt (Shannon_Zelt@wyd.uscourts.gov) USDC-Wyoming). (vkm) (Entered: 01/30/2026) |
| 01/30/2026 | 33 | NOTICE of Hearing Re: 24 MOTION for Preliminary Injunction: If necessary, Motion Hearing set for **2/27/2026 02:00 PM** before JUDGE MARK E WALKER. Joseph |

| | | Woodrow Hatchett United States Courthouse and Federal Building, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301. |
|---|---|---|
| | | NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp access, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made. s/ Victoria Milton McGee Courtroom Deputy Clerk (vkm) (Entered: 01/30/2026) |
| 01/30/2026 | 34 | ORDER SETTING BRIEFING SCHEDULE RE: 24 . An in-person hearing on Plaintiffs' motion for preliminary injunction is set for Friday, **2/27/2026 02:00 PM** (ET). Defendants' response and any declarations in support thereof are due on or before **2/11/2026**. Plaintiffs' reply brief and any rebuttal declarations are due on or before **2/18/2026**. Signed by JUDGE MARK E WALKER on 1/30/2026. (rcb) (Entered: 01/30/2026) |
| 02/10/2026 | 35 | Corporate Disclosure Statement/Certificate of Interested Persons by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (SOUSSI, AHMED) (Entered: 02/10/2026) |
| 02/10/2026 | 36 | DEFENDANT GOVERNOR DESANTIS'S ANSWER AND DEFENSES TO PLAINTIFFS' FIRST AMENDED COMPLAINT. (DESOUSA, JEFFREY) Modified to edit title on 2/11/2026 (rcb). (Entered: 02/10/2026) |
| 02/11/2026 | 37 | DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION. (Attachments: # 1 Affidavit Declaration of Jay K. Arnold Jr.) (DESOUSA, JEFFREY) Modified to edit title on 2/12/2026 (rcb). (Entered: 02/11/2026) |
| 02/13/2026 | 38 | PLAINTIFF'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION. (Attachments: # 1 Text of Proposed Order Proposed Order) (SOUSSI, AHMED) Modified to edit title on 2/13/2026 (rcb). (Entered: 02/13/2026) |
| 02/13/2026 | 39 | ORDER GRANTING 38 EXTENSION. The motion is GRANTED. Plaintiffs' response deadline is extended to on or before **2/20/2026**. Signed by JUDGE MARK E WALKER on 2/13/2026. (rcb) (Entered: 02/13/2026) |
| 02/17/2026 | 40 | ORDER CANCELLING HEARING Re: 24 MOTION for Preliminary Injunction and Supporting Memorandum. Signed by JUDGE MARK E WALKER on 2/17/2026. (baf) Modified title on 2/17/2026 (baf). (Entered: 02/17/2026) |
| 02/20/2026 | 41 | CAIR-FOUNDATION, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION. (Attachments: # 1 Affidavit SUPPLEMENTAL DECLARATION OF MANAL FAKHOURY ON BEHALF OF CAIR-FOUNDATION, INC., # 2 Affidavit SUPPLEMENTAL DECLARATION OF AHMED SOUSSI, # 3 Exhibit 22, # 4 Exhibit 23, # 5 Exhibit 24, # 6 Exhibit 25, # 7 Exhibit 26) (SOUSSI, AHMED) Modified to edit title on 2/23/2026 (rcb). (Entered: 02/20/2026) |
| 02/27/2026 | 42 | FIRST JOINT STATUS REPORT ON DISCOVERY. (MCCOY, SCOTT) Modified to edit title on 3/2/2026 (rcb). (Entered: 02/27/2026) |
| 03/02/2026 | | Set Deadline- Status Report due by **3/30/2026**. (rcb) (Entered: 03/02/2026) |
| 03/04/2026 | 43 | ORDER GRANTING 24 MOTION FOR PRELIMINARY INJUNCTION. Signed by JUDGE MARK E WALKER on 3/4/2026. (baf) (Entered: 03/04/2026) |
| 03/06/2026 | 44 | NOTICE OF APPEAL as to 43 Order on Motion for Preliminary Injunction by RONALD DESANTIS. ( Filing fee $605 Receipt Number AFLNDC-9818433.) (DESOUSA, |

| | | JEFFREY) (Entered: 03/06/2026) |
|---|---|---|
| 03/09/2026 | 45 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 44 Notice of Appeal. (rcb) (Entered: 03/09/2026) |
| 03/09/2026 | | Set Deadlines re 44 Notice of Appeal. Clerk to check status of Appeal on **6/8/2026**. Certificate of Readiness (FRAP 11) due by **3/23/2026**. (rcb) (Entered: 03/09/2026) |
| 03/09/2026 | 51 | USCA CASE #26-10735-A/PROCEDURAL LETTER re: 44 NOTICE OF APPEAL (rcb) (Entered: 03/23/2026) |
| 03/10/2026 | 46 | Appeal Instructions re: 44 Notice of Appeal : The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh-circuit-transcript-information-form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **3/24/2026**. (rcb) (Entered: 03/10/2026) |
| 03/11/2026 | 47 | TRANSCRIPT REQUEST by RONALD DESANTIS (MUEHLHOFF, JASON) (Entered: 03/11/2026) |
| 03/12/2026 | 48 | Supplemental Record on Appeal transmitted to US Court of Appeals RE: 44 Notice of Appeal RE: 47 (rcb) (Entered: 03/12/2026) |
| 03/13/2026 | 49 | REPORT of Rule 26(f) Planning Meeting. (MCCOY, SCOTT) (Entered: 03/13/2026) |
| 03/13/2026 | 50 | SCHEDULING AND MEDIATION ORDER Re: 49 . The bench trial is set for the trial period that begins on Monday, **11/16/2026 9:00 AM** before JUDGE MARK E WALKER.The discovery date is extended to **7/27/2026**. The deadline for filing summary-judgment motions is 21 days after the discovery deadline, **8/17/2026**, but the motions should be filed at the earliest appropriate time. Mediation due by **8/24/2026**. Mediation Report due by **9/7/2026**. Case referred to mediation. Signed by JUDGE MARK E WALKER on 3/13/2026. (rcb) (Entered: 03/13/2026) |
| 03/24/2026 | | Set Deadlines re 44 Notice of Appeal. Clerk to check status of Appeal #26-10735 on **6/22/2026**. (rcb) (Entered: 03/24/2026) |
| 03/25/2026 | 52 | Pursuant to F.R.A.P. 11(c), #26-10735-A the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 44 Notice of Appeal. The entire record on appeal is available electronically. (rcb) (Entered: 03/25/2026) |
| 03/30/2026 | 53 | STATUS REPORT *SECOND JOINT DISCOVERY* by CAIR-FLORIDA INC, CAIR-FOUNDATION INC. (MCCOY, SCOTT) (Entered: 03/30/2026) |
| 03/31/2026 | | Set Deadline- Status Report due by **4/29/2026**. (rcb) (Entered: 03/31/2026) |

---

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/21/2026 08:13:36 | | | |
| **PACER Login:** | jennahodges | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:25-cv-00516-MW-MJF |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CAIR-Foundation, Inc., a
Washington, D.C. nonprofit
corporation, and,

CAIR-Florida, Inc., a Florida
nonprofit corporation,

     Plaintiffs,

v.                           Case No.

Ronald DeSantis, in his official
capacity as Governor, State of
Florida,

     Defendant.

---

**COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs CAIR-Foundation, Inc. and CAIR-Florida, Inc. (collectively "CAIR"), by and through undersigned counsel, bring this Complaint for Declaratory and Injunctive Relief against Defendant Ronald DeSantis, in his official capacity as Governor of the State of Florida. Defendant's Executive Order 25-244 ("Executive Order," "EO," or "the order"), issued on December 8, 2025, violates the United States Constitution and is an *ultra vires* act of authority in violation of the Florida Constitution and laws. Plaintiffs ask this Court to declare Executive Order 25-244

1

App. 14

unlawful, unconstitutional, void, and of no force or effect, and to enjoin Defendant from enforcing it. Plaintiffs allege as follows:

## I.      INTRODUCTION

1. Founded in 1994, the Council on American-Islamic Relations ("CAIR" or "CAIR National") is now America's largest Muslim civil rights and advocacy organization. Its mission is to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims.

2. CAIR National is a 501(c)(3) nonprofit organization registered as CAIR-Foundation, Inc.

3. CAIR National and its over 20 affiliated chapters, including CAIR-Florida, Inc. ("CAIR-Florida"), work to advance the organization's mission through lobbying, training, education, and legal action.

4. CAIR has publicly condemned all forms of unjust violence, including hate crimes, terrorism, ethnic cleansing, and genocide. The foreign terrorist organization ISIS once threatened to assassinate CAIR's leadership in response to the organization's outspoken opposition to terrorism. While CAIR has vocally condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people, CAIR has also condemned Hamas violence against Israeli civilians, specifically including suicide bombings in the 1990s and its attacks on October 7, 2023.

App. 15

5. In recent years, CAIR has filed several free speech-related lawsuits against state entities and officials across America, including Florida Governor DeSantis, to block their attempts to punish or silence Americans who expressed support for Palestinian human rights.

6. On December 8, 2025, Defendant DeSantis issued Executive Order 25-244, which purports to unilaterally designate CAIR a "terrorist organization." The order directs Florida's executive and cabinet agencies, as well as counties and municipalities, to deny local or state contracts, employment, funding, benefits, and privileges to CAIR and anyone known to provide "material support" to CAIR, including "expert advice or assistance." The order also directs Florida Department of Law Enforcement and the Florida Highway Patrol to pursue unspecified "measures" against CAIR.

7. By issuing this order, Defendant DeSantis has violated the U.S. and Florida Constitutions, as well as federal and state laws. He has usurped the exclusive authority of the federal government to identify and designate terrorist organizations by baselessly declaring CAIR a terrorist organization. He has violated the Constitution's guarantee of due process by unilaterally declaring CAIR a terrorist organization and then ordering immediate punitive, discriminatory action against CAIR and its supporters.

8. The Executive Order was issued against the backdrop of Plaintiffs' civil rights advocacy and litigation opposing actions by Florida officials—including Defendant

3

App. 16

DeSantis—that sought to suppress speech supporting Palestinian human rights and Muslim civic participation.

9. On December 8, 2025, Plaintiffs announced their intent to challenge the Executive Order. Defendant DeSantis then stated publicly that he welcomed litigation because it would provide an opportunity to obtain CAIR's financial records and internal information through discovery. These contemporaneous statements confirm that the Executive Order was intended to burden and deter Plaintiffs' advocacy rather than to serve any legitimate state interest.

10. The Executive Order identifies no criminal charges or convictions, relies on no federal designation, and inaccurately invokes statutory authority. It rests on political rhetoric and imposes sweeping legal consequences on a domestic civil rights organization because of its viewpoints and advocacy.

11. By its terms, the Executive Order instructs state actors to condition the availability of contracts, employment, funding, benefits, or privileges on whether a person or entity is deemed to have provided "material support or resources" to CAIR, thereby extending the EO's exclusionary mandate beyond CAIR itself.

12. By its terms, the Executive Order imposes immediate and self-executing legal consequences. It alters CAIR's legal status upon issuance by categorically excluding CAIR from eligibility for state and local contracts, employment, funding, benefits, or privileges, and by conditioning third-party eligibility for such benefits on

4

App. 17

association with CAIR. Viewed in context, this framework reasonably conveys the risk of adverse government action sufficient to chill protected speech and association.

13. The Executive Order announces no process and articulates no lawful basis for its designation. Instead, it relies on demonstrably false assertions contradicted by Plaintiffs' longstanding record.

14. Plaintiffs seek declaratory and injunctive relief to restore constitutional order and prevent continued enforcement of an unlawful executive action.

## II.    **JURISDICTION AND VENUE**

15. This action arises under the Constitution and laws of the United States, including the Supremacy Clause, the First and Fourteenth Amendments, and 42 U.S.C. § 1983. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and authority to issue declaratory relief under 28 U.S.C. §§ 2201–2202.

16. Plaintiffs seek prospective declaratory and injunctive relief against a state official for ongoing violations of federal law. Defendant DeSantis is therefore subject to suit in his official capacity under the doctrine of Ex parte Young, 209 U.S. 123 (1908).

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims—including the issuance, publication, and implementation of Executive Order 25-244—occurred within this District.

App. 18

18. An actual and justiciable controversy exists within the meaning of 28 U.S.C. § 2201, and this Court is authorized to grant declaratory and injunctive relief as appropriate.

### III.    PARTIES

19. Plaintiff CAIR-Foundation, Inc. ("CAIR" or "CAIR National") is a 501(c)(3) nonprofit corporation organized under the laws of the District of Columbia and headquartered in Washington, D.C. CAIR National is a national civil rights and advocacy organization that engages in public education, civil rights litigation, media initiatives, and advocacy to protect constitutional rights and promote justice for American Muslims.

20. Plaintiff CAIR-Florida, Inc. ("CAIR-Florida") is a Florida-based affiliated chapter of CAIR. CAIR-Florida engages in civil rights advocacy, public education, and community outreach across the state, often in partnership with CAIR National, across Florida.

21. Defendant Ronald DeSantis is the Governor of the State of Florida and is sued in his official capacity only. Defendant DeSantis issued the Executive Order and is responsible for its continued enforcement and implementation. He is an appropriate defendant for prospective declaratory and injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

6

## IV.   <u>STANDING</u>

22.   The Executive Order imposes a terrorism designation and exclusionary framework directed at "CAIR," which operates nationally and through its Florida chapter. That framework alters Plaintiffs' legal status and eligibility and reasonably conveys the risk of adverse government action sufficient to chill protected speech and association.

23.   Each Plaintiff has Article III standing based on the Executive Order's self-executing legal effects.

24.   Absent the Executive Order, no statute or regulation bars CAIR or its Florida chapter from eligibility for contracts, employment, funding, benefits, or privileges. Declaratory and injunctive relief setting aside the Executive Order will restore CAIR's legal status and fully redress Plaintiffs' injuries.

### A. *CAIR National*

25.   CAIR National has Article III standing based on the Executive Order's self-executing designation of "CAIR" and its exclusionary framework, which alters CAIR National's legal status and reasonably conveys the risk of adverse government action.

26.   In addition, the Executive Order caused the cancellation of a specific, concrete business relationship as a direct result of Defendant DeSantis's designation and accompanying threats of enforcement.

7

App. 20

27.  CAIR National is itself a direct object of the Executive Order. The Executive Order designates "CAIR" without reference to any specific corporate subdivision or limitation to a Florida affiliate, relying on national-level allegations, leadership references, and historical assertions directed at CAIR as a single organization. By purporting to classify CAIR as a "terrorist organization," the Executive Order imposes a legal stigma and exclusionary framework that attaches to CAIR as an organization, including its national operations.

### B. CAIR-Florida

28.  For purposes of state and local government interaction, CAIR-Florida is the entity through which CAIR engages in civil rights advocacy, public education, and civic participation in Florida, and it is therefore the immediate object of the EO's exclusionary commands.

29.  CAIR-Florida has Article III standing because the Executive Order imposes a present, concrete, and self-executing legal disability that alters CAIR-Florida's legal status and reasonably conveys the risk of adverse government action sufficient to chill protected speech or association.

30.  The EO's categorical exclusion applies automatically upon issuance. By designating "CAIR" and directing statewide exclusion from contracts, employment, funding, benefits, and privileges, the Executive Order alters CAIR-Florida's legal status and

8

App. 21

bars it from eligibility for government programs otherwise open to Florida nonprofit organizations.

31. A binding legal prohibition that applies automatically to a named organization constitutes a present injury the moment it is issued, even absent a denied application or enforcement action, because the law itself changes the legal rights and obligations of the plaintiff. See *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (injury established because the state censorship law was "aimed directly" at the plaintiff booksellers).

32. Moreover, the Executive Order extends its exclusionary mandate by conditioning access to state and local contracts, employment, funding, benefits, or privileges on whether a person or entity is deemed to have provided "material support or resources" to CAIR. Viewed in context, this structure reasonably conveys the risk of adverse government action to third parties and operates to deter association with, and support for, CAIR's protected speech. See *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191-2 (2024) (threats of enforcement actions for associating with a gun rights organization could be reasonably perceived as coercive and violative of the First Amendment).

33. The objective reasonableness of this chilling effect is underscored by Defendant's own public statements framing the Executive Order as a mechanism to exclude

9

App. 22

CAIR from government benefits and subject it to investigation and scrutiny.[1] Viewed in context, a reasonable third party would understand the Executive Order as conveying a risk of adverse government action associated with engagement with or support for CAIR.

34. The Executive Order contains no discretionary language permitting agencies to disregard the prohibition, and the phrase "lawful measures" governs only the manner of implementation, not the existence of the legal disability.

35. Plaintiffs' injuries are therefore traceable to Defendant DeSantis, who created the designation and mandated its enforcement statewide.

## V.    FACTUAL BACKGROUND

### A. CAIR's Lawful Mission, Structure, and Operations

36. The Council on American-Islamic Relations is the nation's largest American Muslim civil rights and advocacy organization. Founded in 1994, CAIR operates through affiliated nonprofit chapters across the United States, including Plaintiff CAIR-Florida.

---

[1] Joseph Ax, *Florida governor designates Muslim rights group as terrorist organization*, REUTERS (Dec. 10, 2025 10:31 a.m.), https://www.reuters.com/world/us/florida-governor-designates-muslim-rights-group-terrorist-organization-2025-12-09/; Jay Waagmeester, *Gov. DeSantis welcomes lawsuit challenging CAIR's terrorist designation*, FLORIDA PHOENIX (Dec. 9, 2025), https://floridaphoenix.com/2025/12/09/gov-desantis-welcomes-lawsuit-challenging-cairs-terrorist-designation/.

10

37. CAIR and its affiliated chapters are long-standing 501(c)(3) American nonprofit organizations whose mission is to enhance public understanding of Islam, protect civil liberties, promote justice, and empower American Muslims.

38. CAIR and its affiliates engage in civil rights advocacy, public education, community organizing, interfaith work, and commentary on matters of public concern, including domestic and United States foreign policy affecting American Muslims. They have also consistently addressed and opposed narratives that portray Islam or American Muslims as inherently violent or extremist.

39. For decades, CAIR and its affiliates—including CAIR-Florida—have consistently and unequivocally condemned terrorism and all forms of unjust violence, including acts committed by organizations designated by the United States government as Foreign Terrorist Organizations. Indeed, CAIR's National Executive Director was targeted for assassination by ISIS specifically because of CAIR's outspoken opposition to terrorism.

40. While CAIR has vocally condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people, CAIR has also condemned Hamas violence against Israeli civilians, specifically including suicide bombings in the 1990s and attacks on Oct. 7, 2023.

41. To this day, CAIR has never been designated as a Foreign Terrorist Organization, Specially Designated Global Terrorist, or any comparable entity by the United States

11

App. 24

Department of State, the Department of the Treasury, or any other federal agency authorized to make such determinations.

42. CAIR's civil rights and charitable work necessarily depends on ongoing interaction and coordination with members of the public and with other organizations.

### B. CAIR's Protected Advocacy and Prior Litigation Challenging State Suppression of Pro-Palestinian Speech

43. As part of its longstanding civil rights mission, CAIR National and CAIR-Florida have actively engaged in advocacy and litigation defending the First Amendment rights of individuals and organizations advocating for Palestinian human rights and criticizing government policies related to Israel and Palestine. This advocacy is a core component of CAIR's civil rights work and addresses matters of public concern protected by the First Amendment.

44. This work includes CAIR's direct representation of, and advocacy for, Students for Justice in Palestine ("SJP") chapters subjected to governmental suppression because of their viewpoints and expressive activities.

45. In November 2023, CAIR National and CAIR-Florida filed suit against Florida officials, including Defendant DeSantis, challenging state directives ordering the deactivation of SJP chapters at Florida public universities. That litigation sought injunctive relief to protect students' First Amendment rights to engage in peaceful,

12

App. 25

pro-Palestinian advocacy and criticism of Israeli government policies that harms Palestinian human rights.[2]

46. In related litigation arising from the same state actions SJP chapters were also represented by the American Civil Liberties Union. CAIR's litigation and advocacy were part of a coordinated effort to challenge the suppression of pro-Palestinian speech in Florida's public universities.

47. CAIR's role in defending pro-Palestinian speech and opposing state efforts to suppress such expression placed the organization in direct and public opposition to positions advanced by Defendant DeSantis and other Florida officials. These state directives and public statements were framed as responses to the content and viewpoints of pro-Palestinian advocacy rather than to any identified unlawful conduct.

48. Beyond campus litigation, CAIR has played a leading role in defending the civil rights of individuals and organizations lawfully advocating for Palestinian human

---

[2] CAIR Press Release, CAIR-FL, "Partners to Announce Lawsuit Against State University Chancellor, Gov. DeSantis for Violating Their First Amendment Rights: Seek Injunction Quashing Order to Deactivate Group," Nov. 21, 2023, available at: https://www.cair.com/press_releases/cair-fl-partners-to-announce-lawsuit-against-state-university-chancellor-gov-desantis-for-violating-their-first-amendment-rights-seek-injunction-quashing-order-to-deactivate-group/ (last visited Dec. 12, 2025); Gabriella Borter, *Florida sued over ban on pro-Palestinian student groups*, REUTERS (Nov. 16, 2023, 4:24 p.m.), https://www.reuters.com/world/us/florida-sued-over-ban-pro-palestinian-student-groups-2023-11-16/.

13

rights, including by challenging governmental actions, institutional bans, and discriminatory enforcement triggered by criticism of Israeli government conduct that harms Palestinian human rights. This advocacy is part of CAIR's longstanding mission and constitutes protected speech on matters of public concern.

49. CAIR's advocacy on Palestine-related issues, including its representation of SJP chapters and opposition to state censorship of pro-Palestinian speech, forms an important part of the factual context in which Defendant DeSantis issued the EO.

### C. The Executive Order's Animus and Retaliatory Context.

50. The context surrounding the issuance of Executive Order 25-244 is relevant to understanding its purpose, operation, and constitutional infirmities. Courts evaluating claims of viewpoint discrimination, retaliation, and equal protection consider the historical background of the challenged action, the sequence of events leading to it, and contemporaneous statements by decisionmakers. See *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

51. Defendant DeSantis publicly stated—when responding to CAIR's intent to file suit—that he welcomed the lawsuit because it would be "opportunity" for the State to obtain CAIR's financial records and internal information through discovery.[3] In

---

[3] Joseph Ax, *Florida governor designates Muslim rights group as terrorist organization*, REUTERS (Dec. 10, 2025 10:31 a.m.),

14

this way, the Defendant publicly framed the Executive Order and the resulting litigation as a means to subject CAIR to scrutiny and investigation. This statement confirms the EO's improper purpose: retaliate against CAIR for its protected advocacy, deter constitutionally-protected expression, and attempt to justify intrusive government scrutiny unrelated to any legitimate state interest.

52. The Executive Order followed—and must be understood in light of—CAIR's own direct involvement in litigation and advocacy challenging Defendant DeSantis's attempts to suppress pro-Palestinian speech. As a specific example, the Executive Order must be considered in the context of CAIR National and CAIR-Florida's lawsuit against Florida officials, including Defendant DeSantis, challenging the deactivation of SJP chapters at public universities.

53. Beyond campus litigation, CAIR has defended the civil rights of individuals and organizations advocating for Palestinian human rights, including by challenging governmental actions and discriminatory enforcement triggered by criticism of Israeli government conduct.

---

https://www.reuters.com/world/us/florida-governor-designates-muslim-rights-group-terrorist-organization-2025-12-09/; Jay Waagmeester, Gov. DeSantis welcomes lawsuit challenging CAIR's terrorist designation, FLORIDA PHOENIX (Dec. 9, 2025), https://floridaphoenix.com/2025/12/09/gov-desantis-welcomes-lawsuit-challenging-cairs-terrorist-designation/.

15

App. 28

54. CAIR's litigation and advocacy placed CAIR in direct opposition to Defendant DeSantis on issues of Palestine-related advocacy and campus speech. The Defendant's directives were framed as responses to the content and viewpoints of pro-Palestinian advocacy rather than to any identified unlawful conduct.

55. Beyond Palestine-specific advocacy, CAIR's mission includes combatting Islamophobia, directly contradicting Defendant DeSantis's political position. Public reporting has documented Defendant DeSantis's statements minimizing concerns about Islamophobia and portraying Muslim civil rights advocacy as suspect. During a nationally televised debate, Defendant DeSantis referred to efforts to combat Islamophobia as addressing "so-called Islamophobia," prompting a formal response from the White House.[4]

56. The Executive Order does not identify any criminal conduct by CAIR, cite any adjudicated findings of wrongdoing, or rely on any federal designation, because none of these exist. Instead, it relies on political rhetoric, historical allegations previously rejected by the federal government, and generalized assertions untethered from any statutory framework. The absence of any criminal findings, federal designation, or procedural safeguards reinforces that the EO functions as a punitive

---

[4] Alex Seitz-Wald, *White House knocks Ron DeSantis over "so-called Islamophobia" remark at GOP debate*, NBC NEWS (Nov. 9, 2023), https://www.nbcnews.com/meet-the-press/meetthepressblog/white-house-knocks-ron-desantis-called-islamophobia-remark-gop-debate-rcna124527.

16

response to CAIR's viewpoints and advocacy rather than as a neutral law-enforcement measure.

### D. Executive Order 25-244 and Its Detrimental Effect

57. The Executive Order imposes immediate legal consequences. By categorically prohibiting CAIR from receiving any state or local contract, employment, funding, benefit, or privilege, the Executive Order alters Plaintiffs' legal status and excludes them from opportunities otherwise available to nonprofit organizations in Florida. These consequences apply automatically upon issuance of the Executive Order and do not depend on any future enforcement activity.

58. In addition, the Executive Order extends its exclusionary mandate by conditioning access to state and local contracts, employment, funding, benefits, or privileges on whether a person or entity is deemed to have provided "material support or resources" to CAIR. Viewed in context, this structure reasonably conveys the risk of adverse government action to third parties and operates to deter association with, and support for, CAIR's protected speech. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024) ("To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech.").

17

59. Plaintiffs' exercise of their First Amendment rights necessarily involves interaction and coordination with members of the public and with other organizations in order to engage in advocacy, public education, community outreach, and civil rights work.

60. Where a state executive action, by its terms and structure, alters an organization's legal status and reasonably conveys the risk of adverse government action in a manner that chills protected speech or association, the resulting constitutional injury is immediate and present at the moment the action is taken.

61. The EO's targeting of third parties that provide "material support or resources" to CAIR detrimentally impacts Plaintiffs' ability to engage with non-state parties. Florida law defines "material support or resources" broadly to include, *inter alia*, property or services of many kinds. Fla. Stat. § 775.33(1)(c).

62. Plaintiffs continue to engage in advocacy, public education, interfaith work, and civil rights activity in Florida. However, the Executive Order places that constitutionally-protected activity under threat. It establishes an ongoing and objective chill by reasonably conveying the risk of adverse government action associated with engagement with CAIR.

63. Because the Executive Order targets CAIR for its viewpoints and directs state agencies to take enforcement action, Plaintiffs reasonably fear retaliatory enforcement and exclusion from government-administered forums. Because the

18

Executive Order also targets third parties, Plaintiffs reasonably fear that their current and future relationships with third parties will be harmed.

64. The Executive Order has already had an immediate effect. In December 2025, CAIR National was in the final stages of launching a new podcast and had entered into a proposed production agreement with a Florida-based company. The podcast was intended to advance CAIR National's public education and civil rights mission through lawful expressive activity.

65. After issuance of Executive Order 25-244, the production company withdrew from the agreement after being advised against working with CAIR given Defendant's designation and the perceived risk of government retaliation, investigation, or legal exposure arising from association with CAIR.

66. A state official may not wield governmental power to burden an organization or deter its advocacy because of disagreement with its speech, its religious identity, or the communities it represents.

67. No process exists under Florida law for CAIR National or CAIR-Florida to challenge the designation, obtain review, or clear their name. The Executive Order is self-executing, indefinite, and issued without procedural safeguards.

68. Because Defendant DeSantis lacks authority to issue such a designation, and because the Executive Order violates foundational constitutional principles, Plaintiffs bring

19

this action seeking declaratory and injunctive relief to prevent continued enforcement, publication, or reliance on EO 25-244.

## COUNT I

### FEDERAL PREEMPTION UNDER THE SUPREMACY CLAUSE
### (8 U.S.C. § 1189 and the Federal Foreign Affairs Power)

69. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

70. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and preempts state action that conflicts with federal statutory schemes or intrudes upon areas reserved exclusively to the federal government.

71. Congress has fully occupied the field of designating organizations as Foreign Terrorist Organizations ("FTOs"). Under 8 U.S.C. § 1189, the authority to designate an entity as an FTO rests solely with the United States Secretary of State. That authority includes both the power to designate and the power to refrain from designation after reviewing the relevant facts and national-security considerations. The statutory scheme is comprehensive, includes detailed procedural safeguards, and creates uniform national consequences for any designation.

72. Florida's criminal material-support statutes incorporate federal designations made by the United States Secretary of State under 8 U.S.C. § 1189. The federal government, however, has never designated CAIR—or any of its chapters—as a

20

App. 33

terrorist organization. Defendant DeSantis's Executive Order conflicts directly with the federal statutory scheme by creating a parallel and unauthorized designation system.

73. The Executive Order stands as an obstacle to the accomplishment and execution of Congress's full purposes and objectives in establishing a uniform, federally controlled system for terrorism designations. It invites inconsistent state determinations, undermines federal foreign-relations authority, and intrudes into an area of exclusive national concern.

74. Federal law also defines the legal consequences of an FTO designation, including criminal prohibitions on providing material support, immigration restrictions, and financial sanctions under 18 U.S.C. §§ 2339A–2339B and related statutes. These consequences apply only to organizations formally designated under federal law.

75. Florida's own terrorism-related statutes rely on and incorporate the federal designation regime, reflecting the Legislature's intent to defer entirely to federal determinations regarding which entities constitute FTOs. See Fla. Stat. § 775.33 (material support statute incorporating federal designations). No Florida statute authorizes state officials to create a separate or parallel system of terrorism designations.

76. The Executive Order also intrudes into the field of foreign affairs and national security—areas of exclusive federal authority. The Executive Order relies on

21

assertions about international terrorism networks and foreign entities to justify its designation, despite governing Supreme Court precedent holding that states may not act in ways that intrude upon the federal government's responsibility for foreign relations. *See Zschernig v. Miller*, 389 U.S. 429 (1968); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

77. Because Congress has occupied the field of terrorism designations, and because the Executive Order conflicts directly with the federal statutory scheme and foreign affairs authority, the Executive Order is preempted under the Supremacy Clause and is therefore invalid and unenforceable.

78. Plaintiffs are entitled to declaratory and injunctive relief prohibiting the enforcement, implementation, publication, or continued maintenance of the Executive Order as preempted by federal law.

**COUNT II**

**ULTRA VIRES EXECUTIVE ACTION**
**(Exceeds Authority Under Florida Constitution and Statutes)**

79. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

80. Plaintiffs plead this Count in the alternative to Count I (Supremacy Clause Federal Preemption). Even if Executive Order 25-244 were not preempted by federal law under the Supremacy Clause—which it is—the Florida Constitution and/or state law

22

App. 35

do not authorize Defendant Desantis to issue the Executive Order designating Plaintiffs as terrorist organizations.

81. The Florida Constitution vests its governor with limited and enumerated executive authority. By creating a new designation and directing law enforcement agencies to act based on that designation, the Executive Order exercises a legislative power that the Florida Constitution assigns exclusively to the Legislature. The Florida governor may not create new legal categories, penalties, or enforcement consequences by unilateral executive proclamation.

82. Florida law does not authorize Defendant DeSantis to declare a domestic nonprofit organization categorically ineligible for contracts, employment, funding, or other governmental benefits or privileges.

83. When a state official acts without statutory authority and imposes a legally binding classification, such action is challengeable under 42 U.S.C. §1983 because it results in ongoing violations of federal constitutional rights.

84. The Executive Order's designation of CAIR as a "terrorist organization" is untethered from any statutory definition, criteria, or process. Florida law provides no standards for the Defendant to make such a designation, no procedures for gathering evidence, no opportunity for affected organizations to be heard, and no authorization for the Defendant to impose legal consequences based on an executive classification.

23

85. The Executive Order's terrorism designation and categorical exclusion place CAIR under an unauthorized enforcement regime, burden its expressive and associational activities, and chill and impair CAIR's ability to continue its public advocacy without fear of state retaliation.

86. Defendant DeSantis's insertion of the term "lawful measures" does not cure the lack of authority. An ultra vires command cannot be transformed into lawful state policy through phrasing alone. Courts look to the substance of executive action, not a Governor's choice of adjectives, and a state official cannot impose a new legal disability and then attempt to avoid judicial review by instructing agencies to implement that disability only through "lawful" means.

87. A governor's general authority over public safety does not include the power to define "terrorist organizations," create binding classifications, or impose enforcement obligations on state agencies outside the scope of legislatively conferred authority. Defendant DeSantis has invented and applied a designation—labeling CAIR a "terrorist organization"—that has no basis in Florida law and no statutory criteria, definitions, or procedures governing such an action. Executive power cannot be expanded through conclusory references to national security or public safety that have no constitutional or statutory grounding.

24

App. 37

88. The Executive Order is unsupported by any evidence referenced therein or in the public record. It cites no criminal charges or convictions of CAIR and provides no reliable factual basis for its sweeping designation.

89. Florida's terrorism-related statutes, including the material-support statute, Fla. Stat. § 775.33, rely exclusively on federal Foreign Terrorist Organization designations made by the United States Secretary of State under 8 U.S.C. § 1189. The Legislature's reliance on federal classifications reflects a deliberate choice not to create a separate state designation regime. Executive Order 25-244 conflicts with that statutory structure by attempting to establish a parallel, executive-created system of classifications and consequences.

90. When a governor acts without statutory authority, the designation itself is void, regardless of the rhetoric used to justify it.

91. Because Florida law contains no delegation permitting the Defendant to identify domestic organizations as terrorist entities, and because the Executive Order imposes legal consequences without statutory authority, the Executive Order constitutes an ultra vires act and is void.

92. As the Executive Order exceeds the Defendant's lawful authority, Plaintiffs are entitled to declaratory and injunctive relief prohibiting its enforcement, implementation, publication, or continued maintenance.

App. 38

## COUNT III

### FIRST AMENDMENT CLAIM FOR VIEWPOINT DISCRIMINATION
### (Facial Challenge)

93. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

94. The First Amendment prohibits state officials from using governmental power to burden or deter speech based on hostility to its content or viewpoint. This protection is at its apex when the targeted speech concerns matters of public concern or civil rights.

95. As set forth in the Factual Background, the Executive Order imposes a self-executing designation and exclusionary framework that alters Plaintiffs' legal status and burdens protected speech and association.

96. CAIR and CAIR-Florida speak on and participate in core protected expression, including civil rights advocacy, public education, litigation, community organizing, and public commentary on matters of public concern, such as domestic and international issues affecting American Muslims. This includes CAIR's advocacy and legal work defending the rights of individuals and organizations engaged in criticism of Israeli government policy and advocacy for Palestinian human rights, as well as CAIR's challenges to state actions suppressing such expression. These forms of expression lie at the heart of First Amendment speech protection.

26

97. Plaintiffs' advocacy concerning Palestinian human rights and opposition to governmental censorship constitutes core political and religious expression, and the Executive Order's singling out of CAIR—the organization that brought such advocacy and litigation—demonstrates impermissible viewpoint discrimination.

98. The designation in the Executive Order imposes burdens on Plaintiffs' speech and expressive activities by attaching an unauthorized terrorism designation, directing law enforcement agencies to "undertake all lawful measures" pursuant to that designation, and altering Plaintiffs' legal status with respect to the State in a manner that chills and burdens protected expression. Such burdens are unconstitutional viewpoint-based penalties.

99. In addition, the Executive Order extends its exclusionary mandate by conditioning access to state and local contracts, employment, funding, benefits, or privileges on whether a person or entity is deemed to have provided "material support or resources" to CAIR. Viewed in context, this structure reasonably conveys the risk of adverse government action to third parties and operates, by its structure and function, to burden association with, and support for, CAIR's protected advocacy on the basis of its viewpoints. See *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024).

100. CAIR's protected advocacy necessarily involves interaction and coordination with members of the public and with other organizations in order to engage in public education, interfaith work, and civil rights expression.

App. 40

101. The First Amendment injury asserted here does not depend on proof of downstream effects or third-party responses. Where a state executive action, by its structure, function, and terms, conditions access to government benefits on association with a disfavored speaker and thereby reasonably conveys the risk of adverse government action, the resulting burden on speech and association—imposed because of the speaker's viewpoints—is immediate and present at the moment the action—here the Executive Order—is taken.

102. Florida law defines the concept of "material support or resources" broadly, Fla. Stat. § 775.33(1)(c), making its impact on Plaintiffs' protected expression yawning.

103. The Executive Order's viewpoint-based targeting is confirmed by Defendant DeSantis's public statements responding to Plaintiffs' intent to challenge the Executive Order, including his assertion that litigation would provide an "opportunity" to subject a civil rights organization to government scrutiny unrelated to any lawful enforcement purpose. These statements demonstrate that the Executive Order was issued, at least in substantial part, because of hostility to Plaintiffs' protected advocacy.

104. The Executive Order goes far beyond expression: it attaches legal penalties and creates binding disqualifications on the basis of viewpoint by categorically excluding CAIR from government-administered programs and directing law enforcement action against Plaintiffs.

App. 41

105. Going even further, the Executive Order extends this exclusionary framework to association with CAIR itself by conditioning access to government benefits on whether a person or entity is deemed to have provided property or services to CAIR. By design, this structure burdens and deters association with CAIR's protected advocacy on the basis of its viewpoints.

106. Defendant has no legitimate governmental interest in deterring or burdening Plaintiffs' speech, and the Executive Order is not narrowly tailored to any compelling state interest. Instead, the Executive Order operates, by its structure, as a mechanism to burden and discredit an American civil rights organization whose advocacy and religious viewpoints the Defendant opposes.

107. Because Executive Order 25-244 was issued in response to and to deter Plaintiffs' protected expression and because it imposes burdens based on the content and viewpoint of Plaintiffs' speech, it violates the First Amendment.

108. The Executive Order's instruction to undertake "lawful measures" does not mitigate its unconstitutionality; it simply directs agencies to enforce an unlawful viewpoint-based designation, even if they do so through authorized means.

109. Plaintiffs are entitled to declaratory and injunctive relief prohibiting the enforcement, implementation, publication, or continued maintenance of the Executive Order.

App. 42

## COUNT IV

## FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM
**(Facial Challenge)**

110. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

111. The Fourteenth Amendment prohibits states from depriving individuals or organizations of liberty or property interests without notice and an opportunity to be heard. This protection applies when the government imposes legal classifications, burdens, or consequences that affect an individual's or organization's ability to operate, associate, or participate in public life. The Due Process Clause is violated when the government imposes a binding classification that alters legal rights or eligibility without any procedural safeguards.

112. The Executive Order deprives Plaintiffs of several fundamental rights, including the First Amendment rights of free speech, association, and to petition the government. It further deprives Plaintiffs of state-created rights, including the right to seek any "contract, employment, funds, or other benefit or privilege" with local and state governments.

113. The Executive Order further imposes a self-executing designation and exclusionary framework that alters Plaintiffs' legal status.

114. The Due Process Clause is violated when the government imposes a binding classification that alters legal rights or eligibility without any procedural safeguards.

30

115. The Executive Order contains no notice, no standards, no criteria, no evidentiary process, no opportunity to respond, and no mechanism for review or removal of the designation. Plaintiffs were provided with no advance notice of any allegations, no opportunity to be heard to contest the designation, and no procedural safeguards whatsoever.

116. Florida law provides no statutory authority or procedural framework permitting Defendant to designate domestic nonprofit organizations as "terrorist organizations," nor does it set forth any process for evaluating, challenging, or reviewing such a designation. The Executive Order therefore imposes a state-driven classification absent any legislative process or due process protection.

117. A binding governmental classification that alters legal status and eligibility for participation in public programs implicate protected liberty interests, even absent any adjudication of criminal conduct.

118. The Executive Order's lack of procedural safeguards is especially constitutionally significant because the Defendant's unilateral classification carries law enforcement implications. The directive that state agencies "undertake all lawful measures" against Plaintiffs creates a credible threat of state action that Plaintiffs cannot contest, navigate, or seek relief from through any established process.

31

App. 44

119. When the government creates a binding or consequential designation that alters legal rights or status, the Due Process Clause requires, at minimum, notice and an opportunity to be heard. The Executive Order provides neither.

120. Because the Executive Order creates and imposes legal consequences without notice, without a factual basis, without legislative authority, and without any opportunity for Plaintiffs to be heard, it violates the procedural guarantees of the Fourteenth Amendment.

121. Plaintiffs are therefore entitled to declaratory and injunctive relief prohibiting the enforcement, implementation, publication, or continued maintenance of the Executive Order.

## VI.   PRAYER

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

1. A declaration pursuant to 28 U.S.C. § 2201 that Executive Order 25-244 is unlawful, unconstitutional, void, and of no force or effect.

2. A temporary restraining order prohibiting Defendant, his agents, and all persons acting in active concert or participation with him from enforcing, implementing, publishing, or otherwise relying on Executive Order 25-244.

3. A preliminary injunction prohibiting Defendant, his agents, and all persons acting in active concert or participation with him from enforcing, implementing, publishing, or otherwise relying on Executive Order 25-244 for the duration of this litigation.

4. A permanent injunction prohibiting Defendant, his agents, and all persons acting in active concert or participation with him from enforcing, implementing, publishing, or otherwise relying on Executive Order 25-244.

5. An order directing that:

   a. Executive Order 25-244 be rescinded and withdrawn;

   b. Any state-administered classifications, labels, or listings created or imposed pursuant to Executive Order 25-244—including the Executive Order's designation of Plaintiffs as a 'terrorist organization'—be removed from all state publications, databases, websites, or public-facing materials that give legal effect to the Executive Order; and,

   c. No further reliance may be placed on those statements for any governmental purpose.

   d. An order declaring that the Defendant lacks authority under Florida law or the U.S. Constitution to create or impose terrorism designations upon domestic nonprofit organizations.

6. An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; however Plaintiffs do not seek money damages.

7.   Such other and further relief as the Court deems just, proper, and consistent with the

Constitution and laws of the United States.

Respectfully submitted,

/s/ Omar Saleh
Omar Saleh (FBN: 91216)
  (833) 224-7352
  osaleh@cair.com
CAIR-FLORIDA
8076 North 56th Street
Tampa, Florida 33617

Lena F. Masri (D.C. Bar No. 1000019)
  *Pro hac vice pending*
  lmasri@cair.com
Gadeir I. Abbas (VA Bar No. 81161; not licensed
in D.C.)
  *Pro hac vice pending*
  gabbas@cair.com
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave SE
Washington, D.C. 20003
(202) 742-6420
ldf@cair.com

Charles D. Swift (Texas Bar No. 24091964)
  *Pro hac vice pending*
  cswift@clcma.org
MUSLIM LEGAL FUND OF AMERICA
100 N. Central Expy. Suite 1010
Richardson, Texas 75080
(972) 914-2507

Arthur Ago (D.C. Bar No. 463681)
  *Pro hac vice pending*
  (202) 961-9325
  arthur.ago@splcenter.org

34

App. 47

Aaron S. Fleisher (N.Y. Bar Number 4431052; not licensed in D.C.)
    *Pro hac vice pending*
    (202) 536-9719
    aaron.fleisher@splcenter.org
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste. 550
Washington, DC 20036
(202) 971-9205 (fax)

Scott D. McCoy (FL Bar No. 1004965)
    *Admission pending*
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd. Ste. 3200
Miami, FL 33131
Tel. (786) 347-2056
scott.mccoy@splcenter.org

Huey Fischer García (Louisiana Bar No. 39571)
    *Pro hac vice pending*
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
(504) 884-7680
huey.fischergarcia@splcenter.org

Shereef H. Akeel (MI Bar No. P54345)
    *Pro hac vice pending*
    shereef@akeelvalentine.com
Samuel Simkins (MI Bar No. 81210)
    *Pro hac vice pending*
    sam@akeelvalentine.com
AKEEL & VALENTINE, PLC
888 W. Big Beaver Rd., Ste. 350
Troy, Michigan 48084
 (248) 269-9595

35

# 21

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,

    *Plaintiffs*,

v.

                                   **Case No. 4:25-cv-00516-MW-MJF**

RONALD DESANTIS, in his official
capacity as Governor, State of Florida,

    *Defendant*.

---

**FIRST AMENDED COMPLAINT FOR
<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**

**INTRODUCTION**

Plaintiffs CAIR-Foundation, Inc. and CAIR-Florida, Inc. bring this First Amended Complaint for Declaratory and Injunctive Relief against Defendant Ronald DeSantis, in his official capacity as Governor of the State of Florida. On December 8, 2025, Defendant issued Executive Order 25-244 (the "Executive Order"), attached as Exhibit A. The Executive Order is unlawful on its face, exceeds Defendant's authority, was issued without any notice or opportunity to be heard, was issued for improper purposes, and imposes immediate, self-executing legal disabilities and impairments on Plaintiffs in violation of their First and Fourteenth Amendment rights. Plaintiffs seek a declaration that the Executive Order is unlawful,

1

unconstitutional, void, and of no force or effect, and an injunction prohibiting its enforcement and continued maintenance and ordering that CAIR be stricken from the Executive Order in all respects. Plaintiffs respectfully allege as follows:

## PARTIES

1. Plaintiff CAIR-Foundation, Inc. ("CAIR" or "CAIR National") is a District of Columbia nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Washington, D.C., and an expressive association engaged in civil rights advocacy.

2. Plaintiff CAIR-Florida, Inc. ("CAIR-Florida") is a Florida nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Tampa, Florida, and an affiliated chapter of CAIR.

3. Defendant Ronald DeSantis is the Governor of the State of Florida, who issued Executive Order 25-244 asserting that it was issued pursuant to his constitutional duty to take care that the laws be faithfully executed and to preserve the public peace, and who is responsible for its execution and ongoing implementation. He is sued in his official capacity for declaratory and prospective injunctive relief.

2

## JURISDICTION AND VENUE

4. This action arises under the Constitution and laws of the United States, including the First and Fourteenth Amendments, and 42 U.S.C. § 1983. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

5. An actual and justiciable controversy exists within the meaning of 28 U.S.C. § 2201, and this Court is authorized to grant declaratory and injunctive relief to redress ongoing, immediate, and imminent constitutional violations under 28 U.S.C. §§ 2201-2202.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within this District, including the issuance, publication, and implementation of the Executive Order.

## FACTUAL BACKGROUND

### A.    CAIR and CAIR-Florida and Their Mission

7. Founded in 1994, the Council on American-Islamic Relations ("CAIR" or "CAIR National") is America's largest Muslim civil rights and advocacy organization. Its faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims through lawful advocacy and expressive activity protected by the First Amendment.

3

App. 52

8.  CAIR National is a 501(c)(3) nonprofit organization registered as CAIR-Foundation, Inc. and operates in Florida and nationwide.

9.  CAIR-Florida is a 501(c)(3) nonprofit organization registered as CAIR-Florida, Inc., and is an affiliated chapter of CAIR National. In association with CAIR, CAIR-Florida has engaged in, and intends to continue engaging in, advocacy, education, and civic participation in Florida.

10. CAIR National and its more than 20 affiliated chapters, including CAIR-Florida, work, and intend to continue working, to advance CAIR's mission through advocacy on cultural, social, nonpartisan political, and civic issues of public concern to American Muslims related to religious tolerance and understanding, cultural education, civil rights, and public policy in furtherance of its mission ("advocacy"). This advocacy includes legal action, including litigation in state and federal courts, and public policy advocacy, training, education, community organizing, interfaith work, and public commentary directed at federal, state and local executive and legislative government officials and the public.

11. Employees of CAIR and CAIR-Florida regularly appear on and are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern as part of their public education and advocacy efforts. Plaintiffs regularly issue press releases

4

and action alerts and hold press conferences as a part of their advocacy efforts. In addition, Plaintiffs regularly make posts, including tagging government officials and influencers, on social media outlets, like X, Instagram, and Facebook, to communicate as part of their advocacy efforts. Plaintiffs also regularly engage in meetings with local, state, and federal government officials, other organizations, civic groups, and religious institutions, and members of the public as part of their advocacy efforts. Plaintiffs attend and participate in local and state public meetings, including school boards, city and county commissions, and legislative committee meetings as part of their advocacy efforts. CAIR and CAIR-Florida may engage in these activities in support of their advocacy efforts individually or jointly and in some instances CAIR-Florida may do so alone but on behalf of itself and CAIR.

12. CAIR-Florida and CAIR have associated and intend to continue associating with each other without CAIR-Florida being subjected to the Executive Order's sanctions for doing so on the theory that such association constitutes provision of "material support or resources" to CAIR. Plaintiffs intend to continue associating through joint participation in events such as Muslim Day at the Florida legislature and Ramadan events, as well as through their ordinary, ongoing activities.

**B.    CAIR's and CAIR-Florida's Lawful Advocacy for Palestinian Human Rights**

13.    As an important component of its longstanding civil rights mission, CAIR National and CAIR-Florida have engaged in and intend to continue engaging in public speech, expressive association, advocacy, and litigation in support of Palestinian human rights and in defense of the First Amendment rights of individuals and organizations advocating for Palestinian human rights, matters of public concern.

14.    For example, CAIR's and CAIR-Florida's work includes direct legal representation of, and advocacy for, Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, including by Defendant, based on their disfavored viewpoints in support of Palestinian human rights.

15.    Plaintiffs' advocacy is carried out through speech that rests on the highest rung of the hierarchy of First Amendment values and is therefore provided with the most protection.

16.    In November 2023, CAIR National and CAIR-Florida sued[1] Florida officials, including Defendant, on behalf of a local SJP student organization at the University of South Florida, challenging a state directive concluding that SJP

---

[1] *Students for Justice in Palestine at the University of South Florida v. DeSantis*, No. 1:23-cv-00281 (N.D. Fla. 2023).

6

App. 55

chapters at Florida public universities must be deactivated. The directive was issued by the Chancellor of the State University System in consultation with Defendant, who previously had publicly called for the student groups to be banned. That litigation sought injunctive relief to protect students' First Amendment rights to engage in pro-Palestinian advocacy and criticism of Israeli government policies that harm Palestinian human rights, without fear of government retaliation.

17. Beyond the SJP litigation, CAIR and CAIR-Florida have played a leading role in defending the civil rights of individuals and organizations advocating for Palestinian human rights, including by challenging governmental actions, institutional bans, and discriminatory enforcement arising from criticism of Israeli government conduct.

18. For example, CAIR and CAIR-Florida engaged in an advocacy campaign to bring back Mohammed Ibrahim—a 16-year-old U.S. citizen from Florida— who has been unjustly detained by Israel since February 2025. Part of the campaign included CAIR joining an August 2025 letter with more than 100 U.S. faith-based, human rights, and civil rights organizations to U.S. Secretary of State Marco Rubio calling for urgent action to secure Mr. Ibrahim's release from Israeli custody through lawful diplomatic channels.

App. 56

19. CAIR and CAIR-Florida also issued a March 2025 public statement condemning an effort by the Mayor of Miami Beach, Florida to prevent a movie theater from showing an Oscar-winning Palestinian documentary based on its viewpoint.

20. In April 2025, CAIR sent a letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers. CAIR also issued a February 2025 press release challenging President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and "own it," expressing opposition to that policy position.

21. CAIR and CAIR-Florida often petition state officials through established legal processes to seek accountability for crimes targeting individuals based on their support for Palestinian human rights. For example, in March 2025, CAIR and CAIR-Florida issued a press release and action alert urging Florida residents to request that State Attorney Amira D. Fox pursue hate crime charges in connection with vandalism motivated by pro-Palestine speech.

### C.   *CAIR's and CAIR-Florida's Faith-based Activities and Advocacy*

22. In furtherance of their faith-driven mission, CAIR and CAIR-Florida engage in core speech to educate, empower, and defend Muslim Americans on matters of public concern. For example, CAIR and CAIR-Florida create and

8

disseminate Know Your Rights materials for Muslims who face discrimination in the workplace and at elementary, secondary, and post-secondary schools.

23. CAIR and CAIR-Florida regularly visit mosques to educate Muslims on their rights and to inform them about CAIR and CAIR-Florida's pro bono legal services through outreach. During Ramadan, one of the holiest and most important months of the year for Muslims, CAIR and CAIR-Florida create specialized programing that includes how to request accommodations at work and at school. CAIR and CAIR-Florida also often reach out to Florida correctional facilities to remind them of their duty not to curtail the rights of Muslims in their custody who seek to fast during Ramadan in accordance with federal and state law.

24. CAIR and CAIR-Florida empower and educate Muslims to be civically engaged through participation in the democratic process. CAIR hosts Muslim Advocacy Day at the U.S. Capitol, which brings Muslims from across the country, including from Florida, to engage in advocacy with their members of Congress. CAIR also partners with CAIR-Florida for Muslim Day at the Florida state legislature, an advocacy event conducted in publicly available Capitol facilities in Tallahassee, Florida, to engage with state legislators. The 2025

9

event focused on free speech, public safety, criminal justice reform, and Muslim American heritage.

25. CAIR-Florida requested to use, but was denied, publicly available space at the Florida State Capitol for its 2026 Muslim Day, scheduled to occur in February during the legislative session. Advocacy in opposition to proposed House Bill 119, also known as the "No Shari'a Act," is expected to be a part of the 2026 Muslim Day, assuming it can still be held. Recruiting participation in these activities is an important part of CAIR and CAIR-Florida's public policy advocacy and petitioning of government officials.

26. CAIR and CAIR-Florida also encourage eligible American Muslims to register to vote to expand the electorate and then to exercise their right to vote in local, state, and federal elections through nonpartisan civic engagement efforts. As a part of that process, CAIR and CAIR-Florida educate and inform voters about their views on the relevant issues at stake in the election as well as about the election process itself, including when and where to vote.

27. CAIR and CAIR-Florida's advocacy and public education also include participation in interfaith organizations and association, and engagement with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to dispel and counter stereotypes, prejudices, false tropes and narratives, disinformation, and misinterpretations of Islamic

10

App. 59

tenets, including with respect to sharia law,[2] which is frequently invoked in political discourse.

28. CAIR's and CAIR-Florida's advocacy, public education, community outreach, civil rights, and charitable work depend on ongoing association, interaction, and coordination with individual members of the public, other organizations, and businesses as an essential predicate to engaging in protected speech, association, and petitioning activity.

### D.   *CAIR's and CAIR-Florida's Message of Nonviolence*

29. Through public education and advocacy, CAIR and its affiliates, including CAIR-Florida, address and oppose narratives that portray Islam or American Muslims as inherently prone to violence, authoritarianism, religious intolerance, antisemitism, or extremism.

30. For decades, CAIR and CAIR-Florida have publicly and consistently condemned all forms of unjust violence, including hate crimes, terrorism, ethnic cleansing, and genocide committed by organizations designated by the United States as Foreign Terrorist Organizations without exception. ISIS, a U.S. designated Foreign Terrorist Organization pursuant to federal law, once

---

[2] Sharia refers to the body of Islamic religious principles derived from Islamic sources, including the Quran and prophetic tradition, which guide personal religious observance, ethics, and aspects of daily life for Muslims. It does not constitute a system of civil or criminal law in the United States.

11

threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

31. While CAIR and CAIR-Florida have consistently condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy, CAIR and CAIR-Florida have also condemned Hamas violence against Israeli civilians, including suicide bombings in the 1990s and its attacks on October 7, 2023.

32. Neither CAIR nor CAIR-Florida has ever been designated as a Foreign Terrorist Organization, Specially Designated Global Terrorist, or any comparable entity by the U.S. Department of State, the U.S. Department of the Treasury, or any other federal agency authorized to make such determinations under U.S. law. Nor have CAIR or CAIR-Florida ever been investigated, prosecuted, indicted, or convicted for any act of violence, terrorism, or material support for terrorism by any Florida law enforcement agency under Florida law.

### E. Defendant's Knowledge of and Opposition to CAIR's and CAIR-Florida's Advocacy

33. CAIR's and CAIR-Florida's advocacy for Palestinian human rights and opposition to state efforts to suppress such expression have placed, and continue to place, them in direct and public conflict with Defendant and positions he has taken on matters of public concern.

12

34.    CAIR's and CAIR-Florida's advocacy against Islamophobia, including with respect to sharia law, and their educational efforts related to Islam have placed, and continue to place, them in direct and public conflict with Defendant and positions he has taken regarding Muslim civil rights and religious freedom and tolerance.

35.    CAIR-Florida has challenged Defendant on other policies through public advocacy and correspondence. For example, in February 2025, CAIR-Florida issued a letter to Defendant following a press conference in which he criticized documented immigrants, reminding him that "Florida's economy runs on immigrant labor."

36.    In October 2023, Defendant publicly stated that Palestinian refugees from Gaza were "all antisemitic."

37.    Defendant has publicly minimized concerns about Islamophobia and portrayed Muslim civil rights advocacy as suspect. During a nationally televised debate in November 2023, Defendant referred to efforts to combat Islamophobia as addressing "so-called Islamophobia" and stated that harassment of Muslims in the United States was not a real issue.

38.    In January 2024, during his presidential campaign, Defendant's campaign website, under the heading "Ron DeSantis Stands with Israel," described his views on Israel and Palestine. The website stated that "Ron DeSantis has

13

expressed unequivocal support for Israel and the Jewish people and has taken strong actions to stand by their side" and stated as an example that "DeSantis' admin directed Florida universities to enforce the law and terminate student chapters, such as National Students for Justice in Palestine (National SJP), that support Hamas' terrorism, which the website characterized as a felony under Florida law." Consistent with these statements, Defendant publicly called for SJP chapters at Florida universities to be banned based on their expressive activity and viewpoints.

39. On October 8, 2025, via a post on the social media platform X (formerly Twitter), Defendant endorsed Florida House Bill 119 ("HB 119"), also known as the "No Shari'a Act", pre-filed the same day for consideration during the upcoming 2026 legislative session by Representative Hillary Cassel, stating, "Sharia law has no place in the USA and is incompatible with the Constitution."

40. On October 14, 2025, CAIR and CAIR-Florida in a joint press release publicly opposed HB 119 and Defendant's endorsement of it. In that release, Plaintiffs sharply criticized Defendant's support for the bill, including by characterizing HB 119 as a discriminatory and anti-Muslim measure, condemning Defendant's endorsement as harmful to religious freedom, and calling on Florida lawmakers and the public to reject the bill through lawful civic action. The release

14

expressly criticized Defendant personally and politically, challenged his priorities and leadership, and urged continued public opposition.[3]

41. On December 1, 2025, through a post on X, Defendant shared a Fox News article about the death of a Muslim woman in the Netherlands, which suggested that her family allegedly targeted her for not wearing a hijab (or headscarf). Defendant's comment accompanying the article was, "The wages of sharia…," despite the article itself not referencing sharia law.

42. On December 8, 2025, again through a post on X, Defendant publicly announced the issuance of the Executive Order, including by posting an image of the Order and stating under the heading "EFFECTIVE IMMEDIATELY", "Florida is designating the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as foreign terrorist organizations. Florida agencies are hereby directed to undertake all lawful measures to prevent unlawful activities by these organizations, including denying privileges or resources to anyone providing material support."

43. Defendant's post inaccurately stated that the Executive Order designated CAIR as a "foreign terrorist organization" when the Order in fact purported to designate CAIR as a "terrorist organization." This inaccuracy has been

---

[3] *See* CAIR & CAIR-Florida Press Release (Oct. 14, 2025) (describing HB 119 as "disgraceful and bigoted," rooted in "lies, fearmongering, and political distraction," calling Defendant's endorsement "political cowardice and moral failure," and urging public opposition).

15

repeated in the media and by third parties. In either case, Defendant lacks authority under Florida law to designate CAIR as any kind of terrorist organization.

44. Later that same evening, Defendant again posted on X, sharing his original announcement of the Executive Order and stating, "Members of the FL Legislature are crafting legislation to stop the creep of sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation."

45. Defendant has knowledge of, disagrees with, disapproves of, and is hostile to CAIR's and CAIR-Florida's religious views and practices, their pro-Palestinian political advocacy, and their public expression and dissemination of those views through speech, association, and petitioning activity, as reflected in his public statements, policy positions, and actions.

### F. Executive Order 25-244

46. On December 8, 2025, Defendant issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations," purporting to exercise executive authority, a copy of which is attached hereto as Exhibit A.

47. On its face, the Executive Order imposes immediate and self-executing legal consequences, alters Plaintiffs' legal status, and excludes them from

16

opportunities otherwise available to nonprofit organizations in Florida, without the need for any further instruction or implementing action. After a series of recitals, the Executive Order has three operative sections.

### Section 1 of the Executive Order

48. Section 1 of the Executive Order unilaterally designates CAIR a "terrorist organization." The Executive Order was issued without notice, opportunity to be heard, or process to challenge Defendant's unilateral designation of CAIR or seek relief from it before or after issuance. The designation alone constitutes a direct ongoing legal disability that inflicts immediate and continuing harm on CAIR.

49. The Executive Order identifies no criminal charges or convictions against CAIR and relies on no federal designation of CAIR as a Foreign Terrorist Organization or a Specially Designated Global Terrorist. It does not identify any conduct by CAIR that would justify or warrant its designation as a "terrorist organization" nor does it explain how CAIR has been, is now, or is likely to become a threat to the public peace in Florida. Although the Executive Order asserts that its purpose is to preserve the public peace, that assertion is pretextual considering Defendant's public statements, actions, and contemporaneous conduct surrounding the issuance of the Order.

17

50. On its face, the Executive Order's designation is not time-bound or limited and remains effective until the Executive Order is rescinded or enjoined, without any periodic review or termination mechanism.

**Section 2 of the Executive Order**

51. Section 2 of the Executive Order prohibits CAIR, solely by virtue of the designation in Section 1, from receiving any contract, employment, funds, or other benefit or privilege from Executive and Cabinet Agencies (other than the Florida Department of Law Enforcement ("FDLE") and the Florida Highway Patrol ("FHP")), from any entity regulated by those agencies, and from any county or municipality. The scope and reach of this prohibition and deprivation is exceptionally broad, encompassing multiple categories of benefits and extending across a wide range of public and private actors.

52. Section 2 of the Executive Order expansively targets and impairs CAIR's ability and opportunity to operate and engage in constitutionally protected advocacy in furtherance of its mission through exclusion from these benefits, programs, and opportunities.

53. Section 2 not only prohibits CAIR from receiving any contracts, employment, funds, or other benefits or privileges, but also extends those prohibitions to any person known to have provided "material support or resources" to CAIR, solely by virtue of the designation in Section 1, including CAIR-Florida.

18

App. 67

Under Florida law, "material support or resources" is defined to broadly include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, . . . communications equipment, facilities, . . . personnel, or transportation." Because this definition sweeps in a wide range of ordinary associational and expressive activity, Section 2 effectively subjects third parties to the same exclusions and prohibitions imposed on CAIR, without any temporal limitation, scienter requirement, or privity constraint.

54.  This aspect of Section 2 impairs Plaintiffs' ability to operate and engage in constitutionally protected advocacy in furtherance of their missions by coercing and deterring third parties from associating and interacting with Plaintiffs for fear of being subjected to the same exclusions imposed on CAIR. Section 2 also burdens the constitutionally protected rights of those third parties, including their freedom of association, compounding the injury caused by the Executive Order.

55.  Under Section 2, FDLE and FHP are directed to take unspecified measures to prevent purportedly unlawful activity by CAIR, a directive that is vague and undefined and that follows directly from the Executive Order's designation of CAIR as a "terrorist organization." By branding CAIR in this manner and directing law enforcement agencies to act on that basis, the Executive Order

19

App. 68

signals that CAIR warrants heightened law enforcement scrutiny. This directive singles out CAIR for adverse treatment based on the content and viewpoint of its protected advocacy, creates an objectively reasonable risk of intimidation, retaliatory enforcement, and exclusion from government-administered forums, and thereby chills and impairs Plaintiffs' constitutionally protected speech, association, and petitioning activity.

**Section 3 of the Executive Order**

56.    Finally, Section 3 of the Executive Order instructs the Domestic Security Oversight Council ("DSOC") to conduct a comprehensive review of Florida law and policy for addressing threats from designated terrorist organizations, that is, CAIR, and recommend changes to statutory authority, among other things, to the Governor and leaders of the legislature by January 6, 2026, one week before the start of Florida's annual general legislative session, underscoring the Executive Order's forward-looking and continuing effects. The DSOC met for this purpose on December 19, 2025.

**G.    *Defendant's Improper Purpose for Issuing Executive Order 25-244***

57.    In addition to issuing the Executive Order against CAIR based on its disfavored expressive activities and advocacy, Defendant publicly revealed an additional improper purpose through his public statements in response to Plaintiffs' announcement of their intent to challenge the Order in court.

20

App. 69

58.    On December 8, 2025, the same day Defendant issued the Executive Order, Plaintiffs announced in a joint statement their intention to file a lawsuit challenging the legality of the Executive Order.

59.    In response, Defendant publicly stated that he welcomed litigation because it would provide an opportunity to obtain CAIR's financial records and internal information through discovery—information he acknowledged would otherwise be unavailable to him.

60.    On the evening of and after Plaintiffs' joint statement, in response to a reporter tagging him in a post on X about Plaintiffs' anticipated lawsuit, Defendant posted, "I look forward to discovery — especially the CAIR finances. Should be illuminating!"

61.    On December 9, 2025, Jeremy Redfern, who is Florida Attorney General James Uthmeier's current Deputy Chief of Staff and Defendant's former press secretary, tagged Defendant in a post on X that linked to a New York Post article concerning a prior lawsuit involving CAIR. In the same post, referring to Plaintiffs' newly announced intention to file suit challenging the Executive Order, Redfern wrote, "Then discovery should be easy for you, right? RIGHT?!?!?" Defendant responded later that day, "Can't wait for CAIR to open the books!"

21

62. Also on December 9, 2025, when asked by reporters at an appearance at Florida International University about Plaintiffs' anticipated lawsuit, Defendant again stated that he welcomed the litigation not to defend the legality of the Executive Order, but because it would allow the State to obtain CAIR's financial records through discovery. Defendant repeatedly emphasized that CAIR's finances were, in his view, "really significant," asserted that "a lot of it is financial," and expressed that a lawsuit would enable the State to "get a lot of information" it does not have and otherwise could not obtain. Defendant further justified this position by invoking discredited allegations from unrelated, decades-old litigation and asserting—without any adjudication or charge—that CAIR's finances warranted heightened scrutiny. Defendant stated that he was "definitely not running from" such discovery and affirmatively welcomed the opportunity to "open the books."

63. Defendant's responses to Plaintiffs' announcement of their intent to challenge the Executive Order's stated purpose of preserving the public peace exposes that justification as pretextual. Rather than defending the legality or necessity of the Executive Order, Defendant publicly welcomed litigation as a means of obtaining CAIR's financial records and internal information through discovery that would otherwise be unavailable to him.

64.   Defendant's public statements and actions instead reveal that the Executive Order was issued for retaliatory and improper purposes: to penalize Plaintiffs because he disapproves of the content and viewpoint of their religious and pro-Palestinian advocacy; to chill and deter constitutionally protected speech, association, and petitioning activity; to coerce third parties into suppressing Plaintiffs' advocacy by deterring them from associating or cooperating with Plaintiffs; to impair the exercise of Plaintiffs' other constitutional rights; and to attempt to justify intrusive government surveillance and investigation of Plaintiffs that would be otherwise improper and unavailable to the Defendant and the State.

### H.   Executive Order 25-244 and Its Realized, Ongoing Harms

65.   In less than 30 days, the Executive Order has already had a direct and immediate effect of harming CAIR and CAIR-Florida and causing irreparable injury.

66.   For example, in December 2025, prior to Defendant's issuance of the Executive Order, CAIR was in the final stages of launching a new podcast and had entered into a proposed production agreement with a Florida-based company. The podcast was intended to advance CAIR's public education and civil rights mission through speech and expressive activity protected by the First Amendment.

23

67. After issuance of the Executive Order, the production company withdrew from the agreement stating that it was advised against working with CAIR due to Defendant's designation of it as a "terrorist organization" and the objectively reasonable risk that associating with CAIR could subject the company to the Executive Order's prohibitions and deprivations for providing "material support" to a designated organization.

68. As a result of the Executive Order, CAIR has already suffered the loss of the contract and business relationship with the production company, as well as the loss of the opportunity for speech and advocacy that the podcast would have provided. The production company further indicated that it would reconsider associating with CAIR if the Executive Order were declared unlawful and enjoined.

69. As another illustration of the concrete and particularized injury caused by the Executive Order, payments owed to CAIR pursuant to an award of attorneys' fees and costs from successful litigation have been suspended in reliance on the Executive Order. Since 2023, Laura Loomer and her media company have been making monthly payments to CAIR to satisfy that award.

70. On January 5, 2026, counsel for Loomer informed CAIR that because of the Executive Order's designation of CAIR and its material support provision—which define "material support" to include currency and other property—

24

Loomer and her media company would seek a stay of further payments pending the outcome of CAIR's legal challenge. Counsel further stated that, during the pendency of the stay request, the payments would be placed into the law firm's trust account rather than paid to CAIR. On January 7, 2026, counsel for Loomer filed a motion to stay the payments.[4]

71. As a result of the Executive Order, CAIR has been deprived of the use of those funds and has been forced to divert staff time and organizational resources to respond to the stay request and to seek recovery of the sequestered payments.

72. In addition to the injuries already suffered, including the loss of the podcast and the loss of monetary payments, CAIR faces a substantial risk of recurring future harm. Other third parties are likely to respond to the Executive Order's designation and sanctions either by disassociating from CAIR, suspending existing relationships, or refusing to associate in the foreseeable future, including in connection with upcoming events such as next month's Muslim Day at the Florida legislature or Ramadan activities.

73. The Executive Order's coercive and deterrent effect on third parties is also evident with respect to CAIR-Florida. Shortly after Defendant issued the Executive Order, a CAIR-Florida employee sought to meet with a county government official for the purpose of engaging in constitutionally protected

---

[4] *Illoominate Media, Inc. v. CAIR Florida*, 2019-cv-81179 (S.D. Fla.).

25

App. 74

speech and petitioning activity. The county official delayed meeting until he was able to consult with legal counsel because of the Executive Order.

74.    As a result of the Executive Order, CAIR-Florida has experienced disruptions to planned advocacy and public-facing activities. CAIR-Florida intends on visiting different Florida mosques throughout Ramadan (because Muslims attend the mosque every night for service) and plans on speaking with members of the mosque about its work including how the members may get more civically engaged. However, CAIR-Florida has not been able to confirm these visits, with at least one mosque declining its request

75.    CAIR and CAIR-Florida have also been forced to divert staff time and organizational resources away from their ordinary programming to respond to the Executive Order and to respond to inquiries from the media and partner organizations concerning the Order and its effects. They also face a substantial risk of suffering this harm in the immediate future.

76.    CAIR and CAIR-Florida are also imminently threatened with denial of access to the Florida Capitol for the 2026 Muslim Day at the legislature during the first week of February (or any time in the future).

77.    There is a substantial risk that the Capitol Police, a division of FDLE, will deny Plaintiffs access to the Capitol based on the Executive Order's designation of CAIR as a "terrorist organization" or based on alleged "material

26

App. 75

support" to such an organization from CAIR-Florida. The substantial risk of denial of use of facilities or access is not limited to the Florida Capitol. It also exists with respect to other state, county, and municipal facilities.

78. Denial of access to the Florida Capitol or its facilities, or other state, county, or municipal facilities, would irreparably harm Plaintiffs by depriving them of their First Amendment rights to speech, association, and petition in a public forum.

## CLAIMS

## COUNT I

## FIRST AMENDMENT VIOLATION

### Deprivation of Right to Free Speech

### (Plaintiffs against Defendant)

79. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

80. Plaintiffs bring this claim under the First Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

### *Discrimination Based on Content and Viewpoint*

81. The First Amendment bars state government officials from punishing organizations for the exercise of First Amendment protected speech.

27

App. 76

82. The First Amendment further prohibits state government officials from discriminating against speech based on its source, content, message, ideas, or viewpoint, particularly where the targeted speech pertains to matters of public concern such as faith and religion, government affairs, public policy, politics, and civil rights.

83. Plaintiffs' advocacy and speech are viewpoint-specific and pertain to matters of public concern, including faith and religion, government affairs, civil rights, politics, and public policy.

84. Plaintiffs engaged in protected speech on matters of public concern when they engaged in civil rights advocacy, public education, community organizing, and public commentary on domestic and international issues affecting American Muslims through lawful and peaceful means.

85. Plaintiffs engaged in protected speech when they advocated for Palestinian human rights; criticized Israeli government policies affecting Palestinian human rights; criticized U.S. government support for those policies; opposed HB 119 and criticized Defendant's endorsement of it; and otherwise engaged in public policy and civil rights advocacy on these matters.

86. Defendant issued the Executive Order to penalize and discriminate against Plaintiffs for exercising their protected speech because he disapproved of Plaintiffs' viewpoints.

28

87. The Executive Order prohibits Plaintiffs from receiving any contract, employment, funds, or other benefit or privilege from any Florida executive agency, any entity regulated by a Florida executive agency, or any Florida county or municipal government, solely by virtue of the designation and because of Plaintiffs' constitutionally protected advocacy.

88. Defendant's issuance of the Executive Order was motivated by Plaintiffs' exercise of their First Amendment free speech rights and his disagreement with and disfavor of the viewpoints held and expressed by Plaintiffs, as reflected in his public statements and actions.

89. The absence of any identified, ongoing, or imminent threat to public safety, combined with the Executive Order's immediate, self-executing designation and lack of standards, findings, or procedural safeguards, further demonstrates that the Order's asserted purpose of preserving the public peace is a pretext for content- and viewpoint-based discrimination. In the absence of any emergency or neutral justification requiring immediate action, Defendant's decision to single out Plaintiffs' protected religious and pro-Palestinian advocacy through a sweeping and punitive classification supports a reasonable inference that the Executive Order was issued because of disagreement with Plaintiffs' viewpoints and expression of them, rather than to serve any legitimate governmental interest.

29

App. 78

90.    Viewpoint-based discrimination is *per se* unconstitutional.

91.    There is no legitimate, let alone compelling, governmental interest justifying the infringement of Plaintiffs' First Amendment rights. Even if a legitimate interest existed, the Executive Order would violate the First Amendment because it is not narrowly tailored and burdens substantially more speech than necessary to further any purported governmental interest.

### *Retaliation for Protected Speech*

92.    The First Amendment bars state government officials from punishing or retaliating against people or organizations for engaging in protected speech on matters of public concern.

93.    Plaintiffs engaged in core constitutionally protected speech through advocacy, public education, community organizing, and public commentary on matters of public concern such as civil rights, public policy, and domestic and international issues affecting American Muslims.

94.    Plaintiffs engaged in protected speech when they advocated for Palestinian human rights; criticized Israeli government policies affecting Palestinian human rights; criticized the U.S. government and Defendant's support for those policies; opposed HB 119 and sharply criticized Defendant's endorsement of it; and otherwise engaged in public policy and civil rights advocacy on these matters.

30

95.    Plaintiffs also engaged in protected activity by suing Defendant on behalf of university students who exercised protected speech on these same topics after Defendant sought to ban those students from public universities in Florida based on their viewpoints.

96.    Defendant was motivated by Plaintiffs' exercise of core protected speech and retaliated against Plaintiffs by issuing the Executive Order because he disapproved of the viewpoints they expressed. Defendant lacked any legitimate, let alone sufficient, non-retaliatory justification for issuing the Executive Order.

97.    The Executive Order imposes government-mandated stigma and alters Plaintiffs' legal status by branding CAIR as a "terrorist organization," prohibits Plaintiffs from receiving any contract, employment, funds, or other benefit or privilege from Florida executive agencies, entities regulated by those agencies, or Florida county or municipal governments, and establishes a coercive framework that creates an objectively reasonable risk of adverse government action against those who associate with Plaintiffs.

98.    Defendant's retaliatory issuance of the Executive Order, with its stigmatizing designation and its sweeping consequences, would likely deter a person of ordinary firmness from engaging in such protected speech in the future.

99.    In addition to disapproving of Plaintiffs' protected advocacy, Defendant issued the Executive Order in response to Plaintiffs' announced opposition to

31

App. 80

HB 119 and condemnation of Defendant's endorsement of it, as well as Plaintiffs' religiously grounded advocacy concerning Islam and sharia law. Defendant's issuance of the Executive Order was intended to punish and suppress Plaintiffs' exercise of their constitutional rights in advance of the 2026 legislative session, during which legislation targeting "creeping sharia" and CAIR was expected to be considered.

***Coercion of Third Parties to Punish or Suppress Free Speech***

100.  The First Amendment also prohibits state officials from coercing private third parties to punish or suppress speech on the State's behalf by threatening or imposing legal sanctions, denying government benefits, or taking other adverse actions to achieve indirectly what the State may not do directly.

101.  To pursue its faith-based mission through core constitutionally protected speech—including public education, interfaith work, and civil rights and policy advocacy—CAIR must interact, associate, transact, and coordinate with third parties such as members of the public, other organizations, businesses, and its affiliates, including CAIR-Florida, as an essential predicate to that speech.

102.  The Executive Order prohibits third parties, whether individuals or businesses, who provide "material support or resources" to CAIR from receiving any contract, employment, funds, or other benefit or privilege from Florida

32

App. 81

executive agencies, entities regulated by those agencies, or Florida county or municipal governments, solely by virtue of providing such support.

103. The Executive Order is coercive and reasonably understood to convey the threat of adverse government action against any third party who provides material support, defined broadly to include property, personnel, or services, to CAIR, even in the absence of any unlawful conduct by those third parties.

104. The Executive Order's prohibition on benefits to third parties that provide material support to CAIR can reasonably be understood as a threat not to cooperate, interact, associate, or coordinate with CAIR, thereby punishing and suppressing CAIR's disfavored speech on Defendant's behalf.

105. Defendant included the material support provision targeting third parties for the purpose of punishing and suppressing CAIR's speech and advocacy of which he disapproved, as reflected in his public statements and actions in response to Plaintiffs' protected expression. The inclusion of this provision—which is not meaningfully limited, narrowly tailored, or necessary to advance the Executive Order's stated purpose—further demonstrates its improper purpose.

106. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of Plaintiffs' First Amendment right to free

33

speech, including the exposure of protected speech to a credible threat of state-imposed penalties.

## COUNT II

## FIRST AMENDMENT VIOLATION

### Deprivation of Right to Petition

### (Plaintiffs against Defendant)

107. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

108. Plaintiffs bring this claim under the First Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

109. The First Amendment protects the right of the people to petition the government for a redress of grievances.

110. The First Amendment bars state government officials from retaliating against individuals or organizations for exercising their right to petition the government for redress of grievances. The right to petition extends to all branches of the government.

111. Plaintiffs engaged in the constitutionally protected right to petition when they represented Students for Justice in Palestine in its lawsuit against Defendant in *Students for Justice in Palestine at the University of South Florida v.*

34

App. 83

*DeSantis*, No. 1:23-cv-00281 (N.D. Fla.), seeking judicial relief from state action.

112. Plaintiffs engaged in the constitutionally protected right to petition through advocacy directed at government officials, including issuing a joint press release opposing HB 119 and Defendant's endorsement of it; submitting advocacy letters to state and federal agencies concerning Islamophobia and Palestinian human rights; and engaging in advocacy before the U.S. Congress, the Florida legislature, and county and municipal governments seeking changes to government policy and practice.

113. Defendant retaliated against Plaintiffs for exercising their right to petition the government by issuing the Executive Order. The Executive Order prevents Plaintiffs, and those who support or provide material support to Plaintiffs, from receiving contracts, employment, funds, or other benefits or privileges from any Florida executive agencies, entities regulated by those agencies, and Florida county or municipal governments. By doing so, the Executive Order substantially burdens and impairs Plaintiffs' right to petition the legislature, state executive agencies, cities and counties, and the courts by limiting or denying access to government officials, governmental forums, facilities, and buildings, and association with third parties necessary to effective petitioning,

and by creating an objectively reasonable risk of deterrence from engaging in such activity.

114. Defendant's retaliatory issuance of the Executive Order would deter a person of ordinary firmness from petitioning the government or engaging in these protected activities again.

115. Defendant's issuance of the Executive Order was motivated by Plaintiffs' exercise of their constitutionally protected right to petition the government because he disapproved of the views and public policy positions Plaintiffs advanced through petitioning activity, as well as the views of individuals and organizations Plaintiffs represented before the courts, as reflected in Defendant's public statements and actions.

116. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of their First Amendment right to petition, including by subjecting their petitioning activity to a credible threat of state-imposed penalties.

## COUNT III

## FIRST AMENDMENT VIOLATION

## Deprivation of Right to Association

## (Plaintiffs against Defendant)

36

117. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

118. Plaintiffs bring this claim under the First Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

119. The First Amendment guarantees freedom of association as an indispensable means of preserving other individual liberties. The right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion— is referred to as expressive association and receives heightened constitutional protection.

120. In pursuing their faith-based mission, Plaintiffs' protected advocacy necessarily involves association, interaction, and coordination with each other, members of the public, and other organizations and businesses as an essential predicate to public education, interfaith work, and legal, civil rights and public policy advocacy. By branding Plaintiffs as "a terrorist organization" and treating association with them as "material support," the Executive Order infringes Plaintiffs' freedom of association by substantially limiting, and creating a significant risk of denying, their ability to engage in expressive association and advocacy.

121. Plaintiffs engage in the protected right to associate to carry out their faith-based mission by educating, advocating, empowering, organizing, and defending American Muslims in Florida and nationwide. This includes, among other activities, civic engagement presentations at Florida mosques, Muslim Day at the U.S. and Florida Capitols, and legal advocacy in the courts as part of their expressive association.

122. Plaintiffs regularly engage in the protected expressive association during Ramadan through outreach to Muslim communities across Florida. Furthermore, they associate with other organizations in their defense of Palestinian human rights, such as with Students for Justice in Palestine. They also engage in coalitions with others as they did in their efforts to secure the release of Mohammed Ibrahim and bring him back to the United States and to advocate for or against local, state, and federal legislative proposals and executive agency rules, policies, and procedures.

123. The Executive Order penalizes and impairs Plaintiffs' freedom of association by prohibiting Plaintiffs—and those who associate with or provide "material support or resources" to Plaintiffs—from receiving contracts, employment, funds, or other benefits or privileges from Florida executive agencies, regulated entities, any county or municipal governments, solely by virtue of that association. The Executive Order's extraordinarily broad definition of

"material support," combined with the absence of temporal, scienter, or privity limitations, causes third parties to reasonably fear that ordinary associational activity may expose them to adverse government action, thereby deterring association or forcing disassociation from Plaintiffs.

124. The Executive Order also infringes the freedom of association of third parties by establishing a coercive framework in which association with Plaintiffs is itself burdened through the threat of adverse government action, including exposure to the Executive Order's material support provisions and exclusion from receiving government benefits. Even apart from formal sanctions, the designation itself deters third parties from exercising their own associational rights due to the stigma and reputational harm associated with guilt by association.

125. The Executive Order was issued in direct response to Plaintiffs' expression of views Defendant opposes and Plaintiffs' association with persons and groups he has public disapproved of and targeted, including Students for Justice in Palestine, as reflected in his public statements and actions.

126. Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of their constitutionally protected freedom of association because it conditions access to government benefits and participation in public life on disassociation from Plaintiffs and deters third parties

39

from associating with them, thereby imposing an ongoing and coercive burden on protected expressive association.

## COUNT IV

## FOURTEENTH AMENDMENT VIOLATION

## Violation of Right to Procedural Due Process

## (Plaintiffs against Defendant)

127. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

128. Plaintiffs bring this claim under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, for declaratory and prospective injunctive relief.

129. The Fourteenth Amendment Due Process Clause prohibits state officials from depriving individuals or organizations of liberty or property interests without notice and an opportunity to be heard. This protection applies when the government imposes legal classifications, burdens, or consequences that affect an individual's or organization's ability to operate, associate, or participate in public life. The Due Process Clause is violated when the government imposes a binding classification that alters rights or eligibility through self-executing state action without procedural safeguards.

130. Defendant issued the Executive Order without notice of any kind to Plaintiffs.

40

App. 89

131. The Executive Order was self-executing and immediately effective upon issuance. It contains no standards, criteria, evidentiary process, opportunity to respond, or mechanism for review or removal of the designation, either before or after issuance.

132. Plaintiffs were provided with no procedural safeguards prior to being designated as a "terrorist organization" by the Executive Order and subjected to deprivations of protected liberty and property interests that alter their legal status and eligibility to participate in public programs and to receive contracts, employment, funds, or other benefits and privileges from a wide range of state and local governmental entities and regulated third parties. The right to be heard before being condemned to suffer grievous loss is a principle basic to our society.

133. The Executive Order was not issued in response to any identified, ongoing, or imminent emergency or threat to public safety. The absence of any such emergency, combined with the lack of findings or procedural safeguards, renders the Executive Order's asserted purpose of preserving the public peace unsupported and insufficient to justify the deprivation of due process protections.

134. Florida law provides no statutory authority or procedural framework permitting Defendant to designate a domestic nonprofit organization as a "terrorist organization," nor does it set forth any process for evaluating, challenging, or

41

reviewing such a designation, before or after it is made. The Executive Order therefore imposes a state-driven classification with binding legal consequences without any legislative authorization or procedural due process protection.

135.    By issuing the Executive Order, Defendant violated Plaintiffs' Fourteenth Amendment right to due process by depriving them of protected interests and causing them to suffer grievous loss without notice or an opportunity to be heard.

136.    Plaintiffs have been harmed and continue to suffer irreparable harm from the Executive Order's violation of their Fourteenth Amendment right to procedural due process, including through the imposition of a binding legal classification and legal consequences without procedural safeguards. State court remedies would be inadequate to address the harms Plaintiffs have suffered.

## PRAYER

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that Executive Order 25-244, on its face and as applied to Plaintiffs, is unlawful, unconstitutional, void, and of no force or effect.

42

App. 91

B. A preliminary injunction prohibiting Defendant, his agents, and all persons acting in concert or participating with him from enforcing, implementing, publishing, publicizing, relying on, or otherwise giving effect to Executive Order 25-244 as it relates to Plaintiffs pending final judgment, including by ordering Defendant to strike CAIR from Executive Order 25-244 for the duration of the injunction.

C. A permanent injunction prohibiting Defendant, his agents, and all persons acting in concert or participating with him from enforcing, implementing, publishing publicizing, relying on, or otherwise giving effect to Executive Order 25-244 as it relates to Plaintiffs, including by ordering Defendant to strike CAIR from Executive Order 25-244 in all respects.

D. An order directing Defendant, his agents, and all persons acting in concert or participating with him to take all necessary steps to effectuate this Court's judgment, including by:

    i.    Directing the Florida Department of Law Enforcement, the Florida Highway Patrol, Florida Executive and Cabinet Agencies, all entities regulated by Florida Executive or Cabinet Agencies, and Florida counties and municipalities to disregard and not give effect to Executive Order 25-244 as it relates to Plaintiffs;

43

ii.  Removing all state-administered classifications, labels, designations, or listings created or imposed by, pursuant to, or based on Executive Order 25-244, that explicitly state or imply that CAIR or CAIR-Florida is a "terrorist organization," from all state publications, databases, websites, and public-facing materials;

iii.  Providing notice to relevant state agencies, departments, political subdivisions, and state regulated entities that Executive Order 25-244 has been declared unlawful, unconstitutional, void *ab initio*, and of no force or effect and has been permanently enjoined;

iv.  Requiring Defendant to issue a corrective notice to relevant state agencies and to the public clarifying that Plaintiffs are not and have never been lawfully designated as a terrorist organization under Florida law, and that any prior statements or publications to the contrary were unlawful and without legal effect; and

v.  Prohibiting Defendant, his agents, and all persons acting in concert or participation with him from reissuing, re-adopting, or enforcing any executive order, directive, policy, or practice that has the purpose or effect of designating Plaintiffs as a "terrorist organization" or otherwise imposing substantially similar classifications, sanctions, or disabilities based on the same conduct or expressive

44

App. 93

activity that underlies Executive Order 25-244, absent constitutionally sufficient statutory authority and procedural safeguards.

E. An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

F. Such other and further relief as the Court deems just, proper, and consistent with the Constitution and laws of the United States and the State of Florida, excluding any award of monetary damages.

Respectfully submitted this 16th day of January, 2026.

/s/ Scott D. McCoy
Scott D. McCoy
    FL Bar No. 1004965
    scott.mccoy@splcenter.org
    (786) 347-2056
SOUTHERN POVERTY LAW CENTER
    2 S. Biscayne Blvd., Ste. 3200
    Miami, FL 33131

Arthur Ago
    DC Bar No. 463681
    Admitted *pro hac vice*
    (202) 961-9325
    arthur.ago@splcenter.org
SOUTHERN POVERTY LAW CENTER
    1101 17th St. NW, Ste. 550
    Washington, DC 20036
    (202) 971-9205 (fax)

Ahmed K. Soussi
    LA Bar No. 38414
    Admitted *pro hac vice*
    ahmed.soussi@splcenter.org
    (334) 213-8303

45

App. 94

Huey Fischer García
  LA Bar No. 39571
  Admitted *pro hac vice*
  huey.fischergarcia@splcenter.org
  (504) 884-7680
SOUTHERN POVERTY LAW CENTER
  400 Washington Ave.
  Montgomery, AL 36104

Omar Saleh
  FL Bar No. 91216
  (833) 224-7352
  osaleh@cair.com
CAIR-FLORIDA
  8076 N. 56th St.
  Tampa, FL 33617

Lena F. Masri
  DC Bar No. 1000019
  Admitted *pro hac vice*
  lmasri@cair.com
Gadeir I. Abbas
  VA Bar No. 81161; not licensed in DC
  Admitted *pro hac vice*
  gabbas@cair.com
CAIR LEGAL DEFENSE FUND
  453 New Jersey Ave. SE
  Washington, DC 20003
  (202) 742-6420
  ldf@cair.com

Charles D. Swift
  TX Bar No. 24091964
  *Pro hac vice* motion forthcoming
  cswift@clcma.org
MUSLIM LEGAL FUND OF AMERICA
  100 N. Central Expy., Ste. 1010
  Richardson, TX 75080
  (972) 914-2507

46

App. 95

Shereef H. Akeel
   MI Bar No. P54345
   Admitted *pro hac vice*
   shereef@akeelvalentine.com
Samuel Simkins
   MI Bar No. 81210
   Admitted *pro hac vice*
   sam@akeelvalentine.com
AKEEL & VALENTINE, PLC
   888 W. Big Beaver Rd., Ste. 350
   Troy, MI 48084
   (248) 269-9595

*Counsel for Plaintiffs*

47

App. 96

# 21-1

EXHIBIT

A

exhibitsticker.com

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 25-244
(Protecting Floridians from Radical Islamic Terrorist Organizations)

**WHEREAS**, pursuant to section 874.03(7), Florida Statutes, a terrorist organization is any organized group engaged in or organized for the purpose of engaging in activity involving a violent act or an act dangerous to human life and is intended to intimidate, injure, or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy; and

**WHEREAS**, the Society of Muslim Brothers (Muslim Brotherhood) was founded in Egypt in 1928 and has developed into a transnational network with a long history of engaging in or supporting violence, including political assassinations and terror attacks on civilians, for the purpose of establishing a world-wide Islamic caliphate and imposing its Islamist system of belief across the globe, including in the United States; and

**WHEREAS**, the Muslim Brotherhood's Islamist ideology is irreconcilable with foundational American principles of life, liberty, and the pursuit of happiness reflected in the Declaration of Independence and the United States Constitution, especially including the right to religious freedom and the equal protection of the laws; and

**WHEREAS**, on November 24, 2025, President Trump issued Executive Order 14362 to initiate "a process by which certain chapters or other subdivisions of the Muslim Brotherhood shall be considered for designation as Foreign Terrorist Organizations"; and

**WHEREAS**, the Muslim Brotherhood supports a network of chapters and affiliated political entities and front organizations that engage in terrorism or funnel money to finance terrorist activities; and

**WHEREAS**, members of the Muslim Brotherhood created Hamas in 1987, the primary goal of which is the destruction of the State of Israel and the eradication of Jews in their historic homeland of Judea and Samaria; and

**WHEREAS**, the United States Government designated Hamas as a foreign terrorist organization on October 8, 1997; and

**WHEREAS**, on October 7, 2023, Hamas murdered over 1,200 men, women, and children in Israel, including 46 Americans, and took 254 hostages, including 12 Americans; and

**WHEREAS**, in the aftermath of the October 7 attack, Muslim Brotherhood chapters in the Middle East joined attacks against Israel with, or otherwise provided material support to, Hamas, Hezbollah, and other Palestinian groups; and

**WHEREAS**, organizations affiliated with the Muslim Brotherhood and Hamas have had active fundraising arms in the United States, which have raised funds to support Hamas's terrorist attacks in the Middle East; and

**WHEREAS**, the Palestine Committee, an organization affiliated with the Muslim Brotherhood and created to support Hamas in the United States, expressly sought to "increase the financial and moral support for Hamas" and oversaw front organizations designed to raise money for Hamas; and

**WHEREAS**, the Palestine Committee founded the Council on American-Islamic Relations (CAIR) in the United States in 1994; and

**WHEREAS**, CAIR was founded by persons connected to the Muslim Brotherhood and was created, in the words of persons affiliated with CAIR, as "an official U.S. cover representing the Islamic community" to conceal ties to Islamic extremist groups; and

**WHEREAS**, CAIR was designated as an unindicted co-conspirator by the United States Government in the largest terrorism-financing case in American history, and the court found "ample evidence to establish the association[]" of CAIR with terrorist organizations, *see United States v. Holy*

2

App. 99

*Land Found. for Relief & Dev.*, No. 3:04-cv-240, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009); and

**WHEREAS**, individuals associated with CAIR have been convicted of providing, and conspiring to provide, material support to designated terrorist organizations; and

**WHEREAS**, pursuant to section 943.0311, Florida Statutes, the executive director of the Florida Department of Law Enforcement serves as the Chief of Domestic Security and is responsible for coordinating ongoing assessments of the State's vulnerability to terrorism and its ability to detect and prevent acts of terrorism within or affecting Florida; and

**WHEREAS**, section 321.05, Florida Statutes, directs the Florida Highway Patrol to conserve the peace and enforce the laws of the State; and

**WHEREAS**, pursuant to Article IV, Section 4 of the Florida Constitution and section 943.0313, Florida Statutes, the Domestic Security Oversight Council is responsible for reviewing the State's domestic security posture and making recommendations to the Governor and Legislature concerning the State's domestic security, including with respect to threats from terrorism.

**NOW, THEREFORE, I, RON DESANTIS,** as Governor of Florida, pursuant to my solemn constitutional duty to take care that the laws be faithfully executed and to preserve the public peace, do hereby promulgate the following Executive Order, to take immediate effect:

Section 1. The Muslim Brotherhood and any chapter or subdivision thereof; the Council on American-Islamic Relations; and any other organization designated by the United States Government as a Foreign Terrorist Organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) are hereby designated as terrorist organizations for the purpose of this Executive Order.

Section 2. The Florida Department of Law Enforcement and the Florida Highway Patrol are directed to undertake all lawful measures to prevent unlawful activities in Florida by the terrorist organizations designated in Section 1. Unless prohibited by federal or state law, all other Executive

3

App. 100

and Cabinet Agencies shall further undertake all lawful action to prevent any terrorist organization designated in Section 1, or any person known to have provided material support or resources to such organization as defined in section 775.33(1)(c), Florida Statutes, from receiving any contract, employment, funds, or other benefit or privilege from such Executive or Cabinet Agency or any entity regulated by such Executive or Cabinet Agency or from any County or Municipality of the State.

Section 3. The Domestic Security Oversight Council shall conduct a comprehensive review of existing statutory authorities, regulations, and policies for addressing threats from the terrorist organizations designated in Section 1 and submit recommendations for any additional action needed to the Governor, the President of the Senate, and the Speaker of the House of Representatives by January 6, 2026.



IN TESTIMONY WHEREOF, I have hereunto set my hand and have caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 8th day of December, 2025.

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

4

App. 101

**24**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,**

    *Plaintiffs*,

**v.**

                           **Case No. 4:25-cv-00516-MW-MJF**

**RONALD DESANTIS, in his official
capacity as Governor, State of Florida,**

    *Defendant*.

_____/

**CAIR-FOUNDATION, INC.'S
MOTION FOR PRELIMINARY INJUNCTION
AND SUPPORTING MEMORANDUM**

App. 103

**TABLE OF CONTENTS**

Motion for Preliminary Injunction.................................................................4

Request for Oral Argument............................................................................4

Certificate of Conferral................................................................................4

Memorandum of Law.....................................................................................5

Preliminary Statement...................................................................................5

Background ...................................................................................................6

Argument......................................................................................................9

    I.     CAIR is substantially likely to establish standing for purposes of a preliminary injunction. ....................................................................10

    II.    CAIR is substantially likely to succeed on the merits of its First Amendment claims. ....................................................................14

        A.    CAIR is substantially likely to succeed on the merits of its Free Speech claim. ....................................................................15

            1.    Defendant is excluding CAIR from government benefits based on Plaintiff's viewpoint. ...........................15

            2.    Defendant is retaliating against CAIR for its protected speech.....................................................................18

                a.    CAIR's speech is protected. ....................................19

                b.    CAIR is suffering adverse action that would likely deter a person of ordinary firmness from engaging in such speech. ..........................................20

                c.    There is a causal relationship between Defendant's Executive Order and CAIR's protected speech. ....................................................21

            3.    Defendant is punishing and suppressing CAIR's speech by coercing third parties not to materially support Plaintiff. ....................................................24

        B.    CAIR is substantially likely to succeed on the merits of its Right to Petition claim. ....................................................27

        C.    CAIR is substantially likely to succeed on the merits of its Free Association claim.................................................30

    III.    CAIR will suffer irreparable injury unless an injunction is issued. ........33

2

IV.    The equities favor CAIR and the injunction would serve the public interest. ..........................................................................................34

Request to Waive Rule 65(c) Security..................................................................35

Conclusion ...........................................................................................................35

Certificate of Word Count ...................................................................................39

Certificate of Service ...........................................................................................40

3

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff CAIR-Foundation, Inc. ("CAIR") moves for a preliminary injunction enjoining Defendant Governor Ronald DeSantis from enforcing, implementing, or otherwise giving effect to Executive Order 25-244, including by ordering Defendant to strike CAIR from the Executive Order for the duration of the injunction and enjoining any enforcement, implementation, or reliance upon the designation during the pendency of this action, based on claims brought in CAIR's First Amended Complaint, Doc. 21. CAIR respectfully requests the Court waive the security requirement in Rule 65(c).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), CAIR respectfully requests oral argument on this motion, which it estimates would take two hours.

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(B), the undersigned counsel states that on January 20, 2026, Plaintiff's counsel emailed the Florida Attorney General's Office to notify it that this motion would be filed and to request to meet and confer. At the time of this filing, Plaintiff's counsel has not received a response, and no attorney for Defendant has entered an appearance in this matter.

4

App. 106

**MEMORANDUM OF LAW**

**PRELIMINARY STATEMENT**

This case is about Defendant's assault on CAIR's constitutionally protected efforts to advance and achieve its faith-driven mission as a nonprofit civil rights and advocacy organization. On December 8, 2025, Defendant issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations," ("the Executive Order"), which, without notice or process, unilaterally designates CAIR in perpetuity as a "terrorist organization" without any statutory standards, temporal limitation, or mechanism for notice or review. The Executive Order, based solely on its terrorist organization designation, imposes immediate and self-executing legal consequences and penalties on CAIR, conditions third-party access to government benefits on disassociation from CAIR, alters its legal status, excludes it from opportunities otherwise available to nonprofit organizations in Florida, and impermissibly restricts or burdens its ability to carry out its faith-driven mission through lawful and peaceful advocacy and expressive activity protected by the First Amendment.

The Executive Order targets CAIR's constitutionally protected advocacy and expressive activity, and it operates to burden and suppress that activity by design. And the Executive Order not only infringes upon CAIR's protected activity, but it also punishes third parties who have associated with CAIR and coerces those who

5

App. 107

otherwise would do so in the future into disassociating from CAIR, for fear of being labeled as giving material support to a terrorist organization and incurring the same penalties.

For all these reasons—because it operates as a viewpoint-based exclusion and coercive blacklist that burdens protected speech and association—the Executive Order violates several of CAIR's constitutional rights guaranteed by the First Amendment, namely the rights to free speech, free association, and petition. From the moment Defendant issued the unlawful Executive Order, CAIR has suffered ongoing irreparable constitutional injury by operation of law and will continue to do so unless and until it is enjoined.

Therefore, this Court should grant Plaintiff's motion for a preliminary injunction enjoining Defendant from enforcing, implementing, or otherwise giving effect to the Executive Order, including by ordering Defendant to strike CAIR from the Executive Order for the duration of the injunction and prohibiting Defendant from enforcing, implementing, or relying upon the designation in any manner.

## <u>BACKGROUND</u>

CAIR is America's largest Muslim civil rights and advocacy nonprofit organization, with a faith-driven mission to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims. Declaration of Manal Fakhoury on Behalf of CAIR ¶¶ 4-5 (Jan. 22, 2026) ("CAIR

App. 108

Decl."). CAIR is an expressive association through which CAIR engages in constitutionally protected advocacy, education, and civic participation in Florida. CAIR has consistently espoused a message of nonviolence and engages in advocacy on matters of public concern, including civil rights and Palestinian human rights.

Following CAIR's public advocacy and criticism of certain state actions, Defendant issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations," which designates CAIR as a "terrorist organization." *See* Ex. 1 to Declaration of Ahmed Soussi (Jan. 22, 2026) ("Soussi Decl."); CAIR Decl. ¶ 21; Declaration of Wilfredo Ruiz on Behalf of CAIR-Florida ¶ 19 (Jan. 22, 2026) ("CAIR-Florida Decl."). The Executive Order punishes CAIR and any individuals or businesses known to have provided "material support or resources" to CAIR by preventing it from receiving any contract, employment, funds, or other benefit or privilege ("Benefits") from all Florida Executive and Cabinet Agencies ("State Agencies"), any entity regulated by State Agencies ("Regulated Entity"), or from any County or Municipality of the State ("Local Governments") (and from all three together, "Government Benefits"). Soussi Decl. Ex. 1 § 2. Further, the Executive Order directs the Florida Department of Law Enforcement ("FDLE") and the Florida Highway Patrol ("FHP") to take unspecified measures with respect to CAIR in Florida. *Id*.

The Executive Order was issued against the backdrop of CAIR's ongoing

7

public advocacy and criticism of state actions, including litigation and public opposition to policies advanced by Defendant. The Executive Order singles out CAIR by name; imposes adverse legal consequences on CAIR and those who associate with it, including Students for Justice in Palestine ("SJP"), whom CAIR represented in a lawsuit against Defendant and who criticized him for endorsing Florida House Bill 119 in the upcoming general legislative session, CAIR Decl. ¶ 19; CAIR-Florida Decl. ¶ 17; coerces third parties into disassociating with CAIR; and allows for an investigation of CAIR that would otherwise be improper.

As intended by the Executive Order's express terms, Defendant's unlawful designation of CAIR has had immediate detrimental effects. For example, CAIR was set to launch a civil rights podcast produced by a Florida-based company, but that company withdrew from the proposed agreement because of the Executive Order. CAIR Decl. ¶¶ 26-27.

The Executive Order has impaired CAIR's ability to engage with government entities in furtherance of its mission. CAIR Decl. ¶ 28; CAIR-Florida Decl. ¶ 21. For example, CAIR applied to reserve a room at the Florida State Capitol for its 2026 Muslim Day in February, but that application was denied. CAIR-Florida Decl. ¶ 27. In addition, CAIR's planned outreach to Florida mosques and community centers for Ramadan 2026 has been placed on hold because third-party organizations have expressed concerns regarding association with CAIR following the issuance of the

8

Executive Order. CAIR Decl. ¶ 29; CAIR-Florida Decl. ¶ 23

These harms flow directly from Defendant's unlawful activity. By issuing the Executive Order, Defendant violated CAIR's First Amendment right to free speech by discriminating against CAIR based on its viewpoint; retaliating against CAIR for past speech and expressive activity; and coercing third parties to suppress CAIR's speech. Defendant furthermore violated CAIR's First Amendment right to petition the government and its freedom of association. The harms, moreover, will continue absent an injunction.

## ARGUMENT

CAIR seeks a preliminary injunction enjoining Defendant from enforcing the Executive Order as it relates to CAIR pending final judgment, including by ordering Defendant to strike CAIR from the Executive Order for the duration of the injunction. "A preliminary injunction is appropriate only when the moving party can show that: (1) 'it has a substantial likelihood of success on the merits'; (2) it will suffer 'irreparable injury' unless an 'injunction issues'; (3) this 'threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party'; and (4) 'the injunction would not be adverse to the public interest.'" *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020)).

All four factors are satisfied here. First, CAIR is likely to succeed on the

App. 111

merits because the Executive Order violates the First Amendment of the U.S. Constitution. Second, CAIR is suffering irreparable harm and will continue to do so unless and until the Executive Order is enjoined, including by ordering Defendant to strike CAIR from the Executive Order for the duration of the injunction. Third, the substantive injuries faced by CAIR far outweigh the State's asserted public-safety justification. Finally, an injunction would serve the public interest by restoring and preserving rights to free speech, free association, petition and the rule of law, and because enforcement of an unconstitutional law would disserve the public interest.

**I.    CAIR is substantially likely to establish standing for purposes of a preliminary injunction.**

Because standing is a threshold jurisdictional issue on which CAIR bears the burden, CAIR starts there. "To have standing, 'a plaintiff must have suffered or be imminently threatened with a concrete and particularized "injury in fact" that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision.'" *Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023), *certified question answered sub nom. DeSantis v. Dream Defs.*, 389 So. 3d 413 (Fla. 2024) (quoting *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1303-04 (11th Cir. 2017) (en banc)).

CAIR suffered "injury in fact" in the form of contractual harm when a Florida production company withdrew from a production agreement with CAIR for a new podcast. *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004)

("physical, economic, reputational, contractual, or even aesthetic" harm constitutes "cognizable harm" for injury in fact); CAIR Decl. ¶¶ 26-27. Because the benefit of the contract included more immediate and future speech opportunities for CAIR's advocacy, the injury from the loss of the contract also constitutes future harm. *Id*. The company identified the Executive Order as the cause of its withdrawal from the agreement, explaining that it had been advised against working with CAIR due to the Executive Order's designation of CAIR and the risk that association with CAIR could subject the company to adverse consequences under the Executive Order. *Id*. CAIR's injury from the loss of the contract would be remedied by the requested declaratory and prospective injunctive relief.

CAIR also has suffered economic harm in the form of monetary loss, which "is a well-established injury for purposes of Article III standing." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (citing *Chevron Corp. v. Donziger*, 833 F.3d 74, 120 (2d Cir. 2016)). CAIR suffered monetary loss when payments owed to it pursuant to a settlement of a court-ordered award of attorneys' fees and costs were affirmatively withheld from CAIR following issuance of the Executive Order. CAIR Decl. ¶ 23. On January 7, 2026, opposing counsel in that case expressly invoked the Executive Order's Designation of CAIR and its "Material Support" Provision as the bases for withholding payment and seeking judicial approval to suspend further payments. CAIR Decl. ¶ 23; *see also* Mot. to Stay,

11

App. 113

*Illoominate Media, Inc. v. CAIR Fla.*, No. 19-cv-81179 (S.D. Fla.), Doc. 179. As a result of the Executive Order, CAIR faces an ongoing and imminent deprivation of funds to which it is legally entitled.

In addition to having been deprived of those funds, CAIR has had to, and will continue to be forced to, divert staff time and organizational resources away from its ordinary programming to respond to the stay request and to seek recovery of the sequestered payments, which also constitutes an injury in fact. *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164-66 (11th Cir. 2008); CAIR Decl. ¶ 32. CAIR's injury from the ongoing deprivation of the funds and the ongoing diversion of resources would be remedied by a favorable decision granting CAIR its requested declaratory and prospective injunctive relief because the challenged provisions of the Executive Order would no longer be operative.

CAIR is also imminently threatened with harm sufficient to establish injury in fact. "A threat of future injury is sufficient to establish standing when 'the threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" *Dream Defs.*, 57 F.4th at 886 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). CAIR, in partnership with CAIR-Florida, intends to participate in the 2026 Muslim Day advocacy at the Florida legislature during the first week of February. CAIR Decl. ¶ 29. CAIR faces the future threat of injury from being denied access to the Florida Capitol for Muslim Day advocacy. CAIR faces a

12

App. 114

substantial risk of exclusion from the Florida State Capitol for Muslim Day advocacy because the Executive Order automatically conditions access to government facilities and benefits on the challenged designation. And because the Executive Order's prohibition against CAIR's receiving any Government Benefit based on the designation is automatic, the substantial risk of future harm to CAIR is continuous. A favorable decision on CAIR's claims and relief declaring the Executive Order unconstitutional and enjoining Defendant from enforcing it against CAIR and striking CAIR from it would redress future harms.

CAIR also faces a substantial risk of recurring future injury, as evidenced by how third parties have already responded to the Executive Order, resulting in harm to CAIR. "Past injury from alleged unconstitutional conduct … constitute[s] evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). In addition to the two examples of past harm to CAIR from the Executive Order, CAIR-Florida intended on conducting civic outreach to attendees of a mosque during Ramadan because of the expected increased presence of Muslims, but the mosque declined its request due to the Executive Order. CAIR-Florida Decl. ¶¶ 22-23. CAIR-Florida will lose the opportunity to speak and associate with these attendees.

App. 115

It is reasonable to infer from this evidence that the Executive Order will continue to operate to deter third parties from associating with CAIR, including prompting the suspension of existing relationships and refusal to enter into new ones, thereby creating a substantial risk of ongoing and imminent harm to CAIR. That harm includes interference with CAIR's planned Ramadan activities and Muslim Day at the Capitol. These imminent and continuing injuries flow directly from the Executive Order's designation and sanctions and would be remedied by declaratory and prospective injunctive relief enjoining its enforcement.

Therefore, CAIR is substantially likely to demonstrate that it has standing with respect to each of its First Amendment claims.

## II.    CAIR is substantially likely to succeed on the merits of its First Amendment claims.

"A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)). "[T]he word 'substantial' does not add to the quantum of proof required to show a likelihood of success on the merits." *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 n.2 (11th Cir. 1983). CAIR is substantially likely to succeed on its claims that the Executive Order violates its First Amendment right to (A) free speech, (B) petition, and (C) free association.

14

App. 116

**A.    CAIR is substantially likely to succeed on the merits of its Free Speech claim.**

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits actions by the government "abridging the freedom of speech." U.S. Const. amend. I; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Defendant's Executive Order is abridging CAIR's freedom of speech in at least three ways: (1) by restricting CAIR's speech or receipt of Government Benefits based on the content and viewpoint of its speech; (2) by retaliating against CAIR for its protected speech; and (3) by coercing third parties not to cooperate with CAIR, thereby suppressing and punishing its speech on Defendant's behalf. CAIR need only meet the requisite showing on one of these grounds to show that it is substantially likely to succeed on the merits of its Free Speech claim. *See, e.g.*, *Pine Ridge Recycling, Inc. v. Butts Cnty.*, 864 F. Supp. 1338, 1342 (M.D. Ga.), *amended*, 886 F. Supp. 851 (M.D. Ga. 1994).

**1.    Defendant is excluding CAIR from government benefits based on Plaintiff's viewpoint.**

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society.'" *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). "Viewpoint discrimination is … 'the greatest First Amendment sin.'" *Moms for Liberty - Brevard Cnty., Fla. v. Brevard Pub. Schs.*, 118 F.4th 1324, 1332 (11th Cir. 2024) (quoting

15

*Honeyfund.com*, 94 F.4th at 1277). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)); *Jarrard v. Sherrif of Polk Cnty.*, 115 F.4th 1306, 1318-19 (11th Cir. 2024) (viewpoint regulation of speech presumptively invalid and must at the very least satisfy strict scrutiny). "[T]he 'government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Moms for Liberty*, 118 F.4th at 1332 (quoting *Rosenberger*, 515 U.S. at 829). "[S]uspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1280 (11th Cir. 2025) (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004)). Restrictions on core political speech are subject to strict scrutiny, *Hetherington v. Madden*, 640 F. Supp. 3d 1265, 1274 (N.D. Fla. 2022) (citing *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002)), and content-based restrictions that target speech based on its communicative content are presumptively unconstitutional, *id.* at 1273 (citing *Reed*, 576 U.S. at 163).

The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "For if the government

16

App. 118

could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited," allowing the government to 'produce a result which (it) could not command directly.'" *Id*. (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

Defendant uses the Executive Order to punish and restrict, both directly and indirectly, CAIR's speech and expressive positions on matters of public concern, including human rights in Palestine, the interpretation of Islamic tenets, and the civil rights, treatment, and well-being of Muslim Americans across Florida.

The Executive Order directly punishes and restricts CAIR's speech and expressive activities. On its face, the Executive Order denies CAIR access to any Government Benefits and to state, county, and municipal public fora. *See* Soussi Decl. Ex. 1 §§ 1-2. Considering the Executive Order's definition of a terrorist organization in its first whereas clause and its stated public-safety rationale, Section 1's designation of CAIR as a "terrorist organization" operates to deny CAIR access to government buildings and facilities. Section 2's prohibition on CAIR receiving any Government Benefits is so broad as to prevent it, for example, from reserving public library conference rooms for Know Your Rights trainings, public parks for rallies, or public school or University auditoriums for town halls.

By imposing the broadest possible unfavorable treatment upon a group advancing disfavored viewpoints, the Executive Order fails strict scrutiny. To survive

this standard and overcome the presumption of unconstitutionality, Defendant must show that the Executive Order "furthers a compelling interest and is narrowly tailored to achieve that interest." *Fed. Elec. Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464 (2007).

Even assuming Defendant has a compelling interest that is furthered by the Executive Order, it fails the narrow tailoring test and cannot survive strict scrutiny. The Executive Order's prohibition on CAIR receiving "any" Benefits is not narrowly tailored, nor are the categories of Benefits themselves. Moreover, the categories of entities, *i.e.*, State Agencies, Regulated Entities, and Local Governments, from which those Benefits are denied and the universe of entities within each of those categories are expansive as well, not narrowly tailored. The Executive Order covers 22 State Agencies, 67 counties, more than 400 municipalities, and an unknown, but certainly vast, number of Regulated Entities from which Benefits are prohibited. Finally, the Executive Order's "Material Support" provision is not narrowly tailored because it lacks any temporal limitation, scienter requirement, or privity constraint, and instead sweeps in a boundless range of expressive and associational conduct.

### 2. Defendant is retaliating against CAIR for its protected speech.

"'As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected

18

App. 120

speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256).

"To make out a First Amendment retaliation claim, [CAIR has] to show that '(1) [its] speech was constitutionally protected; (2) [it] suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech.'" *Jarrard*, 115 F.4th at 1315-16 (quoting *Brannon v. Finkelstein*, 754 F.3d 1269, 1274 (11th Cir. 2014)); *see also Wall-DeSousa v. Fla. Dep't of Highway Safety & Motor Vehicles*, 691 Fed. App'x 584, 590 (11th Cir. 2017). CAIR is likely to make those showings.

### a.    CAIR's speech is protected.

CAIR satisfies this element. CAIR's public expression of its views and opinions on matters of public policy, civil rights, and human rights during its advocacy and education efforts is core constitutionally protected speech under the First Amendment. *See, e.g.*, *Wall-DeSousa*, 691 Fed. App'x at 590 (speech on matter of public concern during televised interview protected); *Huggins*, 151 F.4th at 1281 (speech before public school board meeting protected); *Bennett v. Hendrix*, 423 F.3d

19

App. 121

1247, 1250 n.3 (11th Cir. 2005), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (speech and advocacy in support of county referendum protected); *see also* CAIR Decl. ¶¶ 6-20 (detailing examples of Plaintiff's constitutionally protected speech); CAIR-Florida Decl. ¶¶ 6-18 (same).

> **b.      CAIR is suffering adverse action that would likely deter a person of ordinary firmness from engaging in such speech.**

"[W]hether the allegedly retaliatory conduct 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights' … presents an objective question." *Huggins*, 151 F.4th at 1281 (quoting *Bailey v. Wheeler*, 843 F.3d 473, 481 (11th Cir. 2016)). "[A] First Amendment retaliation claim can use any sort of adverse action at its second element." *Hall v. Merola*, 67 F.4th 1282, 1294 (11th Cir. 2023) (battery); *see also Huggins*, 151 F.4th at 1281 (public humiliation and damage to reputation).

Defendant's issuance of the Executive Order qualifies as retaliatory conduct that meets the objective "person of ordinary firmness" standard. Defendant—acting in his official capacity as Governor and invoking the authority of the State through the Executive Order—has publicly, and with the imprimatur of the state through the Executive Order, branded CAIR as a "terrorist organization," one of the most odious and stigmatizing labels one could apply. Courts have found that similar but less severe descriptions meet the standard. *Cf. Bennett*, 423 F.3d at 1254-55 (flyers

20

App. 122

depicting the plaintiffs as criminals terrorizing the county); *Bailey*, 843 F.3d at 477, 481-82 (be-on-the-lookout advisory describing plaintiff as a "loose cannon" and danger to law enforcement and advising officers to "act accordingly"). And, while the Executive Order's Designation alone meets the ordinary-firmness standard, its prohibition on CAIR—and anyone known to have provided material support to it— from receiving any Government Benefits independently and cumulatively meets the standard. CAIR, therefore, has met the second requirement for retaliation.

      c.      **There is a causal relationship between Defendant's Executive Order and CAIR's protected speech.**

"In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008)). Defendant's improper purpose and subjective motivation may be established directly from the face of the Executive Order and Defendant's public statements or inferred from objective indicia and circumstantial evidence. *See Huggins*, 151 F.4th at 1282.

CAIR meets the causation element. The Executive Order was issued because of CAIR's protected speech, including its public advocacy and criticism of Defendant on matters of public policy, civil rights, and human rights. That causal relationship is apparent from the text, timing, and targeting of the Executive Order and from Defendant's own public statements.

A comparison of Defendant's and CAIR's public statements and policy positions demonstrates Defendant's antagonism toward CAIR's viewpoints, beliefs, and opinions, and naturally, its advocacy in support of them. *See* Soussi Decl. Ex. 2 (Defendant publicly described all Palestinian refugees fleeing Gaza as antisemitic); Soussi Decl. Ex. 3 (Defendant publicly trivialized fears about and efforts to stem anti-Muslim prejudice as "so-called Islamophobia," said anti-Muslim harassment in the U.S. was not real, and portrayed Muslim civil rights advocacy as suspect); Soussi Decl. ¶ 7 (Defendant touted on presidential campaign website unequivocal support for Israel and his attempt to ban pro-Palestinian SJP chapters); Soussi Decl. Ex. 13 (In October 2025, Defendant endorsed Florida House Bill 119 "No Shari'a Act" ("HB 119"), an anti-Muslim legislative proposal pre-filed for consideration during upcoming 2026 legislative session, which CAIR opposes and publicly criticized him for supporting); Soussi Decl. Ex. 14 (anti-sharia post on X); Soussi Decl. Ex. 17 (post on X announcing the Executive Order inaccurately saying CAIR designated as "foreign terrorist organizations"); Soussi Decl. Ex. 15 (anti-sharia post on X).

In addition, Defendant's prior retaliation against protected pro-Palestinian speech he disliked and the fact that CAIR defended the students targeted by his retaliation in a federal lawsuit against him, supports an inference of a causal relationship between the Executive Order and CAIR's protected speech.

In October 2023, Defendant called for pro-Palestinian student groups, namely

22

App. 124

SJP at two Florida universities, to be banned because they engaged in protected pro-Palestinian advocacy and criticism of Israeli government policies that harm Palestinian human rights, views Defendant dislikes, even going so far as to imply that they provided material support to a foreign terrorist organizations. Soussi Decl. Ex. 4. In response to the protected speech, the Chancellor of the State University System, in consultation with Defendant, heeded Defendant's call to ban SJP chapters and issued a directive to university presidents, referencing Florida's felony material support law and concluding that the SJP student chapters must be deactivated. CAIR sued Defendant (and others) on behalf of one of the SJP chapters, seeking injunctive relief to protect students' First Amendment rights without fear of government retaliation. CAIR Decl. ¶ 19; Soussi Decl. Ex. 5.

Defendant's prior efforts to suppress disfavored constitutionally protected pro-Palestine speech—including his call to ban SJP chapters and the State's subsequent directive invoking "material support" rationales—are closely analogous to the structure and rationale of the Executive Order issued because of CAIR's protected speech. CAIR's prior litigation against Defendant on behalf of an SPJ chapter further supports that inference of causality.

The temporal proximity between CAIR's protected speech and Defendant's issuance of the Executive Order supports causation. On October 9, 2025, Defendant publicly endorsed HB 119, stating, "Sharia law has no place in the USA and is

23

incompatible with the Constitution." Soussi Decl. Ex. 12. On October 14, 2025, as part of its civil rights advocacy, CAIR publicly opposed HB 119 and Defendant's endorsement of it in a press release. CAIR sharply criticized Defendant's support for the bill, including by characterizing HB 119 as a discriminatory and anti-Muslim measure, condemning Defendant's endorsement as harmful to religious freedom, and calling on Florida lawmakers and the public to reject the bill. The release expressly criticized Defendant personally and politically, challenged his priorities and leadership, and urged continued public opposition. CAIR Decl. ¶ 12; Soussi Decl. Ex. 13.

Less than two months after CAIR's public opposition to HB 119, and approximately one month before the start of the 2026 legislative session in which HB 119 would be considered, Defendant issued the Executive Order. That close temporal proximity supports an inference that the Executive Order was issued in response to CAIR's protected speech and has impaired its free speech, free association, and petition rights.

Because CAIR meets all three of the elements to establish that Defendant issued the Executive Order in retaliation for CAIR's protected speech, it has shown that it is substantially likely to succeed on the merits of its Free Speech claim.

### 3. Defendant is punishing and suppressing CAIR's speech by coercing third parties not to materially support Plaintiff.

Another ground for issuing the requested injunction is because the Executive

Order independently violates the First Amendment as prohibited coercion. "[A] government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *NRA*, 602 U.S. at 180 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Defendant's Executive Order in this case does exactly that.

In *Floridians Protecting Freedom, Inc. v. Ladapo*, this Court relied on *Bantam Books* and *NRA* in applying strict scrutiny to a coercion claim (as well as a viewpoint discrimination claim), while noting that "the Supreme Court has not clearly identified the standard of review applicable to these cases." 754 F. Supp. 3d 1165, 1175, 1176 n.6 (N.D. Fla. 2024) (granting motion for temporary restraining order). Whether analyzed under *Bantam Books*, *NRA*, or *Ladapo*, the Executive Order cannot withstand First Amendment scrutiny.

The Executive Order's "Material Support" Provision coerces third parties to suppress or punish speech that Defendant disfavors. *NRA*, 602 U.S. at 180. The "Material Support" Provision withholds any "Government Benefits" from "any person known to have provided material support or resources to" CAIR. Soussi Decl. Ex. 1 § 2. This sanction can reasonably be understood by third parties as a threat to marking them as a known supporter of a terrorist organization and suffering the same deprivation of Government Benefits the Executive Order applies to designated terrorist organizations. *NRA*, 602 U.S. at 189-90, 193.

25

App. 127

The threat here comes from the Governor acting and invoking the authority of the State through a public executive order bearing the Great Seal of the State of Florida. *Id*. at 192. Such an order is reasonably understood to carry the force of law, a perception the Executive Order itself reinforces by asserting that it was issued pursuant to constitutionally derived powers.[1] *Id*. at 194. The severity and scope of the consequences imposed by the Executive Order on third parties who associate with CAIR would cause third parties to understand that the Executive Order's "Material Support" Provision is a serious and credible threat involving a risk not worth taking. Finally, the response of third parties who have ceased or declined to associate with CAIR because of the "Material Support" Provision "is further evidence of its coercive nature." *Ladapo*, 754 F. Supp. 3d at 1176; *see also supra* Section I; CAIR Decl. ¶¶ 23-27; CAIR-Florida Decl. ¶¶ 21-23.

Defendant's purpose in issuing the Executive Order was also "to punish or suppress" CAIR's speech based on its viewpoint, as demonstrated by the Executive Order's text, structure, and context. *See supra* Section II.A.2.c.; *NRA*, 602 U.S. at 191. The Executive Order also does not survive strict scrutiny for the same reason explained above. *See supra* Section II.A.1.

---

[1] Plaintiff maintains that Defendant did not have authority to make the Designation or impose the denial of Government Benefits associated with it.

**B.      CAIR is substantially likely to succeed on the merits of its Right to Petition claim.**

"Among other rights essential to freedom, the First Amendment protects 'the right of the people … to petition the Government for a redress of grievances.'" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 382 (2011) (quoting U.S. Const. amend. I); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). "[T]he right to petition [is] 'one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002)). "The right of petition … [includes] the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citations and quotations omitted); *Guarnieri*, 564 U.S. at 387-88. ("The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives ….").

"It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct …." *Id.* (quoting

27

App. 129

*Buckley v. Valeo*, 424 U.S. 1, 65 (1976)). Defendant must show "a substantial relation between the [impairment] and a sufficiently important governmental interest," and the impairment must also "be narrowly tailored to the government's asserted interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607, 608 (2021) (quoting *Reed*, 561 U.S. at 196).

The Executive Order constitutes a "significant impairment" of CAIR's right to petition. Again, as previously discussed, Section 1's designation of CAIR as a "terrorist organization" has the effect of preventing CAIR from accessing government buildings and facilities of any branch of state government and at any level of government. Not being able to access the places where the government agencies and their employees, elected and appointed officials, and the public engage in the business of government and the democratic process naturally would significantly impair CAIR's right to petition.

The Executive Order on its face prevents CAIR from receiving any contract, employment, funds, or other benefit or privilege from those agencies. This prohibition is so broad that it also effectively cuts off CAIR's ability physically to meet and communicate with State Agencies in person. Access to state government buildings that house State Agencies, use of parking lots at those government buildings, or use of public transit to reach State Agencies are all benefits or privileges that must be denied to CAIR and its employees. State employees would be prevented from

28

App. 130

meeting with CAIR in their state offices or in conference rooms because use of those state facilities confers a benefit or privilege on CAIR in violation of the Executive Order. Moreover, if even meeting with a state employee were not considered a benefit or privilege, state employees would be unlikely to meet with CAIR in state facilities (or anywhere else) for fear of providing material support through use of property or providing expert advice or assistance, putting their own employment at risk. The "Material Support" Provision also impairs CAIR's right to petition State Agencies through other common means of modern communication like email, videoconference, or telephone, because no person who provides the property, services, and communications equipment necessary for modern communication will want to risk transacting with CAIR for fear of triggering the "Material Support" Provision and its severe consequences. These significant impairments with respect to petitioning State Agencies would also similarly impair CAIR's ability to petition any branch of state government and county and local governments.

The Executive Order's denial of Government Benefits and "Material Support" Provision also significantly impair CAIR's ability to petition the courts through lawsuits on its own behalf or on behalf of its clients by deterring others from providing essential litigation support services, *e.g.*, court reporting or videography services, and the property and services necessary for modern word processing and communications.

29

These broad and significant impairments to CAIR's right to petition cannot survive under the required exacting scrutiny. The Executive Order is not narrowly tailored to Defendant's purported interest in preserving the public peace for the same reasons discussed previously. *See supra* Section II.A.1.

### C.   CAIR is substantially likely to succeed on the merits of its Free Association claim.

"Freedom of association is a fundamental right [including] 'expressive association.'" *Gary v. City of Warner Robins*, 311 F.3d 1334, 1338 (11th Cir. 2002) (quoting *McCabe v. Sharrett*, 12 F.3d 1558, 1562-63 (11th Cir. 1994)). Expressive association is the "'right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Id*. at 1338 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Bonta*, 594 U.S. at 606 (quoting *Roberts*, 468 U.S. at 622).

The First Amendment "protects the right of associations to engage in advocacy on behalf of their members." *Smith v. Ark. State Hwy. Emp., Loc. 1315*, 441 U.S. 463, 464 (1979) (citing *NAACP v. Button*, 371 U.S. 415, 428, 443 (1963)). "The government is prohibited from infringing upon these guarantees either by a general

30

prohibition against certain forms of advocacy or by imposing sanctions for the expression of particular views it opposes." *Id.* (internal citation omitted). "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, 'because First Amendment freedoms need breathing space to survive.'" *Bonta*, 594 U.S. at 618-19 (brackets omitted) (quoting *Button*, 371 U.S. at 433).

Unless the government can meet its burden to show its restriction on expressive association serves a "compelling state interest, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms," the restrictions are unconstitutional. *Roberts*, 468 U.S. at 623. The Executive Order fails this test.

CAIR engages in expressive association with other people and organizations, including CAIR-Florida, when it engages in advocacy in furtherance of its faith-driven mission. *See* CAIR Decl. ¶¶ 5-20; CAIR-Florida Decl. ¶¶ 6-18. The Executive Order chills this association through its "Material Support" Provision, which conditions eligibility for Government Benefits on refraining from providing "material support or resources" to CAIR. Soussi Decl. Ex. 1. The definition of "material support" is broad and includes providing CAIR with "property," "service," "personnel" or even "expert advice or assistance." Fla. Stat. § 775.33(1)(c); *see also supra* Section

31

App. 133

II.B. The consequences of this sweeping definition are wide-ranging.

CAIR-Florida provides material support when it partners with CAIR to create civil rights educational materials; Florida mosques provide material support when they grant access to their property for CAIR to conduct presentations or offer its pro bono legal services; and Florida State Capitol employees provide material support when CAIR reserves a space to host Florida Muslim Day at the Capitol. After providing that "material support," CAIR-Florida, Florida mosques, and the Florida State Capitol employees will now be subject to the Executive Order's denial of Government Benefits on the same basis as entities designated by the Executive Order.

This sweeping restriction on the ability to associate with others to engage in core First Amendment activities requires a compelling interest, while Defendant lacks even a legitimate interest. Although the Executive Order borrows language from Florida criminal statutes, there has been neither an adjudication nor charge of any crime against CAIR in Florida. What is more, even if CAIR had been found guilty of a crime in Florida, the Executive Order would need to survive strict scrutiny and be unrelated to the suppression of ideas. As demonstrated above, the Executive Order was issued in retaliation for CAIR's speech. Additionally, the Executive Order is not narrowly tailored because it punishes association with CAIR. *See Button*, 371 U.S. at 433 (The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.).

32

The Supreme Court's decision in *Button* supports CAIR's case. In *Button*, Virgina prevented lawyers from soliciting individuals with certain claims. *Id.* at 423. The NAACP was found to have violated this provision. *Id.* at 424. The Supreme Court reversed this decision and held that the NAACP's solicitation was a protected mode of "expression and association." *Id.* at 428.

The Court explained that the NAACP's solicitation was a means of "achieving the lawful objectives of equality of treatment [for Black Americans] by all government, federal, state and local." *Id.* at 429. The Court acknowledged that Virigina had the right to regulate the legal profession but found that it was not a compelling state interest that justified "limiting First Amendment freedoms." *Id.* at 438. The Court highlighted that Virginia's restriction risked "smothering all discussion" "on behalf of the rights of members of an unpopular minority." *Id.* at 434.

Here, Defendant's Executive Order similarly eliminates CAIR's ability to associate with others to advance Muslim civil rights due to the associating person or organization becoming ineligible to receive Government Benefits. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* at 433. Thus, Defendant's Executive Order violates CAIR's First Amendment right to associate.

### III. CAIR will suffer irreparable injury unless an injunction is issued.

As demonstrated above, CAIR is substantially likely to succeed on its claims

33

that the Executive Order violates its rights to free speech, petition, and free associa-

tion. CAIR therefore suffers irreparable injury because the Executive Order imposes

ongoing harm in violation of the First Amendment. *Honeyfund.com*, 94 F.4th at 1283

(quoting *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th

Cir. 2017)). "Such a violation, even for a minimal period of time, constitutes irrepa-

rable injury. *Id.* (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-

72 (11th Cir. 2006)). "'[D]irect penalization, as opposed to incidental inhibition, of

First Amendment rights constitutes irreparable injury.'" *KH Outdoor*, 458 F.3d at

1272 (citing and quoting *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983)).

## IV.    The equities favor CAIR and the injunction would serve the public in-terest.

"When the state is a party, the third and fourth [factors] are largely the same."

*Scott v. Roberts*, 612 F.3d 1279, 1280 (11th Cir. 2010); *Nken v. Holder*, 556 U.S.

418, 435 (2009) (the balance of the equities and the public interest "factors merge

when the Government is the opposing party."). CAIR's First Amendment injury is

not outweighed by any threatened harm to Florida because the government has "no

legitimate interest" in enforcing an unconstitutional law. Granting a preliminary in-

junction would preserve the status quo ante while this case is adjudicated and serve

the public interest by preventing ongoing constitutional violations. *Honeyfund.com*,

94 F.4th at 1283 (quoting and citing *KH Outdoor*, 458 F.3d at 1272).

34

## REQUEST TO WAIVE RULE 65(C) SECURITY

Plaintiff respectfully requests that the Court waive any security under Rule 65(c). Courts in the Eleventh Circuit hold wide discretion in the amount of security required and "may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (citing *City of Atlanta v. Metro Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981)). In its First Amended Complaint, Plaintiff has alleged infringement of its fundamental First and Fourteenth Amendment rights, and, in this motion, has shown a substantial likelihood of success on its First Amendment claims. Defendant faces no risk of monetary loss from the requested injunction, which would merely prevent enforcement of an unconstitutional executive action pending final adjudication. As this Court noted in waiving security in *Florida Decides Healthcare, Inc. v. Boyd*, "'[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.'" 790 F. Supp. 3d 1335, 1358 (N.D. Fla. July 8, 2025) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. Apr. 9, 2009)).

## CONCLUSION

For these reasons, the Court should grant CAIR's motion and enjoin Defendant from enforcing, implementing, or otherwise giving effect to the Executive Order as it relates to CAIR, including by ordering Defendant to strike CAIR and

35

prohibiting any reliance on the designation for the duration of the injunction.

Respectfully submitted this 23rd day of January 2026.

Arthur Ago
   DC Bar No. 463681
   Admitted *pro hac vice*
   (202) 961-9325
   arthur.ago@splcenter.org
SOUTHERN POVERTY LAW CENTER
   1101 17th St. NW, Ste. 550
   Washington, DC 20036
   (202) 971-9205 (fax)

Scott D. McCoy
   FL Bar No. 1004965
   scott.mccoy@splcenter.org
   (786) 347-2056
SOUTHERN POVERTY LAW CENTER
   2 S. Biscayne Blvd., Ste. 3200
   Miami, FL 33131

/s/ *Ahmed Soussi*
_____
Ahmed K. Soussi
   LA Bar No. 38414
   Admitted *pro hac vice*
   ahmed.soussi@splcenter.org
   (334) 213-8303
Huey Fischer García
   LA Bar No. 39571
   Admitted *pro hac vice*
   huey.fischergarcia@splcenter.org
   (504) 884-7680
SOUTHERN POVERTY LAW CENTER
   400 Washington Ave.
   Montgomery, AL 36104

Omar Saleh
   FL Bar No. 91216
   (833) 224-7352

36

App. 138

osaleh@cair.com
CAIR-FLORIDA
8076 N. 56th St.
Tampa, FL 33617

Lena F. Masri
DC Bar No. 1000019
Admitted *pro hac vice*
lmasri@cair.com
Gadeir I. Abbas
VA Bar No. 81161; not licensed in DC
Admitted *pro hac vice*
gabbas@cair.com
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave. SE
Washington, DC 20003
(202) 742-6420
ldf@cair.com

Charles D. Swift
TX Bar No. 24091964
*Pro hac vice* motion forthcoming
cswift@clcma.org
MUSLIM LEGAL FUND OF AMERICA
100 N. Central Expy., Ste. 1010
Richardson, TX 75080
(972) 914-2507

Shereef H. Akeel
MI Bar No. P54345
Admitted *pro hac vice*
shereef@akeelvalentine.com
Samuel Simkins
MI Bar No. 81210
Admitted *pro hac vice*
sam@akeelvalentine.com
AKEEL & VALENTINE, PLC
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595

37

App. 139

*Counsel for Plaintiffs*

38

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), I certify that this memorandum contains 7,270 words, inclusive of headings, footnotes, and quotations, according to the word-processing system used to prepare it.

Date: January 23, 2026.

/s/ *Ahmed Soussi*
Ahmed K. Soussi

39

## CERTIFICATE OF SERVICE

I certify that I served this document on Defendant by emailing a copy of this

filing to the Florida Office of the Attorney General at oag.civil.eserve@myfloridale-

gal.com and delivered a copy to Ronald Desantis, Governor of Florida, c/o the Alli-

ance Center, 113 S. Monroe St., Tallahassee, Fl 32301.


Date: January 23, 2026.

/s/ *Ahmed Soussi*
Ahmed K. Soussi

40

App. 142

# 36

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,

     *Plaintiffs,*

   v.

RONALD DESANTIS, in his official
capacity as Governor, State of Flor-
ida,

     *Defendant.*

Case No. 4:25-cv-516-MW-MJF

## DEFENDANT GOVERNOR DESANTIS'S ANSWER AND DEFENSES TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant Governor DeSantis (hereinafter "Defendant") hereby answers the First Amended Complaint, DE 21, as follows:

## ANSWER

Pursuant to Federal Rule of Civil Procedure 8(b), Defendant denies each and every allegation in Plaintiffs' First Amended Complaint, except those expressly admitted herein. The headings (without sub-headings, which are omitted) and paragraphs below directly correlate to the sections and numbered paragraphs of Plaintiffs' First Amended Complaint. Headings that are reproduced in this Answer are included for

1

organizational purposes only, and Defendant does not admit any matter contained therein, unless otherwise expressly admitted herein.

## INTRODUCTION

Defendant admits that Plaintiffs brought this action for declaratory and injunctive relief against Ronald DeSantis in his official capacity as the Governor of the State of Florida, and that on December 8, 2025, Defendant signed Executive Order 25-244 (the "Executive Order"). The majority of the "INTRODUCTION" contains Plaintiffs' characterization of the Executive Order, which speaks for itself. Defendant denies Plaintiffs' characterizations to the extent they are inconsistent with the Executive Order. The "INTRODUCTION" also includes Defendant's legal conclusions about Executive Order and how it came into being, to which no response is required. However, to the extent a response is required, those allegations are denied. Defendant denies that this Court can or should grant Plaintiffs the relief they desire as described in the remaining portions of their "INTRODUCTION" section.

## PARTIES

1.    Admitted, except that Defendant is without knowledge, and therefore denies, the description that it is "an expressive association

engaged in civil rights advocacy" – to the extent this definition is intended to suggest that CAIR does nothing else.

2.   Admitted.

3.   Admitted that Defendant is the Governor of the State of Florida and that he issued Executive Order 25-244, which speaks for itself. The paragraph contains Plaintiffs' characterizations of the Executive Order. Defendant denies Plaintiffs' characterizations to the extent they are inconsistent with the Executive Order. Admitted that Defendant is being sued in his official capacity for declaratory and prospective injunctive relief. The remaining allegations and legal conclusions in the paragraph are denied.

## JURISDICTION AND VENUE

4.   Denied as written. Admitted that Plaintiffs purport to bring claims under federal law and allege that this Court has federal question jurisdiction, but denied that any such claims are valid or legally cognizable. Defendant notes that Plaintiffs have also raised Florida-law challenges to the Executive Order.

5.   Admitted that Plaintiffs have attempted to state a claim under the federal laws cited, as well as under the Constitution, but denied

3

that they have properly stated such claims, that there is any ongoing, immediate, and imminent constitutional violation, that Plaintiffs properly raised a justiciable controversy, and that Plaintiffs are entitled to any of the relief they seek.

6.    Admitted.

## FACTUAL BACKGROUND[1]

### A. CAIR and CAIR-Florida and Their Mission

7.    Admitted that CAIR was technically founded in 1994. Defendant lacks sufficient knowledge or information to form a belief about the truth of the remainder of Paragraph 7; therefore, Defendant denies those allegations.

8.    Admitted.

9.    Admitted that "CAIR-Florida is a 501(c)(3) nonprofit organization registered as CAIR-Florida, Inc., and is an affiliated chapter of CAIR National." Defendant lacks sufficient knowledge to form a belief as to whether CAIR-Florida engages in advocacy, education, and civic participation, and, therefore, denies those allegations.

---

[1]  Subheadings are omitted, but to the extent a response to the subheadings is necessary, the legal conclusions contained in those subheadings are denied.

4

10.   Defendant lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 10, and therefore Defendant denies those allegations.

11.   Admitted that Plaintiffs, through people associated with Plaintiffs (whether as an "employee" or otherwise) engage in the activities listed in the paragraph, but denied that the list of activities is relevant to the reason behind the Executive Order. As to the last two sentences of paragraph 11, Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in that sentence, and, therefore Defendant denies those allegations.

12.   Defendant lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 12, and therefore Defendant denies those allegations.

## B. CAIR's and CAIR-Florida's Lawful Advocacy for Palestinian Human Rights.

13.   Admitted as to past conduct.  Without sufficient knowledge, and therefore denied, as to future conduct.  Otherwise denied.

14.   Admitted that Plaintiffs have assisted SJP based on the type of allegations listed in the paragraph, which are denied. Otherwise, denied.

5

App. 148

15.   The allegations in this paragraph are vague, and therefore, they are denied as stated.  The paragraph contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

16.   Admitted that Plaintiffs were involved in the lawsuit listed in footnote 1 of the First Amended Complaint.  Denied as to the specific allegations regarding the lawsuit – the records of which are available to this Court and speak for themselves.  Defendant denies the remaining allegations in the paragraph.

17.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

18.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

19.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

App. 149

20.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

21.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

### C. CAIR's and CAIR-Florida's Faith-based Activities and Advocacy.

22.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

23.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

24.    Admitted that CAIR-Florida has participated in Muslim Day at the Florida legislature.  Defendant lacks sufficient knowledge to form a belief regarding the truth of the remaining allegations in this paragraph, and, therefore, Defendant denies those allegations.

25.    Admitted that CAIR-Florida requested to use a specific space at the Florida State Capitol for its 2026 Muslim Day and was denied use

7

App. 150

of that space because it had already been reserved by a different group. Defendant lacks sufficient knowledge to form a belief regarding the truth of the remaining allegations in this paragraph, which are therefore denied.

26. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

27. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

28. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

D. **CAIR's and CAIR-Florida's Message of Nonviolence.**

29. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

30. Denied.

8

App. 151

31. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

32. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

### D. Defendant's Knowledge of and Opposition to CAIR's and CAIR-Florida's Advocacy

33. Denied as alleged.

34. Denied as alleged.

35. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations, except that Defendant admits that there is an "open letter to the Governor" on cairflorida.org, which speaks for itself.

36. Defendant denies Plaintiffs' characterization of Defendant's statement.

37. Denied.

38. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations. This paragraph refers to a purported public

9

statement by Defendant, the statement, if made, speaks for itself, in context, and Defendant denies Plaintiffs' characterization of any such public statement to the extent it is inconsistent with the public statement, when properly interpreted in context.

39.   Defendant admits the content of the quotation, but denies Plaintiffs' characterization thereof.

40.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.  Defendant denies the characterizations of HB 119 and of Defendant contained in footnote 3.

41.   Defendant admits content of the post, but denies Plaintiffs' characterization thereof.

42.   Admitted.

43.   Admitted that the Executive Order designates CAIR as a "terrorist organization" without being preceded by the word "foreign," and that the post includes the language "Florida is designating the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as 'foreign terrorist organizations.'"  The paragraph contains a legal conclusion about Defendant's legal authority, to which no response is required.

However, to the extent a response is required, that allegation is denied. Defendant lacks sufficient knowledge to form a belief regarding the truth of the remaining allegations in this paragraph, and, therefore, Defendant denies those allegations.

44.    Admitted.

45.    Defendant denies Plaintiffs' characterization of his views.

**F.  Executive Order 25-244.**

46.    Admitted that Defendant issued the Executive Order, which speaks for itself.  Defendant denies Plaintiffs' characterizations of the Executive Order and its issuance.

47.    The Executive Order speaks for itself.  Defendant denies Plaintiffs' characterizations of the Executive Order.  The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied.

**Section 1 of the Executive Order**

48.    The Executive Order speaks for itself.  Defendant denies Plaintiffs' characterizations of the Executive Order that are inconsistent with the Executive Order.  The paragraph also contains legal conclusions,

11

to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

49. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied. Denied that any statements in the Executive Order were pretextual.

50. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order that are inconsistent with the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

## Section 2 of the Executive Order

51. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order that are inconsistent with the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

52. Denied.

53.    The Executive Order speaks for itself.  Defendant denies Plaintiffs' characterizations about the Executive Order that are inconsistent with the Executive Order.  The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied.

54.    The Executive Order speaks for itself.  Defendant denies Plaintiffs' characterizations about the Executive Order that are inconsistent with the Executive Order.  The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied.

55.    The Executive Order speaks for itself.  Defendant denies Plaintiffs' characterizations about the Executive Order that are inconsistent with the Executive Order.  The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied.

**Section 3 of the Executive Order**

56.    The Executive Order speaks for itself.  Defendant denies Plaintiffs' characterizations about the Executive Order that are inconsistent with the Executive Order.  The paragraph also contains legal

13

conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied. Admitted that the DSOC met for purposes of addressing the Executive Order on December 19, 2025.

### G. Defendant's Improper Purpose for Issuing Executive Order 25-244

57.   Denied.

58.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

59.   To the extent this paragraph refers to a purported public statement by Defendant, the statement, if made, speaks for itself, in context, and Defendant denies Plaintiffs' characterization of any such public statement to the extent it is inconsistent with the public statement, when properly interpreted in context.

60.   Admit the content of the quotation by Defendant, but deny any characterization thereof.

61.   This paragraph refers to a purported public statement by non-party.  Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations involving the non-party in this paragraph,

14

App. 157

and, therefore, Defendant denies those allegations.  As to the final sentence, admit the content of the quotation, but deny any characterization thereof.

62.   Admit that Defendant responded to reporter questions, but deny Plaintiffs' characterization of Defendant's response.

63.   Denied as stated, and to the extent that this paragraph includes a legal conclusion, no response is required. However, to the extent a response is required, those legal conclusions are denied.

64.   Denied.

**H. Executive Order 25-244 and its Realized, Ongoing Harms**

65.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

66.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

67.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

15

68.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

69.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

70.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

71.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

72.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

73.    Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

16

74.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

75.   Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.

76.   Denied.

77.   Denied. The paragraph contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

78.   Denied. The paragraph contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.  Otherwise, denied.

## CLAIMS

### COUNT I

79.   Defendant realleges and incorporates, by reference, his responses to paragraphs 1-78 as if fully set forth herein.

17

80.    Admitted that Plaintiffs are suing under the cited federal laws and the Constitution and are seeking declaratory and injunctive relief.

## Discrimination Based on Content and Viewpoint

81.    The paragraph includes Plaintiffs' characterization and legal conclusions about the meaning of the First Amendment.  No response is required, but to the extent a response is required, Defendant denies to the extent those characterizations are inconsistent with the law and notes that the characterization is overbroad and vague, and denies that the characterization is accurate.

82.    The paragraph includes Plaintiffs' characterization and legal conclusions about the meaning of the First Amendment.  No response is required, but to the extent a response is required, Defendant notes that the characterization is overbroad and vague, and denies that the characterization is accurate. Those legal conclusions are denied to the extent they are inconsistent with the law.

83.    The allegations in this paragraph are broad and vague, and, therefore, Defendant cannot form a basis to admit or deny the allegations, and therefore denies the allegations. To the extent that Plaintiff

18

raises legal conclusions, no response is required, but to the extent that a response is required, Defendant notes that the characterization is over-broad and vague, and denies that the characterization is accurate. Those legal conclusions are denied to the extent that a response is required.

84. The allegations in this paragraph are broad and vague, and, therefore, Defendant cannot form a basis to admit or deny the allegations, and therefore denies the allegations. To the extent that Plaintiff raises legal conclusions, no response is required, but to the extent that a response is required, Defendant notes that the characterization is over-broad and vague, and denies that the characterization is accurate. Those legal conclusions are denied to the extent that a response is required.

85. The allegations in this paragraph are broad and vague, and, therefore, Defendant cannot form a basis to admit or deny the allegations, and therefore denies the allegations. To the extent that Plaintiff raises legal conclusions, no response is required, but to the extent that a response is required, Defendant notes that the characterization is over-broad and vague, and denies that the characterization is accurate. Those legal conclusions are denied to the extent that a response is required.

86. Denied.

19

87.    Denied.

88.    Denied.

89.    Denied.

90.    The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

91.    Denied.

## Retaliation for Protected Speech

92.    The paragraph contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

93.    The allegations in this paragraph are broad and vague, and, therefore, Defendant cannot form a basis to admit or deny the allegations, and therefore denies the allegations. The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

20

94. The allegations in this paragraph are broad and vague, and, therefore, Defendant cannot form a basis to admit or deny the allegations, and therefore denies the allegations. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

95. The allegations in this paragraph are broad and vague, and, therefore, Defendant cannot form a basis to admit or deny the allegations, and therefore denies the allegations. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law

96. Denied.

97. Denied.

98. Denied.

99. Denied.

**Coercion of Third Parties to Punish or Suppress Free Speech**

21

100. The paragraph includes Plaintiffs' characterization and legal conclusions about the meaning of the First Amendment. No response is required, but to the extent a response is required, Defendant notes that the characterization is overbroad and vague, and denies that the characterization is accurate and denies those characterizations to the extent they are inconsistent with the law.

101. The paragraph includes Plaintiffs' characterization and legal conclusions about the meaning of the First Amendment. No response is required, but to the extent a response is required, Defendant notes that the characterization is overbroad and vague, and denies that the characterization is accurate and denies those characterizations to the extent they are inconsistent with the law.

102. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

103. Denied.

104. Denied.

22

App. 165

105. Denied. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

106. Denied. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

## COUNT II

107. Defendant realleges and incorporates, by reference, his responses to paragraphs 1-78 as if fully set forth herein.

108. Defendant acknowledges that through Count II Plaintiffs' attempt to state a claim pursuant to the First Amendment, the Fourteenth Amendment, and Section 1983, for declaratory and injunctive relief.

109. The paragraph contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

110. The paragraph contains legal conclusions, to which no response is required. However, to the extent a response is required, those

23

App. 166

legal conclusions are denied to the extent they are inconsistent with the law.

111.  The paragraph contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

112.  Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations.  The paragraph also contains legal conclusions, to which no response is required.  However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

113.  Denied.

114.  Denied.

115.  Denied.

116.  Denied.

App. 167

## COUNT III

117. Defendant realleges and incorporates, by reference, his responses to paragraphs 1-78 as if fully set forth herein.

118. Defendant acknowledges that through Count III Plaintiffs' attempt to state a claim pursuant to the First Amendment, the Fourteenth Amendment, and Section 1983, for declaratory and injunctive relief.

119. The paragraph contains legal conclusions, to which no response is required. However, to the extent a response is re-quired, those legal conclusions are denied to the extent they are inconsistent with the law.

120. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in the first sentence. Defendant denies the allegations in the second sentence.

121. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

25

122. Defendant lacks sufficient knowledge to form a belief regarding the truth of the allegations in this paragraph, and, therefore, Defendant denies those allegations. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied to the extent they are inconsistent with the law.

123. Denied.

124. Denied.

125. Denied.

126. Denied.

## COUNT IV

127. Defendant realleges and incorporates, by reference, his responses to paragraphs 1-78 as if fully set forth herein.

128. Defendant acknowledges that through Count IV Plaintiffs' attempt to state a claim pursuant to the Fourteenth Amendment, and Section 1983, for declaratory and injunctive relief.

129. The paragraph contains legal conclusions, to which no response is required. However, to the extent a response is re-quired, those

26

legal conclusions are denied to the extent they are inconsistent with the law.

130. Admitted.

131. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

132. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

133. Denied. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

134. The Executive Order speaks for itself. Defendant denies Plaintiffs' characterizations of the Executive Order. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

27

App. 170

135. Denied. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

136. Denied. The paragraph also contains legal conclusions, to which no response is required. However, to the extent a response is required, those legal conclusions are denied.

## PRAYER

137. Defendant denies that Plaintiffs are entitled to any of the relief requested in their First Amended Complaint.

## DEFENDANT'S DEFENSES

1. Plaintiffs have failed to state a claim for which relief can be granted.

2. Plaintiffs lack a cause of action to sue Defendant.

3. Plaintiffs' claims present non-justiciable political questions.

4. To the extent Plaintiffs claim that Defendant acted outside of his legal authority in issuing the Executive Order, that issue belongs in State Court.

App. 171

5.    Defendant asserts all applicable immunities to Plaintiffs' claims, including but not limited to his entitlement to Eleventh Amendment and sovereign immunity.

6.    Pursuant to 42 U.S.C. Section 1988(b), Defendant will be entitled to recover his attorney's fees if he is deemed the substantially prevailing party and if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

## DEFENDANT'S PRAYER FOR RELIEF

Defendant prays that:

1.    Plaintiffs' claims be denied.

2.    Plaintiffs take nothing by this action;

3.    Defendant recovers all costs, including attorney's fees; and

4.    Such other relief this Court deems proper or to which Defendant is entitled.

29

App. 172

February 10, 2026                    Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*

/s/ *Jeffrey P. DeSousa*
JEFFREY P. DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
  *Deputy Solicitor General*
TYLER E. GUSTAFSON (FBN 1049292)
  *Assistant Solicitor General*
CASEY J. WITTE (FBN 1070288)
  *Solicitor General Fellow*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*jeffrey.desousa@*
*myfloridalegal.com*
*jenna.hodges@*
*myfloridalegal.com*

*/s/ James P. Waczewski*
James P. Waczewski (FBN 0154989)
Special Counsel
Complex Litigation Division
Office of the Attorney General
PL - 01, The Capitol
Tallahassee, Florida 32399-1050
850-414-3300
James.Waczewski@myfloridalegal.com

*Counsel for Defendant*

30

App. 173

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has

been furnished by electronic service through the CM/ECF Portal on Feb-

ruary 10, 2026, to all counsel of record.

/s/ *Jeffrey P. DeSousa*
Jeffrey P. DeSousa
*Acting Solicitor General*

31

# 37

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and CAIR-FLORIDA, INC.,

      *Plaintiffs*,

      v.

RONALD DESANTIS, in his official capacity as Governor, State of Florida,

      *Defendant*.

Case No. 4:25-cv-516-MW-MJF

## DEFENDANT'S RESPONSE
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JAMES UTHMEIER
  *Attorney General*

JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
  *Deputy Solicitor General*
TYLER E. GUSTAFSON (FBN 1049292)
  *Assistant Solicitor General*
CASEY J. WITTE (FBN 1070288)
  *Solicitor General Fellow*
JAMES WACZEWSKI (FBN 0154989)
  *Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Governor DeSantis*

1

App. 176

# TABLE OF CONTENTS

Introduction ........................................................................................................... 3

Statement of Facts................................................................................................. 4

    A.    CAIR's founding, organizational structure, and history of
terrorism. ................................................................................................. 4

    B.    The Governor's Executive Order. .............................................. 11

    C.    CAIR sues the Governor.............................................................. 12

Legal Standard...................................................................................................... 12

Argument............................................................................................................... 13

I.    CAIR lacks standing for preliminary-injunction relief. ....................... 13

II.    CAIR has not met the preliminary-injunction factors........................... 19

    A.    CAIR is unlikely to succeed on the merits of its First
Amendment claims................................................................................. 19

        1.    CAIR's free-speech claims are unlikely to succeed........................ 20

            i.    The Executive Order is not a regulation of
speech, but if it were, it is viewpoint neutral,
content neutral, and otherwise valid. ................................. 20

            ii.    CAIR's alleged retaliation claim is deficient....................... 25

            iii.    The coercion claim fails as a matter of law. ....................... 32

        2.    CAIR's association claim is unlikely to succeed............................. 35

        3.    CAIR's petition claim is unlikely to succeed. ................................ 36

    B.    CAIR's claims of irreparable injury are weak and
undermined by delay. ........................................................................... 36

    C.    The public interest and balance of the equities disfavor
preliminary relief.................................................................................. 37

Conclusion............................................................................................................ 38

Certificate of Service .......................................................................................... 39

2

**INTRODUCTION**

Substantial evidence—none of which CAIR-Foundation, Inc. (CAIR) disputes—shows that CAIR has close links to radical terrorist organizations. Indeed, CAIR began as a "cover" for Hamas, was an unindicted co-conspirator in the Holy Land Foundation prosecution, and for decades has seen its board members and other representatives repeatedly tied to terrorism. Through Executive Order 25-244 (EO), Governor DeSantis identified CAIR itself as a terrorist organization and instructed Florida state agencies not to contract with or bestow government benefits on the organization. That decision by the state executive on matters of state security is entitled to deference.

CAIR's request for a preliminary injunction should be denied. At this stage, CAIR has failed to demonstrate that it has standing to secure such a drastic remedy. Rather, CAIR's alleged harms are both speculative and based on third-party conduct. It is therefore no surprise that its alleged harms have not materialized. As an example, while it claims to be barred from Florida government buildings, it recently participated in events at the Florida Capitol.

On the merits, CAIR's claims also falter. It has not shown that the EO is a viewpoint-based restriction of speech; in fact, the EO is not a speech regulation at all, and instead singles CAIR out for the organization's past *conduct*—CAIR's support of terrorism. Likewise, CAIR's First Amendment retaliation claim is not viable. CAIR cannot show that the Governor targeted CAIR because it holds views that the Governor does not like. All the evidence is to the contrary: that the Governor issued the EO because

3

CAIR has longstanding links to terrorism, which (again) CAIR does not dispute. Finally, its coercion claim ignores that the EO has nothing to do with speech and that, at any rate, the government can prohibit material support for terrorism under any tier of scrutiny.

As for CAIR's non-speech claims, the EO does not deprive CAIR of the First Amendment right of association. Third parties are free to associate with CAIR; they simply cannot provide material support for terrorism. Courts across the country have rejected materially identical theories. And CAIR's novel right-to-petition claim is undermined by its conduct since filing this lawsuit and by the fact that the EO does nothing to prevent CAIR from seeking a redress of grievances.

Finally, CAIR has shown neither that it is irreparably harmed by the EO—after all, it delayed a month and a half before seeking preliminary relief in this Court—or that the equities favor injunctive relief.

## STATEMENT OF FACTS

### A.    CAIR's founding, organizational structure, and history of terrorism.

The Council on American-Islamic Relations (CAIR) purports to be "America's largest Muslim civil rights and advocacy organization." Am. Compl., Dkt. 21, ¶ 7. Yet its founding, organizational structure, and history reflect its longstanding ties to terrorism and terror organizations.

CAIR was created by terror elements including the Muslim Brotherhood and Hamas. Those connections remain. The Muslim Brotherhood is a radical transnational

App. 179

Islamist organization that seeks to impose Islamic, or "Sharia," law through violent means, including terrorism.[1] In the late 1980s, Muslim Brotherhood members founded Hamas, which, as its founding charter states, "is one of the wings of M[usli]m Brotherhood."[2]

Hamas, guided by "Islamic fundamentalism," seeks to destroy the state of Isreal and establish an "Islamic state" in its place through violence.[3] Hamas has a long history of violent terrorism. True to form, it heinously attacked Israel on October 7, 2023, killing 1,200 people (including 46 Americans) and taking more than 250 hostages.[4]

The Muslim Brotherhood quickly created a robust support apparatus for Hamas across the globe, including within the United States.[5] Between the late 1980s and early 1990s, Musa Abu Marzook, a Hamas Politburo leader, established several entities under the "Palestine Committee of the Muslim Brotherhood" umbrella.[6] These organizations

---

[1] *See The Muslim Brotherhood's Global Threat, H. Oversight and Gov. Reform Subcomm. on Nat'l Sec.*, 115th Cong. 5–7 (2018) (statement of Dr. Hillel Fradkin, Senior Fellow, Hudson Institute), https://perma.cc/ERW8-GP9E;

[2] The Covenant of the Islamic Resistance Movement (August 18, 1988), https://perma.cc/9Y27-Z6QN.

[3] Jim Zanotti, Cong. Rsch. Serv. IF12549, Hamas: Background, Current Status, and U.S. Policy 1 (2024).

[4] *Id.*; *see also* Jim Zanotti & Jeremy M. Sharp, R47828, Israel and Hamas Conflict In Brief: Overview, U.S. Policy, and Options for Congress 3 (2024).

[5] Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History* 19 (July 2025), https://perma.cc/E2C2-7D6B.

[6] *Id.*

5

App. 180

included the Holy Land Foundation (HLF) and Islamic Association for Palestine (IAP).[7] As early as 1991, the Palestine Committee planned to create one more organization focused on "political work" that would have its "headquarters" in "Washington [D.C.]."[8]

After the Oslo Accords were signed in August 1993, the Palestine Committee became concerned that Hamas would soon be the target of actions by the United States.[9] So the Palestine Committee convened in Philadelphia.[10] The attendees agreed that, to continue operating in the United States, they should create a "an official U.S. cover representing the Islamic community" that would also serve as a "cover for the [HLF and IAP] in case they got dissolved."[11] FBI officials who had wiretapped the meeting noted the attendance of, among others, two IAP officials, Omar Ahmad and Nihad Awad.[12] Ahmad drove much of the meeting's conversation and Awad gave "a presentation on [] media strategy."[13]

Mere months after the Philadelphia meeting, Ahmad and Awad founded CAIR in Washington D.C. and staffed the new organization with individuals from the

---

[7] *Id.*

[8] *Id.* at 25.

[9] *Id.* at 20.

[10] *Id.*

[11] *Id.* at 24–25.

[12] *Id.* at 20.

[13] *Id.* at 23.

6

App. 181

Philadelphia meeting.[14] One attendee affiliated with HLF became the head of one of CAIR's first chapters.[15] In fact, much of CAIR's founding was closely intertwined with these other groups. So much so that Ahmad and Awad performed the early fundraising and organizing for CAIR while both were still at IAP.[16] Ultimately, Ahmad would serve as CAIR's Board Chairman until 2005 and then as a member of the Board for several years thereafter.[17] Awad still serves as CAIR's Executive Director.[18]

By 1994, Palestine Committee records identified CAIR, along with HLF and IAP, as parts of the Palestine Committee.[19] One Palestine Committee meeting agenda suggested that CAIR would be responsible for future "[c]oordination" among those groups.[20] The minutes from that meeting reaffirm the Palestine Committee's commitment to the "Mother Group" — the Muslim Brotherhood.[21]

---

[14] *Id.* at 25–26.

[15] *Id.*

[16] Nihad Awad, *Muslim-Americans in Mainstream America*, The Link (Feb.–March 2000) ("Omar suggested to me that we leave the IAP . . . . He proposed that I move to Washington, D.C., where any effective national effort would have to be based, while he tried to raise the seed money for the project."), https://perma.cc/N8SJ-AC9D.

[17] *CAIR Board Elects New Chairman*, CAIR, May 18, 2005, https://perma.cc/VS22-H88E; *see also* Gerstein *infra* n.58.

[18] Nihad Awad, National Executive Director, CAIR (last accessed Feb. 11, 2026), https://perma.cc/9VPA-44YX.

[19] Vidino, *supra* n.5, at 26.

[20] Lara Burns, et al., *CAIR—Why History is Important* 4 (2025), https://perma.cc/VB73-LKBE.

[21] *Id.* at 5.

Numerous terrorist designations, investigations, and convictions have swirled around CAIR since its founding in 1994. In 1995, President Clinton signed EO 12947, formally designating Hamas a terrorist organization.[22] That same year, the U.S. Treasury designated Palestine Committee organizer Mousa Mohamed Abou Marzook a Specially Designated Terrorist.[23] In 2001, the U.S. Treasury added HLF as a terrorist organization.[24] And in 2004, IAP was held liable for a murder committed by two Hamas terrorists because it had fundraised, published propaganda, and organized travel to the United States for Hamas.[25] Much of IAP's material support for Hamas occurred while Ahmad and Awad were leading IAP.[26]

CAIR itself faced similar troubles. In 1999, Omar Ahmad, then serving as CAIR's chairman, was caught on a wiretap directing an HLF employee and organizing payments for an individual convicted of fundraising for Hamas in the United States.[27]

---

[22] Exec. Order No. 12947, 60 Fed. Reg. 5079 (Jan. 25, 1995), https://perma.cc/6QJ9-JXMZ. The United States also designated Hamas as a Foreign Terrorist Organization in 1997. U.S. Dept. of State, Foreign Terrorist Organizations (last accessed Feb. 11, 2026), https://perma.cc/ZNH2-S7BD.

[23] Press Release, Shutting Down the Terrorist Financial Network, U.S. Dep't of the Treasury, Dec. 4, 2001, https://perma.cc/SVF9-PCPK.

[24] *Id.*

[25] *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 688 (7th Cir. 2008) (en banc) (noting that the IAP is an "alter ego" of the American Muslim Society and affirming judgment of liability against the IAP).

[26] *See id.* at 907–911 (citing deposition testimony from Omar Ahmad).

[27] *See United States v. El-Mezain*, 664 F.3d 467, 530–31 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (describing Ahmad's wiretapped statements).

8

In the late 2000s, litigation revealed that CAIR, alongside the IAP and HLF, was a key player in "the largest terrorism financing case in U.S. history."[28] At trial, "FBI Special Agent Lara Burns labeled the Council on American-Islamic Relations a front group for Hamas."[29] The U.S. Department of Justice went so far as to list CAIR and IAP as unindicted co-conspirators in the HLF prosecution.[30] And the court rejected CAIR's challenge to that designation, concluding there was "ample evidence to establish the associations of CAIR, [HLF, and IAP] . . . with Hamas,"[31] including a check from HLF to CAIR for "consulting services."[32] Prosecutors successfully proved that HLF and its co-conspirators had funneled "approximately $12.4 million" to Hamas.[33]

Governor DeSantis is not the first to limit government involvement with CAIR. In 2008, the FBI banned all "non-investigative outreach with CAIR . . . to ensure that the FBI is not supporting individuals who support extremist or terrorist ideologies."[34]

---

[28] Jason Trahan, *Witness links charity, jihad: Holy Land prosecution expert's credibility questioned by defense*, Dallas Morning News, July 26, 2007, 2007 WLNR 14329176.

[29] Jason Trahan, *Judge due to rule on Holy Land defense challenge*, Dallas Morning News, Oct. 14, 2008, 2008 WLNR 19527769.

[30] *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-0240-P, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009), *aff'd in relevant part*, 624 F.3d 685 (5th Cir. 2010).

[31] *Id.*

[32] Vidino, *supra* n.5, at 26.

[33] Press Release, Federal Judge Hands Downs Sentences in Holy Land Foundation Case, U.S. Dep't of Just., May 27, 2009, https://perma.cc/6HAN-GPB2.

[34] Vidino, *supra* n.5, at 26; *see also* Dep't of Just., Review of FBI Interactions with the Council on American-Islamic Relations 1 (2013), https://perma.cc/2EHW-H8EF.

9

And in 2014, the United Arab Emirates designated CAIR a terrorist organization.[35] In 2025, the State of Texas followed suit.[36]

In addition to these organizational charges and designations, many CAIR officials, employees, and affiliates have been arrested for, deported for, or convicted of terror-related activities:

- Rabih Haddad, a CAIR-Ann Arbor fundraiser, was deported in 2002. His organization, the Global Relief Foundation, was designated as a front for al-Qaeda by the U.S. Treasury.[37]

- Bassem Khafagi, a CAIR Community-Affairs Director, pled guilty in 2003 to bank and visa fraud, funneling money to a group supporting suicide attacks.[38]

- Randall "Ismail" Royer, a CAIR Communications Specialist, pled guilty in 2004 to weapons and explosives charges that involved assistance he provided to the Taliban.[39]

- Abdurahman Alamoudi, a CAIR affiliate, was sentenced in 2004 for a Libyan-funded plot to assassinate the Saudi crown prince.[40]

---

[35] *UAE Includes 2 US Muslim Groups on Terror List*, Voice of America (Nov. 17, 2014), https://perma.cc/3KBX-J94Y.

[36] Proclamation, Governor Greg Abbott (Nov. 18, 2025), https://perma.cc/W3E3-P88F.

[37] Disassociation from Council on American-Islamic Relations, H.R. 1209, 2024 Sess. at *4 (2024), https://perma.cc/FZ9E-X2DT.

[38] *Id.* at 3–4.

[39] *Id.* at 3.

[40] *Id.*

10

- Ghassan Elashi, the founder of CAIR-Texas, was convicted in 2008 of providing material support to Hamas via the Holy Land Foundation.[41]

- Mohammad El-Mezain, CAIR's Endowments Chairman, was convicted in 2008 of conspiracy to provide material support to Hamas.[42]

- Muthanna al-Hanooti, Executive Director of CAIR-Michigan, was sentenced in 2011 for violating U.S. sanctions against Iraq by coordinating with the Saddam Hussein regime.[43]

### B.    The Governor's Executive Order.

Considering this wealth of incriminating evidence, the Governor signed Executive Order 25-244 on December 8, 2025. Executive Order, Dkt. 24-4 (EO). The EO contains numerous factual findings and designates several organizations as terrorist organizations. *See* EO 1–3. These include entities the United States has designated as a Foreign Terrorist Organization, as well as the Muslim Brotherhood and CAIR. *See id.* at 3. The EO then instructs select law enforcement agencies to undertake "all lawful measures to prevent unlawful activities in Florida" by these organizations. *Id.* It also requires all executive and cabinet agencies to "undertake all lawful action" to prevent the designated terrorist groups, or any person known to have provided material support "from receiving any contract, employment, funds, or other benefit or privilege" from those agencies. *Id.* at 3–4.

---

[41] *Id.*; *see also supra* n.33.

[42] *El-Mezain*, 664 F.3d at 485; *see also supra* n.33.

[43] *Supra* n.37, at 4.

11

**C.      CAIR sues the Governor.**

CAIR filed its initial complaint on December 15, 2025, yet it did not serve the Governor or move for injunctive relief at that time. It was not until January 16, 2026 that CAIR filed its amended complaint alleging viewpoint discrimination, retaliation, coercion, petition, and association claims under the First Amendment, as well as a due process claim under the Fourteenth Amendment.

CAIR did not serve the Governor until January 20, 2026 and waited until January 23, 2026 to move for preliminary injunctive relief on its First Amendment claims. CAIR seeks a preliminary injunction enjoining the Governor from enforcing the EO, as well as an order compelling the Governor to "strike CAIR from the Executive Order." Dkt. 24 (PI Mot.) 4.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, plaintiffs must show each of the following: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury absent the injunction; (3) their threatened injury outweighs the harm the injunction may cause to Defendants; and (4) the injunction is in the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

## ARGUMENT

### I.    CAIR lacks standing for preliminary-injunction relief.

As a threshold matter, CAIR cannot demonstrate standing. To prove standing, CAIR must show that it "has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotation omitted). The Court "must first satisfy itself that Plaintiff is substantially likely to establish standing" to seek a preliminary injunction. *Students for Justice in Palestine at the Univ. of S. Fla. v. DeSantis*, 2024 WL 371875, at *1 (N.D. Fla. Jan. 31, 2024) (*SJP I*).

For a preliminary injunction, standing is evaluated "under the heightened standard for evaluating a motion for summary judgment." *Id.* at *2 (citation omitted).[44] The court need not accept the Plaintiff's allegations as true or accept all reasonably drawn inferences in the Plaintiff's favor. *Id.*

CAIR cannot meet this threshold. CAIR's alleged injuries are "one-step-removed, anticipatory" injuries largely stemming from third parties that are not before the court. *See Murthy*, 603 U.S. at 57. Yet CAIR "must face a real and immediate threat of repeated injury" to warrant prospective injunctive relief. *Id.* at 58 (quotation omitted). And any threat of imminent harm is unlikely where there is only a "sequence of uncertain contingencies" "involving multiple independent actors," that must occur before a

---

[44] *See also Students for Justice in Palestine at University of Florida v. Rodrigues*, 2024 WL 374543, at *2 (N.D. Fla. Jan. 31, 2024) (*SJP II*).

13

App. 188

harm is realized. *Dream Defenders v. Gov. of the State of Fla.*, 57 F.4th 879, 888 (11th Cir. 2023).

CAIR's motion suffers these defects. It alleges a number of past and future harms that it claims establishes standing: (1) the loss of a podcasting contract with an unnamed third party; (2) the loss of attorneys' fees from an unrelated case and the costs of litigating that motion; (3) denial of access to the Florida Capitol; (4) lost opportunity of a possible future government contract or benefit; and (5) fewer partnerships with mosques for civic events. PI Mot. 10–14. Each alleged injury fails.

**A.**     Start with imminency. CAIR offers generic concerns about future harms but omits any evidence that these harms are "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). It worries, for example, about the loss of government benefits, but offers no concrete government contract or benefit that it was pursuing or even considering. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*; *see also Corbett v. Transportation Sec. Admin.*, 930 F.3d 1225, 1233 (11th Cir. 2019) ("Immediacy requires that the anticipated injury occur within some fixed period of time in the future.").

Worse still, CAIR seeks to widen the possibility of future imminent harms by overreading the EO. It claims that the EO's provision denying government benefits to people providing material support to CAIR "significantly impair[s] CAIR's ability to petition the courts" by jeopardizing access to products like Microsoft Word and court

14

App. 189

reporters. *See* PI Mot. 29. But the EO prevents no such thing. The EO incorporates the definition of "material support or resources" from Section 775.33, Florida Statutes. EO 4. As the statute makes clear, *providing* material support requires doing so "*knowingly.*" Fla. Stat. § 775.33(3) (emphasis added). As part of the "old soil" transplanted into the EO, that mens rea requirement applies. *DeSantis v. Dream Defs.*, 389 So. 3d 413, 421 (Fla. 2024). CAIR has offered no reason to believe that any provider has *knowingly* provided resources to a designated terrorist organization.

CAIR has therefore not pointed to any Florida-government action that would amount to continued pressure from the EO. Instead, CAIR relies on its own members' declarations—which include unsubstantiated allegations—to establish an "imminent" injury. Tellingly, the declarations do not point to concrete examples but, rather, reference "fears," Dkt. 24-2, Pg. 7, 8, "concerns," *id.* at 8, and "hesitat[ions]," Dkt. 24-3, Pg. 5, of anticipatory harm.

So, it is no surprise that two of CAIR's core assertions of harm have not panned out. CAIR repeatedly warned that Plaintiffs faced a threat of future injury by being "denied access to the Florida Capitol for Muslim Day advocacy" and because the EO denied "access to government facilities." PI Mot. 12–13; *see also id.* at 28 (claiming impaired right to petition because the EO "prevent[s] CAIR from accessing government buildings"). Yet CAIR-Florida, in its own words, "celebrated the resounding success of

15

App. 190

the 2026 Florida Muslim Day" at the Capitol, which included "impactful meetings with legislative staff" and a "significant victory for representation" in the Legislature.[45]

CAIR's harms regarding attorneys' fees are similarly ephemeral. It claimed loss of attorneys' fees and costs in an unrelated case as a harm from the EO, PI Mot. 10–11, but the court there has already ruled in CAIR's favor. *See Illoominate Media, Inc. v. CAIR Florida, Inc.*, No. 9:19-cv-81179-RAR, (S.D. FL. Jan. 29, 2026).

In sum, CAIR's allegations of past harms have not materialized. And that documented history only undermines its already speculative assertions of future harms. *See Bowen v. First Fam. Fin. Servs.*, 233 F.3d 1331, 1340 (11th Cir. 2000) (dismissing a theory of future harm that "perhaps or maybe" has a chance of occurring (quotation omitted)). CAIR has relied on nothing but a series of contingencies, mostly involving independent actors, to establish an injury. More is needed. *See Murthy*, 603 U.S. at 57.[46]

---

[45] *See* Press Release, CAIR-Florida Celebrates Successful 2026 Muslim Day at the Capitol, Muslim-American Heritage Resolution, CAIR-Florida (Feb. 3, 2026), https://perma.cc/58GH-YSY8. The fact that CAIR-Florida has access to the Capitol means that CAIR would have that same access as they are both covered by the EO. Plaintiffs claim CAIR-Florida was denied conference room space in the Capitol as another harm, Am. Compl. ¶ 25, but never explain how that denial was related to the EO. As explained by the declaration submitted with this response, the denial was not related to the EO. Arnold Decl. ¶ 10.

[46] In its retaliation claim, CAIR presumably asserts a "reputational" harm. *See* PI Mot. 11, 20. For standing purposes, plaintiffs must mount a reputational-harm argument with more than a cursory diversion-of-resources claim. *SJP I*, 2024 WL 371875, at *6. Here, CAIR asserts that resources have been diverted from journalism programs and scheduled events to responding to media and partner organizations. PI Mot. 7–8. For starters, those assertions hardly show *how* CAIR's reputation was harmed. *SJP I*, 2024 WL 371875, at 6. Secondly, it would appear that CAIR still coordinates with the

16

App. 191

**B.**    CAIR's traceability and redressability problems are worse. To show a traceable chilling effect as CAIR claims, it must show more than personal displeasure with the EO. *Compare SJP II*, 2024 WL 374543, at *4 *with* Dkts. 24-1 *through* 24-3 (declarations of CAIR-affiliated individuals). "[E]vidence of subjective fear or anxiety, on its own, does not give rise to a cognizable constitutional injury." *SJP II*, 2024 WL 374543, at *4. Moreover, "the record is devoid of any evidence that [CAIR's] members . . . have self-censored" because of the EO. *SJP I*, 2024 WL 371875, at *4. By its own admission, CAIR-Florida continues its advocacy, including at the Capitol.

CAIR's remaining allegations of harm are not redressable by a court order. "To determine whether an injury is redressable, [the court] consider[s] the relationship between the judicial relief requested and the injury suffered." *Murthy*, 603 U.S. at 73 (quotation marks and citation omitted). Alleged anticipatory third-party injuries tied to requested prospective relief are non-redressable. The Supreme Court has explained that anticipatory third-party injuries involve non-parties "to the suit, and there is no reason [that those third parties] should be obliged to honor an incidental legal determination the suit produced." *Lujan*, 504 U.S. at 569.

---

media (by admission) and its own partner organizations (also by admission). *See* Dkts. 24-1–24-3. CAIR still engages in advocacy, and CAIR's actions to date demonstrate the same. The reputational "harm" stems not from the EO but from CAIR's pre-existing reputation.

17

The most concrete injury in CAIR's pleading involves an unnamed Florida-based production company that allegedly "withdrew" its production agreement with CAIR after the EO was announced. PI Mot. 10–11. Yet CAIR offers little to connect how that podcasting contract is redressable. The assumption is that this unnamed party would desire future government benefits or contracts, but CAIR never proves that. And when a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed." *Lujan*, 504 U.S. at 562 (1992) (emphasis added). CAIR also supplies no reason to believe that the unnamed company is still willing and able to resume the contract if relief were granted. The unnamed party is not party "to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).[47]

In sum, CAIR's theory of standing rests on "amorphous threat[s] contingent upon" third-party actions or the so-far-non-existent enforcement actions of the State. *Cf. SJP I*, 2024 WL 371875, at *6. CAIR has not shown a likelihood of establishing standing.

---

[47] The same analysis applies to CAIR's allegations that the plaintiff in an unrelated case now refuses to pay court-ordered attorney's fees to CAIR and that unnamed mosques have limited their association with CAIR.

**II.   CAIR has not met the preliminary-injunction factors.**

CAIR further falls short of establishing the likelihood of success on the merits of its claims. It offers a barrage of First Amendment claims, claiming that the EO (1) is impermissible viewpoint discrimination; (2) is retaliation for its protected speech; (3) infringes on its right to petition; and (4) has harmed its associational rights. *See* PI Mot. 14–33. Yet these claims assume critical facts found nowhere in the EO, ignore the deference owed to the executive branch when making determinations about public safety, and clash with precedent.

**A.   CAIR is unlikely to succeed on the merits of its First Amendment claims.**

When it comes to designating terrorist groups, the "evaluation of the facts by the Executive . . . is entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010). That deference is akin to a "presumption of regularity" that courts do "not lightly discard." *Hartman v. Moore*, 547 U.S. 250, 263 (2006). And "where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007). Indeed, "there is no First Amendment right nor any other constitutional right to support terrorists." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003).

Because supporting terrorism falls outside the scope of the First Amendment, free-speech challenges to terrorism designations fail, including when made pursuant to

App. 194

an executive order. *See, e.g., Islamic Am. Relief Agency*, 477 F.3d at 735; *Holy Land Found. for Relief & Dev.*, 333 F.3d at 166; *Kadi v. Geithner*, 42 F. Supp. 3d 1, 34 (D.D.C. 2012). Even if CAIR's conduct fell within the scope of the First Amendment, precedent militates against a likelihood of success on the merits.

### 1.   CAIR's free-speech claims are unlikely to succeed.

None of CAIR's free-speech claims—viewpoint discrimination, retaliation, coercion, or petition—are likely to succeed on the merits.

### i.   The Executive Order is not a regulation of speech, but if it were, it is viewpoint neutral, content neutral, and otherwise valid.

CAIR leads with the idea that the EO is infirm because it is viewpoint based by "imposing . . . unfavorable treatment upon a group advancing disfavored viewpoints." PI Mot. 17. That is unpersuasive for multiple reasons.

As a threshold matter, the EO is not a speech regulation. On its face, the EO has nothing to do with speech; it does not single out any speech for prior restraint or otherwise regulate what anyone may say. The EO instead identifies a group—CAIR—for designation as a terrorist organization based on that group's past *conduct. See Islamic Am. Relief Agency*, 477 F.3d at 735; *Holy Land Found. for Relief & Dev.*, 333 F.3d at 166; *Kadi*, 42 F. Supp. 3d at 34; *cf. TikTok Inc. v. Garland*, 604 U.S. 56, 67–69 (2025) (suggesting First Amendment scrutiny may not apply). In practice, the EO merely ensures that "public funds [are] spent for the purposes for which they were authorized" i.e. not supporting terrorism. *Rust v. Sullivan*, 500 U.S. 173, 196 (1991). To the extent CAIR

20

App. 195

wishes to advocate in Florida, it is "free to do so without [state] assistance." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality).

Since the EO contains no speech regulations, it is nonsensical to analyze whether those regulations are content or viewpoint based. The EO simply does "not implicate the First Amendment at all." *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (explaining that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct"). The Court's analysis should end there.

Even if the EO implicated the First Amendment, it does not discriminate based on viewpoint. "All viewpoint discrimination is first content discrimination." *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1318 (11th Cir. 2020) (cleaned up) (affirming denial of preliminary injunction). But the text of the EO shows that it is not only view-point neutral, it makes no content-based distinctions whatsoever. Indeed, *not a single one* of the Governor's findings supporting CAIR's designation references speech. Not from CAIR itself, any founder, director, or member.

CAIR assumes strict scrutiny applies anyways by gesturing at "unfavorable treat-ment" it has allegedly received. PI Mot. 17. But the Supreme Court has twice rejected CAIR's effects-based reasoning. *See McCullen v. Coakley*, 573 U.S. 464, 480 (2014) ("[A] facially neutral law does not become content based simply because it may dispropor-tionately affect speech on certain topics."); *Hill v. Colorado*, 530 U.S. 703, 724 (2000)

21

(Viewpoint discrimination is not triggered "simply because [an] enactment was motivated by the conduct of the partisans on one side of a debate.").

Faced with a content-neutral EO, CAIR invites this Court to look beyond the text and divine a viewpoint discriminatory motive based on circumstance. That conflates a claim that a law burdens speech with a retaliation claim of the sort that CAIR raises elsewhere. In any event, under settled precedent the Court must decline CAIR's invitation. S*ee United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("[T]his Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); *In re Hubbard*, 803 F.3d 1298, 1313 (11th Cir. 2015) ("*O'Brien* teaches against striking down otherwise constitutional legislation on the basis of a speculated illicit legislative motive." (citation omitted)).[48]

And even if this Court entertained CAIR's viewpoint discrimination claim, it "cannot prevail on an *as-applied* [viewpoint-discrimination] challenge without showing that the law has in fact been . . . unconstitutionally applied to [it]." *McCullen*, 573 U.S. at 485 n.4. In other words, CAIR "must show that [it] was prevented from speaking while someone espousing another viewpoint was permitted to do so." *Id.*

---

[48] As recently as 2022, the Eleventh Circuit was "not aware of" any binding precedent "that relied on legislative history or statements by proponents to characterize as viewpoint-based a law challenged on free-speech grounds." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1225 (11th Cir. 2022), *vacated on other grounds sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

22

App. 197

CAIR cannot meet that burden. Not only does the EO not restrict any speech, but various civic groups like FAITH and the ACLU continue to express viewpoints virtually identical to CAIR's positions.[49] These groups often act alongside CAIR to advance the same political and legal goals, but have not been designated as terrorist organizations because, unlike CAIR, they do not have a long history of ties to terrorism.

At any rate, the EO is valid. When assessing executive orders implicating security interests, courts ask "whether the policy is facially legitimate and bona fide." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018). If so, "that would put an end to [any] review." *Id.* After all, "[a]ny rule of constitutional law that would inhibit the flexibility" of an executive "to respond to changing world conditions should be adopted only with the greatest caution." *Id.* CAIR does not allege the EO is facially illegitimate, nor does it contest that it is a bona fide executive order.

Alternatively, the EO should, at most, be assessed under intermediate scrutiny. *See Kadi*, 42 F. Supp. 3d at 31–34 (applying intermediate scrutiny and upholding terrorist

---

[49] *Compare* Am. Compl. ¶ 85, *with* Jewish Voice of Peace, *$27 million in divestment victories* (Dec. 5, 2025) (sharply criticizing "Israeli violence against Palestinians"), https://perma.cc/MDP8-DNGU, *and* Anthony Man, *There's no sharia law in the state, but South Florida lawmaker files bill to outlaw it anyway*, Sun Sentinel (Oct. 25, 2025) (Mark Winer, the President of the Foundation to Advance Interfaith Trust and Harmony, criticizing HB 119 alongside CAIR as "appealing to the hatred of Muslims"), 2025 WLNR 27763069, and ACLU Florida, *ACLU of Florida and CAIR Florida File Lawsuit Challenging Policy Denying Religious Meals to Muslim Inmates at Miami-Dade Jails* (Sept. 3, 2015) (ACLU advocating for civil rights of Muslim inmates alongside CAIR), https://perma.cc/KH3E-65VN.

23

designation after *Holder*); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 82 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) (applying *O'Brien*'s intermediate scrutiny standard and upholding terrorist designation); *TikTok*, 604 U.S. at 73–80 (holding that TikTok-specific regulations satisfied intermediate scrutiny).

The EO easily clears the intermediate scrutiny standard. In fact, it would survive even under CAIR's incorrect standard of strict scrutiny. Thwarting terrorism is a textbook compelling government interest. *Holder*, 561 U.S. at 28–29. Barring government resources from supporting terrorism is simply a narrower subset of that compelling interest. As for tailoring, the Supreme Court in *Holder* upheld a material support provision virtually identical to the definition incorporated in the EO. *Compare id.* at 10 n.2, *with* EO 4 (incorporating Fla. Stat. § 775.33(l)(c)).

If anything, the EO is more narrowly tailored than the federal material-support framework. For one, it is not a criminal provision. Under the broadest interpretation, the EO prohibits government entities and entities "regulated by [] Executive or Cabinet Agenc[ies]" from providing "any contract, employment, funds, or other benefit or privilege" to designated terrorist organizations or those that provide them material support. EO 4. And this civil sanction, like its federal criminal counterpart, requires an individual to *knowingly* provide material support.[50] At bottom, the Governor has simply determined

---

[50] *See, supra*, at 15.

that Florida should not use its government resources to facilitate the activities of terrorist organizations.

To date, no court has accepted the theory that a terrorist designation is viewpoint based. This Court should not be the first.

### ii.    CAIR's alleged retaliation claim is deficient.

CAIR's theory is more aptly assessed under the retaliation rubric, but even then it falls short. To make out a retaliation claim, CAIR must clearly identify its protected speech, show the Governor's adverse action in response, and explain the causal connection between CAIR's statements and the supposed retaliation. *See Hartman*, 547 U.S. at 256, 260–65. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). The supposed retaliatory motive must be the "but-for cause" of an adverse action. *Hartman*, 547 U.S. at 260. But-for causation is a strict test, and when an intervening cause (such as probable cause for government action) exists, the causal link between speech and supposed retaliatory action is severed. *Id.* at 265.

Here, the Governor not only has probable cause to declare CAIR a terrorist organization, but CAIR's retaliation claim is otherwise plagued by causation issues.

***Probable cause.*** For retaliation cases challenging government action, plaintiffs must make a "threshold showing" that the government lacked "probable cause" to initiate the legal process. *Nieves*, 587 U.S. at 400, 404; *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304 (11th Cir. 2019). Probable cause "is not a high bar" and "requires only

25

App. 200

a probability or substantial chance of criminal activity, not an actual showing of such activity." *D.C. v. Wesby*, 583 U.S. 48, 57 (2018). Outside the strictures of a criminal prosecution, as is the case here, "probable cause is measured by a lesser standard." *DeMartini*, 942 F.3d at 1310 (quotation omitted).

CAIR favorably cites *Hartman* and *Nieves*, PI Mot. 18–19, and the Governor agrees that they set the proper legal backdrop. Retaliation claims hinge on an official's purportedly improper "state of mind," which is "easy to allege and hard to disprove." *Nieves*, 139 U.S. at 403 (cleaned up). "Any inartful turn of phrase or perceived slight during a legitimate [use of executive power]" can lead to "years of litigation," "dampen[ing] the ardor of all but the most resolute" public official. *Id.* (cleaned up).[51] Unchecked by robust requirements, retaliation claims paired with requests for injunctive relief threaten government efficacy. *See id.* Thus, the Eleventh Circuit has held, for example, that civil retaliatory lawsuit claims fail if the government establishes probable cause for the lawsuit. *DeMartini*, 942 F.3d at 1304.

The Governor plainly had probable cause here. Under Florida law, a terrorist organization is "any organized group engaged in or organized for the purpose of engaging in terrorism." § Fla. Stat. 874.03(7). Terrorism is any "activity that involves" a "violent act or an act dangerous to human life which is a violation of the criminal laws

---

[51] CAIR also cannot save its claim under the *Nieves* "exception" because "otherwise similarly situated" groups, such as FAITH and the ACLU, were "engaged in the same sort of protected speech." *DeMartini*, 942 F.3d at 1297.

26

App. 201

of this state or the United States" and "is intended to intimidate, injure, or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy." § Fla. Stat. 775.30(1)–(2) (cleaned up). Courts interpret the phrase "act dangerous to human life" broadly. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (Posner, J.) (en banc) ("Giving money to Hamas, like giving a loaded gun to a child (which [] is not a violent act), is an 'act dangerous to human life.'").

Ample evidence shows a "substantial chance," *Wesby*, 583 U.S. at 57, that CAIR is a group "organized for the purpose of engaging in terrorism" or an organized group that has "engaged in" terrorism.[52] CAIR disputes none of the following:

- CAIR originated from the Palestine Committee's 1993 Philadelphia meeting, where the express goal was to create a U.S. "cover" to support Hamas.[53]

- By 1994, internal Palestine Committee records identified CAIR as a part of the Palestine Committee.[54]

---

[52] To the extent the Court rejects the applicability of the "lack of probable cause" requirement for this retaliation claim, the same evidence proves that the Governor would have made the "same decision" regardless of CAIR's speech. *See Warren v. De-Santis*, 631 F. Supp. 3d 1188, 1198 (N.D. Fla. 2022) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Even under this alternative theory, precedent cuts in favor of upholding the EO and denying preliminary relief. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 655 (9th Cir. 2025).

[53] Vidino, *supra* n.5, at 25–26.

[54] *Id.* at 26.

27

- One of CAIR's founders, Omar Ahmad, was a powerful member of the Palestine Committee and exercised sizable influence over the HLF's terror financing.[55]

- Since CAIR's founding, numerous CAIR officials and affiliates have been convicted of terrorism-related offenses.[56]

- CAIR's role as an unindicted co-conspirator in the HLF terror financing scheme also points to a willingness to engage in acts dangerous to human life.[57] One of CAIR's founders, Omar Ahmad, was individually named as an unindicted co-conspirator in the HLF trial.[58] HLF, an organization dedicated to funneling support for Hamas, paid CAIR for "consulting services."[59]

- CAIR is also part of the Muslim Brotherhood. CAIR only challenges its individual designation as a terrorist organization. It does not, however, challenge the EO's designation of the "Muslim Brotherhood and any chapter or subdivision thereof" as terrorist organizations. EO 3. As a subdivision of the "Palestine Committee of the Muslim Brotherhood," CAIR's designation would stand regardless.

Though CAIR asks the Court to enjoin enforcement of the EO, it never engages

with any of the evidence linking it to terrorism. That alone warrants denying the motion.

At minimum, the Governor had probable cause to issue the EO.

---

[55] *See El-Mezain*, 664 F.3d at 530–31 (describing Ahmad's wiretapped statements); *see also* Vidino, *supra* n.5 at 20–25.

[56] *See supra* n.37.

[57] *Holy Land Found.*, 2009 WL 10680203, at *7.

[58] Josh Gerstein, *Report: Feds close probe of CAIR founder*, POLITICO (April 14, 2011), https://www.politico.com/blogs/under-the-radar/2011/04/report-feds-close-probe-of-cair-founder-035045.

[59] Vidino, *supra* n.5, at 26.

28

***CAIR cannot prevail under any standard.*** Even under a more relaxed causation test, CAIR has not shown retaliation. Because not every retaliatory act amounts to a "constitutional tort," viable retaliation claims require strict "but for" causation. *Nieves*, 587 U.S. at 399. Thus, CAIR must prove that "but for" its protected speech, it would not have been designated a terrorist organization. *Id.* And the further removed the alleged retaliation is from the protected speech, the less likely a plaintiff is to prove causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).[60]

When a government official's "First Amendment rights are implicated" by a plaintiff's retaliation claim, "special concerns" arise that militate against counting the official's speech towards causation. *DeMartini*, 942 F.3d at 1289 n.8; *see Dixon v. Burke Cnty.*, 303 F.3d 1271, 1275–76 (11th Cir. 2002). Courts also consider whether the 'face" of an allegedly retaliatory executive order demonstrates "retaliatory animus." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 655 (9th Cir. 2025).

Nothing on the face of the EO "express[es] any retaliatory animus." *Id.* That weighs against causation. *See id.* CAIR also muddles the analysis by leaning heavily on not their own speech but the *Governor's* protected speech. *See* PI Mot. 22. Counting a state official's protected speech against him to prove retaliation would undermine "the most fundamental First Amendment activities." *Green v. Finkelstein*, 73 F.4th 1258, 1266

---

[60] When considering First Amendment retaliation claims, the Eleventh Circuit has used Title VII cases to inform its analysis because "the two standards are consonant." *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1301 n.2 (11th Cir. 2005).

(11th Cir. 2023) (quotation omitted). All the more for the State's chief executive officer, who must speak on pressing issues affecting Floridians. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 781–82 (2002).

Thus, the Court should decline to factor any of the Governor's protected speech against him. *See DeMartini*, 942 F.3d at 1289 n.8; *Dixon*, 303 F.3d at 1275–76. Regardless, much of the Governor's cited political speech is from months and years ago and does not directly address CAIR. *See* PI Mot. 22. It lacks any temporal nexus to the EO.

Apart from the Governor's public statements, CAIR describes only two concrete examples of what it thinks spurred retaliation: CAIR's Students for Justice in Palestine (SJP) litigation and CAIR's October 14, 2025, press release. PI Mot. 22–24. Neither substantiates a retaliation claim.

CAIR argues that its unsuccessful litigation against various university officials, including the Governor, was the speech that prompted the Governor to designate CAIR as a terrorist organization. *See* PI Mot. 22–23. As this Court knows, those two cases started and ended more than two years ago.[61] Courts routinely reject retaliation claims where similar periods have elapsed between the speech and alleged retaliation.

---

[61] *See* Order Granting Motion to Dismiss, *Students for Just. in Pal. at the Univ. of S. Fla. v. Rodriguez, et al.*, 1:23-CV-281 (N.D. Fla. Feb. 1, 2024), DE 81; Order Granting Motion to Dismiss, *Students for Just. in Pal. at the Univ. of Fla. v. Rodriguez, et al.*, 1:23-CV-275 (N.D. Fla. Feb. 1, 2024), DE 52.

*See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam) (collecting cases).

Next, CAIR attempts to reverse engineer a retaliation claim by citing an October 14, 2025 press release condemning the Governor's "endorsement" of HB 119. PI Mot. 23–24. Yet a plain reading of the Governor's social media post shows that the Governor did not "endorse" HB 119. Moreover, plaintiffs become increasingly unlikely to prove causation once the period between speech and alleged retaliation stretches beyond a month. *See Faircloth v. Herkel Invs. Inc.*, 514 F. App'x 848, 852 (11th Cir. 2013) (one month is "not too protracted" but three months "cannot alone establish causation" (citations omitted)).

CAIR also ignores other confounding factors that complicate its theory of causation. During the two months separating CAIR's press release and the EO, academics and officials published a wave of material highlighting CAIR's past, current, and continuing ties to terrorism. The George Washington University's Center on Extremism, for example, released new work emphasizing CAIR's affiliation with known terrorists and shed new light on CAIR's roots in the Hamas support apparatus.[62] Then, on November 24, 2025, President Trump signed Executive Order 14262, directing federal officials to begin investigating whether "Muslim Brotherhood chapters or other

---

[62] Lara Burns et al., *supra* n.20.

31

subdivisions" should be designated as terrorist organizations under federal law.[63] The Governor consulted these materials, among others, in deciding to designate CAIR as a terrorist organization. Arnold Decl. ¶ 7. These intervening events, in addition to the temporal distance, undermine any causal link between CAIR's press release and the EO. *Cf. Thomas v. Marshall Pub. Schs.*, 152 F.4th 884, 892 (8th Cir. 2025). And, again, CAIR has not even attempted to refute its many demonstrated links to terror over the years.[64]

### iii.    The coercion claim fails as a matter of law.

Next, to make out a coercion claim, CAIR must clearly present state action that could be reasonably understood to convey a threat of adverse action against third parties meant to punish or suppress CAIR's *speech. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963). Ultimately, coercion occurs when government officials do indirectly what they are barred from doing directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). But facially valid government action cannot amount to coercion, *see Trump*, 585 U.S. at 704; *TikTok*, 604 U.S. at 70–71, and here, Florida is entitled to attempt to stamp out terror.

CAIR's coercion claim is based on the flawed notion that the EO is founded upon viewpoint discrimination. But the opposite is true. On its face, the EO addresses

---

[63] Executive Order 14262, https://www.federalregister.gov/documents/2025/11/28/2025-21664/designation-of-certain-muslim-brotherhood-chapters-as-foreign-terrorist-organizations-and-specially

[64] For the same reasons, CAIR's association and petition claims fail to the extent they allege retaliation against CAIR's prior association and petitioning activities.

*conduct*: terrorism and material support for terrorism. It therefore does not implicate the First Amendment at all. Moreover, CAIR has not pointed to any state action that would amount to coercion of third parties. CAIR does not allege that the State threatened the unknown podcast company or the unknown mosques with sanctions for supposedly materially supporting CAIR.[65] Thus, *Vullo* is inapposite.[66] If any speech is involved, however, the EO nevertheless passes muster.

*Holder v. Humanitarian Law Project* is instructive, involving a substantially similar material-support definition. *See* 561 U.S. at 8–9. The Humanitarian Law Project wished to support two terrorist organizations by (1) training them to use humanitarian and international law to peacefully solve conflict; (2) teaching them to seek U.N. relief; and (3) engaging in coordinated political advocacy with them. *Id.* at 36–38. As applied to that expression, the Supreme Court held the federal government's material-support statute survived First Amendment scrutiny. *Id.* at 36–39.[67]

---

[65] Moreover, the definition of "material support" in the Florida Statutes expressly excludes "religious materials." Fla. Stat. § 775.33(c). Thus, the EO does not stand as an obstacle to mosques engaging in protected religious expression with CAIR.

[66] CAIR's citation of *Floridians Protecting Freedom, Inc. v. Ladapo*, 754 F. Supp. 3d 1165 (N.D. Fla. 2024), fares no better. In *Ladapo*, the State had claimed that the plaintiff's TV advertisement was categorically false and sought to have it removed from the air. *Id.* at 1171. Not so in this case. The EO is premised on unprotected *conduct*, not on any viewpoint.

[67] If CAIR were to claim that the EO deters a third party from engaging in expressive conduct that supports CAIR, then the *O'Brien* test would apply. *Holder*, 561 U.S. at 26–27 (citing *United States v. O'Brien*, 391 U.S. 397, 403 (1968)).

33

"Everyone agrees," the Court explained, "that the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder*, 561 U.S. at 28; *see also id.* at 34 (noting "the lack of competence on the part of the courts" in this setting (quotation omitted)); *Winter*, 555 U.S. at 24. To achieve that objective, the government employed a preventative measure, criminalizing "aid that makes [terrorist] attacks more likely to occur." *Holder*, 561 U.S. at 35. With deference in mind, the Court concluded that the government's interest in preventing terrorism outweighed a third party's desire to materially support terrorist organizations "even if the supporters meant to promote only the groups' nonviolent ends." *Id.* at 36.[68]

Here, CAIR never explains how the State has "coerced" a third party based on any supposed third party's material support. But even if CAIR had adequately done so, it still has not shown a likelihood of success on the merits. Indeed, protection of public health and safety "is a paramount governmental interest," which the Governor seeks to pursue through the EO. *See Hodel v. Va. Surface Mining & Reclamation Ass'n.*, 452 U.S. 264, 299–300 (1981). The EO's denial of government benefits to entities that materially support designated terrorist organizations is the least restrictive means of achieving these compelling interests. The Governor made an "informed judgment" about terrorist organizations and how to best protect the citizens of Florida. *TikTok*, 604 U.S. at 75.

---

[68] Because "[m]oney is fungible," material support to a terrorist organization—even toward a non-violent end—allows the organization to direct more resources to terrorism. *Holder*, 561 U.S. at 31.

His judgment, based on a wealth of information connecting CAIR to terrorism, is afforded "substantial respect" in this setting. *Id.*; *see also Holder*, 561 U.S. at 35–36.

On this record, CAIR cannot overcome the deference and respect owed to the State for the safety of its citizens.

### 2. CAIR's association claim is unlikely to succeed.

*Holder* also refutes CAIR's First Amendment association claim. The plaintiffs there, like CAIR, pled an association claim in addition to their free-speech claim. 561 U.S. at 39. The Supreme Court rejected the association claim "because the [material support] statute does not penalize mere association with a foreign terrorist organization." *Id.* The federal statute, like the state statute and EO here, "does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group," but rather "the act of giving material support." *Id.*; *see also Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1026 (7th Cir. 2002); *United States v. Chandia*, 514 F.3d 365, 371 (4th Cir. 2008) ("[T]he statute 'does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO'" (quotation omitted)).

The EO similarly does not obstruct any right of association. Individuals and organizations may associate with CAIR without jeopardizing their ability to obtain contracts, employments, funds, or other benefits or privileges. *See Boim*, 291 F.3d at 1026.

35

App. 210

The EO addresses "only the provision of material support," which is not the same as association. *Id.*[69]

### 3. CAIR's petition claim is unlikely to succeed.

Nor will CAIR's novel petition claim succeed. As explained above, the EO withstands any level of scrutiny. The EO's material-support provision targets conduct other than petitioning, and leaves CAIR free to petition the government for redress of grievance. And even if the EO did burden CAIR's right to petition, it is the least restrictive means of advancing compelling governmental interests. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011) (applying free speech precedent to a petition claim in light of "the extensive common ground in the definition and delineation of these rights").

### B. CAIR's claims of irreparable injury are weak and undermined by delay.

Merits aside, the Court should deny a preliminary injunction because CAIR is not suffering irreparable harm. To show irreparable harm, CAIR must demonstrate that the harm is "neither remote nor speculative, but actual and imminent." *Ne. Fla. Ch. of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted); *Swain*, 961 F.3d at 1292 (Plaintiff must "suffer irreparable injury unless the injunction issues") (quotation marks and citation omitted).

---

[69] This distinguishes *National Association for Advancement of Colored People v. Button*, which held that a Virginia statute burdened association by prohibiting the NAACP from advising its members to seek the assistance of particular attorneys. 371 U.S. 415, 433 (1963).

App. 211

CAIR has not shown that it faces actual, imminent harm. CAIR admits it has still engaged in advocacy after the EO issued. *E.g.*, Dkt. 24-3, at 7–8. CAIR has not alleged that the State has treated it or any third party differently because of the EO. CAIR has lost no past, present, or future government contracts. Moreover, CAIR's apparent concern "about potential negative publicity," related to "reputation and goodwill," is speculative and inadequate to demonstrate a clear and present need for equitable relief." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 952 (8th Cir. 2023) (quotation omitted).

Delay in seeking injunctive relief also "militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Benisek v. Lamone*, 585 U.S. 155, 159 (2018); 11A Fed. Prac. & Proc., § 2948.1 (3d ed. 2025 update). CAIR waited a month and a half to ask the Court to preliminarily enjoin the EO, which is *not* complex. It has offered no explanation for the delay.

## C.    The public interest and balance of the equities disfavor preliminary relief.

Finally, the public interest and balance of the equities—which merge when the government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favors the Governor. The State has a "paramount governmental interest" in protecting public safety. *Hodel*, 452 U.S. at 300. "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (citation omitted). By blocking contracts and other

37

App. 212

government benefits to terrorist organizations and those who provide them material support, the EO furthers the health and safety of Floridians. Preliminary relief for CAIR is inappropriate.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

February 11, 2026

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*

*/s/ Jeffrey Paul DeSousa*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
  *Deputy Solicitor General*
TYLER E. GUSTAFSON (FBN 1049292)
  *Assistant Solicitor General*
CASEY J. WITTE (FBN 1070288)
  *Solicitor General Fellow*
JAMES WACZEWSKI (FBN 0154989)
  *Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Governor DeSantis*

App. 213

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on February 11, 2026, to all counsel of record.

/s/ Jeffrey Paul DeSousa
*Acting Solicitor General*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F) and this Court's order allowing a reasonable amount of words over the local rule, I certify that this memorandum contains 8,890 words, inclusive of headings, footnotes, and quotations, according to the word-processing system used to prepare it.

/s/ Jeffrey Paul DeSousa
*Acting Solicitor General*

App. 214

# 37-1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and CAIR-
FLORIDA, INC.,

     *Plaintiffs,*

     v.

RONALD DESANTIS, in his official
capacity as Governor, State of Florida,

     *Defendant.*

Case No. 4:25-cv-516-MW-MJF

## <u>DECLARATION OF JAY K. ARNOLD JR.</u>

I, Jay K. Arnold Jr., declare as follows.

1.     I am over 18 years of age and am competent to make this declaration.

2.     I hold the position of Deputy Chief of Staff for Florida Governor Ron DeSantis and work in the Executive Office of the Governor. I have held this position since August 2025.

3.     During my tenure, the Executive Office of the Governor has performed the research, drafting, preparation, and promulgation of executive orders.

4.     On December 8, 2025, Governor DeSantis signed an executive order titled "Protecting Floridians from Radical Islamic Terrorist Organizations," also known as Executive Order 25-244.

5.     I have personal knowledge of the research, drafting, preparation, and promulgation that culminated in Executive Order 25-244.

6.    When researching, drafting, preparing, and promulgating Executive Order 25-244, the Executive Office of the Governor made several factual findings that, in its reasoned judgment, qualified CAIR as a terrorist organization.

7.    When making these factual findings, the Executive Office of the Governor consulted numerous sources, including the following:

   a.  Scholarly works from the George Washington University Program on Extremism, Hudson Institute, Foundation for Defense of Democracies, and Foreign Policy Research Institute:

      i.  A work titled "The Muslim Brotherhood's U.S. Network."[1]

      ii.  A work titled "The Muslim Brotherhood in America: A Brief History."[2]

      iii.  A work titled "CAIR—Why History is Important."[3]

      iv.  A work titled "Hamas's Influence on US Campuses: A Study of Networks, Strategies, and Ideological Advocacy."[4]

---

[1] Zeyno Baran, *The Muslim Brotherhood's U.S. Network*, Hudson Institute (Feb. 27, 2008), https://perma.cc/H6GP-MUF6.

[2] Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History*, George Washington University Program on Extremism (July 2025), https://perma.cc/5CJ4-E7PA.

[3] Lara Burns et al., *CAIR—Why History is Important*, George Washington University Program on Extremism (Nov. 2025), https://perma.cc/7TE5-PJF3.

[4] *Hamas's Influence on US Campuses: A Study of Networks, Strategies, and Ideological Advocacy*, George Washington University Program on Extremism (2024), https://perma.cc/LWP6-SF4C.

2

        v.  A work titled "Patient Extremism: The Many Faces of the Muslim Brotherhood."[5]

       vi.  A work titled "Muslim Brotherhood Organizations in America: Goals, Ideologies, and Strategies."[6]

   b.  The Executive Order signed by President Donald J. Trump titled "Designation of Certain Muslim Brotherhood Chapters as Foreign Terrorist Organizations and Specially Designated Global Terrorists."[7]

   c.  The list of entities currently designated as Foreign Terrorist Organizations by the United States.[8]

   d.  The hearing conducted in the 115th Congress titled "The Muslim Brotherhood's Global Threat."[9]

   e.  The resolution adopted in the Florida House of Representatives titled "A resolution to strongly encourage all executive agencies of the State of Florida, all law enforcement agencies, and all local governments in

---

[5] David Adesnik et al., *Patient Extremism: The Many Faces of the Muslim Brotherhood*, Foundation for Defense of Democracies (Oct. 27, 2025), https://perma.cc/3EEQ-M5UJ.

[6] Lorenzo Vidino, *Muslim Brotherhood Organizations in America: Goals, Ideologies, and Strategies*, Foreign Policy Research Institute (Dec. 3, 2011), https://perma.cc/PV5T-MLSZ.

[7] Exec. Order No. 14,362, 90 Fed. Reg. 55033 (Nov. 24, 2025), https://perma.cc/6285-K5JA.

[8] *Foreign Terrorist Organizations*, U.S. Dep't of State, https://perma.cc/74BA-WZB5.

[9] *The Muslim Brotherhood's Global Threat: Hearing Before the H. Oversight and Gov. Reform Subcomm. on Nat'l Sec.*, 115th Cong. (2018), https://perma.cc/L3D2-MS84.

3

this state to suspend contact and outreach activities with the Council on American-Islamic Relations."[10]

    f. The events, statements, materials, judicial findings, charges, and convictions arising from the investigation into, and prosecution of, the Holy Land Foundation.[11]

8.     CAIR's conduct, as well as the conduct of its past and present leaders, employees, and affiliates, motivated the decision to designate CAIR as a terrorist organization for the purposes of Executive Order 25-244.

9.     At no point did the Governor or his agents knowingly deny CAIR, CAIR-Florida, their leaders, employees, or affiliates, access to the Florida Capitol in connection with the 2026 Muslim Day event.

10.     CAIR-Florida made a request to reserve a space in the Florida Capitol to be used for the 2026 Muslim Day event, but that request was denied due to the fact that the requested space had already been reserved by another organization. At no point did CAIR or CAIR-Florida's speech or viewpoints motivate that decision.

11.     I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

---

[10] Disassociation from Council on American-Islamic Relations, H.R. 1209, 2024 Sess. (Fla. 2024), https://perma.cc/95LT-QBXB.

[11] *See, e.g., United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-240, 2009 WL 10680203 (N.D. Tex. July 1, 2009), *aff'd in relevant part*, 624 F.3d 685 (5th Cir. 2010).

4

Executed on this 11th day of February, 2026 in Tallahassee, Florida.

_____

Executive Office of the Governor
Deputy Chief of Staff
Jay K. Arnold Jr.

5

App. 220

**40**

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**CAIR-FOUNDATION, INC., and
CAIR-FLORIDA, INC.,**

  *Plaintiffs,*

v.                                    **Case No.:  4:25cv516-MW/MJF**

**RONALD DESANTIS, in his official
capacity as Governor, State of Florida,**

  *Defendant.*
_____/

**<u>ORDER CANCELLING HEARING</u>**

This case is set for a hearing on Plaintiffs' motion for preliminary injunction, ECF No. 24, on February 27, 2026. In setting the hearing, this Court adopted the parties' proposed briefing schedule and did not limit either side with respect to deadlines. Nobody requested expedited discovery. Moreover, the parties agreed that the pending motion could be decided on the papers and nobody planned to call live witnesses at the hearing. Nonetheless, this Court set this matter for a hearing for oral argument in an abundance of caution, and with the caveat that this Court would cancel the hearing if it determined that a hearing was not necessary after reviewing the briefing.

Having reviewed the pending motion and response, this Court does not need the parties to appear for oral argument before issuing a ruling. Accordingly, the

App. 222

hearing set for February 27, 2026, is **CANCELLED**. This Court will take the matter

under advisement once the Plaintiffs' reply is filed.

　　　　**SO ORDERED on February 17, 2026.**

　　　　　　　　　　　　　　**s/Mark E. Walker**
　　　　　　　　　　　　　　**United States District Judge**

2

41

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION


**CAIR-FOUNDATION, INC. and**
**CAIR-FLORIDA, INC.,**

    *Plaintiffs*,

**v.**

                              **Case No. 4:25-cv-00516-MW-MJF**

**RONALD DESANTIS, in his official**
**capacity as Governor, State of Florida,**

    *Defendant.*

_____/


### CAIR-FOUNDATION, INC.'S
### REPLY IN SUPPORT OF ITS
### MOTION FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

Introduction ...................................................................................................3

Argument......................................................................................................5

   I.     CAIR has shown it is substantially likely to have standing to
       pursue its claims. ........................................................................5

   II.    CAIR has met the requirements to obtain a preliminary injunction. .........7

      A.    CAIR is substantially likely to succeed on the merits of its
           First Amendment claims. .............................................................7

           1.     CAIR is likely to succeed on its Free Speech claim..............9

                a.     CAIR has shown viewpoint discrimination. ...............9

                b.     CAIR has shown retaliation. ....................................12

                c.     CAIR has shown coercion........................................14

           2.     CAIR is likely to succeed on its Right to Association
               claim.............................................................................15

           3.     CAIR is likely to succeed on its Right to Petition
               claim.............................................................................16

      B.    CAIR will suffer irreparable injury absent an injunction. .............18

      C.    The equities favor CAIR and the injunction would serve the
           public interest. ...........................................................................19

Conclusion .................................................................................................20

Certificate of Word Count .............................................................................22

App. 226

## <u>INTRODUCTION</u>

This Court should enjoin Executive Order 25-244 ("Executive Order") because Defendant's response does not challenge any of the essential facts that CAIR offered to show that it has standing and is substantially likely to succeed on the merits of its First Amendment claims:

- CAIR is an expressive association that engages in constitutionally protected advocacy, education, and civic participation in Florida. Doc. 24 ("Mem.") 7.

- Defendant issued the Executive Order, which designated CAIR as a terrorist organization and imposed on it and anyone who it associates with immediate and self-executing legal consequences and penalties. *Id.* at 5.

- The Executive Order has already harmed CAIR and it has lost opportunities to conduct First Amendment activities including, but not limited to, launching a civil rights podcast and visiting Florida mosques with CAIR-Florida to speak with Muslims about their rights. *Id.* at 8.

In the weeks since CAIR filed its motion, the harm to it has worsened. For example, the Florida Attorney General publicly warned the City of Coral Springs of consequences under the Executive Order if it allowed the South Florida Muslim Federation (the "Federation") to host a conference at a city facility there because CAIR and CAIR-Florida were partner organizations. *See* Supp. Decl. of Manal Fakhoury on Behalf of CAIR-Foundation, Inc., dated Feb. 20, 2026 ("CAIR Supp. Decl.") ¶ 2; Supp. Decl. of Ahmed Soussi, dated Feb. 20, 2026 ("Soussi Supp. Decl.") Ex. 22. This led the Federation to publicly cut ties with CAIR and CAIR-Florida. CAIR Supp. Decl. ¶ 3; Soussi Supp. Decl. Ex. 23. The Florida Attorney General celebrated

3

CAIR's banishment, stating that it was "a step in the right direction" and that "[a]ny entity that wants to do business or use state or local resource in Florida would be wise to dissociate from CAIR." CAIR Supp. Decl. ¶ 4; Soussi Supp. Decl. Ex. 24.

Defendant also does not dispute that he unilaterally designated CAIR as a terrorist organization without notice or process, imposing immediate penalties on it. Defendant claims this unprecedented action was justified because of CAIR's supposed ties to terrorists. Doc. 37 ("Resp.") 4-11. But CAIR has never been charged with any crime in Florida, nor has it been designated as a Foreign Terrorist Organization under federal law. And most of Defendant's purported "evidence" is decades old—from before CAIR (or CAIR-Florida) was even founded in 1994—and thus is irrelevant to the designation and this lawsuit.

In any event, even if every allegation against CAIR were true, the First Amendment would still prohibit Defendant's actions. The First Amendment forbids state officials from targeting and silencing a nonprofit civil rights organization that has repeatedly criticized state action. Moreover, although this Court need not look beyond the text of the Executive Order to see its illegality, Defendant's public statements are telling. At a press conference the day after the Executive Order was issued, Defendant stated that he welcomed this lawsuit because it would provide him with discovery "to get the information that we need to make sure." Doc. 24-1 ¶ 21 (20:04-20:10). In other words, Defendant does not view the instant lawsuit as an opportunity

to defend the Executive Order's legality but rather as a post hoc means to obtain information about CAIR otherwise unavailable to him.

Because Defendant's actions have deprived CAIR of its rights to Free Speech, Free Association, and Petition, strict scrutiny must be applied. *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963). Defendant cannot show any compelling government interest for targeting CAIR, much less that the Executive Order is narrowly tailored to achieve that interest. Ultimately, the Executive Order is about punishing and silencing a civil rights organization with a faith-driven mission to educate, empower, and defend Muslim Americans. But attacks on organizations that uphold the rights of minorities are not new. *See Button*, 371 U.S. 415. Just as the Supreme Court upheld the First Amendment rights of the NAACP in *Button*, this Court should do the same and enter the injunctive relief requested in CAIR's motion.

## ARGUMENT

**I.    CAIR has shown it is substantially likely to have standing to pursue its claims.**

In its opening brief, CAIR demonstrated that at the time of the filing of its lawsuit it had standing because it had suffered injury in fact that was directly traceable to the Executive Order and would be redressed by the entry of the requested preliminary injunction. Mem. 10-11; Doc. 24-2 ¶¶ 26-27. In addition, CAIR showed

that third parties dissociated with CAIR because of the Executive Order.[1] *See* CAIR Supp. Decl. ¶¶ 2-7; Soussi Supp. Decl. Exs. 22-24. More recently, CAIR was disinvited from a convention because of the Executive Order. CAIR Supp. Decl. ¶¶ 2-4; Soussi Supp. Decl. Ex. 23. Those harms constitute injury-in-fact sufficient to establish standing.

Regarding traceability and redressability, Defendant asserts that CAIR's harms are insufficient because they are dependent on the actions of third parties and unlikely to occur because they are dependent on a sequence of uncertain contingencies. Resp. 13 (relying on *Murthy v. Missouri*, 603 U.S. 43 (2024)). *Murthy* is distinguishable and supports CAIR's standing.

In *Murthy*, plaintiffs sought a prospective preliminary injunction against various government entities they claimed were pressuring social-media platforms to suppress plaintiffs' posts about COVID. Consistent with CAIR's position, *Murthy* held that "[t]o obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them." *Id*. at 58. The Court found that plaintiffs

---

[1] Since the filing of CAIR's opening brief, the judge in *Illoominate Media, Inc. v. CAIR Florida, Inc.*, No. 9:19-cv-81179-RAR, (S.D. Fla. Jan. 29, 2026), denied the motion to stay the payment of attorney's fees. While this may have resolved the harm in this instance, it remains as evidence that third parties have and continue to interpret the Executive Order as a threat to which they respond by dissociating with CAIR, to its detriment.

6

App. 230

failed to show sufficient factual proof of an ongoing pressure campaign by the defendants and that it was speculative that the platforms' future moderation decisions would be attributable, even in part, to the defendants. *Id*. at 69.

Here, however, CAIR has shown through uncontroverted facts that third parties are "react[ing] in predictable ways to the defendant['s] conduct," *i.e.*, the Executive Order, and that its past injuries are in fact predictive." *Id*. at 58-59. Despite Defendant's assertion to the contrary, no contingencies are involved. Defendant issued the Executive Order which is self-executing and immediate and ongoing until enjoined; third parties consistently interpret it as a prohibition on associating with CAIR, and third parties have then dissociated or refused to associate with CAIR. All this occurs to the detriment of CAIR, thus accomplishing the intended result of the Executive Order. Indeed, the third parties themselves have indicated that their actions are traceable directly to the Executive Order and that they would associate with CAIR if the Executive Order was enjoined. *See* CAIR Supp. Decl. ¶ 7; *see also* Doc. 24-2 ¶¶ 23-29; Doc. 24-3 ¶¶ 21-27. That is sufficient to establish standing.

## II.    CAIR has met the requirements to obtain a preliminary injunction.

### A.    CAIR is substantially likely to succeed on the merits of its First Amendment claims.

In response to CAIR's First Amendment claims, Defendant essentially argues that (1) as Governor, he has inherent power to designate terrorist organizations, and (2) such organizations have no First Amendment rights. Resp. 19. Thus, according

7

App. 231

to Defendant, CAIR is unlikely to succeed on the merits of its First Amendment claims because he has designated it as a terrorist organization. This flawed syllogism swallows the First Amendment and effectively allows executive nullification of constitutional protections.

Defendant claims that the Supreme Court allows these expansive powers, repeatedly citing *Holder v. Humanitarian League Project*, 561 U.S. 1, 33 (2010). Resp. 19. But that case involved vastly different circumstances. *Holder* focused on a federal law that provided neutral criteria for the Secretary of State to designate entities as Foreign Terrorist Organizations, complete with judicial review. 561 U.S. at 9 (citing 8 U.S.C. §1189). Here, by contrast, Florida has no similar law providing criteria for its governor to designate terrorist organizations. Nor does the Executive Order allow judicial review. So this is not a case where a court should defer to the "considered judgment of Congress and the Executive." *Id*. at 36. Deference presupposes a lawful framework.

*Holder* is also distinguishable because it analyzed the limits of regulating *foreign* terrorist organizations. 561 U.S. at 33. Here, though, Defendant acted against a *domestic* nonprofit organization. Indeed, the Supreme Court cautioned that it was "not suggest[ing] that Congress could extend the same prohibition on material support at issue here to domestic organizations." *Id.* at 39. Thus, *Holder* provides no support to Defendant's arguments.

8

App. 232

1.    **CAIR is likely to succeed on its Free Speech claim.**

CAIR offered three grounds to show that it was substantially likely to succeed on the merits of its Free Speech claim: first, the Executive Order discriminates based on viewpoint; second, the Executive Order retaliates against CAIR for its protected speech; and third, the Executive Order coerces third parties into disassociating with CAIR. Mem. 15-26. Defendant does not dispute that CAIR need only show a substantial likelihood of success on just one of these grounds.

a.    **CAIR has shown viewpoint discrimination.**

As CAIR previously demonstrated, courts have consistently ruled that content-based discrimination is presumptively unconstitutional and subject to strict scrutiny. Mem. 15-16 (collecting cases). Defendant does not challenge this well-established legal principle. Instead, he urges this Court to dispense with the First Amendment analysis altogether because the Executive Order could be read to prohibit only conduct, not speech. Resp. 20-21. But CAIR's uncontested allegations and evidence refute this implausible reading of the Executive Order. *See* Doc. 36, Answer, ¶ 11 (admitting that CAIR representatives discuss issues of public concern as part of their public education and advocacy efforts); Doc. 24-2 ¶¶ 24-25 (explaining how CAIR's advocacy efforts have been limited by the Executive Order). Thus, the Executive Order very much regulates First Amendment speech.

Defendant next argues that even if the Executive Order implicates the First

9

Amendment, the Executive Order is content neutral and thus not subject to strict scrutiny. Resp. 21. This argument also crumbles under examination. First, CAIR is not relying on an effects-based theory of liability, as Defendant claims. Resp. 21. To the contrary, CAIR argued that the Executive Order "*directly* punishes and restricts CAIR's speech and expressive activities." Mem. 17 (emphasis added). Second, CAIR is not asking this Court to "look beyond the text." Resp. 22. Quite the opposite: the text of the order itself—which singles out CAIR by name—is all this Court needs to conclude that the Executive Order discriminates based on viewpoint.

By targeting the source of the speech, Defendant has violated the core First Amendment principle that the government cannot impose "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018) (quotations omitted). Defendant's response, that the Executive Order does not restrict the speech of similar civil rights organizations, Resp. 23, only underscores why the Executive Order is unconstitutional.

To be sure, differential treatment may sometimes be "justified by some special characteristic of the particular speaker being regulated." *TikTok v. Garland*, 604 U.S. 56, 73 (2025) (cleaned up) (quotations omitted). But unlike in *TikTok*, where the

10

App. 234

restrictions were based on "content neutral" standards, *id.*, here every justification for the Executive Order is based on purported conduct by CAIR or its agents. Moreover, *TikTok* involved extraordinary circumstances not present here—the risk of a foreign adversary accessing sensitive data of 170 million people in the United States. *See id.* (emphasizing "the inherent narrowness of our holding"). Thus, no justification exists for the Executive Order to single out and stifle CAIR, and strict scrutiny must be applied.

Defendant does not challenge CAIR's arguments that he lacks a compelling interest and that the Executive Order is not narrowly tailored to serve any such interest. Mem. 17-18. Instead, Defendant claims that because the Executive Order implicates national security, this Court need only determine whether the Executive Order is legitimate and if so, uphold it. Resp. 23 (citing *Trump v. Hawaii*, 585 U.S. 667 (2018)). But *Trump v. Hawaii* dealt with a "fundamental sovereign attribute," admission and exclusion of foreign nationals, that was "largely immune from judicial control." 585 U.S. at 702. Not so here. Redressing state censorship falls well within this Court's domain.

Perhaps recognizing that the Executive Order cannot survive strict scrutiny, Defendant asks this Court to apply intermediate scrutiny. Resp. 24-25. But even under that more relaxed standard, CAIR still would be substantially likely to succeed on the merits. First, based on the proffered stale and inapt record, Defendant has no

11

App. 235

"important or substantial" interest in designating CAIR—the nation's largest Muslim civil rights and advocacy organization—as a terrorist organization. *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also* Mem. 17-18. Second, the Executive Order's sweeping scope and expansive prohibitions likewise show that it is far "greater than is essential" to serve that interest. *O'Brien*, 391 U.S. at 377; *see also* Mem. 18. The Executive Order imposes immediate legal penalties on CAIR and excludes it from opportunities otherwise available to nonprofit organizations in Florida, among other harms.

Finally, contrary to Defendant's contention, Resp. 25, this Court would be breaking no ground in granting CAIR's motion. *See Al Haramain Islamic Found. v. United States Dep't of Treasury*, 686 F.3d 965, 997 (9th Cir. 2012). In *Al Haramanim*, the Ninth Circuit applied strict scrutiny to a terrorist designation against a domestic nonprofit organization that had ties to a foreign entity. The court held that the government's content-based restrictions violated the First Amendment because those restrictions prevented the nonprofit organization from engaging in advocacy. So too here.

### b.    CAIR has shown retaliation.

CAIR previously has shown that it is likely to succeed on its retaliation claim because (1) its speech was constitutionally protected; (2) it suffered adverse action that would deter others from engaging in such speech; and (3) a causal relationship

12

App. 236

existed between the adverse action and the protected speech. Mem. 18-24. Defendant fails to contest the first two elements, effectively conceding that CAIR has met its burden. Although Defendant does challenge the causation element, he applies the wrong legal framework in doing so.

Defendant devotes much ink to arguing that probable cause existed for him to designate CAIR as a terrorist organization. But this Court need not reach that issue because that argument presupposes an existing legal process. Here, there was none: no statute authorizes CAIR's designation, no evidentiary standards exist, no neutral decisionmaker reviewed the designation, and no adversarial process exists for CAIR to challenge the designation. So this is not a case where "the governmental defendant has utilized the legal system to arrest or prosecute the plaintiff" and thus requires a plaintiff to prove a lack of probable cause. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).

Defendant identifies no case applying the "lack of probable cause" standard outside of retaliatory arrests or legal proceedings. Resp. 25-26. For good reason—the whole point of the probable cause requirement is to "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Hartman v. Moore*, 547 U.S. 250, 263 (2006). Here, no gap needs to be filled—all the harm suffered by CAIR can be traced to a single action by a single person: the Executive Order issued by Defendant. Thus, this Court need only apply the standard three-part

13

App. 237

test to determine whether Defendant's actions were retaliatory. *See, e.g.*, *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268 (11th Cir. 2025); *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306 (11th Cir. 2024), *cert. denied sub nom. Moats v. Jarrard*, 145 S. Ct. 2702 (2025).

On the causation prong, Defendant is correct that CAIR must show that its protected speech "was a but-for cause of" Defendant issuing the Executive Order against it. *Huggins*, 151 F.4th at 1282. As the Eleventh Circuit has explained, because "direct evidence of an official's inner motivations is often not possible, we have relied on circumstantial evidence to establish the causal link." *Id.* That circumstantial evidence can include temporal proximity between the protected speech and the adverse action—even when the adverse action occurs two months later. *Id.* Here, the Executive Order was issued after CAIR's criticism of Defendant on matters of public policy. Mem. 21-24. That is sufficient.

### c.     CAIR has shown coercion.

In addition to the claims above, CAIR has also shown that the Executive Order violates the First Amendment by coercing third parties to join Defendant's effort to suppress CAIR's protected speech. Mem. 24-26. Contrary to Defendant's characterization, Resp. 34, CAIR has explained how Defendant successfully coerced third parties to do his bidding; for example, one third party canceled a podcast agreement, and another disinvited CAIR from a convening—both citing the Executive Order.

14

*See* Doc. 24-2 ¶¶ 25-27; CAIR Supp. Decl. ¶¶ 2-4, 7; Soussi Supp. Decl. Exs. 22-24. These actions are more than enough to show a substantial likelihood of success on the coercion theory.

### 2.    CAIR is likely to succeed on its Right to Association claim.

CAIR's freedom of association claim is unrebutted by Defendant because he does not address the strict scrutiny standard. Instead, he relies entirely on *Holder*, but as explained above, that case is distinguishable because it involved a foreign plaintiff challenging a federal law—not a domestic nonprofit organization challenging a governor's unilateral order. *See supra* Section II.A. Indeed, *Holder* emphasized that "we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." 561 U.S. at 39. This is also why Defendant's lone string citation fails. Resp. 35 (citing cases involving federally designated Foreign Terrorist Organizations).

Defendant posits that the Executive Order does not "obstruct any right of association," Resp. 35, but that contradicts the text of the Executive Order, and how it has been interpreted and implemented with Attorney General Uthmeier's threats. *See* CAIR Supp. Decl. ¶ 2; Soussi Supp. Decl. Ex. 22. The Executive Order prohibits CAIR from conducting core First Amendment activities with third parties by automatically denying it Government Benefits and by denying third parties from access

to those same Government Benefits through the material support provision if they associate with CAIR. Mem. 33-34. Defendant seeks to rewrite the Executive Order by arguing that the material support provision includes an intent requirement, Resp. 15, but he cites to a provision of a statute that is not referenced in or a part of the Executive Order and only applies to federally designated Foreign Terrorist Organizations. *Id.* (citing Fla. Stat. § 775.33(3) instead of 775.33(1)(c), the latter of which is merely a definition of "material support or resources").

In fact, the sweeping material support prohibition is why *Button* controls here. In a footnote, Defendant argues that *Button* dealt with prohibiting the NAACP from advising its members to seek legal assistance. Resp. 36 n.69. But that is exactly what CAIR does when, for example, it associates with CAIR-Florida to provide legal assistance to Muslims at Florida mosques. *See e.g.*, Doc. 24-2 ¶ 31, Doc. 24-3 ¶ 14. Those legal services are needed here because CAIR's members have been denied entry to Florida mosques because of the Executive Order. Doc. 24-3 ¶ 23. Thus, *Button* is analogous to the instant case.

### 3.   CAIR is likely to succeed on its Right to Petition claim.

In a single paragraph, Defendant conclusively states that, by regulating "conduct other than petitioning," the Executive Order avoids scrutiny under the Petition Clause. Resp. 36. This fact-evasive conclusion ignores the practical reality of how petitioning happens. Section 2 of the Executive Order prevents CAIR from accessing

16

App. 240

Florida's government buildings and facilities and significantly impairs its ability to engage with agencies and public officials. State employees are either directly prevented from meeting with CAIR employees or advocates or indirectly deterred from any engagement with CAIR for fear of allowing CAIR to receive Government Benefits or being known themselves to have provided material support to CAIR. Mem. 27-30.

This is not speculative. On January 23, 2026, the Florida Attorney General referenced the Executive Order's terrorist organization designation and accompanying prohibitions in seeking to deter a Local Government from permitting a group affiliated with CAIR from hosting a conference in a city facility: "Coral Springs should remember that state and local resources cannot be used by any organization affiliated with CAIR, which is a designated terrorist organization. The city commission is on notice." Soussi Supp. Decl. Ex. 22.

Defendant claims that, if the Executive Order did burden CAIR's right to petition, it survives scrutiny because it is the "least restrictive means of advancing compelling government interests." Resp. 36. Not so. Section 2 of the Executive Order is a blanket prohibition with sweeping language prohibiting "material support or resources," the definition of which itself broadly includes, among other things, any property or services, and "any contract, employment, funds, or other benefit or privilege," and restricting such from any "Executive or Cabinet Agency or from any

17

App. 241

County or Municipality of the State." Doc. 24-2 Ex. 1. This language shuts CAIR out of the ability to petition the Florida government for redress at multiple levels. *See, e.g.*, Doc. 24-2 ¶ 28 (CAIR may not be able to access correctional facilities); Mem. 27-30.

### B.    CAIR will suffer irreparable injury absent an injunction.

As CAIR stated in its opening brief, because the Executive Order violates its First Amendment rights, CAIR has suffered irreparable injury, and no further inquiry on this prong of the preliminary injunction standard is required. *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) (First Amendment violation, "even for a minimal period of time, constitutes irreparable injury"); Mem. 33-34. Defendant does not engage with this argument, instead focusing on the allegedly speculative nature of the harms Plaintiff asserts, which is unavailing. *See supra* Section I; Mem. 10-14.

An examination of those harms, though, reveals that CAIR has suffered irreparable injury, and continues to suffer irreparable injury, just as predicted. The very fact that the government has labeled CAIR as a terrorist organization brands it with a stigma that is, in and of itself, a harm. *See, e.g.*, *Talbott v. United States*, 775 F. Supp. 3d 283, 332 (D.D.C. 2025) ("transgender servicemembers suffer from the irreparable reputational stigma the Military Ban espouses"). Its chilling effects are further harms. For example, the South Florida Muslim Federation cut ties with CAIR

after the Florida Attorney General called on the City of Coral Springs to cancel the Federation's convention due to CAIR's involvement with it.  *See* CAIR Supp. Decl. ¶¶ 2-3; Soussi Supp. Decl. Exs. 22-23. Such a real and concrete injury is a far cry from the concerns about "consumer confusion"—for which there was a "paucity of evidence"—in the out-of-circuit trademark infringement case that Defendant stretches to equate with this case. *See H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951-52 (8th Cir. 2023).

Defendant also points to CAIR's "delay" in seeking injunctive relief.  However, CAIR filed the instant motion just a month and a half after Defendant issued the Executive Order. That time allowed CAIR to obtain counsel; meaningfully evaluate the actual consequences of the Executive Order, rather than merely speculate about potential injuries at the outset; and prepare the record necessary to support this motion. As this Court has said when addressing a one-month delay in filing a motion for preliminary injunction, "a one-month delay, however, is akin to no delay." *Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137, 1174 (N.D. Fla. 2022) (Walker, J.), *vacated and appeal dismissed*, No. 22-10448-GG, 2023 WL 5051221 (Mar. 20, 2023 11th Cir.).

**C.   The equities favor CAIR and the injunction would serve the public interest.**

If the Court finds that CAIR is likely to succeed on its First Amendment claims, it necessarily follows that the equities favor CAIR, because the government

App. 243

can have no legitimate interest in acting in an unconstitutional manner. While Defendant asserts that he has an interest in "protecting public safety," Resp. 37, that purported interest is a mere cover for his desire to punish CAIR because he disagrees with CAIR's viewpoint. The Executive Order, in fact, does nothing to advance safety or any other public interest, while violating CAIR's constitutional rights, and the equities therefore favor CAIR.

## **CONCLUSION**

For these reasons, the Court should grant CAIR's motion and enjoin Defendant from enforcing, implementing, relying on, or otherwise giving effect to the Executive Order as it relates to CAIR, including by ordering Defendant to strike CAIR from the Executive Order for the duration of the litigation.

Respectfully submitted this 20th day of February 2026.

Omar Saleh
FL Bar No. 91216
(833) 224-7352
osaleh@cair.com
CAIR-FLORIDA
8076 N. 56th St.
Tampa, FL 33617

Lena F. Masri
DC Bar No. 1000019
Admitted pro hac vice
lmasri@cair.com

Arthur Ago
DC Bar No. 463681
Admitted pro hac vice
(202) 961-9325
arthur.ago@splcenter.org
SOUTHERN POVERTY LAW CENTER
1101 17th St. NW, Ste. 550
Washington, DC 20036
(202) 971-9205 (fax)

Scott D. McCoy
FL Bar No. 1004965
scott.mccoy@splcenter.org
(786) 347-2056

20

Gadeir I. Abbas
VA Bar No. 81161; not licensed in DC
Admitted pro hac vice
gabbas@cair.com
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave. SE
Washington, DC 20003
(202) 742-6420
ldf@cair.com

Charles D. Swift
TX Bar No. 24091964
Pro hac vice motion forthcoming
cswift@clcma.org
MUSLIM LEGAL FUND OF AMER-
ICA
100 N. Central Expy., Ste. 1010
Richardson, TX 75080
(972) 914-2507

Shereef H. Akeel
MI Bar No. P54345
Admitted pro hac vice
shereef@akeelvalentine.com
Samuel Simkins
MI Bar No. 81210
Admitted pro hac vice
sam@akeelvalentine.com
AKEEL & VALENTINE, PLC
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595

SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd., Ste. 3200
Miami, FL 33131

/s/ *Ahmed K. Soussi*
Ahmed K. Soussi
LA Bar No. 38414
Admitted pro hac vice
ahmed.soussi@splcenter.org
(334) 213-8303
SOUTHERN POVERTY LAW CENTER

Huey Fischer García
LA Bar No. 39571
Admitted pro hac vice
huey.fischergarcia@splcenter.org
(504) 884-7680
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, AL 36104

*Counsel for Plaintiffs*

21

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.1(F), I certify that this memorandum contains 4176 words, inclusive of headings, footnotes, and quotations, according to the word-processing system used to prepare it. This enlarged response is permitted under the Court's Order dated January 30, 2026 (Doc. 34).

Date: February 20, 2026.

/s/Ahmed K. Soussi
Counsel for Plaintiffs

22