No. 26-10735

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CAIR FOUNDATION, et al.,

Plaintiffs – Appellees,

v.

GOVERNOR, STATE OF FLORIDA,

Defendant – Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

**APPELLEES' RESPONSE BRIEF**

HINA SHAMSI
CHARLES HOGLE
CELIN CARLO-GONZALEZ
NATALIE SMITH

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org

ARTHUR AGO
SCOTT D. MCCOY
AARON FLEISHER
BRANT S. LEVINE

**SOUTHERN POVERTY LAW CENTER**
400 Washington Ave
Montgomery, AL 31604
(771) 215-8661
Brant.Levine@splcenter.org

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................viii

INTRODUCTION...........................................................................1

STATEMENT OF THE ISSUES ...................................................3

STATEMENT OF THE CASE .......................................................4

    A.    CAIR engages in faith-based, civil rights advocacy. ...............................................................................4

    B.    Governor DeSantis issues an Executive Order branding CAIR as a terrorist organization....................6

    C.    Third parties sever ties with CAIR. .............................10

    D.    The district court enjoins the Executive Order. ..........11

SUMMARY OF THE ARGUMENT..............................................14

ARGUMENT.................................................................................17

I.    CAIR HAS STANDING TO SEEK RELIEF FROM THE UNCONTESTED HARMS IT SUFFERED AFTER THE GOVERNOR ISSUED HIS EXECUTIVE ORDER. .............17

    A.    The Executive Order objectively chills others from associating with CAIR. ...............................................19

    B.    The Executive Order independently harms CAIR. ......25

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FINDING THAT CAIR IS SUBSTANTIALLY LIKELY TO SUCCEED ON ITS FIRST AMENDMENT COERCION CLAIM. .......................27

    A.    The Executive Order coerces others to cut ties with CAIR. ..........................................................................28

i

B.    The Executive Order is not narrowly tailored to serve a compelling governmental interest...................31

C.    The Governor's anti-terrorism rationale does not exempt his actions from First Amendment scrutiny.............................................................................37

III.   CAIR ALSO SHOWED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON ITS OTHER FIRST AMENDMENT THEORIES. ...............................................42

A.    The Governor discriminated based on CAIR's viewpoint. ...............................................................43

B.    The Governor infringed on CAIR's right to association. ...............................................................47

IV.   THE GOVERNOR FAILS TO MEET HIS BURDEN TO JUSTIFY THE EXTRAORDINARY REMEDY OF REASSIGNMENT...............................................................50

A.    The Governor has not shown that the district court would have difficulty putting aside its views. .............51

B.    The Governor fails to show that reassignment is necessary to preserve the appearance of justice. ........54

C.    The Governor fails to show that waste and duplication would not result from reassignment. .......56

CONCLUSION ...........................................................................57

CERTIFICATE OF COMPLIANCE ..............................................58

# TABLE OF AUTHORITIES

Page(s)

Cases

*Al Haramain Islamic Found. v. U.S. Dep't of Treasury,*
　686 F.3d 965 (9th Cir. 2012) .................................................................32

*Ams. for Prosperity Found. v. Bonta,*
　594 U.S. 595 (2021) ...............................................................................48

*Associated Builders & Contractors Fla. First Coast Chapter v. Gen. Servs. Admin.,*
　174 F.4th 26 (11th Cir. 2026) ...............................................................43

*\*Bantam Books v. Sullivan,*
　372 U.S. 58 (1963) ........................................................28, 29, 31, 32, 33

*Belue v. Leventhal,*
　640 F.3d 567 (4th Cir. 2011) .....................................................54, 55, 56

*\*Chiles v. Salazar,*
　146 S. Ct. 1010 (2026) ...............................................................33, 34, 44

*Citizens United v. FEC,*
　558 U.S. 310 (2010) .........................................................................45, 47

*Cobell v. Kempthorne,*
　455 F.3d 317 (D.C. Cir. 2006) ...............................................................54

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.,*
　447 U.S. 530 (1980) ...............................................................................34

*Delesdernier v. Porterie,*
　666 F.2d 116 (5th Cir. 1982) .................................................................53

*Dep't of Com. v. New York,*
　588 U.S. 752 (2019) ...............................................................................21

*Diamond Alt. Energy, LLC v. EPA,*
　606 U.S. 100 (2025) ...............................................................................21

iii

*Federal Trade Commission v. Corpay, Inc.*,
  164 F.4th 807 (11th Cir. 2026) ........................................................... 24

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
  146 S. Ct. 1114 (2026) .................................................................. 21, 48

*Fla. State Conf. of, NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ........................................................... 26

*Food & Drug Admin.  v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................. 26

*Gould v. Interface, Inc.*,
  153 F.4th 1346 (11th Cir. 2025) ........................................................ 49

*Harris v. DeSantis*,
  No. 4:23-CV-328, 2024 WL 2703812 (N.D. Fla. Feb. 29, 2024)........... 53

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010). .......................................................................... 33, 37

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ............................................................................. 36

*Honeyfund.com v. Governor, State of Fla.*,
  94 F.4th 1272 (11th Cir. 2024) ..................................................... 43, 44

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  565 U.S. 171 (2012) ............................................................................. 46

*Liteky v. United States*,
  510 U.S. 540 (1994) ........................................................................ 54, 55

*Lynch v. Baxley*,
  744 F.2d 1452 (11th Cir. 1984)............................................................ 26

*MacPhee v. MiMedx Grp., Inc.*,
  73 F.4th 1220 (11th Cir. 2023) ........................................................... 18

*Maron v. Chief Fin. Officer of Fla.*,
  136 F.4th 1322 (11th Cir. 2025) ......................................................... 18

iv

*Moms for Liberty - Brevard Cnty., FL v. Brevard Pub. Schs.*,
118 F.4th 1324. (11th Cir. 2024) ........................................................43

*Murthy v. Missouri*,
603 U.S. 43 (2024) ..............................................................................29

*NAACP v. Button*,
371 U.S. 415 (1963) .................................................................33, 48, 49

*Namphy v. DeSantis*,
493 F. Supp. 3d 1130 (N.D. Fla. 2020) ...............................................53

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ............................................................................45

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .........................................28, 29, 30, 31, 32, 40, 41

*PDVSA U.S. Litig. Tr. v. LukOil Pan*,
Ams., 65 F.4th 556 (11th Cir. 2023) ..............................................18, 25

*Polelle v. Fla. Sec'y of State*,
131 F.4th 1201 (11th Cir. 2025) ...............................................17, 18, 25

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................................45

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ......................................................................47, 49

*Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
158 F.4th 1227 (11th Cir. 2025) .....................................................22, 27

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ......................................................19, 23

*Stargel v. SunTrust Banks, Inc.*,
791 F.3d 1309 (11th Cir. 2015) .................................................51, 55, 56

*Students for Just. in Pal. v. DeSantis*,
No. 1:23-CV-281, 2024 WL 371875 (N.D. Fla. Jan. 31, 2024).............53

*Support Working Animals, Inc. v. Moody*,
  No. 4:19-CV-570, 2020 WL 10728640 (N.D. Fla. June 12, 2020)........53

*U.S. v. Gupta*,
  572 F.3d 878 (11th Cir. 2009)...........................................................51

*U.S. v. Holy Land Found. for Relief & Dev.*,
  624 F.3d 685 (5th Cir. 2010)...........................................................8, 9

*U.S. v. Holy Land Found.*,
  No. 3:04-cv-240, 2009 WL 10680203 (N.D. Tex. July 1, 2009).............8

*U.S. v. Robin*,
  553 F.2d 8 (2d Cir. 1977) ...............................................................52

*U.S. v. Slay*,
  714 F.2d 1093 (11th Cir. 1983)........................................................53

*U.S. v. Torkington*,
  874 F.2d 1441 (11th Cir. 1989)........................................................51

*U.S. v. White*,
  846 F.2d 678 (11th Cir. 1988)......................................................52, 54

*Walters v. Fast AC, LLC*,
  60 F.4th 642 (11th Cir. 2023) .........................................................18

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*,
  536 U.S. 150 (2002)........................................................................34

*Wilding v. DNC Servs. Corp.*,
  941 F.3d 1116 (11th Cir. 2019)....................................................18, 26

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
  247 F.3d 1262 (11th Cir. 2001).........................................................23

Federal Statutes

8 U.S.C. § 1189 ................................................................................40

18 U.S.C. § 2339B............................................................................38, 39

State Statutes

Fla. Stat. §§ 874.03(7), 775.30 (2025) ........................................................ 7

## STATEMENT REGARDING ORAL ARGUMENT

Because this case raises important and far-reaching questions about the scope of the First Amendment's protections for domestic nonprofit organizations, Appellee requests oral argument.

## INTRODUCTION

This case is about a Governor using the machinery of the State to suppress faith-based advocacy by a civil rights organization. That civil rights organization, CAIR Foundation, has for decades protected and vindicated the civil rights of American Muslims. In pursuing its mission, CAIR has never been charged with any crimes, much less committed any terrorist acts. But CAIR and its state affiliate, CAIR Florida, have been a thorn in the side of Florida Governor Ronald DeSantis, repeatedly challenging his policies that restrict Islamic expression. The Governor responded by issuing an Executive Order declaring CAIR to be a terrorist organization, immediately upending the organization's faith-based advocacy.

The terrorism designation alone raises grave First Amendment concerns. But there is more. The Governor also restricted CAIR's ability to conduct its faith-based advocacy in the State by barring CAIR from receiving any benefits or resources from any state agency. Even worse, the Governor starved CAIR of third-party assistance by sanctioning all who materially support the group. Compounding all this harm, the

Governor denied CAIR any opportunity to challenge the terrorist designation.

As the district court concluded—and as Governor DeSantis does not challenge on appeal—CAIR suffered immediate and irreparable harm after the Governor issued his Executive Order. Longstanding partners with CAIR cut ties, and CAIR needed to divert its resources to address the Executive Order's consequences. Despite these uncontested injuries, the Governor argues that the courthouse doors should still be shut to CAIR, effectively insulating his conduct from judicial review. And judicial scrutiny is sorely needed here.

The Governor's actions, if allowed to stand, would have widespread consequences far beyond Florida, empowering state officials to silence their critics and restrict disfavored religious expression simply by citing "state security." To be sure, states can and must keep their citizens safe, but they cannot bypass the First Amendment when doing so. Indeed, no court has ever before adopted the Governor's novel legal argument otherwise. This Court should not become the first.

## STATEMENT OF THE ISSUES

Florida Governor DeSantis issued an Executive Order declaring CAIR to be a terrorist organization and imposing sanctions on the organization and on anyone who provides material support to it. CAIR, a nonprofit civil rights organization, sought and received a preliminary injunction after the district court found that the Executive Order likely violated the First Amendment. In this appeal, Governor DeSantis no longer challenges that CAIR suffered ongoing and irreparable injuries after his Executive Order was issued. The remaining issues are:

1.      Whether CAIR satisfied the traceability element of standing by presenting uncontested evidence that the Executive Order chilled third parties from associating with the organization.

2.      Whether the district court abused its discretion by issuing a preliminary injunction after finding that:

- CAIR presented sufficient evidence to show that the Executive Order caused third parties to sever ties with the organization;

- the Governor presented insufficient evidence to justify his indirect censorship of CAIR's speech; and

- based on all the evidence, CAIR is substantially likely to succeed on the merits of its First Amendment coercion claim.

3.      Whether CAIR is substantially likely to succeed on the merits of its First Amendment viewpoint discrimination or associational claims after showing that the Governor targeted the organization because of its speech and that the Executive Order chilled others from associating with CAIR.

4.      Whether, after considering the evidence and finding that Governor DeSantis likely violated the First Amendment, the district court's forceful language merits the extraordinary remedy of reassigning the case to a different judge.

**STATEMENT OF THE CASE**

**A.      CAIR engages in faith-based, civil rights advocacy.**

CAIR is the largest Muslim civil rights and advocacy nonprofit organization in the United States, with a faith-driven mission to enhance the public's understanding of Islam, protect and vindicate civil rights, and empower American Muslims. Doc 24-2, at ¶¶ 4–7. CAIR advances this faith-based mission through advocacy, education, and nationwide community engagement with affiliated state chapters, including CAIR Florida. *Id.* at ¶¶ 6–9. For example, CAIR publishes "Know Your Rights" guides for religious accommodations, conducts civic engagement

-4-

trainings at mosques, and hosts Muslim advocacy days with lawmakers. *Id.* at ¶¶ 9–14.

CAIR regularly opines on public policies and proposed legislation, and the organization unflinchingly criticizes elected officials whose actions clash with CAIR's faith-driven mission. Doc. 24-2, at ¶¶ 10–12, 16–19; Doc. 24-1, at ¶¶ 6, 8–13, 15. CAIR, for example, has called out President Trump for his statements concerning Gaza. Doc. 24-2, at ¶ 18. Likewise, in Florida, CAIR opposed the "No Shari'a Act" and rebuked Governor DeSantis for his support of that bill. *Id.* at ¶ 12. CAIR has similarly stood up for pro-Palestinian student groups: after Governor DeSantis called those students terrorists and tried to ban them from campuses, CAIR sued him on their behalf in federal court. *Id.* at ¶ 18; Doc. 24-1, at ¶¶ 5–6.

CAIR operates in the United States as a 501(c)(3) nonprofit organization; it is not affiliated with any foreign governments or movements. Doc. 24-2, at ¶¶ 4, 6; *Dispelling Rumors About CAIR*, CAIR, https://www.cair.com/dispelling-rumors-about-cair (last visited June 29, 2026) ("CAIR Website"). CAIR has consistently and repeatedly opposed all forms of hatred and violence against civilians, condemning

antisemitism with the same vigor as Islamophobia. *See* CAIR Website; *see also* Doc. 21, at ¶¶ 30–31. In fact, CAIR has issued over 100 statements over the years denouncing terrorism, including condemning Hamas's October 7 attacks on Israeli civilians "unequivocally . . . without reservation." CAIR Website; *see also* Doc. 21, at ¶ 31.

**B.    Governor DeSantis issues an Executive Order branding CAIR as a terrorist organization.**

In December 2025, Governor DeSantis issued an Executive Order designating CAIR as a terrorist organization. Doc. 21-1 (Executive Order No. 25-244, *Protecting Floridians from Radical Islamic Terrorist Organizations* (Dec. 8, 2025)). Governor DeSantis chose not to notify CAIR before issuing his Executive Order, and CAIR thus had no opportunity to contest the findings beforehand. Doc. 21, at 40 ¶¶ 130–131; Doc. 36, at 27 ¶ 130. Nor did the Governor include a provision in his Executive Order allowing CAIR to contest the terrorist designation after it was issued.

In addition to branding CAIR as a terrorist organization, the Governor imposed immediate sanctions on the organization and its supporters. Doc. 21-1, at 2–3. First, CAIR itself was barred "from receiving any contract, employment, funds, or other benefit or privilege"

from any Florida Executive and Cabinet Agency, any entity regulated by them, and from any local government. *Id.* at 4. Second, these same penalties were imposed on "any person known to have provided material support or resources" to CAIR. *Id.* Third, the Governor directed the Florida Department of Law Enforcement and the Florida Highway Patrol "to undertake all lawful measures to prevent unlawful activities in Florida" by CAIR. *Id.* at 3.

No Florida statute allowed the Governor to take these punitive actions. Instead, the Governor relied on his "solemn constitutional duty to take care that the laws be faithfully executed and to preserve the public peace." Doc. 21-1, at 3. The Governor also cited Florida's criminal code, which defines a "terrorist organization" to be "any organized group engaged in or organized for the purpose of engaging in" certain activities, including "[a] violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States." *Id.* at 1; Fla. Stat. §§ 874.03(7), 775.30 (2025). But nowhere in these laws is a provision empowering the Governor to decree that CAIR or any other group is "organized for the purpose of engaging in terrorism." Fla. Stat. § 874.03(7). And in any event, CAIR has never committed a violent or

-7-

dangerous act and thus could not reasonably be charged with a terrorism offense in Florida.

The Governor nonetheless attempts to justify the terrorist designation by stringing together dire-sounding accusations that CAIR has supported groups that have engaged in terrorism. For example, the Executive Order claims that people affiliated with terrorist organizations helped form CAIR over three decades ago. Doc. 21-1, at 2. Likewise, the Executive Order also contends that people "associated with CAIR" were convicted of crimes related to supporting terrorist organizations. *Id.* at 3.

Perpetuating the guilt-by-association theory, the Executive Order refers to a terrorist-financing prosecution against another organization nearly 20 years ago. Doc. 21-1, at 2–3 (citing *U.S. v. Holy Land Found.*, No. 3:04-cv-240, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009)). In that case, the federal government mistakenly and wrongly filed a public list of 246 unindicted co-conspirators—an action that the government conceded violated the Fifth Amendment rights of the persons and organizations on the list, including CAIR. *See U.S. v. Holy Land Found. for Relief & Dev.,* 624 F.3d 685, 693 (5th Cir. 2010). As the Fifth Circuit noted, the inclusion of their names "was simply an untested allegation of

the Government, made in anticipation of a possible evidentiary dispute that never came to pass." *Id.* Thus, CAIR's appearance on a 19-year-old list of 246 alleged coconspirators hardly shows that the organization engages in violent acts that qualify as terrorism under Florida law.

The Governor now tries to buttress the Executive Order's sparse findings by repeatedly citing the work of a self-styled expert on Islamism: Lorenzo Vidino. Br. n.2, n.5, n.6, n.7, n.8, n.9, n.10, n.11, n.12, n.13, n.17, n.30, n.32, n.37, n.49. Putting aside the soundness of a state governor relying so heavily on a single researcher's work to support so serious a sanction against a civil rights organization, Vidino's reports do not support the designation. His publications purport to document historical (and increasingly attenuated) relationships and ideological affinities within a broader system of organizations. Yet those reports do not claim that CAIR itself engages in terrorist activity or provides material support to terrorist organizations. Even more problematic, Vidino may not be an objective source: he financially benefited from a foreign government's operation to brand Muslim organizations as fronts for the Muslim Brotherhood, according to a published report. *See* David D. Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker, Mar. 27, 2023.

Even the Governor has conceded that more information may be needed for him to confirm whether CAIR qualifies as a terrorist organization: at a press conference the day after the Executive Order was issued, the Governor stated that he "welcomes [CAIR's] lawsuit" because it would provide him with discovery "to get the information that we need to make sure." Doc. 24-1, at ¶ 21. The Governor similarly posted on social media that he "look[s] forward to discovery—especially the CAIR finances," and that he "[c]an't wait for CAIR to open the books!" Doc. 24-1, at ¶¶ 22, 24.

## C.    Third parties sever ties with CAIR.

After the Governor issued and publicized the Executive Order, CAIR suffered immediate repercussions that continue to this day. Multiple organizations told CAIR that they were reluctant to associate with the organization because of the Executive Order, including mosques that CAIR relies on for its civil education outreach and fundraising. Doc. 24-2, at ¶¶ 24–25. This led to widespread disruptions in CAIR's operations—from planned advocacy to public-facing activities to cash flow—requiring CAIR to divert staff away from ordinary programming to address these issues. *Id.* at ¶¶ 23–26.

A Florida-based production company, for example, withdrew from a proposed agreement with CAIR to launch a new podcast to support CAIR's civil rights work. Doc. 24-2, at ¶¶ 26–27. The company informed CAIR that it had been advised not to proceed with the project due to concerns about the designation and the potential consequences of associating with CAIR. *Id.* ¶ 27. But the company said it would reconsider its decision if the Executive Order were to be found unlawful. Doc. 41-1, at ¶ 7.

Similarly, after the Florida Attorney General advised the City of Coral Springs to cancel a convention because of CAIR's involvement, the convention's organizer publicly cut ties with CAIR Florida. Doc. 41-1, at ¶¶ 2-3. The Attorney General applauded this decision, calling it a "step in the right direction." *Id.* at ¶ 4. The Attorney General further warned that "[a]ny entity that wants to do business or use state or local resources in Florida would be wise to dissociate from CAIR." *Id.* at ¶ 4.

### D.    The district court enjoins the Executive Order.

One week after Governor DeSantis issued the Executive Order, CAIR and CAIR Florida sued, and their amended complaint seeks declaratory and injunctive relief for violations of their First and

-11-

Fourteenth Amendment rights. Doc. 21. CAIR later moved for a preliminary injunction, citing irreparable harm to its First Amendment rights to free speech, association, and petition. Doc. 24. The district court granted CAIR's motion, finding that CAIR had standing and that CAIR was substantially likely to prevail on its First Amendment coercion claim. Doc. 43, at 3.

On standing, the court found sufficient evidence that CAIR suffered a concrete injury traceable to the Executive Order and redressable by an injunction. *Id.* at 5-10. First, the court found that the Executive Order caused the Florida production company to withdraw an agreement to make a podcast for CAIR. *Id.* at 6. Second, the court found that the Executive Order led another organization to publicly cut ties with CAIR and prevent CAIR from participating in its annual convention. *Id.* at 7–8. Thus, the court held that CAIR continues to suffer First Amendment harms "traceable to Defendant's EO, which explicitly threatens the loss of government benefits to third parties who run afoul of its prohibitions and who have reliably heeded the State's warning that it 'would be wise to dissociate from CAIR,' given the EO's broad restrictions." *Id.* at 9.

-12-

On the merits, the court found that CAIR is substantially likely to succeed on its First Amendment coercion claim. Doc. 43, at 10–22. First, the court highlighted the "sweeping" threat: any relationship with CAIR will be "punished by cutting off access to all benefits even peripherally within [the Governor's] control." *Id.* at 12. Second, the court observed that the threat was issued through official state action, leaving "no room for doubt as to the consequences the podcast producers—or any other third party that wished to work with [CAIR] in Florida—will face." *Id.* at 14. Third, the Court determined that these threats worked—the Governor stifled CAIR's speech. *Id.* at 15. Finally, the court concluded that the Governor's actions cannot survive even intermediate scrutiny because he "offers no evidence to show how cutting off benefits to third parties who engage with [CAIR] in any way furthers an interest in protecting public health and safety." *Id.* at 18.

Finding that CAIR satisfied all other requirements for a preliminary injunction, the court ordered Governor DeSantis to "take no steps to enforce Executive Order Number 25-244 as it applies to Plaintiff CAIR until otherwise ordered." Doc. 43, at 30. The court's order does not directly apply to CAIR Florida, which was not specifically designated as

a terrorist organization and thus did not join CAIR's motion for a preliminary injunction. *Id.* at 27. But now that the Executive Order has been enjoined, CAIR Florida can continue to materially support CAIR.

## SUMMARY OF THE ARGUMENT

This case involves a narrow First Amendment question: whether a Governor may invoke state-security concerns to suppress speech by a disfavored faith-based civil rights organization. As the district court properly recognized in rejecting Governor DeSantis's unprecedented argument that would allow this, state officials are not entitled to "blind deference" when they designate a domestic nonprofit organization as a terrorist entity. Doc. 43, at 21. That is all the more so here, where the Governor acted unilaterally and without providing any opportunity for the organization to challenge his actions. In short, the Executive Order is unconstitutional in design and indefensible in operation.

1. CAIR has standing to pursue its First Amendment claims. That conclusion is even more apparent on appeal given that the Governor does not challenge the district court's well-reasoned findings that CAIR suffered concrete, imminent, and irreparable injuries. Instead, the Governor limits his arguments to traceability, arguing that he did not

-14-

cause CAIR's injuries. But the uncontested evidence shows otherwise: CAIR lost key supporters, business partners, and resources because the Executive Order imposes severe legal penalties on anyone who associates with CAIR. This chilling effect was eminently predictable, especially after Florida's Attorney General highlighted the Executive Order when warning the public that they would be wise to stay away from CAIR. That is enough to open the courthouse doors to CAIR's First Amendment claims.

2. The district court did not abuse its discretion when finding that CAIR is substantially likely to prevail on the merits of its First Amendment coercion claim. By using the Governor's official power to coerce third parties to suppress CAIR's speech, the Executive Order does exactly what Supreme Court precedent forbids. And, in fact, the Governor's plan worked: CAIR's partners succumbed to the Governor's threats and severed ties with the organization.

As the district court determined after surveying the evidence, the Governor failed to show a compelling or even important interest in designating CAIR—a faith-based nonprofit civil rights organization—as a terrorist entity. Even accepting as true all the information in the

-15-

Governor's cited materials, they do not supply authority or safeguards to penalize a domestic nonprofit and those who associate with it. Not only that, but the Executive Order is nowhere near narrowly tailored: it sweeps far beyond any proven threat and punishes a vast range of protected expressive and associational activity. The district court thus did not clearly err when resolving these factual disputes.

3. Although the district court reached only the coercion claim, CAIR also showed that the Executive Order discriminates based on CAIR's viewpoint and constitutes a direct assault on CAIR's associational freedom. By singling out CAIR by name, branding it a terrorist organization, and threatening sanctions against anyone who works with it, the Governor targeted disfavored speech. His actions also predictably chilled the relationships CAIR needs to speak, organize, and advocate. The Executive Order thus violates the First Amendment many times over, and this Court should affirm the preliminary injunction based on any or all the reasons advanced by CAIR in district court.

4. The reason the Governor lost in district court is because of his unprecedented and unconstitutional executive order, not because the judge was biased against him. In fact, the Governor's attacks on the

district court only reinforce the troubling pattern of him trying to silence his critics. Especially considering that the Governor has not identified a single instance where the district court refused to follow this Court's instructions, no basis exists for the extraordinary remedy of reassignment to a different judge.

## ARGUMENT

### I. CAIR HAS STANDING TO SEEK RELIEF FROM THE UNCONTESTED HARMS IT SUFFERED AFTER THE GOVERNOR ISSUED HIS EXECUTIVE ORDER.

As the district court correctly ruled (Doc. 43, at 4–10), CAIR satisfied all three requirements of standing to sue Governor DeSantis in federal court: CAIR "suffered an injury in fact that is concrete, particularized, and actual or imminent"; the Governor "likely caused [its] injury"; and "a favorable judicial decision can likely redress [its] injury." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1208 (11th Cir. 2025) (quotation marks omitted), *cert. denied sub nom. Polelle v. Byrd*, 146 S. Ct. 298 (2025). On appeal, the Governor no longer challenges that CAIR suffered concrete, imminent, or irreparable injuries. Instead, the Governor claims that those harms are not traceable to his Executive

-17-

Order. Br. 22. This Court reviews standing de novo. *See Polelle*, 131 F.4th at 1207.

"[T]raceability is not an exacting standard." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023). A plaintiff need only show "a substantial likelihood of causation." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (quotation marks omitted). "Even harms that 'flow indirectly' from challenged conduct 'can be said to be fairly traceable to that action for standing purposes.'" *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1331 (11th Cir. 2025) (quoting *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1240 (11th Cir. 2023)).

The traceability standard is easily satisfied here: third parties *expressly* stated that they cut ties with CAIR because of the Executive Order. Doc. 24-2, at ¶¶ 24–25, 27; Doc. 24-3, at ¶ 26. That alone establishes traceability, but there is more. CAIR also suffered independent harm, including loss of resources. Although the district court did not reach all these harms, this Court may affirm standing on any basis in the record. *See PDVSA U.S. Litig. Tr. v. LukOil Pan Ams.*, 65 F.4th 556, 562 (11th Cir. 2023).

### A.    The Executive Order objectively chills others from associating with CAIR.

When, as here, a plaintiff contends that state action restricts First Amendment speech, the "fundamental question" for standing "is whether the challenged policy 'objectively chills' protected expression." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). In answering this question, a court need not find a "formal punishment" for the speech; "indirect pressure may suffice." *Id.* at 1123. These questions often hinge on disputed facts, and a district court's factual findings will be overturned only if they are "clearly erroneous." *Id.* at 1118 n.2.

1. As the district court correctly found, the Executive Order has had, and will continue to have, the predictable effect of chilling CAIR's associations with third parties. These third parties reasonably fear that any connection with CAIR will incur both official and unofficial penalties—resulting in the suppression of CAIR's speech. Doc. 43, at 6–8. Shortly before the Governor issued the Executive Order, for example, CAIR was in the final stages of launching a new podcast to support CAIR's public education and civil rights work through expressive content. Doc. 24-2, at ¶ 26. After the Executive Order was issued, though, the production company withdrew from the proposed agreement because

the company "had been advised not to proceed with the project due to concerns about the designation and the potential consequences of associating with CAIR." *Id.* ¶ 27. The company explained that it would reconsider its decision if the Executive Order were declared unlawful.[1] Doc. 41-1, at ¶ 7.

Although the loss of the podcasting agreement is ample evidence of traceability, there is more. Other organizations also cut ties with CAIR and CAIR's affiliates, saying that they felt compelled to do so because of the Executive Order. Mosques, for example, were reluctant to associate with CAIR and CAIR Florida "due to the material support provision" of the Executive Order. Doc. 24-2, at ¶¶ 24–25; Doc. 24-3, at ¶ 25. Likewise, the South Florida Muslim Federation issued a public statement that it was reluctantly cutting its longstanding ties with CAIR Florida because of the Executive Order. Doc. 41-4, at 3. The Muslim Federation, an

---

[1] Amicus America First Legal Foundation incorrectly states that CAIR did not "offer any evidence of why the podcasting company withdrew, only that it did." Amicus Br. of America First Legal Foundation, at 10–11. That is plainly wrong: CAIR submitted a declaration confirming that the podcasting company "withdrew a proposed agreement for a podcast with CAIR *due to the Executive Order*." Doc. 41-1, at ¶ 7 (emphasis added). Because America First builds its legal arguments on this faulty factual foundation, its conclusions carry no weight.

umbrella organization of Muslim organizations and mosques across Southern Florida, added that it was "look[ing] to our courts to provide guidance on this in the future," thus indicating that it hoped to restore those ties with CAIR. Doc. 41-4, at 3.

As the district court found after examining this evidence, CAIR's allegations do not "rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." Doc. 43, at 8 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). In *Department of Commerce*, the Supreme Court held that even unfounded fears by third parties will not break the causal connection if those third parties "will likely react in predictable ways" to the government action. 588 U.S. at 767–68.

As the Supreme Court recently reiterated, "courts may make 'commonsense inferences' when assessing Article III standing, including inferences about 'third party behavior.'" *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026) (holding that plaintiff had standing based on the chilling effect caused by subpoenas for donor information) (quoting *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025)). The reaction here by third parties who cut ties with CAIR

was more than predictable—especially after the Florida Attorney General warned the public that "[a]ny entity that wants to do business or use state or local resources in Florida would be wise to dissociate from CAIR." Doc. 41-5, at 2.

What is more, the Executive Order "intimates that providing material support to CAIR is, itself, a crime under Florida law." Doc. 43, at 12 n.10. That is enough to scare off someone who wants to engage with CAIR. *See Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1242 (11th Cir. 2025) ("When a plaintiff challenges a law soon after it was enacted and the state vigorously defends the law in court, we can infer a credible threat of prosecution exists.") (cleaned up) (quotation marks omitted).

2. The Governor, though, tries to nitpick CAIR's clear examples of chill, claiming that CAIR did not show sufficient evidence that those parties "received, or hoped to receive, public benefits that the EO threatened to cut off." Br. 22. But this case is not about whether the Executive Order restricts third parties from receiving public benefits; it is about whether the Executive Order objectively chills third parties from associating with CAIR. And because CAIR seeks prospective relief, it

does not matter in the end whether the podcasting company or the South Florida Muslim Federation lost state business. What matters is whether the Executive Order will continue to chill CAIR's associations going forward. *See Speech First,* 32 F.4th at 1120. It plainly will—that's the whole point of the Order.

The Governor also protests that CAIR lacks standing because it has not shown that his Executive Order actually "coerces third parties into punishing CAIR for CAIR's protected speech." Br. 21. But whether the Governor's actions amounted to improper coercion under the First Amendment is a merits issue, not a standing issue. As this Court has emphasized, standing "is a threshold determination that is conceptually distinct from whether the plaintiff is entitled to prevail on the merits." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1280 (11th Cir. 2001) (quotation marks omitted). After all, "[a] finding that a plaintiff has standing simply means that the plaintiff is entitled to walk through the courthouse door and raise his grievance before a federal court." *Id.* (quotation marks omitted).

The Governor similarly misses the mark when he argues that the South Florida Muslim Federation's decision to cut ties with CAIR Florida

is irrelevant because it was CAIR, not CAIR Florida, that sought an injunction. Br. 23. This argument ignores the evidence that CAIR Florida regularly engages with CAIR to advocate on matters of public interest and to plan public religious events. Doc. 24-2, at ¶¶ 19, 25; Doc. 24-3, at ¶ 25. So when third parties cut ties with CAIR Florida, the national organization also suffers the consequences.

After the Executive Order was issued, for example, CAIR Florida partnered with CAIR for the annual Muslim Day at the Florida Capitol. Doc. 41-1, ¶ 5. But the morning of the event, Florida's Attorney General publicly called for increased law enforcement presence at the Capitol and warned that "terrorist organizations are barred from using any and all state resources" under the Executive Order. Doc. 41-6, at 2. Not surprisingly, then, attendance was down by around 50% from the year before, with some former attendees citing the Executive Order as the reason they did not return. Doc. 41-1, ¶ 5.

3. Finally, the Governor's half-hearted challenge to redressability should also be rejected. Br. 22 n.36. First, because the Governor only perfunctorily disputes redressability in a footnote, he has forfeited the argument. *See Federal Trade Commission v. Corpay, Inc.*, 164 F.4th 807,

837 n.7 (11th Cir. 2026). Second, enjoining the Order would remove a significant legal threat that is currently deterring third parties from associating with CAIR. For instance, the podcasting company said it would reconsider its decision to cut ties with CAIR if a court invalidated the order, Doc. 41-1, at ¶ 7, and the South Florida Muslim Federation likewise indicated that it hoped to restore ties with CAIR after the courts review the issue, Doc. 41-4, at 3. That is enough to show that an injunction "will likely redress the plaintiff's injury, whether directly or indirectly." *Polelle*, 131 F.4th at 1222 (quotation marks omitted).

## B.    The Executive Order independently harms CAIR.

Even putting aside the harm CAIR suffered from third parties who distanced themselves from the organization because of the Executive Order, CAIR would still have standing to pursue its First Amendment claims based on the independent harm it suffered. Although the district court did not address this argument, because CAIR raised it below, this Court may affirm based on it. *See PDVSA US Litig. Tr.*, 65 F.4th at 562.

First, soon after the Executive Order was issued, CAIR's income decreased after a debtor withheld payments, explicitly citing the Executive Order's material support provision. Doc. 24-2, at ¶ 23.

"[E]conomic harm is a well-established injury for purposes of Article III standing." *Wilding v. DNC Servs. Corp.*, 941 F.3d at 1125. Although another court has since ordered the debtor to resume those payments, this likely-to-be-repeated incident still establishes standing. As this Court has recognized, "[p]ast wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984).

Second, CAIR has had to divert organizational resources away from its ordinary programming to respond to the problems it faced after the Executive Order was issued. Doc. 24-2, at ¶ 32. This additional harm also shows why CAIR has standing to sue. *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1164–66 (11th Cir. 2008) ("*Florida NAACP*"). In *Florida NAACP*, this Court held that civil rights organizations had standing to challenge an allegedly unconstitutional state law because the organizations would have to divert staff, time, and other resources to not only comply with that law, but to carry out the organizations' missions. *Id.* Here, the Governor's actions likewise "directly affected and interfered with [CAIR's] core business activities." *Food & Drug Admin.  v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 395 (2024). That suffices to establish standing.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FINDING THAT CAIR IS SUBSTANTIALLY LIKELY TO SUCCEED ON ITS FIRST AMENDMENT COERCION CLAIM.

After determining that CAIR had standing to pursue its claims, the district court granted CAIR's motion for a preliminary injunction, finding that:

(1) CAIR showed a substantial likelihood of success on the merits of its First Amendment Free Speech claim;

(2) CAIR showed that it will suffer irreparable harm without an injunction;

(3) CAIR showed that its injuries outweigh any potential harm to the Governor, and

(4) CAIR showed that an injunction serves the public interest.

Doc. 43, at 10-25. On appeal, Governor DeSantis challenges only the first factor, whether CAIR is likely to succeed on the merits on its coercion claim. Br. 24. This Court reviews the district court's ruling for abuse of discretion. *See Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1240 (11th Cir. 2025).

Although Governor DeSantis argues that the district court abused its discretion by ruling for CAIR, the Governor does not point to any error

in how the district court applied well-established Supreme Court precedent on First Amendment coercion claims. Instead, the Governor urges this Court to reject the district court's factual finding that the Governor supplied "no evidence" to show how his EO "in any way furthers an interest in protecting public health and safety." Doc. 43, at 18. But the district court's well-reasoned factual findings are not clearly erroneous, and a government official cannot bypass the First Amendment simply by invoking state security.

### A.    The Executive Order coerces others to cut ties with CAIR.

CAIR agrees with Governor DeSantis that First Amendment coercion claims are governed by *Bantam Books v. Sullivan*, 372 U.S. 58 (1963) and *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024). Br. 25–26. CAIR further agrees that for a First Amendment coercion claim to proceed under these cases, "the plaintiff must identify state action that reasonably could be understood to convey a threat of adverse action against third parties, that is in turn meant to punish or suppress the plaintiff's speech" that the government otherwise could not regulate. Br. 26. As the Supreme Court observed, this test requires a "fact-intensive" inquiry. *Vullo*, 602 U.S. at 189–90.

The district court faithfully applied this framework when it concluded that CAIR's First Amendment claim "bears all the hallmarks of unconstitutional coercion that the Supreme Court identified in *Bantam Books* and *Vullo*." Doc. 43, at 11. The district court reached this conclusion by examining (1) the power of the government official who took the action, (2) whether the government's communications could be interpreted as a threat, and (3) the reaction from recipients. *Id.* (citing *Vullo*, 602 U.S. at 191). These are the "three leading factors" to determine coercion under *Vullo*. *Murthy v. Missouri*, 603 U.S. 43, 99–100 (2024) (Alito, J., dissenting).

On the first factor, the defendant's authority, *Vullo* stated that "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." 602 U.S. at 191–92. The district court found that "[t]his factor is at its zenith here where Defendant is Florida's head of government and controls Florida's executive branch and cabinet agencies." Doc. 43, at 12. Governor DeSantis does not challenge this finding.

The Governor likewise identifies no error in the district court's ruling on the second *Vullo* factor, about whether the communication

could reasonably be interpreted as a threat. 602 U.S. at 193. The district court found "[t]he threat here is sweeping and clear," finding that the text of the Executive Order ensured that "[a]ny relationship with [CAIR] will be punished by cutting off access to all benefits even peripherally within [the Governor's] control." Doc. 43, at 12. The court added that Florida's Attorney General publicly affirmed the threats in the Executive Order, warning that "[a]ny entity that wants to do business or use state or local resources in Florida would be wise to dissociate from CAIR." *Id.* at 15 n.11.

On the third factor, the reaction from third parties, the district court cited the podcasting company's decision to withdraw from its agreement with CAIR, finding that the company viewed the Executive Order "as the sole impediment to the parties' agreement to platform [CAIR's] speech." Doc. 43, at 14. Here too, the Governor's brief silently agrees with this finding. Other uncontested evidence reinforces this finding, including mosques that no longer wanted to associate with CAIR because of the Executive Order (Doc. 24-2, at ¶¶ 24-25), a debtor who withheld funds because of the Executive Order (Doc. 24-2, at ¶ 23), and

a convention organizer's decision to cut ties with CAIR Florida because of the Executive Order (Doc. 41-1, at ¶¶ 2-3).

At bottom, the Governor's failure to allege any error on any of these factors is reason enough to hold that the district court did not abuse its discretion by issuing a preliminary injunction. But there is more. The Governor likewise does not challenge the district court's finding that without an injunction, CAIR would suffer ongoing and irreparable First Amendment harms. For good reason: CAIR's faith-based advocacy depends on interacting with other people and organizations, who are now distancing themselves from CAIR because of the Executive Order's threat. Especially considering CAIR's longstanding adversarial relationship with the Governor and his policies, this case exemplifies "[using] the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 193.

### B.    The Executive Order is not narrowly tailored to serve a compelling governmental interest.

When, as here, a government official makes coercive threats aimed at suppressing disfavored speech, that action "bear[s] a heavy presumption against its constitutional validity." *Bantam Books,* 372 U.S. at 70. Courts have also imposed strict scrutiny to evaluate speech-based

restrictions flowing from a federal terrorist designation. *See Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 997 (9th Cir. 2012). Although this Court should thus apply strict scrutiny to the Governor's actions, the result would not change even if intermediate scrutiny were applied, as the district court concluded. Doc. 43, at 18. At bottom, the Governor lacks any legitimate interest in designating CAIR—the nation's largest Muslim civil rights and advocacy organization—as a terrorist organization.

The Governor, though, tries to escape First Amendment scrutiny altogether by arguing that "the EO says nothing about CAIR's *speech*; it focuses on CAIR's *conduct*." Br. 37. The district court correctly disposed of this argument, characterizing it as "disingenuous at best." Doc. 43, at 17 n.12. Like the threats directed against the NRA's banks and insurance companies, the Executive Order is a transparent attempt to blacklist an advocacy group that expresses views disfavored by the Governor. *See Vullo*, 602 U.S. at 190. And like the morality commission in *Bantam Books*, the Order stifles CAIR's constitutionally protected speech by deterring intermediaries from platforming CAIR's message. Doc. 43, at

15 (citing *Bantam Books*, 372 U.S. at 68–70). That is classic speech suppression.

Because the Executive Order threatens to punish anyone who materially supports CAIR, which could include disseminating CAIR's speech, it restricts protected expression and triggers strict First Amendment scrutiny. *See Bantam*, 372 U.S. at 70; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010), (holding that the prohibition on material support triggered strict scrutiny as applied to expressive activities). The Governor cannot evade such scrutiny simply by characterizing the Executive Order as conduct-based. Br. 27 (claiming that the Executive Order is "directed at stopping terrorism finance and material support," not suppressing speech). After all, "a State cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963).

As the Supreme Court recently reiterated, "what matters is not how a government describes its law or whether the law may regulate conduct in other circumstances," but "whether, in fact, the law regulates speech in the case at hand." *Chiles v. Salazar*, 146 S. Ct. 1010, 1023–024 (2026). Otherwise, "[g]overnments could easily wield all manner of laws

-33-

regulating some conduct to silence speech they disfavor." *Chiles*, 146 S. Ct. at 1025. That is exactly what is happening here.

The Governor also falls back on his argument that even if strict scrutiny applies, he has a compelling interest in thwarting terrorism in his state. Br. 25. But saying so does not make it so. As the Supreme Court has cautioned, "[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 530, 543 (1980).

For example, in a case where a city regulated door-to-door solicitations, the Supreme Court held that a generalized assertion of crime prevention would not save the ordinance. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (noting that there was no evidence in the record about "a special crime problem related to door-to-door solicitation"). Especially considering that nothing in the Executive Order alleges that CAIR committed any crimes in Florida, much less ones related to terrorism, the district court did not abuse its discretion in finding that the Executive Order is a solution to a nonexistent problem.

The Governor also faults the district court for supposedly ignoring the "core factual question in this case," about "whether the evidence supports the Governor's decision to designate CAIR a terror organization." Br. 24. Yet far from ignoring the Governor's asserted evidence, the district court addressed it and concluded that it did not show how the Executive Order advanced any compelling (or even important) interest. Doc. 43, at 18. As CAIR argued below, even if every statement in the Governor's sources were accurate, he still had not shown that his Executive Order is narrowly tailored to serve a compelling government interest. Doc. 41, at 4. So the district court did not "ignore[] or misunderstand[] the relevant evidence," as the Governor claims. Br. 31. Rather, the Governor misunderstands what the relevant evidence is. And again, the district court's factual findings on this issue are not clearly erroneous.

In addition to lacking a compelling governmental interest in targeting CAIR and its associates, the Executive Order also is not narrowly tailored to serve the Governor's purported state-security interests. As the district court highlighted, the Executive Order "sweeps far broader than merely limiting the expenditure of public funds and

arguably includes restrictions on the use of public spaces and facilities otherwise made available to the public." Doc. 43, at 25 n.15. Likewise, the court determined that the Governor "offers no evidence to show how cutting off benefits to third parties who engage with [CAIR] in any way furthers an interest in protecting public health and safety." Doc. 43, at 18; *see also Holt v. Hobbs*, 574 U.S. 352, 364 (2015) ("[I]t is hard to swallow the argument that denying petitioner a 1/2–inch beard actually furthers the Department's interest in rooting out contraband."). These factual findings underscore the constitutional deficiencies in the Governor's actions.

Because the Executive Order does not serve a compelling or even important interest, and because the Executive Order is not narrowly tailored to serve the Governor's purported interests, CAIR is substantially likely to prevail on the merits of its First Amendment claims. And as detailed later in the brief, this same conclusion applies to CAIR's other First Amendment claims. Whether characterized as coercion, viewpoint discrimination, or chilling the right to association, the Executive Order cannot withstand First Amendment scrutiny.

-36-

**C.    The Governor's anti-terrorism rationale does not exempt his actions from First Amendment scrutiny.**

Governor DeSantis seems to be arguing for an exception to First Amendment scrutiny whenever a state executive raises the specter of terrorism. He contends that because his actions are "directed at stopping terrorism finance and material support," they "are undoubtedly valid, even when they sweep in some speech." Br. 27. Not so. First, the primary case that the Governor relies on for his anti-terrorism exception, *Holder v. Humanitarian Law Project*, says nothing of the sort. Second, *Vullo* rejected a materially similar defense. These cases only underscore the legal soundness of the district court's ruling and the insurmountable deficiencies in the Governor's arguments.

1. The Governor relies heavily on *Humanitarian Law Project*, but he badly misreads the case. According to the Governor, *Humanitarian Law Project* announced a sweeping rule: "Laws forbidding material support to terrorism survive the most rigorous First Amendment scrutiny." Br. 30. That is not remotely right—in fact, the Supreme Court's opinion in that case expressly forecloses the Governor's argument.

In *Humanitarian Law Project*, the Supreme Court considered a First Amendment challenge to 18 U.S.C. § 2339B, the federal law that

bans providing material support to federally designated "foreign terrorist organizations." The plaintiffs there, U.S. human rights experts and humanitarian groups, sought to provide training and expert assistance to two foreign terrorist organizations—not to further terrorist activity, but to pursue peaceful conflict resolution and engage with international tribunals. *Humanitarian Law Project*, 561 U.S. at 36–37. In relevant part, the plaintiffs claimed that § 2339B violated the First Amendment by imposing a content-based restriction on their intended speech. *Id.* at 27. The Supreme Court disagreed. It was true, the Court said, that § 2339B imposed a content-based restriction on the plaintiffs' intended speech; thus, as applied to the plaintiffs, the statute was subject to strict scrutiny. *Id.* But the statute survived. *Id.* at 39.

Critically, even as it upheld § 2339B against the plaintiffs' as-applied challenge, the Court cautioned against overreading its opinion. "We . . . do not suggest," said the Court, "that Congress could extend the same prohibition on material support at issue here to *domestic* organizations." *Id.* at 39. (emphasis added). Nor, the Court explained, did its holding mean that "any other statute relating to speech and terrorism would satisfy the First Amendment." *Id.* Indeed, according to the Court,

-38-

other applications of § 2339B itself might not "survive First Amendment scrutiny." *Id.*

The Court's distinction between foreign and domestic organizations makes sense for a host of reasons. To name but two: foreign organizations generally lack First Amendment rights, and—as the Solicitor General's briefing in *Humanitarian Law Project* explained—"[i]ndividuals are subject to limitations in their relations with foreign governments and entities that differ from any found in the domestic setting." *Reply Br. of Respondents, Holder v. Humanitarian Law Project*, 2010 WL 565212, at *41 (S. Ct. Feb. 16, 2010). In short, the Governor's reliance on *Humanitarian Law Project* depends on ignoring the very limits that the Court took pains to preserve.

The Governor also fails to appreciate other critical differences between his actions and those in *Humanitarian Law Project*. For one thing, in *Humanitarian Law Project*, the designated terrorist organizations had "committed numerous terrorist attacks, some of which [had] harmed American citizens," 561 U.S. at 9. CAIR is not accused of doing anything of the sort here. For another, *Humanitarian Law Project* implicated "sensitive and weighty interests of national security and

foreign affairs," an area where "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy." 561 U.S. at 33, 35.

The Court's rationale for deference in *Humanitarian Law Project* gains no traction here: Governor DeSantis has no comparable foreign-policy role and no access to the classified intelligence that often underlies federal designations. Nor does his Executive Order allow for judicial and legislative review like 8 U.S.C. § 1189. So this is not a case in which a court should defer to the "considered judgment of Congress and the Executive." *Humanitarian Law Project*, 561 U.S. at 36. Deference presupposes a lawful framework.

2. The Governor's arguments about preventing terrorism also fall flat given the robust evidence at this stage of the case that his actual purpose had nothing to do with preventing terrorism and everything to do with suppressing disfavored speech. The Supreme Court's decision in *Vullo* illustrates this point. There, a state official also tried to justify her conduct by characterizing it as a "legitimate enforcement action" against illegal conduct. *Vullo*, 602 U.S. at 194. The Supreme Court unanimously

rejected that defense, holding that even "the conceded illegality" of underlying conduct "does not insulate [the official] from First Amendment scrutiny." *Id.* at 178.

As *Vullo* instructs, the Executive Order must be examined "against the backdrop" of other evidence of retaliatory purpose, not on how strong the government's case is for its enforcement action. *Vullo*, 602 U.S. at 195. Here, the other evidence in the record paints a damning picture, illustrating how CAIR has been a vocal opponent of the Governor, from criticizing him, his policies, and his allies to suing him on behalf of pro-Palestinian student groups that the Governor has also labeled as terrorists. Doc. 24-2, at ¶¶ 10-12, 16-20; Doc. 24-1, at ¶¶ 6, 8-13, 15. Only after all this advocacy did the Governor issue his Executive Order.

The Governor contests none of the above evidence, and those concessions doom his arguments. "[W]here, as here, the complaint plausibly alleges coercive threats aimed at punishing or suppressing disfavored speech, the plaintiff states a First Amendment claim." *Vullo*, 602 U.S. at 197. Although *Vullo* involved a motion to dismiss, that reasoning applies just as forcefully here, where the district court

examined all the operative facts and determined that CAIR is substantially likely to prevail on the merits.

Of course, as the district court rightly recognized, the First Amendment does not provide a free pass for CAIR to violate the law, and the State of Florida remains free to investigate and prosecute CAIR for criminal wrongdoing. Doc. 43, at 24. But the Governor may not "threaten anyone wishing to do business in this state from giving a platform to [CAIR's] speech." *Id.* at 24–25. The district court thus did not abuse its discretion when granting the preliminary injunction.

## III. CAIR ALSO SHOWED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON ITS OTHER FIRST AMENDMENT THEORIES.

The Executive Order's coercive effect on third parties was just one basis CAIR advanced for the preliminary injunction. CAIR also showed that it was substantially likely to succeed on its First Amendment claims because the Governor discriminated against CAIR on the basis of its viewpoint, because the Governor retaliated against CAIR because of its speech, and because the Governor infringed on CAIR's rights to association and petition. Although the district court did not address these other arguments, this Court may affirm based on any basis in the record.

*See Associated Builders & Contractors Fla. First Coast Chapter v. Gen. Servs. Admin.*, 174 F.4th 26, 35 (11th Cir. 2026).

Two of these other arguments are discussed below. First, by singling out CAIR by name in his Executive Order, the Governor engaged in precisely the type of viewpoint discrimination that the First Amendment prohibits. Second, by designating CAIR a terrorist organization and imposing sanctions upon all who materially support its faith-based advocacy, the Governor chilled third parties from associating with CAIR. Either theory thus provides an additional—or alternative— basis to affirm the district court's order.

## A.    The Governor discriminated based on CAIR's viewpoint.

As this Court recognized when affirming an injunction against another Florida law, viewpoint discrimination is "the greatest First Amendment sin." *Honeyfund.com v. Governor, State of Fla.*, 94 F.4th 1272, 1277 (11th Cir. 2024). States thus cannot regulate speech in ways that favor some viewpoints at the expense of others. *See Moms for Liberty - Brevard Cnty., FL v. Brevard Pub. Schs.*, 118 F.4th 1324, 1331–332 (11th Cir. 2024). Such discrimination is presumed to be unconstitutional. *Id.* at 1332.

Here, CAIR provided uncontested evidence that the Executive Order curtailed its faith-based expression and led to widespread disruptions of its operations. Doc. 24-2, at ¶¶ 23–27. Indeed, the Governor alleges no error in the district court's conclusion that CAIR was suffering irreparable First Amendment harms. Doc. 43, at 22–23.

Instead, the Governor argues that whatever First Amendment harms CAIR may be suffering, he cannot be responsible for them because his Executive Order regulates only conduct, not speech. Br. 37. But as this Court has said before, "Florida's attempts to repackage its Act as a regulation of conduct rather than speech do not work." *Honeyfund.com* 94 F.4th at 1280 (11th Cir. 2024); *see also Chiles v. Salazar*, 146 S. Ct. 1010, 1023–024 (2026) (collecting a long line of cases rejecting attempts by government officials "to recast speech as conduct."). Thus, just as this defense fails for the coercion claim, it fails here. *See* Section II.B, above.

The Governor also tries to skirt the First Amendment by contending that his Executive Order simply ensures that "taxpayer funds never finance or materially support terrorism." Br. 25. That contention is a smokescreen. In the abstract, ensuring that taxpayer funds do not finance or materially support terrorism is unobjectionable. But the

question is not whether the Governor's abstract goal is objectionable; it is whether the Governor's means of pursuing that goal violate the Constitution. The answer is yes.

By singling out CAIR for sanctions, Defendant violated the core First Amendment principle prohibiting government "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC,* 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra,* 585 U.S. 755, 778 (2018) (quotations omitted). After all, "speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Reed v. Town of Gilbert,* 576 U.S. 155, 170 (2015) (cleaned up) (quotation marks omitted). That is precisely what happened here.

And lest there be any doubt about why the Governor zeroed in on CAIR, the Governor himself said the quiet part out loud. After the Executive Order was issued, he boasted how he welcomed this lawsuit because it would provide him with discovery "to get the information that we need to make sure," Doc. 24-1 ¶ 21 (20:04-20:10), and that he "[c]an't

wait for CAIR to open the books!" *id.* ¶¶ 22, 24. In other words, the Governor does not view the Executive Order as a means to address terrorism, but as a tool to discredit a political adversary and to silence a disfavored religious group.

Compounding this constitutional violation, the Executive Order homes in on Islamic groups. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012) (emphasizing the "special solicitude" that the First Amendment gives to religious organizations). And again, the Governor himself has openly criticized Islam: "Members of the FL Legislature are crafting legislation to stop the creep of sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation." Doc. 21, at ¶ 44. This statement leaves little doubt that the Governor "disagrees with, disapproves of, and is hostile to CAIR's and CAIR Florida's religious views and practices," as CAIR alleged in its complaint. *Id.* ¶ 45.

Given this overt discrimination, the Governor would need to show that he has a compelling governmental interest in targeting CAIR and that his Executive Order is narrowly tailored to carry out that interest.

*See Citizens United*, 558 U.S. at 340 (2010). He cannot meet his burden to do so for the same reasons discussed in the prior section on coercion. *See* Section II.B, above. Thus, this viewpoint discrimination provides an additional basis to show that CAIR is substantially likely to prevail on its First Amendment claim.

## B.    The Governor infringed on CAIR's right to association.

Another equally compelling reason to affirm the district court's order is that CAIR is substantially likely to succeed on its claim under the First Amendment's right to association.

1. As the Supreme Court has long recognized, "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). This right to associate "carr[ies] special significance for political, social, religious, and other minorities" because their views are "particularly vulnerable to marginalization or outright suppression by the majority." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) (quotation marks omitted).

Indeed, as Florida rightly emphasized in *Davenport*, States violate the First Amendment when they pursue politically motivated investigations against a faith-based group while "denying [that group] a forum to vindicate itself against insinuations of wrongdoing." *See Br. of Fla. & 18 Other States as Amicus Curiae, First Choice Women's Res. Ctrs. v. Platkin,* 2025 WL 2534646, at \*1 (S. Ct. Aug. 28, 2025). No principled reason exists for Florida to take a different stance here. *Davenport* says it best: when the State intrudes on collective advocacy, "the freedom to associate may become no freedom at all—individuals deterred, groups diminished, and their protected advocacy suppressed." 146 S. Ct. at 1123.

2. As the Supreme Court has also emphasized, the First Amendment prohibits not only "actual restrictions on an individual's ability to join with others to further shared goals," but also government actions that "risk [] a chilling effect on association." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021). After all, "First Amendment freedoms need breathing space to survive." *Id.* (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963)).

*Button* is particularly instructive, as it also involved a state citing a seemingly neutral explanation (regulating legal businesses) to target a civil rights organization. 371 U.S. at 433–34. But the state's legitimate interest in regulating the legal profession did not allow it to restrict the First Amendment freedoms of the NAACP. *Id.* at 434–35. That is why the Executive Order fails as well—it likewise risks "smothering all discussion . . . on behalf of the rights of members of an unpopular minority." *Id.* at 434.

Of course, the right to associate is not absolute, and a state may act to "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. The Governor, when defending this viewpoint discrimination claim below, did not argue that his actions could survive strict scrutiny, and he has thus forfeited any contrary argument on appeal. Doc. 37, at 35-36; *see also Gould v. Interface, Inc.*, 153 F.4th 1346, 1355 (11th Cir. 2025) (stating the "general principle that litigants can waive or forfeit positions or issues through their litigation conduct in the district court") (cleaned up).

-49-

Instead, the Governor defended the viewpoint discrimination claim by relying almost exclusively on the Supreme Court's decision in *Humanitarian Law Project*. Doc. 37, at 35-36. But that case provides no help to him for the same reasons discussed earlier in this brief. *See* Section II.C, above. In the end, the Executive Order cannot survive any level of scrutiny for the same reasons discussed in the coercion section above. *See* Section II.B. CAIR has thus shown a substantial likelihood of success on its First Amendment association claim.

## IV. THE GOVERNOR FAILS TO MEET HIS BURDEN TO JUSTIFY THE EXTRAORDINARY REMEDY OF REASSIGNMENT.

As detailed above, the constitutional deficiencies of the Executive Order are numerous and glaring. So it is not surprising that the district court used forceful language in resolving this dispute. But forceful language is not bias. And even if this Court interprets the law differently than the district court, the district court has not suggested that it would have any trouble applying this Court's ruling. In short, this is not an exceptional case that would justify the "extraordinary order" of reassignment. *U.S. v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009).

Where, as here, a party does not allege actual bias by the district court, this Court considers three factors to determine whether to reassign the case to a different judge on remand:

> (1) whether the original judge would have difficulty putting his previous views and findings aside;

> (2) whether reassignment is appropriate to preserve the appearance of justice; and

> (3) whether reassignment would entail waste and duplication out of proportion to the gains realized from reassignment.

*Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309, 1311–12 (11th Cir. 2015) (quotation marks omitted). All three factors counsel against reassignment here.

## A.    The Governor has not shown that the district court would have difficulty putting aside its views.

The first factor, about whether a district court could be expected to reconsider its views, almost always comes into play on a *second* appeal, where the district court refused to change its views on the initial remand. *See, e.g., Gupta*, 572 F.3d at 892 ("The refusal of the district court to set aside its feelings is more pronounced after a third appeal."); *U.S. v. Torkington*, 874 F.2d 1441, 1447 (11th Cir. 1989) (reassigning after the judge had been reversed once before by this Court); *U.S. v. White*, 846 F.2d 678, 696 (11th Cir. 1988) (same). Indeed, every case cited in the

-51-

Governor's brief on this point involves a district court that had been reversed at least once before in the same case. Br. 39-41.

This case, of course, has never been before this Court, and there is thus no reason assume that the district court would "have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous." *White*, 846 F.2d at 696 (quoting *U.S. v. Robin, 553* F.2d 8, 10 (2d Cir. 1977) (en banc)). The Governor, though, complains that the district court has "repeatedly voiced his disdain for the Governor and his administration in prior cases." Br. 40. But the Governor fails to show even a single instance where this Court reversed the district court in those other cases, much less one where the district court refused to follow the law.

What is more, the other cases that the Governor highlights are all from years ago—and thus were known to the Governor when CAIR filed this suit. Br. 45 ("The Governor and other Florida leaders long ago realized they were unlikely to get a fair hearing in front of Judge Walker."). The Governor, though, waited until after he lost before raising this issue for the first time on appeal. Such untimely efforts need not be considered by the Court. *See U.S. v. Slay*, 714 F.2d 1093, 1094 (11th Cir.

1983); *see also Delesdernier v. Porterie*, 666 F.2d 116, 121 (5th Cir. 1982) ("Lack of a timeliness requirement encourages speculation and converts the serious and laudatory business of insuring judicial fairness into a mere litigation stratagem.").

In any event, although the Governor may be correct that the district court has ruled against him several times before, he fails to mention the many other times the district court has ruled in his favor—including in a case where CAIR was counsel of record. *See Students for Just. in Pal. v. DeSantis*, No. 1:23-CV-281, 2024 WL 371875, at \*7 (N.D. Fla. Jan. 31, 2024) (denying motion for preliminary injunction); *see also, e.g., Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1146 (N.D. Fla. 2020) (same); *Harris v. DeSantis*, No. 4:23-CV-328, 2024 WL 2703812, at \*2 (N.D. Fla. Feb. 29, 2024) (granting motion to dismiss); *Support Working Animals, Inc. v. Moody*, No. 4:19-CV-570, 2020 WL 10728640, at \*1 (N.D. Fla. June 12, 2020) (same), aff'd sub nom. *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198 (11th Cir. 2021). Thus, the Governor has not carried his burden on this factor.

**B.     The Governor fails to show that reassignment is necessary to preserve the appearance of justice.**

Nor is reassignment necessary to "preserve the appearance of justice" because this is not a case where "a reasonable person would question the trial judge's impartiality." *White*, 846 F.2d at 695–96. As the Supreme Court has emphasized, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (explaining that the proper remedy is an appeal, not recusal). As other courts have recognized, this "high bar . . . makes good sense" because "if strong views on a matter were disqualifying—then a judge would hardly have the freedom to be a judge." *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011).

Although the district court employed sharp language in its order, "in hard-fought litigation dealing with controversial issues, district judges must sometimes take strong actions and use strong words." *Cobell v. Kempthorne*, 455 F.3d 317, 332 (D.C. Cir. 2006). As *Cobell* explained, "[p]residing over such challenging cases would become even more difficult if district judges had to worry that appellate courts would routinely

-54-

review their decisions not just for legal error, but for bias as well." *Id.* (holding that "recusal must be limited to truly extraordinary cases"). *See also Belue*, 640 F.3d at 575 ("[T]o argue that judges must desist from forming strong views about a case is to blink the reality that judicial decisions inescapably require judgment.").

Here, in asking for a new judge, the Governor relies solely on the district court's rulings and in-court statements in this and other cases. But "the fact that the district judge ruled against the appellants previously is of little impact; otherwise, every reversed case would have to be reassigned on remand." *Stargel*, 791 F.3d at 1312. As the Supreme Court has explained, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555 (emphasis added).

No such impossibility exists here. After all, it is neither surprising nor improper for a judge to sharply criticize a state official who repeatedly violates the Constitution. As the Fourth Circuit properly recognized, "[n]o

appellate court can afford to leave trial judges prey to a slew of groundless calls for recusal from litigants whose major objection to those judges appears to be a perceived disagreement with them." *Belue*, 640 F.3d at 576. This is exactly what is happening here, and this Court should thus refuse to indulge the Governor's thinly veiled attempt to silence another one of his critics.

### C. The Governor fails to show that waste and duplication would not result from reassignment.

The final factor, which considers judicial resources, similarly counsels against reassignment. Although the Governor correctly notes that this case was in the early stages of litigation when he filed his brief (April 20, 2026), that is surely going to change by the time this Court issues a decision. Summary judgment motions are due in September, and a trial is scheduled for January. Sidelining the district court in the middle of all this would amount to "waste and duplication" that "outweighs any gains" from reassignment. *Stargel*, 791 F.3d at 1312. The Governor's request for a new judge on remand should thus be denied.

## CONCLUSION

This Court should affirm the district court's order granting a preliminary injunction barring enforcement of Executive Order 25-244 against CAIR-Foundation, Inc.

Respectfully submitted,

s/ *Brant S. Levine*

| | |
|---|---|
| HINA SHAMSI | ARTHUR AGO |
| CHARLES HOGLE | SCOTT D. MCCOY |
| CELIN CARLO-GONZALEZ | AARON FLEISHER |
| NATALIE SMITH | BRANT S. LEVINE |

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org

**SOUTHERN POVERTY LAW CENTER**
400 Washington Ave
Montgomery, AL 31604
(771) 215-8661
Brant.Levine@splcenter.org

-57-

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,064 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft 365.

s/Brant S. Levine
BRANT S. LEVINE
 Attorney

Date: July 2, 2026