No. 26-10735

# In The United States Court of Appeals for the Eleventh Circuit

CAIR FOUNDATION, ET AL.,

*Plaintiffs-Appellees,*

v.

RONALD DESANTIS, GOVERNOR, STATE OF FLORIDA,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:25-cv-516-MW

**BRIEF OF *AMICI CURIAE* NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC., THE FRED T. KOREMATSU CENTER
FOR LAW AND EQUALITY, AND TEN ADDITIONAL NONPROFIT
ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES AND IN
SUPPORT OF AFFIRMANCE**

Katie Townsend
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7839
KTownsend@gibsondunn.com

Hassaan Shahawy*
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street NW,
Washington, DC 20036
(202) 887-3571
HShahawy@gibsondunn.com

Avatara A. Smith-Carrington
Kacey Mordecai
**NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.**
700 14th Street NW,
Suite 600
Washington, DC 20005
(202) 682-1300

*Additional counsel on inside cover*

Robert S. Chang
**FRED T. KOREMATSU CENTER
FOR LAW AND EQUALITY**
UC Irvine School of Law
401 E. Peltason Dr. Suite 100
Irvine, CA 92697
(949) 824-3034

Shirin Sinnar
**WILLIAM W. AND GERTRUDE H.
SAUNDERS PROFESSOR OF LAW**
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-0613

*Counsel for Amici Curiae*

*Admitted in California and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel certifies that, in addition to the entities listed in the parties' briefs (Dkt. 15, 40) and the *amici curiae* briefs (Dkt. 23, 28), the following persons and entities have an interest in the outcome of this matter:

1. American-Arab Anti-Discrimination Committee — Amicus Curiae

2. Arab American Institute — Amicus Curiae

3. Asian Americans Advancing Justice (AAJC) — Amicus Curiae

4. Asian Law Caucus — Amicus Curiae

5. Chang, Robert S. — Attorney for Amici Curiae

6. Fred T. Korematsu Center for Law and Equality — Amicus Curiae

7. GLBTQ Legal Advocates & Defenders (GLAD Law) — Amicus Curiae

8. Japanese American Citizens League — Amicus Curiae

9. LatinoJustice PRLDEF — Amicus Curiae

10. Mordecai, Kacey — Attorney for Amici Curiae

11. Muslim Advocates — Amicus Curiae

12. Muslim Public Affairs Council — Amicus Curiae

13. NAACP Legal Defense and Educational Fund, Inc. — Amicus Curiae

14. Shahawy, Hassaan — Attorney for Amici Curiae

15. Sikh Coalition — Amicus Curiae

16. Sinnar, Shirin — Attorney for Amici Curiae

17. Smith-Carrington, Avatara A. — Attorney for Amici Curiae

18. Townsend, Katie — Attorney for Amici Curiae

I further certify that *amici curiae* submitting this brief have no parent corporations and that no publicly held corporations own 10% or more of their stock.

Respectfully submitted this 9th day of July, 2026.

/s/ *Katie Townsend*
Katie Townsend

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF THE IDENTITY AND INTEREST OF *AMICI* .........................1

STATEMENT OF THE ISSUES ADDRESSED BY *AMICI* ...................................2

SUMMARY OF THE ARGUMENT .................................................................3

ARGUMENT ............................................................................................6

    I.    The EO Echoes Past Efforts by States to Attack Black Civil Rights Organizations and Label Them, as well as Immigrant and Religious Communities, as Security Threats...........................................6

        A.    State Attacks on Civil Rights Organizations for Purported "Subversion."........................................................................6

        B.    State Labeling of Immigrants and Religious Minorities as Security Threats........................................................12

    II.    The EO Repeats the Transgressions of the Past and Violates the First Amendment by Suppressing CAIR's Rights to Free Association. .....19

        A.    Allegations of CAIR's Attenuated Associations with Disfavored Actors as Pretext for Punishment. ................................20

        B.    EO's Coercion of Third Parties Not to Associate with CAIR.....24

CONCLUSION .......................................................................................26

CERTIFICATE OF COMPLIANCE ...............................................................29

CERTIFICATE OF SERVICE ......................................................................30

APPENDIX A: INTERESTS OF TEN ADDITIONAL *AMICI* .......................... A-1

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ...............................................................25

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ................................................................26

*Bates v. Little Rock*,
361 U.S. 516 (1960) ...............................................................25

*Brown v. Board of Education*,
347 U.S. 483 (1954) .................................................................4

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ...............................................................24

*Chae Chan Ping v. United States*,
130 U.S. 581 (1889) ...............................................................13

*Chy Lung v. Freeman*,
92 U.S. 275 (1875) .................................................................13

*Espinoza v. Montana Dept. of Rev.*,
591 U.S. 464 (2020) ...............................................................18

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026)..............................4, 5, 20, 25, 26

*Fujii v. State*,
242 P.2d 617 (Cal. 1952) .........................................................18

*Gibson v. Florida Legislative Investigation Committee*,
372 U.S. 539 (1963)..........................................................11, 12, 25

*Louisiana ex rel. Gremillion v. NAACP*,
366 U.S. 293 (1961) ...............................................................10

*Healy v. James*,
408 U.S. 169 (1972) ...............................................................22

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010).....................................................................23

*Korematsu v. United States*,
323 U.S. 214 (1944)...........................................................15, 16

*Mitchell v. Helms*,
530 U.S. 793 (2000) ...............................................................18

*NAACP v. Alabama ex rel. Patterson,
    357 U.S. 449 (1958) ................................5, 9, 20, 25

*NAACP v. Button,
    371 U.S. 415 (1963) ................................1, 6, 11, 20

NAACP v. Claiborne Hardware Co.,
    458 U.S. 886 (1982) ................................21, 22

Namba v. McCourt,
    204 P.2d 569 (Or. 1949) ................................18

National Rifle Association of America v. Vullo,
    602 U.S. 175 (2024) ................................26

Noto v. United States,
    367 U.S. 290 (1961) ................................21

Oyama v. California,
    332 U.S. 633 (1948) ................................17

Porterfield v. Webb,
    263 U.S. 225 (1923) ................................15

Scales v. United States,
    367 U.S. 203 (1961) ................................21

Shelton v. Tucker,
    364 U.S. 479 (1960) ................................25

Sweezy v. New Hampshire,
    354 U.S. 234 (1957) ................................6, 20

Terrace v. Thompson,
    263 U.S. 197 (1923) ................................14

Trump v. Hawaii,
    585 U.S. 667 (2018) ................................19

Twitter, Inc. v. Taamneh,
    598 U.S. 471 (2023) ................................23

**Executive Orders**

Fla. Exec. Order 25-244 ................................2, 3, 20, 24, 26

**Statutes**

Chinese Exclusion Act, ch. 126, 22 Stat. 58 (1882) ................................13

## Other Authorities

*CAIR's Condemnation of Terrorism,* CAIR, https://www.cair.com/about_cair/cairs-condemnation-of-terrorism/ (last visited July 7, 2026) ..................................................24

Chanelle Rose, *The "Jewel" of the South?: Miami, Florida and the NAACP's Struggle for Civil Rights in America's Vacation Paradise*, 86 Fla. Hist. Q. 39 (2007) ..........................10, 11

Christopher W. Schmidt, New York Times v. Sullivan *and the Legal Attack on the Civil Rights Movement*, 66 Ala. L. Rev. 293 (2014) ...............7, 12

David T. Smith, *Religious Persecution and Political Order in the United States* (2015) ....................................................17

Donna Doan Anderson & Joanna YangQing Derman, *Alien-ating Asians in 21st-Century Land Laws*, Just Security, Feb. 13, 2026 .....................19

Elizabeth Koh & Samantha J. Gross, *Here's How Floridians Voted on the 12 Constitutional Amendments*, Miami Herald, Nov. 7, 2018 .....................18

Erika Lee, *America for Americans: A History of Xenophobia* (2019) .....................14

Erika Lee, *The Making of Asian America: A History* (2015) ..........................13, 14

Gabriel J. Chin & Anna Ratner, *The End of California's Anti-Asian Alien Land Law: A Case Study in Reparations and Transitional Justice*, 29 Asian Am. L. J. 17 (2022) ..................................................18

Howard H. Quint, *Profile in Black and White: A Frank Portrait of South Carolina* 86 (1958) ....................................................8, 9

Hyung-chan Kim, *A Legal History of Asian Americans, 1790-1990* (1994) ..........................................................13

Jack Greenberg, *Crusaders in the Courts: How a Dedicated Band of Lawyers Fought for the Civil Rights Revolution* (1994) ..................................................7, 8, 9, 10, 12

John A. Scanlan, *American-Arab—Getting the Balance Wrong—Again!*, 52 Admin. L. Rev. 347 (2000) ..................................................16

Keith Aoki, *No Right to Own? The Early Twentieth-Century "Alien Land Laws" as a Prelude to Internment*, 40 B.C. L. Rev. 37 (1998) ...............15

*The Last Alien Land Law*, Densho Encyclopedia (Feb. 7, 2018) ..........................18

Michael W. McConnell, *Is There Still a "Catholic Question" in America? Reflections on John F. Kennedy's Speech to the Houston Ministerial Association*, 86 Notre Dame L. Rev. 1635 (2011) ..........................16

*N.A.A.C.P. Is Called Threat To Georgia,* N.Y. Times (Oct. 20, 1955).....................7

Nate Carlisle, *Guv who removed anti-LDS decree is exiting politics,* The Salt Lake Tribune (Jan. 7, 2011) ....................................................................18

*Newspapers Call "Red" Attack on NAACP "Silly", "No-Nothingism"*, NAACP Press Release (Nov. 10, 1955) ........................................8

Numan V. Bartley, *The Rise of Massive Resistance: Race and Politics in the South During the 1950s* (1969)....................................................7, 8, 12

Paul Finkelman & Lance J. Sussman, *Defeating Antisemitism in the World's First Democratic Republic: The American Revolution*, 40 Touro L. Rev. 121 (2025) ...............................................................16

Robert Pfarr, *Callison Raps NAACP 'Rule,'* The Columbia Record (Dec. 12, 1955) .................................................................................8

Roger Daniels, *The Politics of Prejudice: The Anti-Japanese Movement in California and the Struggle for Japanese Exclusion* (1966) ............................................................................13

Sarah Imhoff, *Hoover's Judeo-Christians: Jews, Religion, and Communism in the Cold War*, in *The FBI and Religion: Faith and National Security Before and After 9/11* (eds. Sylvester A. Johnson and Steven Weitzman, 2016) ..................................................17

Walter F. Murphy, *The South Counterattacks: The Anti-NAACP Laws*, 12 W. Pol. Q. 371 (1959).............................................................6

Zinn Education Project, *May 15, 1956: Elloree 21 Refuse to Sign Anti-NAACP Teacher Oath*, https://www.zinnedproject.org/news/tdih/elloree-21/ (last visited July 7, 2026) .............................................................................9

v

<u>**STATEMENT OF THE IDENTITY AND INTEREST OF *AMICI*[1]**</u>

The NAACP Legal Defense and Educational Fund, Inc. ("LDF") is a nonprofit legal organization, founded in 1940 under the leadership of Thurgood Marshall, to advance racial justice and ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other communities of color. During the height of the Civil Rights Movement, LDF and its lawyers were accused of communist sympathies and connections and regularly attacked by southern state governments for advocacy and litigation dedicated to pursuing racial equality, leading to a number of Supreme Court decisions, including the landmark decision *NAACP v. Button*, 371 U.S. 415 (1963). LDF therefore intimately understands the importance of protecting the associational and other First Amendment rights of dissident organizations and marginalized groups.

The Fred T. Korematsu Center for Law and Equality ("Korematsu Center") is a nonprofit organization based at the UC Irvine School of Law.[2] Inspired by the legacy of Fred Korematsu, the Korematsu Center seeks to ensure that other groups

---

[1] Amici file this brief unopposed. *See* Fed. R. App. P. 29(a)(2). Amici conferred with the parties via email. Plaintiffs-Appellees consent and Defendant-Appellant takes no position.

No party's counsel authored the brief in whole or in part, and no entity or person aside from amici, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

[2] The Korematsu Center does not, in this brief or otherwise, represent the official views of the University of California, Irvine School of Law.

and individuals are not subjected to discriminatory treatment based on perceived disloyalty and association with foreign powers.

Amici LDF, the Korematsu Center, and ten additional nonprofit organizations[3] submit this brief because they have a significant interest in ensuring that organizations like the Council on American-Islamic Relations ("CAIR") are able to engage in litigation and advocacy and are otherwise able to pursue their work freely and without fear of reprisal from the government.

## STATEMENT OF THE ISSUES ADDRESSED BY *AMICI*

Whether the District Court's preliminary injunction prohibiting enforcement of Executive Order 25-244 should be affirmed because:

1. The Executive Order violates the First Amendment by targeting CAIR based on guilt-by-association reasoning that echoes the troubling history of state governments weaponizing security concerns to target disfavored civil rights organizations and minority groups.

2. The Executive Order violates the First Amendment by threatening to deprive third parties of government benefits in order to coerce them to disassociate from CAIR.

---

[3] *See* Appendix A.

## SUMMARY OF THE ARGUMENT

Executive Order 25-244, entitled "Protecting Floridians from Radical Islamic Terrorist Organizations" ("EO"), unfairly labels the Council on American-Islamic Relations ("CAIR")—the largest Muslim civil rights organization in the United States—as a security threat based on unsupported and Islamophobic claims. Specifically, the EO alleges that CAIR is a "cover" organization "founded by persons connected to the Muslim Brotherhood" to "conceal ties to Islamic extremist groups." EO at 2–3. The EO then purports to designate CAIR a "terrorist organization" and prohibits CAIR, as well as others who associate with CAIR, from receiving state funds. *Id.* at 3–4.

On March 4, 2026, the District Court granted CAIR's preliminary injunction motion, holding that the First Amendment bars Florida's Governor from coercing third parties, under the threat of losing government benefits, to disassociate from CAIR, "thereby closing avenues of expression and suppressing CAIR's protected speech." Doc. 43 ("Order") at 2. In so doing, the District Court noted that Florida was "continuing the troubling trend of using an executive office to make a political statement at the expense of others' constitutional rights." Order at 1–2.

As the District Court correctly recognized,[4] the EO is yet another unjust vestige of our nation's long history of state governments weaponizing their power to label dissident organizations and marginalized groups as security threats to chill and suppress their speech and other First Amendment-protected activity. For example, the EO mimics the strategies deployed by southern states to attack civil rights organizations like the NAACP and the NAACP Legal Defense and Educational Fund, Inc. ("LDF")[5] by accusing these civil rights organizations of being subversive and aligned with communist ideology—as a scare tactic—to impede their desegregation efforts in the wake of *Brown v. Board of Education*, 347 U.S. 483 (1954). Fixated on these civil rights organizations' alleged associations, states across the South exploited the legal system to hinder the NAACP and LDF's desegregation efforts, both by penalizing the organizations directly and by discouraging others from associating with them. Indeed, much of the First Amendment jurisprudence protecting the right of association, especially for marginalized political, social, and religious groups, was developed in the context of this history. *See First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S.

---

[4] Order at 28 ("It should be lost on no one that Defendant's EO targets one of America's largest Muslim civil rights organization [sic] for indirect suppression of speech. But, as we all know, it is easy for those in power to target minority groups with little pushback. Sadly, history teaches that it is often minority religious groups who find themselves in the crosshairs.").

[5] Founded by the NAACP in 1940, LDF has operated as a completely separate organization since 1957.

Ct. 1114, 1122 (2026) (tracing associational rights doctrine to *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)).

Moreover, the EO draws on discriminatory stereotypes that have long undergirded state government efforts targeting immigrants and religious minorities—who often are also people of color—based on their perceived associations with foreign actors. The EO invokes a nebulous threat emanating from abroad that renders members of a marginalized group—in this case, CAIR and the Muslim communities it serves—inherently foreign and threatening.

Finally, the First Amendment doctrines shaped by the United States' history of falsely demonizing certain groups as foreign security threats make clear that the EO is unconstitutional. Specifically, the EO infringes First Amendment rights in two distinct ways. *First*, on the front end, the EO relies on baseless allegations of CAIR's alleged associations with others as grounds for punishing CAIR and chilling its speech and protected activities while ignoring all evidence to the contrary. *Second*, on the back end, the EO impermissibly coerces third parties to stop associating with CAIR.

As the Supreme Court recently recognized in a unanimous decision, "associational rights carry special significance for political, social, religious, and other minorities." *First Choice*, 146 S. Ct. at 1122. After all, "[h]istory has amply proved the virtue of political activity by minority, dissident groups." *Button*, 371

U.S. at 431 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250–51 (1957)). Ultimately, the history of states targeting Asians, Catholics, and other immigrants and religious minorities, as well as Black civil rights activists and organizations, underlines why Florida's proffered rationales for the EO deserve no deference but rather the closest scrutiny. For the reasons herein, Amici respectfully urge this Court to affirm the District Court's preliminary injunction.

## ARGUMENT

I. **The EO Echoes Past Efforts by States to Attack Black Civil Rights Organizations and Label Them, as well as Immigrant and Religious Communities, as Security Threats.**

A. **State Attacks on Civil Rights Organizations for Purported "Subversion."**

Much of our current First Amendment jurisprudence regarding associational rights is a response to the onslaught of repressive actions by state governments against civil rights organizations like amicus LDF. Following the Supreme Court's decision in *Brown,* declaring racial segregation in public schools unconstitutional, white segregationists mobilized quickly to impede the work of the NAACP and LDF by utilizing "the political weapons to which they had access: the state legislative and executive branches, and even occasionally the state judiciary."[6] As LDF's former Director-Counsel, Jack Greenberg, recounted, "virtually every Southern state passed

---

[6] Walter F. Murphy, *The South Counterattacks: The Anti-NAACP Laws*, 12 W. Pol. Q. 371, 373 (1959).

laws and started legislative investigations, criminal prosecutions, suits for injunction, and disbarment proceedings against lawyers to put the NAACP and LDF out of business."[7]  The segregationists' war on the NAACP and LDF through state governments presented "the gravest overt threat to basic civil liberties during the 1950s,"[8] especially to the rights of speech and association guaranteed by the First Amendment.

Attacks on the NAACP and LDF often invoked dubious security concerns and were "facilitated by omnipresent segregationist accusations that the NAACP was a subversive organization infiltrated by, and perhaps even run by, Communists and other brands of radicals."[9]  Southern officials jumped on such claims to disparage the NAACP and LDF and hinder their goals to end segregation and make the Constitution's guarantees for Black people a reality.  In 1955, for example, Georgia's Attorney General accused the NAACP of "subversion" and asserted that the "association's real design was to 'force upon the South the Communist-inspired doctrine of racial integration and amalgamation.'"[10]  As several newspapers noted at the time, this "Red" attack on the NAACP was supported by "no evidence," but

---

[7] Jack Greenberg, *Crusaders in the Courts: How a Dedicated Band of Lawyers Fought for the Civil Rights Revolution* 217 (1994).

[8] Numan V. Bartley, *The Rise of Massive Resistance: Race and Politics in the South During the 1950s* 213 (1969).

[9] Christopher W. Schmidt, New York Times v. Sullivan *and the Legal Attack on the Civil Rights Movement*, 66 Ala. L. Rev. 293, 299 (2014).

[10] *N.A.A.C.P. Is Called Threat To Georgia,* N.Y. Times (Oct. 20, 1955), https://www.nytimes.com/1955/10/20/archives/naacp-is-called-threat-to-georgia.html.

was rather "99 per cent hysteria and demagogy and one per cent 'guilt by association.'"[11] Similarly, in South Carolina, officials threatened to "declare the NAACP both subversive and illegal,"[12] and stated that the NAACP was led by "meddlers" who were "playing directly into the hands of Communism."[13]

Invoking these claims, state governments implemented legal measures targeting the NAACP and LDF, as well as their members and supporters. One common practice was to obtain and publicize membership lists, a tactic designed to threaten the NAACP and deter its members and supporters by exposing them to threats of intimidation, violence, and economic harm.[14] In 1956, Alabama secured a temporary injunction in state court, restraining the NAACP from doing business in the state because "it had not registered as a foreign (out-of-state) corporation, had refused to produce its membership list, had fomented the Montgomery bus boycott, and had paid Autherine Lucy to enroll at the University of Alabama."[15] But in 1958, the Supreme Court found that the NAACP was constitutionally entitled to refuse to comply with the state court's order that had compelled it to reveal the names and

---

[11] *Newspapers Call "Red" Attack on NAACP "Silly", "No-Nothingism"*, NAACP Press Release (Nov. 10, 1955), https://www.coldcaserecords.gov/uploads/emmett-till/naacppressreleases.pdf.

[12] Howard H. Quint, *Profile in Black and White: A Frank Portrait of South Carolina* 86 (1958).

[13] Robert Pfarr, *Callison Raps NAACP 'Rule,'* The Columbia Record (Dec. 12, 1955), https://thestate.newspapers.com/image/745130951/.

[14] Bartley, *supra* note 8 at 218.

[15] Greenberg, *supra* note 7 at 218.

addresses of all its members and agents.  *Patterson*, 357 U.S. at 466.  The Court held that this compelled disclosure infringed the right to freedom of association of the NAACP and its members because it "affect[ed] adversely [their] ability . . . to pursue their collective effort to foster beliefs which they admittedly have the right to advocate."  *Id.* at 462–63.

In 1956, as part of South Carolina's campaign to "equat[e] the NAACP's desegregation aims" with a purported "communist conspiracy against the United States,"[16] state legislators enacted a law declaring that the NAACP had a "major objective [of] fomenting and nurturing . . . a bitter feeling of unrest, unhappiness and resentment among members of the Negro race with their status in the social and economic structure of the south."[17]  The law barred schools from employing members of the NAACP and authorized a requirement that teachers supply written oaths regarding their NAACP status.[18]  Similarly, in Arkansas, where a Committee of the Legislative Council found that the NAACP was a "captive of the international communist conspiracy," the state required those who promoted school desegregation

---

[16] Quint, *supra* note 12 at 87.

[17] Greenberg, *supra* note 7 at 218.

[18] *Id.*; *see* Zinn Education Project, *May 15, 1956: Elloree 21 Refuse to Sign Anti-NAACP Teacher Oath*, https://www.zinnedproject.org/news/tdih/elloree-21/ (last visited July 7, 2026) ("On May 15, 1956, 21 teachers at the Elloree Training School in Elloree, South Carolina refused to sign this oath and were subsequently fired.").

to register, keep records of their contributions, and report to a State Sovereignty Commission.[19]

Louisiana demanded that the NAACP comply with a 1924 statute—originally aimed at the Ku Klux Klan—that required submitting membership lists to the state, as well as another statute requiring the organization to file annual affidavits swearing that none of its officers were members of a "Communist, Communist-front or subversive organization." *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 294–96 (1961). The Supreme Court struck down both of those Louisiana statutes, reasoning that they constituted "regulatory measures which, no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights." *Id.* at 297.

The State of Florida was no exception to this trend. Legislative committees in Florida investigated the NAACP and LDF for alleged communist ties and demanded member lists as part of the process. One such committee was the Florida Legislative Investigation Committee—also called the "Johns Committee" after the committee chairman, Charley E. Johns, who was "a committed segregationist."[20] The Johns Committee was a formidable bulwark against integration, and the NAACP's Miami chapter became its "chief target . . . to prove Communist

---

[19] Greenberg, *supra* note 7 at 554–55 & n.219.
[20] Chanelle Rose, *The "Jewel" of the South?: Miami, Florida and the NAACP's Struggle for Civil Rights in America's Vacation Paradise*, 86 Fla. Hist. Q. 39, 62–63 (2007).

infiltration" of the NAACP.[21]  The Committee's mounting attacks on the Miami chapter's officials for their refusal to produce membership lists almost destroyed the chapter.[22]

In *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963), the Court again found that the Constitution protected the NAACP's refusal to comply with a state court order compelling it to produce membership records to the Johns Committee.  In doing so, the Court recognized that "[w]e cannot close our eyes to the fact that the militant Negro civil rights movement has engendered the intense resentment and opposition of the politically dominant white community." *Id.* at 557 (quoting *Button*, 371 U.S. at 435).  The Court therefore held that groups like the NAACP do not "automatically forfeit their rights to privacy of association simply because the general subject matter of the legislative inquiry is Communist subversion," no matter the State's interest in combating "Communist infiltration." *Id.* at 549.  The Court especially noted that the Committee "neither demonstrated nor pointed out any threat to the State by virtue of the existence of the N.A.A.C.P. or the pursuit of its activities." *Id.* at 555.  As the Court recognized, vindication of the NAACP's First Amendment rights was "all the more essential" because the organization was "espousing beliefs already unpopular with [its] neighbors," making

---

[21] *Id.* at 63.
[22] *Id.* at 67–68.

"the deterrent and 'chilling' effect" on the exercise of those rights "more immediate and substantial." *Id.* at 556–57.

Despite these important legal victories by the NAACP and LDF, the attacks on both organizations took a toll. The organizations were forced to divert significant resources to defend themselves and protect their members.[23] And while the organizations were able to continue much of their desegregation work, they were unable to operate in several states for significant periods, including an eight-year pause in Alabama.[24] Indeed, the pervasive intimidation by state actors caused the NAACP's membership in the Deep South to drop by more than half in two years— from over 90,000 in 1955 to around 40,000 in 1957.[25]

### B. State Labeling of Immigrants and Religious Minorities as Security Threats.

The EO does not only echo attacks against civil rights organizations' First Amendment rights. It also evokes a related but distinct historical trend: state governments' xenophobic branding of immigrants and religious minorities as security threats based on their perceived disloyalty and associations with foreign powers.

---

[23] Greenberg, *supra* note 7 at 217–21.
[24] Bartley, *supra* note 8 at 215; Greenberg, *supra* note 7 at 218; Schmidt, *supra* note 9 at 324–25.
[25] Greenberg, *supra* note 7 at 220–21.

A prime example of this trend is the historical targeting of Asian immigrants. Beginning in the nineteenth century, many states, especially on the West Coast, implemented legal measures based on fears of a "yellow peril"—a shadowy threat of a coming "Oriental invasion" that would overpower the West and the white race.[26] Anti-Asian politicians and the press popularized the belief that "peaceful immigrants were but a vanguard of an invading horde to come" at the behest of Asian powers.[27]

California attempted to address the perceived threat by restricting Chinese immigration—efforts thwarted when the U.S. Supreme Court held in *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875), that regulating immigration was solely the province of the federal government, depriving state governments of that authority. Immigration restrictionists in California then turned to the federal level.[28]  In 1882, Congress acted—and President Arthur signed—"An Act to execute certain treaty stipulations relating to Chinese," which forbade immigration by Chinese laborers. Chinese Exclusion Act, ch. 126, 22 Stat. 58 (1882).  The power of Congress to restrict immigration in this manner was upheld in *Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889) (finding that if the legislature "considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be

---

[26] Erika Lee, *The Making of Asian America: A History* 122–24 (2015); Roger Daniels, *The Politics of Prejudice: The Anti-Japanese Movement in California and the Struggle for Japanese Exclusion* 68–69 (1966).

[27] Daniels, *supra* note 26 at 68–69.

[28] Hyung-chan Kim, *A Legal History of Asian Americans*, *1790-1990* 55–62 (1994).

dangerous to its peace and security . . . its determination is conclusive upon the judiciary").

The Court's acceptance of a xenophobic, race-based rationale—under the guise of a security interest—emboldened states to advance similar rationales to justify discrimination, at least for matters within a state's traditional police powers. Rhetoric advancing discriminatory policies often invoked racial, cultural, and religious differences and characterized Asian immigrants as unassimilable and never able to become "American."[29]  For example, in 1913, California passed the first Alien Land Law that barred the purchase of land by "aliens ineligible for citizenship"—a euphemism for Asian immigrants forbidden by federal law from naturalizing as U.S. citizens on account of their race.  Directed primarily at Japanese immigrants who had purchased farms, these discriminatory laws spread to Washington, Colorado, Arizona, Texas, Oregon, and Idaho within a decade.[30]  In a set of cases decided in 1923, the Court upheld the discriminatory alien land laws enacted in Washington and California, accepting the rationale that aliens ineligible for citizenship could be considered a threat to the state's peace and security. *See Terrace v. Thompson*, 263 U.S. 197, 220–21 (1923) (upholding Washington's law and quoting, with approval, district court finding that "one who is not a citizen and

---

[29] Erika Lee, *America for Americans: A History of Xenophobia*, 75–79 (2019).
[30] Lee, *supra* note 26 at 132.

cannot become one lacks an interest in, and the power to effectually work for the welfare of, the state" and noting fear that "every foot of land within the state might pass to the ownership or possession of noncitizens" (citation omitted)); *Porterfield v. Webb*, 263 U.S. 225, 233 (1923) (upholding California's law based on reasoning in *Terrace*).

Marking Japanese and Japanese Americans as foreign and disloyal, state alien land laws "laid the ideological, legal and cultural foundation for the mass physical dispossession, evacuation and internment of Japanese and Japanese Americans on the West Coast in 1942."[31]  This racial guilt-by-association logic—institutionalized first at the state level—culminated in the incarceration of Japanese Americans during World War II.  As Justice Murphy argued in his dissent in *Korematsu v. United States*, the case in which the Court's majority upheld the U.S. military's internment order, assumptions of "racial guilt" rather than evidence of disloyalty underlay the military's order: "Individuals of Japanese ancestry are condemned because they are said to be 'a large, unassimilated, tightly knit racial group, bound to an enemy nation by strong ties of race, culture, custom and religion.'"  323 U.S. 214, 237 (1944).  In this atmosphere, ominous claims about "emperor worshipping ceremonies," dual

---

[31] Keith Aoki, *No Right to Own? The Early Twentieth-Century "Alien Land Laws" as a Prelude to Internment*, 40 B.C. L. Rev. 37, 66–68 (1998).

citizenship, and attendance at Japanese language schools were deemed sufficient substitutes for actual evidence of disloyalty. *Id.*

Similar fears of disloyalty and invasion also motivated state laws targeting religious minorities. During the founding of this nation, nine states required officeholders to be Christian, with five going further and barring Catholics from holding office.[32] This distrust persisted long after the nation's founding, with nativists in the nineteenth century calling for anti-Catholic measures on the ground that Catholics' allegiance to the Pope rendered them "Un-American."[33] The distrust of American Catholics' loyalty was so severe that John F. Kennedy expressly addressed, during his presidential campaign, "what was then called 'the Catholic Question' in American politics: could an adherent of the Roman Catholic religion be elected president of the United States?"[34]

Charges that religious minorities were of divided loyalty or otherwise threatened American security have also affected Jews, Mormons, Sikhs, Buddhists, and practitioners of Shinto during various points in U.S. history. For instance, in the mid-nineteenth century, multiple states and later the federal government took action

---

[32] Paul Finkelman & Lance J. Sussman, *Defeating Antisemitism in the World's First Democratic Republic: The American Revolution*, 40 Touro L. Rev. 121, 149–50 (2025).

[33] *See* John A. Scanlan, *American-Arab—Getting the Balance Wrong—Again!*, 52 Admin. L. Rev. 347, 357–58 (2000).

[34] Michael W. McConnell, *Is There Still a "Catholic Question" in America? Reflections on John F. Kennedy's Speech to the Houston Ministerial Association*, 86 Notre Dame L. Rev. 1635, 1636 (2011).

against Mormons based on doubts about their "allegiance."[35]  Among these actions was an executive order by the Governor of Missouri, known as the "Mormon Extermination Order," declaring that Mormons had "made war upon the people of this state" and ordering that they "be exterminated or driven from the state if necessary for the public peace."[36]  And during the Cold War, government agencies disproportionately investigated Jews on suspicion of communist sympathies.[37]

Over time, courts, legislatures, and the public have rightly disavowed such discriminatory measures, recognizing them as products of prejudice and contrary to the United States Constitution, as well as the constitutions of the various states.  For over a century, courts have rejected various local and state measures resulting from racial or religious animosity, oftentimes noting their conflict with federal policies.  In *Oyama v. California*, the Supreme Court invalidated a provision in California's Alien Land Law that discriminated against U.S. citizen children of Japanese immigrants as a violation of equal protection under the law based on their parents' national origin.  332 U.S. 633, 640 (1948).

The Supreme Court's decision led state courts, including California and Oregon, to nullify their alien land laws.  *See Namba v. McCourt*, 204 P.2d 569 (Or.

---

[35] David T. Smith, *Religious Persecution and Political Order in the United States* 44 (2015) (calling Mormonism "the most violently persecuted religion in American history").

[36] *Id*.

[37] Sarah Imhoff, *Hoover's Judeo-Christians: Jews, Religion, and Communism in the Cold War*, in *The FBI and Religion: Faith and National Security Before and After 9/11* 121, 124–26 (eds. Sylvester A. Johnson and Steven Weitzman, 2016).

1949); *Fujii v. State*, 242 P.2d 617 (Cal. 1952). Importantly, voters and state legislatures also rejected these laws. In fact, the California legislature awarded reparations to U.S. citizens whose land had been escheated, and voters repealed the alien land laws.[38] In 2018, Florida became the last state to repeal its alien land provision when voters approved a ballot measure stripping that language from its constitution.[39]

Measures that targeted religious minorities similarly have been condemned. In 1975, the Governor of Missouri formally rescinded the Mormon Extermination Order and expressed "deep regret for the injustice and undue suffering" it caused.[40] The Supreme Court likewise has recognized that past state efforts to restrict state funding for "sectarian" schools, a euphemism for Catholic schools, were "born of bigotry . . . at a time of pervasive hostility to the Catholic Church and to Catholics in general." *Espinoza v. Montana Dept. of Rev.*, 591 U.S. 464, 482 (2020) (quoting *Mitchell v. Helms*, 530 U.S. 793, 828–29 (2000) (plurality opinion)).

Yet, recent developments—including the EO at issue in this case— demonstrate the failure of state governments to fully heed the lessons of history. A

---

[38] Gabriel J. Chin & Anna Ratner, *The End of California's Anti-Asian Alien Land Law: A Case Study in Reparations and Transitional Justice*, 29 Asian Am. L. J. 17, 31–32 (2022).

[39] Elizabeth Koh & Samantha J. Gross, *Here's How Floridians Voted on the 12 Constitutional Amendments*, Miami Herald, Nov. 7, 2018; *The Last Alien Land Law*, Densho Encyclopedia (Feb. 7, 2018).

[40] Nate Carlisle, *Guv who removed anti-LDS decree is exiting politics,* The Salt Lake Tribune (Jan. 7, 2011).

new wave of discriminatory noncitizen land ownership bans, often targeted at Chinese people, resurrects stereotypes of "their perceived inability to assimilate, thus maintaining their treatment as perpetual 'aliens' or 'agents' of their national governments."[41]    In addition, while the Supreme Court has recognized the *Korematsu* decision as "gravely wrong" and "overruled in the court of history," *Trump v. Hawaii*, 585 U.S. 667, 710 (2018), new restrictions like the one challenged here continue to rely on racialized, guilt-by-association reasoning to brand immigrants and religious minorities—and civil rights groups advocating for them— as national security threats.

## II.   The EO Repeats the Transgressions of the Past and Violates the First Amendment by Suppressing CAIR's Rights to Free Association.

Like attacks on civil rights organizations, including the NAACP and amicus LDF during the Civil Rights Movement, the EO accuses CAIR of being a dangerous front group to justify imposing severe, chilling sanctions on the organization and those who associate with it.  As with state measures that targeted immigrants and religious minorities in the past, the EO relies on an unfounded fear of a religious minority's purported connections to foreign actors.[42]  As the case law shaped by similar accusations in the past makes clear, the Constitution forbids such measures.

---

[41] Donna Doan Anderson & Joanna YangQing Derman, *Alien-ating Asians in 21st-Century Land Laws*, Just Security, Feb. 13, 2026 (describing new state and federal measures seeking to restrict purchase of farmland for individuals domiciled in selected nations, especially China).

[42] EO at 1–2 (alleging connections to, *inter alia*, "the Muslim Brotherhood," "Islamist ideology," "Hamas," "Hezbollah," "the Palestine Committee," and "other Palestinian groups").

"Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Button*, 371 U.S. at 431 (quoting *Sweezy*, 354 U.S. at 250–51 (1957)). For that reason, "actions tending to 'curtai[l] the freedom to associate' warrant 'the closest scrutiny' under the First Amendment." *First Choice,* 146 S. Ct. at 1122 (quoting *Patterson*, 357 U.S. at 460–61 (alteration in original)). The EO employs two forms of guilt-by-association reasoning in violation of the First Amendment.

A. **Allegations of CAIR's Attenuated Associations with Disfavored Actors as Pretext for Punishment.**

To justify the EO, the State impermissibly relies entirely on CAIR's alleged connections to other organizations and individuals. The State does not deny targeting CAIR based on its alleged associations with others. To the contrary, it asserts that "when it comes to terrorism, association is worthy of guilt." Brief of Appellants at 18. Not so under the First Amendment. As the District Court correctly recognized, the State's "strained guilt-by-association theory" cannot "justif[y] singling out and de-platforming one of America's largest Muslim civil rights organizations." Order at 22 n.14.

The First Amendment "restrict[s] the ability of the State to impose liability on an individual solely because of his association with another." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918–19 (1982). This applies even if the individual formally "belong[s] to a group, some members of which committed acts of

violence." *Id.* at 920. Under the First Amendment, a government must show not merely that the individual joined such a group, but that "the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.*

The Court first articulated these principles in *Scales v. United States*, 367 U.S. 203 (1961), and *Noto v. United States*, 367 U.S. 290 (1961), which are companion cases involving charges brought under anti-communist criminal statutes. As those rulings make clear, the First Amendment does not permit punishing anyone for associating with an organization—even if that organization has, in fact, engaged in illegal activity—if there is not "clear proof that a defendant 'specifically intend[s] to accomplish [the aims of the organization].'" *Scales*, 367 U.S. at 229 (quoting *Noto*, 367 U.S. at 299 (alterations in original)).

The Court affirmed those First Amendment principles in *Claiborne Hardware*, holding that Mississippi could not impose liability on those who organized and participated in boycotts during the Civil Rights Movement based on allegations that some participants in those boycotts engaged in violence. 458 U.S. at 918–20. The Court held that, "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920.

These same First Amendment principles also bar burdening an *organization's* speech based solely on that organization's association with others. In *Healy v. James*, 408 U.S. 169 (1972), a state university refused to recognize a local chapter of Students for a Democratic Society ("SDS") as a campus organization because of its alleged affiliation with the national SDS, which had a reputation for campus disruption via unlawful action. 408 U.S. at 185–86. The Court held that this alleged affiliation was too attenuated to justify the university's refusal: "The government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *Id.* at 186. The state university had not met that burden, the Court held, because the local SDS chapter claimed "independence" from the national SDS and that it "shared only some of the beliefs [national SDS] leaders have expressed." *Id.* at 186–87. The Court found that, despite the presumable affinity between a national organization and its local chapter, that relationship still was "not an adequate ground" for refusing to recognize the local chapter as a campus organization. *Id.*

There is no terrorism exception to the First Amendment's prohibition on guilt by association. In *Holder v. Humanitarian Law Project*, the Court rejected a freedom-of-association challenge to a federal statute because "the statute does not penalize *mere association* with a foreign terrorist organization," nor even "vigorously promoting and supporting the political goals of the group," but rather

22

"the act of giving material support." 561 U.S. 1, 35 (2010) (emphasis added). The Court's holding, which requires—at a minimum—"material support," is patently at odds with the State's assertion in this case that "when it comes to terrorism, association"—alone—"is worthy of guilt." Brief of Appellants at 18. *Holder* makes clear that the First Amendment requires far more than "mere association." *Cf. Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (applying ordinary aiding-and-abetting principles to reject Twitter's culpability for terrorist attacks when terrorist groups used Twitter's services to recruit members).

The State's "strained guilt-by-association theory" to indict CAIR offends not only the First Amendment but also basic principles of corporate independence and separateness. Putting aside the State's failure to differentiate between CAIR's national and local chapters (a failure *Healy* condemned), the EO makes grave allegations about CAIR based solely on the alleged conduct of other people and groups, not CAIR the organization. The State alleges, for example, that two individuals who helped found CAIR are also associated with other groups, and points to the personal conduct of a few individuals who were at some point employed by CAIR. However, CAIR, as an organization, is "distinct" from any of those

individuals and organizations, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001), and has repeatedly denounced terrorism.[43]

The State's flawed reasoning is reminiscent of past accusations that the NAACP and LDF were communist front groups. Such charges were leveled to discredit and obstruct the organizations' desegregation efforts. Likewise, here, the EO targets CAIR by alleging that it is a "cover" for "Islamic extremist groups," EO at 2, and on that basis "publicly designat[es CAIR] a terrorist organization from Florida's bully pulpit." Order at 9. Notably, however, the State does not point to anything that CAIR has actually said or done and ignores the substance of CAIR's actual work promoting civil rights for Muslims in America. The State conveniently overlooks that reality in favor of a fabricated and prejudiced, connect-the-dots attempt to discredit CAIR by linking the organization to individuals and other organizations that, in turn, are allegedly linked to terrorism.

**B.      EO's Coercion of Third Parties Not to Associate with CAIR.**

After improperly using purported guilt-by-association reasoning to justify targeting CAIR, the EO compounds the constitutional violation by deterring third parties from associating with CAIR. The Supreme Court has repeatedly rejected this tactic, which risks silencing advocacy organizations.

---

[43] *See CAIR's Condemnation of Terrorism,* CAIR, https://www.cair.com/about_cair/cairs-condemnation-of-terrorism/ (last visited July 7, 2026) ("CAIR condemns terrorism whenever it happens, wherever it happens, whoever commits it.").

As discussed above, *see supra* Part I.A, the Supreme Court has held that requiring an advocacy organization to disclose membership or donor lists violates the First Amendment because it discourages others from associating with that organization. *See Patterson*, 357 U.S. at 460–62 (invalidating Alabama law requiring membership disclosure); *Bates v. Little Rock*, 361 U.S. 516 (1960) (same for Arkansas); *Gibson*, 372 U.S. at 557–58 (same for Florida); *see also Shelton v. Tucker*, 364 U.S. 479 (1960) (invalidating Arkansas law requiring teachers to disclose organizational memberships). As the Court has explained, compelled disclosure "may induce members to withdraw from [an organization] and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *Patterson*, 357 U.S. at 463. The Court has repeatedly reaffirmed those holdings, including a recent unanimous decision this Term. *First Choice,* 146 S. Ct. at 1125 (holding that religious nonprofit organization suffered injury-in-fact from state subpoena for donor records); *see also Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 606, 618–19 (2021) (invalidating California requirement that charities disclose identities of major donors).

The EO makes explicit that those who associate with CAIR face a "risk of harassment and reprisals." *First Choice,* 146 S. Ct. at 1130. That is because the EO expressly denies state benefits to entities that "provided material support or

25

resources to" CAIR. EO at 4. Third parties will naturally decline to associate with CAIR to avoid the significant economic consequences and the stigma of associating with an organization that the State has labeled a terrorist organization. CAIR has submitted evidence that at least two entities have, "in a predictable manner," already dissociated from CAIR for those very reasons. Order at 6–8. In short, the EO makes a direct coercive "'threat of invoking legal sanctions . . . to achieve the suppression' of disfavored speech." *National Rifle Association of America v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). For that reason, the EO violates the First Amendment rights both of CAIR and of third parties who would associate with it. *See Vullo*, 602 U.S. at 190 ("[A] government official cannot do indirectly what she is barred from doing directly.").

## CONCLUSION

As the Supreme Court has recognized, and as history has proven, "all of society" benefits when "political, social, religious, and other minorities" are able to exercise their "freedom to associate." *First Choice*, 146 S. Ct. at 1122. "[T]ake that freedom away" and we will all be "poorer for it." *Id.* The EO ignores these lessons and repeats the mistakes of history in ways that violate the constitutional doctrines those historical struggles forged. The EO violates the First Amendment rights not only of CAIR but also of those who would associate with it. And if allowed to stand, the EO would set a dangerous precedent affecting many others. For those reasons

26

and for the other reasons set forth in this brief, Amici respectfully urge this Court to affirm the District Court's preliminary injunction.

Dated: July 9, 2026

Respectfully submitted,

<u>/s/ *Katie Townsend*</u>

KATIE TOWNSEND
*Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071

HASSAAN SHAHAWY
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW,
Washington, DC 20036

AVATARA A. SMITH-CARRINGTON
KACEY MORDECAI
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

ROBERT S. CHANG
FRED T. KOREMATSU CENTER
FOR LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Suite 100
Irvine, CA 92697
(949) 824-3034

SHIRIN SINNAR
WILLIAM W. AND GERTRUDE H.
SAUNDERS PROFESSOR OF LAW
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-0613

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(5), I hereby certify that the foregoing Brief contains 6,395 words exclusive of the items listed in Fed. R. App. P. 32(f).  This brief has been prepared using a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, consistent with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6).

Dated: July 9, 2026

/s/ *Katie Townsend*
Katie Townsend

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 9, 2026, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

/s/ *Katie Townsend*
Katie Townsend

*Counsel for Amici Curiae*

# APPENDIX A

## INTERESTS OF TEN ADDITIONAL *AMICI*

The **American-Arab Anti-Discrimination Committee (ADC)**, founded in 1980, is a nonpartisan, nonprofit civil rights organization committed to defending the civil and constitutional rights of Americans, with a focus on issues affecting the Arab-American community. ADC has a longstanding interest in opposing government actions that penalize protected political expression, infringing upon First Amendment rights. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995), *vacated on other grounds*, 525 U.S. 471 (1999). That mission encompasses efforts to challenge government attempts to impose legal or political penalties on organizations based on their protected advocacy or associations.

The **Arab American Institute (AAI)** is a national nonprofit civil rights organization dedicated to promoting the civic and political empowerment of Arab Americans and protecting civil rights and liberties for all. For decades, AAI has worked to combat discrimination against Arab Americans, defend constitutional protections for free speech and association, and advocate for public policies that uphold equal treatment under the law—all in the furtherance of an inclusive democracy. AAI has a substantial interest in this case because it has firsthand experience with the ways government actions and national security rhetoric can chill

protected advocacy, stigmatize entire communities, and discourage individuals and institutions from exercising their First Amendment rights.  Throughout its history, AAI has documented and responded to policies that have disproportionately burdened Arab American communities through political targeting, and unfounded allegations linking protected advocacy on the issue of Palestinian human rights to national security threats.  The issues presented in this appeal therefore extend beyond the parties before the Court.  The constitutional protections for speech and association at stake are essential to ensuring that civil rights organizations may advocate on behalf of their communities without fear of government retaliation or official efforts to deter others from engaging with them.  AAI submits this brief to assist the Court in understanding the broader civil rights implications of the Executive Order and to support the protection of the First Amendment principles that safeguard organizations, the communities they serve, and our democracy.

**Asian Americans Advancing Justice ("Advancing Justice-AAJC")** is a nonprofit, nonpartisan organization that seeks to create an equitable society for all. Advancing Justice-AAJC works to further civil and human rights and empower Asian American communities through organization, education, advocacy, and litigation.  Advancing Justice-AAJC is a leading expert on issues of importance to the Asian American community, including immigrant rights, racial profiling, and national security.

**Asian Law Caucus (ALC)** was founded in 1972 as the nation's first legal and civil rights organization serving low-income, immigrant, and underserved Asian American and Pacific Islander communities. The organization continues to advocate for Asian, Pacific Islander, Arab, Middle Eastern, Muslim, South Asian, and other immigrants across a range of issues, including Immigrant Justice, Housing Rights, Workers' Rights, and Democracy and National Initiatives. Through community outreach and engagement, policy advocacy and narrative change, and direct legal services and impact litigation, ALC works to advance civil rights that empower its client communities and to promote a fair and equitable society for all. ALC routinely files briefs as *amicus curiae* on behalf of the communities it represents.

**GLBTQ Legal Advocates & Defenders (GLAD Law)** is a legal rights organization that seeks equality for all persons under the law regardless of their sexual orientation, transgender status, or HIV status. Since 1978, GLAD Law has worked nationally through strategic litigation, public policy advocacy, and education.

The **Japanese American Citizens League ("JACL")** is a national nonprofit organization that exists to advance the civil and human rights of all Americans affected by injustice and bigotry, while also promoting cultural, educational, and social values and preserving the heritage and legacy of the Japanese American community. Since its founding in 1929, JACL has fought prejudice and bigotry

A-3

against Japanese Americans and other marginalized communities.  During World War II, Japanese Americans were denied constitutional rights, stripped of their property and sources of livelihood, and incarcerated by the United States for no reason other than their ethnicity.  Through JACL and other groups, those who were wrongfully forced into American concentration camps obtained redress, but the enduring legacy of discrimination against Japanese Americans remains an issue.  JACL knows the lasting harm caused by discrimination.  Thus, JACL has an important interest in supporting organizations like CAIR, which similarly seeks to advance the civil and human rights of Americans affected by injustice and bigotry.

The mission of **LatinoJustice PRLDEF**, founded in 1972, is to use and challenge laws to create a more just and equitable society, transform harmful systems, empower Latino communities, fight for racial justice, and grow the next generation of leaders.  For over fifty years, LatinoJustice has litigated landmark cases and advanced policy reforms in areas of practice including immigrants' rights, voting, and economic justice.  LatinoJustice has filed and participated in hundreds of briefs in support of bedrock constitutional principles, including *Trump v. Barbara*, 609 U.S. __ (2026) and *Pernell v. Florida Board of Governors of State University*, 84 F.4th 1339 (11th Cir. 2023).

**Muslim Advocates**, a national legal advocacy and educational organization, works at the frontlines of civil rights to guarantee freedom of speech and association

for Americans of all faiths.  The issues at stake in this case directly relate to Muslim Advocates' work to protect the freedom to dissent and the right to freely associate, as well as its work to fight institutional and religious discrimination against Muslims and other marginalized communities.

The **Muslim Public Affairs Council (MPAC)** is a national nonprofit, nonpartisan organization founded in 1988 and dedicated to improving public understanding and policies that impact American Muslims by engaging government, media, and communities.  For nearly four decades, MPAC has worked at the intersection of civil rights, constitutional law, and Muslim civic life advocating before Congress, advising the executive branch, monitoring anti-Muslim legislation in 27+ states, and defending the First Amendment rights of American Muslims in courts of public opinion and law alike.  MPAC has a direct and substantial interest in the outcome of this appeal.  The Executive Order at issue is not an isolated act.  It is part of a broader legislative and executive campaign to designate American Muslim civil society organizations as threats, strip them of government participation, and silence the communities they serve.  MPAC files this statement to ensure the Court understands the full constitutional stakes of affirming the District Court's well-reasoned preliminary injunction.

**The Sikh Coalition** is a nonprofit and nonpartisan civil rights organization dedicated to ensuring that members of the Sikh community in America are able to

practice their faith without fear of discrimination or backlash.  It defends the civil rights and civil liberties of Sikhs by providing direct legal services and advocating for legislative change, educating the public about Sikhs and Sikhi, and fostering civic engagement.