No. 26-10735

# In the United States Court of Appeals
# for the Eleventh Circuit

CAIR FOUNDATION, ET AL.,
*Plaintiffs-Appellees,*

V.

RONALD DESANTIS, GOVERNOR, STATE OF FLORIDA,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:25-cv-516-MW

## REPLY BRIEF ON APPEAL

JAMES UTHMEIER
 *Attorney General*

RYAN D. NEWMAN
 *Chief Deputy Attorney General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
david.dewhirst@myfloridalegal.com
jenna.hodges@myfloridalegal.com

July 23, 2026

DAVID M.S. DEWHIRST
 *Solicitor General*

JEFFREY PAUL DESOUSA
JASON J. MUEHLHOFF
 *Chief Deputy Solicitors General*

TYLER E. GUSTAFSON
 *Assistant Solicitor General*

*Counsel for Governor Ron DeSantis*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................iv

INTRODUCTION ........................................................................................ 1

ARGUMENT .............................................................................................. 3

I.  CAIR is unlikely to show standing because any injury is
    not traceable to the EO. ............................................................... 3

    A.  CAIR has not even attempted to show that any
        third parties that cut ties with it did so because
        they feared the legal effects of the EO. ................................... 3

    B.  The district court properly declined to credit
        CAIR's theories of economic harm. ........................................ 8

II. CAIR is still unlikely to succeed on the merits of its First
    Amendment coercion claim. ........................................................ 10

    A.  CAIR cannot salvage the district court's failure to
        engage with the Governor's evidence of terrorism. .............. 11

    B.  CAIR cannot undermine the anti-terrorism
        rationale behind the EO. ....................................................... 17

III. CAIR's alternative First Amendment theories also fail. ............... 20

    A.  The Executive Order did not discriminate against
        CAIR's viewpoint. .................................................................. 20

    B.  The EO does not infringe on CAIR's right to
        association. ............................................................................ 22

IV. The case should be reassigned on remand. ................................. 25

CONCLUSION .......................................................................................... 32

CERTIFICATE OF COMPLIANCE ...................................................... 33

CERTIFICATE OF SERVICE.............................................................33

**Cases**

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ......................................................................15

*Belue v. Leventhal,*
  640 F.3d 567 (4th Cir. 2011) .......................................................30

*Bennett v. Spear,*
  520 U.S. 154 (1997) ......................................................................6

*Boim v. Quranic Literacy Inst. & Holy Land Found.,*
  91 F.3d 1000, 1026 (7th Cir. 2002) .......................................23, 24

*CBS Broad., Inc. v. EchoStar Comm'ns Corp.,*
  265 F.3d 1193 (11th Cir. 2001) ...................................................12

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................................4, 6

*Cobell v. Kempthorne,*
  455 F.3d 317 (D.C. Cir. 2006).....................................................30

*Bank of U.S. v. Dandridge,*
  25 U.S. 64 (1827) ........................................................................18

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019) ...................................................................6, 9

*Detroit Free Press v. Ashcroft,*
  303 F.3d 681 (6th Cir. 2002) .......................................................19

*First Choice Women's Res. Ctrs., Inc. v. Davenport,*
  146 S. Ct. 1114 (2026) ..................................................................7

*Florida State Conference of NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) .................................................9, 10

*Gerhart v. Barnes,*
  724 F. App'x 316 (5th Cir. 2018) .................................................26

*Harbourside Place, LLC v. Town of Jupiter,*
  958 F.3d 1308 (11th Cir. 2020) ...................................................21

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) .....................................................................10

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
  572 U.S. 559 (2014) .....................................................................13

*Holder v. Humanitarian L. Project,*
561 U.S. 1 (2010) ................................................................. passim
*Holy Land Found. for Relief & Dev. v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003)................................. 15, 21, 25
*Illoominate Media, Inc. v. CAIR Florida, Inc.,*
No. 9:19-cv-81179, 2026 WL 1458489 (S.D. Fla. Jan. 29, 2026) .......8, 9
*In re Gateway Radiology Consultants, P.A.,*
983 F.3d 1239 (11th Cir. 2020) .........................................25
*Islamic Am. Relief Agency v. Gonzales,*
477 F.3d 728 (D.C. Cir. 2007)......................................... 10, 21
*Jacobson v. Massachusetts,*
197 U.S. 11 (1905) ........................................................ 11, 18
*Janki Bai Sahu v. Union Carbide Corp.,*
528 F. App'x 96 (2d Cir. 2013).........................................26
*Johnson v. Sawyer,*
120 F.3d 1307 (5th Cir. 1997) ..........................................32
*Knowlton v. City of Wauwatosa,*
119 F.4th 507 (7th Cir. 2024) ...........................................19
*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,*
51 F.3d 982 (11th Cir. 1995) .............................................12
*Liteky v. United States,*
510 U.S. 540 (1994) .........................................................30
*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001) .........................................................20
*Miller v. Sam Houston State Univ.,*
986 F.3d 880 (5th Cir. 2021) .............................................28
*Moon v. Med. Tech. Assocs., Inc.,*
577 F. App'x 934 (11th Cir. Aug. 18, 2014)........................12
*Nat'l Assoc. for Adv. of Colored People v. Button*
371 U.S. 415 (1963) .........................................................24
*Nat'l Rifle Assoc. of Am. v. Vullo,*
602 U.S. 175 (2024) ...................................................... 10, 15
*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.,*
*Fla. Dep't of Health,*
50 F.4th 1126 (11th Cir. 2022).........................................21
*O'Rourke v. City of Norman,*
875 F.2d 1465 (10th Cir. 1989) ........................................27

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ..........................................................................10
*Sentis Grp., Inc., Coral Grp., Inc. v. Shell Oil Co*,
  559 F.3d 888 (8th Cir. 2009) ..........................................................30
*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ..........................................................................21
*St. Michael Press Pub. Co. v. One Unknown Wreck*,
  610 F. App'x 940 (11th Cir. 2015) ..................................................20
*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025) ............................................................................21
*United States v. Allen*,
  114 F.3d 1196 (Table), 1997 WL 289446 (9th Cir. 1997) ..............29, 32
*United States v. Chandia*,
  514 F.3d 365 (4th Cir. 2008) ..........................................................23
*United States v. Cota-Luna*,
  891 F.3d 639 (6th Cir. 2018) ............................................................2
*United States v. Gupta*,
  572 F.3d 878 (11th Cir. 2009) ...................................................26, 27
*United States v. Holy Land Found. for Relief & Dev.*,
  624 F.3d 685 (5th Cir. 2010) ......................................................13, 14
*United States v. Holy Land Found. for Relief & Dev.*,
  No. 3:04-cv-240, 2009 WL 10680203 (N.D. Tex. July 1, 2009) ............14
*United States v. Padilla*,
  186 F.3d 136 (2d Cir. 1999) ............................................................29
*United States v. Slinkard*,
  61 F.4th 1290 (10th Cir. 2023) ........................................................29
*United States v. Swenson*,
  894 F.3d 677 (5th Cir. 2018) ..........................................................29
*United States v. Torkington*,
  874 F.2d 1441 (11th Cir. 1989) ......................................26, 28, 29, 31
*United States v. White*,
  846 F.2d 678 (11th Cir. 1988) ........................................................25
*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ..........................................................................6
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................18

**Rules**

Fed. R. App. P. 28(a)(8)(A) ..................................................................20

# INTRODUCTION

Governor Ron DeSantis designated CAIR as a terrorist organization. He did so based on a wealth of evidence documenting CAIR's long-standing connections to undisputed terror organizations, and CAIR did not dispute those factual assertions below. That should have been fatal to CAIR's preliminary injunction, but the district court saved CAIR's motion by dismissing the Governor's evidence as "mere *ipse dixit*." Order at 17–18. The Governor, however, did not merely say so himself; he relied upon numerous academic and judicial authorities to conclude that CAIR was in fact a terrorist organization.

The district court's refusal to engage with the evidence infects its legal analysis and warrants reversal. CAIR strives to save this error by claiming that the district court did, in fact, weigh evidence, but that is, ironically, mere *ipse dixit*. Recognizing the weaknesses of the Order, CAIR recycles numerous theories not addressed in the Order as grounds for alternative affirmance. But no theory can undermine an Executive Order ("EO") that was founded on significant evidence, based on CAIR's

conduct and organizational structure, and narrowly tailored to focus on State money and benefits.

That leaves reassignment. The Governor litigated this case in front of Judge Walker with the expectation that he would be fair and impartial. He was not. The Order is littered with personal attacks and insults against the Governor wholly unrelated to the case. The public noticed. *See, e.g.*, Stephany Matat, *DeSantis appeals judge's order on Muslim group 'terrorist' designation*, Tallahassee Democrat (noting Judge Walker "didn't spare any criticism of the governor"), https://perma.cc/3RWU-X33W (Apr. 21, 2026, 7:15 PM). "Reassignment therefore is warranted to maintain the integrity of our judicial system and to ensure that these cases are heard by a judge whose impartiality cannot reasonably be questioned." *United States v. Cota-Luna*, 891 F.3d 639, 650–51 (6th Cir. 2018). At the bare minimum, any reasonable observer would question Judge Walker's impartiality. Reassignment may be strong medicine, but here, it's the only cure.

# ARGUMENT

## I. CAIR is unlikely to show standing because any injury is not traceable to the EO.

CAIR has not demonstrated that it has Article III standing. The district court found standing based on its conclusion that CAIR has suffered injury in fact because various third parties have disassociated from CAIR. But CAIR has not proved that the EO *itself* caused those disassociations. To bolster its case, CAIR now also relies on a theory the district court did not credit: lost income and diversion of resources. That argument is similarly unavailing.

### A. CAIR has not even attempted to show that any third parties that cut ties with it did so because they feared the legal effects of the EO.

An executive order cannot "injure" a party in the abstract; it has effect only to the extent that a party falls within the ambit of the order and thus is subject to regulation by the enforcing agency. CAIR brought a First Amendment coercion claim: the idea being that the EO coerced third parties into punishing CAIR for its speech. *See* Ans. Br. 28–31. But the EO's effects are felt only when a third party has state contracts or receives state benefits that the enforcing agency might potentially with-

hold at the Governor's instruction. That, after all, is the EO's sole enforcement mechanism. *See* EO at 3–4 (DE21-1) (instructing "all other Executive and Cabinet Agencies" to "prevent any terrorist organization . . . or any person known to have provided material support or resources to such organization . . . from receiving any contract, employment, funds, or other benefit or privilege from any such Executive or Cabinet Agency"). Short of that, the EO lacks any coercive power.

CAIR could therefore establish traceability only by showing that any third parties that severed their relationships with CAIR did so *because* they were subject to that enforcement mechanism—in other words, because those third parties stood to lose out on government contracts or benefits. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) (speculation does not "satisfy the fairly traceable requirement" (quotation marks omitted)). Yet CAIR never even *alleged*, let alone proved, that fact. *See* Init. Br. 21–23; *see also* Amicus Br. of Am. First Legal Found., CA11-DE28, at 3 (CAIR "must show that the government's conduct *procured* the third party's responsive action—not merely that the third party acted in temporal proximity to the government action.").

CAIR does not meaningfully address this defect. It simply argues that "third parties reasonably fear that any connection with CAIR will incur both official and unofficial penalties," and thus that "CAIR's speech" will be "suppress[ed]." Ans. Br. 19. But again, CAIR did not allege that any of its third-party associates feared "official" penalties: the loss of government benefits. That's the whole traceability problem. It is therefore irrelevant that a "production company withdrew" from a contract to create a "podcast" with CAIR, since any such injury could be traced back to the EO only if the production company feared the loss of government contracts or benefits. Same with the "[m]osques" and the "South Florida Muslim Federation," none of which cited the potential loss of government contracts or benefits as the basis for their disassociation from CAIR. Ans. Br. 19–20.

On this record, the EO didn't apply to any of those groups: those organizations did not "receiv[e] any contract, employment, funds, or other benefit or privilege." EO at 4. So the EO could not have "coerced" them into disassociating from CAIR.

CAIR responds by attempting to split hairs: "this case is not about whether the Executive Order restricts third parties from receiving public

benefits; it is about whether the Executive Order objectively chills third parties from associating with CAIR." Ans. Br. 22. But those two are indistinguishable. Under the relevant traceability standards, the EO can *objectively chill* a third party's association with CAIR only by *restricting* that third party *from receiving public benefits*. *Clapper*, 568 U.S. at 410; *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("A threatened injury must be certainly impending." (cleaned up)).

Lacking any record to prove true coercion, CAIR pivots to "*unfounded* fears by third parties," Ans. Br. 21 (emphasis added)—presumably, a third party's irrational fear that the State will somehow punish it for associating with CAIR in a manner that itself does not implicate the EO. But Article III standing doesn't stretch that far. Rather, the Supreme Court has maintained that injuries are not traceable when they are "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *see also Clapper*, 568 U.S. at 414.

Indeed, the causal chain remains intact only when third party behavior reflects the "*predictable* effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768

6

(2019) (emphasis added). And while courts may of course "make 'commonsense inferences'" when evaluating standing, Ans. Br. 21, there is nothing "commonsense" or "predictable" about the inference that third parties will react (at all) to an executive order to which they are not subject. If CAIR wished to rely on this theory of standing, it bore the obligation to show that these third parties were implicated by the EO. It failed to do so.

Finally, CAIR claims that the EO "intimates that providing material support to CAIR is, itself, a crime under Florida law." Ans. Br. 22 (citation omitted). Whether or not that is true, it is immaterial. An EO's "intimat[ion]" has no force of law and issues no official directive to a state agency. And that theory of standing also fails the redressability prong, because an injunction barring the enforcement of the EO would not stop state agencies from independently concluding that providing material support to CAIR is criminal.[1]

---

[1] CAIR claims that because the Governor addressed redressability in a footnote, he waived that argument. Ans. Br. 24. Not so. The Governor's redressability argument tackled the district court's conclusions about redressability both above and below the line. *See* Init. Br. 22–23.

**B. The district court properly declined to credit CAIR's theories of economic harm.**

CAIR also retreads a basis for standing that the district court declined to reach: that "soon after" the EO, "CAIR's income decreased after a debtor withheld payments." Ans. Br. 25. Calling that a "likely-to-be-repeated incident," CAIR invokes "economic harm" as an alternative injury in fact. *Id.* at 26. Adding to that, it cites a need to "divert organizational resources away from its ordinary programming" to address the EO instead. *Id.*

There is nothing to CAIR's lost-income claim. That income was the alleged loss of attorneys' fees and costs in an unrelated case where CAIR's debtor, an opposing party in litigation, invoked the EO as a ground for not making its payments. *See* DE24 at 11–12. But the court in that other case has already ruled in CAIR's favor and required continued payments. *See* Order on Defendant's Motion to Stay, *Illoominate Media, Inc. v. CAIR Florida, Inc.*, No. 9:19-cv-81179-RAR, 2026 WL 1458489 at *2 (S.D. Fla. Jan. 29, 2026). That a litigant seized on the EO as a basis to forego its legal obligations is not a "predictable effect of Government action on the

decisions of third parties." *Dep't of Commerce*, 588 U.S. at 768.[2] And that unusual situation is unlikely to recur, anyways.

As for diversion of resources, CAIR alleged below only the most minimal interference with its "ordinary programming." Ans. Br. 26. In a declaration, CAIR asserted that it "divert[ed] staff attention" from its "ordinary programming" to "respond to inquiries from the media and partner organizations and to address issues arising from the designation." DE24-2 at ¶ 32. Unsurprisingly, the district court ignored this theory. Unlike in the case that CAIR cites—*Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)—CAIR failed to offer any facts showing that it would "expend many more hours than it otherwise would have" on tasks outside its typical activities. *Id.* at 1166. In *Browning*, by contrast, the challenged government action meant that

---

[2] The order in *Illoominate Media* also underscores why CAIR lacks standing on its first theory above—disassociation by third parties. The *Illoominate* plaintiff would not suffer any irreparable harm because the only "harm" the EO might conceivably cause is the "deni[al]" of "government contracts or benefits." *Illoominate Media*, 2026 WL 1458489, at *2. But the plaintiff had "not offered any evidence that they are seeking . . . government contracts or benefits that could fall under the Executive Order." *Id.*

the organization "would divert *substantial resources* away from" those typical tasks. *Id.* (emphasis added); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (standing based on diversion of "significant resources").

## II. CAIR is still unlikely to succeed on the merits of its First Amendment coercion claim.

To sustain such a coercion claim, plaintiffs must show that the government lacked the authority to regulate the speech directly. *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 190–91 (2024).

CAIR fails to establish this requirement. The EO violates no protected speech right. States simply cannot be forced to contract with terrorist organizations or subsidize their activities. *Cf. Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010); *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007); *Rust v. Sullivan*, 500 U.S. 173, 201 (1991) (the government "has no constitutional duty to subsidize an activity"). In other words, Governor DeSantis has the authority to issue EOs directed toward material support of terrorism to defend and pre-

serve the health, safety, and welfare of Floridians.  *See Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905).

What this means is that CAIR's coercion claim rises and falls on the lynchpin legal and factual questions in this case—whether the Governor was justified in designating CAIR a terrorist organization and ensuring state funds did not further any terrorist activity.  The district court left those questions unanswered, *see* Init. Br. 25–37, and CAIR does little to remedy that failure on appeal.

### A. CAIR cannot salvage the district court's failure to engage with the Governor's evidence of terrorism.

The district court ignored the Governor's key predicate factual assertion justifying the EO—that CAIR is a terrorist organization—and instead assume that protected speech is implicated.  That misstep undermines the rest of its First Amendment analysis.

At bottom, Governor DeSantis did what he is allowed to do—direct state agencies to ensure taxpayer funds don't finance or materially support terrorism.  Thwarting terrorism is a textbook compelling interest. *Humanitarian L. Project*, 561 U.S. at 28.  And Governor DeSantis thoroughly laid out the case that CAIR is a terrorist organization, *see, e.g.*,

Init. Br. 32–37; Amicus Br. of The Nat'l Jewish Advoc. Ctr., et al., CA11-DE23, at 6–21, (outlining the deep and continued ties that CAIR has to terrorism), but the district court dismissed the Governor's evidence as "*ipse dixit.*" Order at 18. That was the central error in this case.

The district court failed to properly engage with the evidence before granting the preliminary injunction. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). When weighing the evidence, "the district court is not at liberty to accept one construction of the evidence and reject the other without the benefit of an evidentiary hearing." *CBS Broad., Inc. v. EchoStar Comm'ns Corp.*, 265 F.3d 1193, 1207–08 (11th Cir. 2001). But that is exactly what happened below. The Governor presented weighty evidence that supports his action. Init. Br. 32–37. CAIR did not refute that evidence below, *see, e.g.*, DE41 at 4, but the district court nonetheless dismissed the Governor's evidence without serious engagement. This "hotly contested issue[]" required an evidentiary hearing to weigh the evidence of both parties. *Moon v. Med. Tech. Assocs., Inc.*, 577 F. App'x 934, 936 (11th Cir. Aug. 18, 2014). The district court's order, however, provides no serious analysis of that evidence.

That was an abuse of discretion.  *Cf. Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014).

CAIR now responds to the Governor's evidence on appeal, *see* Ans. Br. 8–10, but CAIR is not the district court.  And besides, it does little to undermine the EO's factual basis.  To start, CAIR dismisses the voluminous evidence of CAIR's connections to terrorist organizations as a "guilt-by-association theory."  Ans. Br. 8.  The evidence here far surpasses mere association; it documents how CAIR's own leadership has been directly involved in terrorism and terrorist activities.  Init. Br. 8–15. CAIR fails to rebut this evidence.

CAIR also claims the federal government "mistakenly and wrongly" designated CAIR an unindicted co-conspirator in the *HLF* case. *See* Ans. Br. 8–9 (citing *United States v. Holy Land Found. for Relief & Dev.* ("*HLF*"), 624 F.3d 685 (5th Cir. 2010)).  But that was no mistake. After a protracted battle about the designation, the Fifth Circuit explained that "the Government's procedural error . . . was its failure to file" the list of unindicted co-conspirators "under seal, *not* its decision to try to characterize the scope of the charged conspiracy."  *HLF*, 624 F.3d at 693 (emphasis added).  And before the district court in the *HLF* case,

13

the government "produced ample evidence to establish the associations of CAIR . . . with HLF, the Islamic Association for Palestine, and with Hamas." *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-cv-240, 2009 WL 10680203, at \*7 (N.D. Tex. July 1, 2009). So CAIR's efforts to strike its name from the list of unindicted co-conspirators were denied. *Id.* at \*9; *HLF*, 624 F.3d at 693.

CAIR next impugns scholar Lorenzo Vidino. *See* Ans. Br. 9–10. Notably, the Governor relied on a number of sources outside of Vidino, so CAIR's accusations accomplish little. Init. Br. 8–15. CAIR suggests that Vidino may not be an objective source because he had a financial stake in another government's designation of Muslim fronts as terrorists. But without more, paid experience in another setting hardly disqualifies.[3] Perhaps most telling, CAIR doesn't attempt to claim that Vidino's work in that other setting was incorrect.

Turning to the Order, CAIR claims that the district court did in fact "address[] [the evidence] and concluded that it did not show how the Ex-

---

[3] CAIR also claims that the Governor's comments about discovery in this case somehow prove he lacked sufficient intel. *See* Ans. Br. 10. But it should surprise no one that the Governor thought discovery would further prove what he already knew: CAIR is a terrorist organization.

ecutive Order advanced any compelling (or even important) interest." Ans. Br. 35 (citing the Order at 18).[4] Yet it offers only a single citation to a single page of the Order, and nowhere on that page does the court deal with the actual evidence demonstrating CAIR's terrorist ties.

And without seriously refuting the evidence behind the EO designation, CAIR's extensive discussion of cases like *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and *Vullo*, *see* Ans. Br. 28–31, do nothing to advance its claim. Those cases address situations where the government attempted to "do indirectly what [it] is barred from doing directly." *Vullo*, 602 U.S. at 190. But here, the Governor *can* prevent material support flowing to terrorist organizations. *See Humanitarian L. Project*, 561 U.S. at 27–29; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) (explaining that there is "no First Amendment right . . . to support terrorists"); *see also* Am. First Legal Br. at 8 (explaining the differences between *Bantam Books* and *Vullo* and the present action).

---

[4] CAIR elsewhere claims that the district court made "well-reasoned factual findings" by pointing to the district court's analysis of CAIR's coercion claim, not its factual findings. Ans. Br. 28, 29–31.

CAIR also takes the extraordinary position that even if the Governor's evidence of terrorism is accurate, "he still had not shown that his Executive Order is narrowly tailored to serve a compelling government interest." Ans. Br. 35. Yet laws forbidding material support to terrorism survive the most rigorous First Amendment scrutiny. *See Humanitarian L. Project*, 561 U.S. at 36. The reasons for that are clear: "[P]roviding material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization." *Id.* Governments' decisions to address these concerns are therefore "entitled to significant weight, and we have persuasive evidence before us to sustain it." *Cf. id.* So too here.

"In [CAIR's] world," material support "is all to the good." *Id.* at 38. But "we live in a different world: one in which . . . any contribution to [terrorist] organization[s] facilitates [terrorism]." *Id.* (quotation omitted). Governor DeSantis presented robust evidence that CAIR is a front organization for Hamas—a designated foreign terrorist organization. Init. Br. 32–37. Just like the valid congressional action in *Humanitarian Law Project*, this EO was crafted to avoid "any restriction on independent

16

advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." 561 U.S. at 36.

The EO is also tailored appropriately. *Contra* Ans. Br. 35–36. As explained, the sweep of this EO is only toward those organizations that (1) have a relationship with the State and (2) knowingly choose to materially support terrorist organizations. Any coercion that the EO applies is to coerce parties from materially supporting a terrorist organization's unprotected conduct. The EO survives.

### B.    CAIR cannot undermine the anti-terrorism rationale behind the EO.

As a final argument, CAIR argues that the Governor's desire to address terrorism can't survive First Amendment scrutiny. *See* Ans. Br. 37. This claim largely recycles arguments addressed elsewhere, but CAIR's few late-breaking points fail to persuade.

CAIR first seeks to narrow *Humanitarian Law Project*'s holding by singling out select lines in the opinion that offer caution about different fact-patterns. *See* Ans. Br. 37–40. It specifically highlights that the Court declined to address whether the federal law could apply to "domestic organizations." Ans. Br. 38 (citing *Humanitarian L. Project*, 561 U.S.

17

at 39).    But "[e]veryone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order," *Humanitarian L. Project,* 561 U.S. at 28, so it's unclear why this distinction would matter when assessing the government's justification for the law.

CAIR also discounts the Governor's entitlement to deference because he is not a federal actor.  *See* Ans. Br. 40.  Yet like federal actors in the international security space, Governor DeSantis acted for the health, safety, and welfare of Floridians.  *Jacobson*, 197 U.S. at 38.  So he is entitled to deference.  *Bank of U.S. v. Dandridge*, 25 U.S. 64, 69 (1827); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[N]either the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." (quotation omitted)).  That is why *Humanitarian Law Project* noted the proper deference to the "political branches."  *Id.* at 36.  That includes the Governor.[5]

---

[5] In fact, the district court presumed that the Governor acted in bad faith.  That is unsurprising, given the district court's clear bias against the Governor, *see infra* at 25–32, but it also upturns the presumption of regularity.  *See Dandridge*, 25 U.S. at 64; Amicus Br. of The Nat'l Jewish Advoc. Ctr., et al., CA11-DE23, at 22–25 (explaining the deference owed to the states validly exercising police powers).

Relatedly, CAIR claims the Governor lacks sufficient warrant for the EO because Congress acted after "numerous terrorist attacks," in *Humanitarian Law Project*, *see* Ans. Br. 39, which hasn't yet happened with CAIR in Florida. But surely, CAIR is not claiming that an executive cannot address terrorism *before* a catastrophic event. "[T]he government has an interest in preventing emergencies and threats to public safety, not merely responding to them after they transpire." *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 516 (7th Cir. 2024); *see also Detroit Free Press v. Ashcroft*, 303 F.3d 681, 706 (6th Cir. 2002) ("The Government certainly has a compelling interest in *preventing* terrorism." (emphasis added)).

Finally, CAIR asserts that "robust evidence" shows the EO's "actual purpose" was to suppress CAIR's speech. Ans. Br. 40. It claims that the EO arose only after CAIR's vocal opposition to the Governor and its involvement in another lawsuit. But that telling of the story ignores the vast evidence of terrorism about CAIR *itself*. And it doesn't explain the why the Governor has not designated other political or legal adversaries as terrorists. *See infra* at 22 n.8. If the Governor was truly punishing enemies by designating them terrorists, he's off to a very slow start.

**III. CAIR's alternative First Amendment theories also fail.**

Given the weakness of the preliminary injunction order, CAIR hedges by raising other First Amendment claims not addressed below.[6] Rebutting them requires only brief treatment.

**A. The Executive Order did not discriminate against CAIR's viewpoint.**

CAIR alleges that the Governor targeted CAIR for its viewpoint because the EO "singl[ed] out" CAIR[7] and "homes in on Islamic groups." Ans. Br. 45, 46. That is unpersuasive for multiple reasons.

As a threshold matter, the EO is not a speech regulation. The EO has nothing to do with speech; it does not single out any speech for prior restraint or otherwise regulate what anyone may say. The EO instead designates a group—CAIR—as a terrorist organization based on that

---

[6] CAIR gestures at other First Amendment theories, *see* Ans. Br. 42–43, but this Court normally "will not consider" undeveloped arguments. *See St. Michael Press Pub. Co. v. One Unknown Wreck*, 610 F. App'x 940, 941 (11th Cir. 2015) (citing Fed. R. App. P. 28(a)(8)(A)); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 570 (2001) ("We decline to address an issue that was not sufficiently briefed and argued before this Court.").

[7] This argument is odd for the simple reason that the EO did not single out CAIR alone; it also designated the Muslim Brotherhood based off evidence of its terrorist activities. *See* EO at 1.

group's past *conduct. See Islamic Am. Relief Agency*, 477 F.3d at 735; *Holy Land Found. for Relief & Dev.*, 333 F.3d at 166; *cf. TikTok Inc. v. Garland*, 604 U.S. 56, 67–69 (2025) (suggesting First Amendment scrutiny may not apply).

Since the EO contains no speech regulation, it is nonsensical to analyze whether those regulations are viewpoint based. The EO simply does "not implicate the First Amendment at all." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (explaining that "restrictions on protected expression are distinct from restrictions on . . . nonexpressive conduct"). The Court's analysis should end there.

Even if the EO implicated the First Amendment, however, it doesn't discriminate based on viewpoint. "All viewpoint discrimination is first content discrimination." *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1318 (11th Cir. 2020) (cleaned up) (affirming denial of preliminary injunction). But the text of the EO shows that it is not only viewpoint neutral, it makes no content-based distinctions whatsoever. Indeed, *not one* of the Governor's findings alludes to speech. Not from CAIR

itself, or any founder, director, or member.

CAIR alleges that the EO discriminates on its viewpoint because it "homes in on Islamic groups," Ans. Br. 46, but that's not true. The EO was not motivated by CAIR's expressive viewpoints, but by its terrorist connections and past behavior. Regardless, other groups express viewpoints similar to CAIR's positions, yet the EO didn't designate them terrorist organizations.[8]

### B. The EO does not infringe on CAIR's right to association.

CAIR next claims that the EO violates CAIR's right to association. *See* Ans. Br. 47–50. But its vague citations to association cases do not support its claim, nor does it explain why the Governor cannot impose limitations on those who provide material support to terrorists.

---

[8] *E,g,* Anthony Man, *There's no sharia law in the state, but South Florida lawmaker files bill to outlaw it anyway*, Sun Sentinel (Oct. 25, 2025) (President of the Foundation to Advance Interfaith Trust and Harmony, criticizing HB 119 alongside CAIR, as "appealing to the hatred of Muslims"), 2025 WLNR 27763069; ACLU Florida, *ACLU of Florida and CAIR Florida File Lawsuit Challenging Policy Denying Religious Meals to Muslim Inmates at Miami-Dade Jails* (Sept. 3, 2015) (ACLU advocating for civil rights of Muslim inmates alongside CAIR), https://perma.cc/KH3E-65VN.

*Humanitarian Law Project* makes all this clear. The plaintiffs there pled an association claim in addition to their free-speech claim. 561 U.S. at 39. But the Supreme Court rejected the association claim "because the [material support] statute does not penalize mere association with a foreign terrorist organization." *Id.* The federal statute, like the EO here, "does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group," but rather "the act of giving material support." *Id.* (quotation omitted); *see also United States v. Chandia*, 514 F.3d 365, 371 (4th Cir. 2008) ("[T]he statute 'does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO.'" (quotation omitted)).

The EO similarly does not obstruct any right of association. Individuals and organizations may associate with CAIR without jeopardizing their ability to obtain contracts, employment, funds, or other benefits or privileges from the State. *See Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1026 (7th Cir. 2002).

The EO addresses "only the provision of material support," which is not the same as association. *Id.*; *see also Humanitarian L. Project*, 561 U.S. at 39.[9]

CAIR relies heavily on *National Association for Advancement of Colored People v. Button*, *see* Ans. Br. 48–49, but that case is distinguishable for exactly this reason. The Virginia statute at issue there was quite broad: "a person who advises another that his legal rights have been infringed and refers him to a particular attorney or group of attorneys . . . for assistance has committed a crime." 371 U.S. 415, 434 (1963). The EO, on the other hand, contains no similar provision and only prevents those who provide material support to CAIR from obtaining the narrow benefit of government contracts or support. That distinction is key. *See Humanitarian L. Project*, 561 U.S. at 39.

---

[9] CAIR does not address *Humanitarian Law Project*'s associational holding. It instead cites an amicus brief filed by Florida in support of a crisis pregnancy center's First Amendment rights to claim that there is "no principled reason" to support crisis pregnancy centers but not CAIR. Ans. Br. 48. There's at least one principled reason: the first group empowers women to bring pregnancies to term; the other is a terrorist organization.

*    *    *

Governor DeSantis acted on behalf of the health, safety, and welfare of Floridians in issuing this EO.  The Governor can help limit material support to terrorism since "there is no First Amendment right nor any other constitutional right to support terrorists." *Holy Land Found. for Relief & Dev.* 333 F.3d at 166.  The district court, however, ignored the Governor's evidence, presumed invalidity, and misapplied Supreme Court precedent on coercion.[10]  That warrants reversal.

## IV.    The case should be reassigned on remand.

Finally, Judge Walker's conduct in this case warrants reassignment.  His gratuitous and bombastic criticisms of the Governor, at minimum, ensure that "a reasonable person would question the trial judge's impartiality." *United States v. White*, 846 F.2d 678, 695 (11th Cir. 1988).

---

[10] CAIR repeatedly asserts that the Governor waived any challenge to the other preliminary injunction factors.  *See, e.g.*, Ans. Br. 24, 27, 49. That accomplishes little given "[i]f there is no substantial likelihood of success on the merits, no injunction may be issued." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1254 (11th Cir. 2020).  Regardless, the Governor's brief repeatedly addresses the lack of irreparable harm to anyone on this record, the public interest (such as protecting Floridians) and the balance of the equities (the fact that the EO prevents only select government benefits).  *See, e.g.*, Init. Br. 2, 5, 15, 20, 25.

Plaintiffs downplay Judge Walker's rhetoric and conduct in this case and suggest novel, heightened requirements that must be satisfied to justify reassignment. But no argument can cure the bias within the Order's four corners. Only reassignment will remedy "the appearance of a lack of neutrality and act to preserve in the public mind the image of absolute impartiality and fairness of the judiciary." *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir. 1989).

**A.** Judge Walker repeatedly surfaced past grudges against the Governor throughout his Order. *See* Init. Br. 38–41. Those diatribes leave no doubt about "whether the original judge would have difficulty putting his previous views and findings aside." *United States v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009).

CAIR contends otherwise by offering several procedural obstacles found nowhere in the caselaw. To start, they claim that the Governor's effort at reassignment was "untimely" because it was raised "for the first time on appeal." Ans. Br. 52. Yet reassignment is a "supervisory authority" that belongs to the "federal court of appeals," *Gerhart v. Barnes*, 724 F. App'x 316, 328 n.7 (5th Cir. 2018), so it would not have been possible to raise a request for reassignment before now. *See, e.g., Janki Bai Sahu*

*v. Union Carbide Corp.*, 528 F. App'x 96, 104 (2d Cir. 2013) (reassignment requests are properly before appellate courts, not district courts).

CAIR may be conflating a request for *reassignment* with a request for *recusal*, but that argument still fails. "The appellate court's authority to reassign exists apart from the judicial disqualification statutes." *O'Rourke v. City of Norman*, 875 F.2d 1465, 1475 (10th Cir. 1989) (collecting cases). There is no requirement for reassignment that a party first seek recusal below, which is why CAIR's general citations to timeliness cases do not arise in the reassignment context. *See* Ans. Br. 52–53. Moreover, the Governor's argument is that Judge Walker's *Order* is what necessitated reassignment, so it would not have been possible to raise this issue before that Order issued.

Plaintiffs also contend that the request for reassignment is premature because those requests are normally reserved "on a *second* appeal, where the district court refused to change its views on the initial remand." Ans. Br. 51. Yet Plaintiffs offer no authority holding that reassignment requests must wait until a successive appeal, and for good reason. The test asks only "whether the original judge would have difficulty putting his previous views and findings aside." *Gupta*, 572 F.3d at 891.

27

Being reversed before by the appellate court in the same case, as plaintiffs emphasize, is certainly one indication that the judge will have difficultly putting aside his views. But it is not the only indication. Another sufficient indication is emphasizing *past* views about a party in new cases. This case, in the district court's mind, was not a new case with new parties, but rather a "troubling trend" where "[o]nce again, Florida chooses political posturing over the First Amendment." Order at 1, 2. Whether it be prior opinions in the same case or prior opinions in other cases with the same party, the end result is the same—"the appearance of a lack of neutrality." *Torkington*, 874 F.2d at 1447.[11]

Nor is reassignment on the first appeal as novel as Plaintiffs claim. *See, e.g.*, *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir.

---

[11] CAIR also tries to rehabilitate Judge Walker by noting that he has at other times "ruled in [the Governor's] favor." Ans. Br. 53. That fact is unremarkable given the number of cases litigated in federal court over the Governor's eight years in office. Yet Judge Walker himself has admitted reoccurring conflict with the Eleventh Circuit: "Hasn't the Eleventh Circuit said . . . [w]e don't care what the preliminary injunction panel says. . . . I mean, maybe that only applies to Judge Walker favorable preliminary injunction rulings. That may be the special rule that it's enforceable and binding any other time, but not when Judge Walker is affirmed[.]" ECF 71 at 18:23–19:4, *Comput. & Commc'n Indus. Ass'n, v. Uthmeier*, No. 4:24-CV-438 (N.D. Fla. Feb. 28, 2025).

2021) (first time appeal); *United States v. Slinkard*, 61 F.4th 1290, 1297 (10th Cir. 2023) (same); *United States v. Swenson*, 894 F.3d 677, 686 (5th Cir. 2018) (same); *United States v. Padilla*, 186 F.3d 136, 143 (2d Cir. 1999) (same); *United States v. Allen*, 114 F.3d 1196 (Table), 1997 WL 289446 at *6 (9th Cir. 1997) (same).

**B.** The district court's diatribe against the Governor confirms that "reassignment is appropriate to preserve the appearance of justice." *Torkington*, 874 F.2d at 1447. Calling the twice-elected governor of the state a "bully" and mocking his presidential run doesn't convey the neutrality and evenhandedness required from an Article III judge.

Despite this, Plaintiffs still assure this Court that "this is not a case where a reasonable person would question the trial judge's impartiality." Ans. Br. 54 (citation omitted). That's remarkable given the Order's language. But it's an even more remarkable claim given that CAIR *itself* referred to Judge Walker as "one of [the Governor's] critics." Ans. Br. 56. That's not the normal way to describe the relationship between a judge and party. CAIR's own admission says it all.

Nor do CAIR's other justifications for Judge Walker's conduct hold any water. They claim the Order uses only "sharp language" that is jus-

tified given the nature of the case. *See id.* at 54. But the cases on which they rely do not justify Judge Walker's conduct here.[12] As the Eight Circuit explained: "reassignment may be necessary based solely on events transpiring in current court proceedings or on a court's statements or rulings where they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Sentis Grp., Inc., Coral Grp., Inc. v. Shell Oil Co,* 559 F.3d 888, 904 (8th Cir. 2009) (citation and quotation marks omitted). Under that standard, reassignment is necessary.

Plaintiffs also rely on *Cobell v. Kempthorne*, 455 F.3d 317 (D.C. Cir. 2006) for the idea that reassignment isn't warranted for all critical statements by a judge. But *Cobell* itself ordered reassignment specifically because it thought that "passages" from the Court's order had crossed the line and "suggest[ed] [that] the district court has condemned . . . the [government] as an institution." *Id.* at 333–34. The Governor did not request reassignment because of strong language or an adverse ruling; he sought reassignment because it is clear this judge is not willing to neutrally ad-

---

[12] Those cases also come from contexts other than reassignment. *See* Ans. Br. 54 (citing *Liteky v. United States*, 510 U.S. 540, 543 (1994) and *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011)).

judicate these important claims moving forward.  That is what *Cobell* held, and that is what this Court should hold here.

**C.** Finally, ordering reassignment will not entail "waste and duplication out of proportion to gains realized from reassignment."  *Torkington*, 874 F.2d at 1447.  The case remains in early stages of litigation with minimal involvement from the district court, so this element poses no obstacle for reassignment.

Plaintiffs offer only a single paragraph in response, claiming that the case will no longer be in early stages of litigation "by the time this Court issues a decision."  Ans. Br. 56.  That may or may not be true: The district court has extended the discovery deadline and delayed the bench trial until March of 2027.  *See* ECF 89.

But even taking Plaintiffs' argument head on, the "loss of efficiency and economy pales in comparison" to the need "to preserve the appearance of impartiality, fairness, and justice." *Johnson v. Sawyer*, 120 F.3d 1307, 1333–34 (5th Cir. 1997); *see also United States v. Allen*, 114 F.3d 1196 (Table), 1997 WL 289446 at *6 (9th Cir. 1997) ("[T]hough reassignment might entail some waste of effort, the benefits that will accrue from the reassignment with respect to the appearance of justice far outweigh

the detriments of such reassignment.").

## CONCLUSION

This Court should reverse the preliminary injunction and remand with instructions to the Chief Judge of the Northern District of Florida to reassign the case to a different district judge for further proceedings.

Dated: July 23, 2026

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
david.dewhirst@myfloridale-gal.com
jenna.hodges@myfloridalegal.com

Respectfully submitted,

*/s/ David M.S. Dewhirst*
DAVID M.S. DEWHIRST (FBN 1076928)
  *Solicitor General*

JEFFREY PAUL DESOUSA (FBN 110951)
JASON J. MUEHLHOFF (FBN 1076410)
  *Chief Deputy Solicitors General*

TYLER E. GUSTAFSON (FBN 1049292)
  *Assistant Solicitor General*

  *Counsel for Governor Ron DeSantis*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,405 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ David M.S. Dewhirst*

**CERTIFICATE OF SERVICE**

I certify that on July 23, 2026, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ David M.S. Dewhirst*